BROWN VS CLAIMS MANAGEMENT     DEPOSITION OF VICTORIA HEPPES     4-13-06

PAGE 1   SHEET 1

1    VICTORIA HEPPES, being called upon to testify and having
2    been first duly sworn, testified as follows:
3
4                   DIRECT EXAMINATION
5    MR. TINNEY:
6    Q.    State your name please?
7    A.    My name is Victoria Heppes.
8    Q.    Where do you live, Ms. Heppes?
9    A.    I live at 1905 South 9th Street in Rogers.
10   Q.    Arkansas?
11   A.    Arkansas.
12   Q.    Ms. Heppes, as you know, my name is John Tinney and
13   I'm representing Mr. Brown in this case. I'm here to ask
14   you questions concerning your work on this file. I'd like
15   it understood, for the record, that any answer you give
16   today would be the same answer I would expect at the time
17   of trial in this case. Do you understand that?
18   A.    Yes, sir.
19   Q.    If there's anything that I say that's not clear to
20   you, just ask me again and we'll stop and try to clear it
21   up so that everything is understood by you.
22   A.    Yes, sir.
23   Q.    Where are you employed?
24   A.    I'm employed at CMI, Claims Management Incorporated
25   for Wal-Mart Stores on -- It's North or East Walnut Street

1

PAGE 2

1    in Rogers, Arkansas.
2    Q.    Tell me what CMI is, to your knowledge.
3    A.    Claims Management Incorporated is the insurance
4    carrier for the Wal-Mart Company.
5         MR. BROWN: What are our stipulations?
6         MR. TINNEY: The usual stipulations. Do you want
7         to have her read and sign?
8         MR. BROWN: I do want to read and sign, yes,
9         please.
10        MR. TINNEY: Okay. And then all objections,
11        except as to the form of the question, we
12        reserve until the time of trial?
13        MR. BROWN: And responsiveness of the answer,
14        yes, sir. The same ones we had during Mr.
15        Brown. And I apologize.
16        MR. TINNEY: No, that's okay.
17   Q.    Tell me what your understanding of who the company is
18   again.
19   A.    The company is the insurance carrier for the Wal-Mart
20   Store. Workman's Compensation carrier on one side of the
21   office. The other side is general liability.
22   Q.    Do you know who owns CMI?
23   A.    Wal-Mart, I guess.
24        MR. BROWN: Object. I don't want you speculating
25        or guessing on anything. If you don't know,

2

PAGE 3

1         tell him you don't.
2    A.    I don't know.
3    MR. TINNEY:
4    Q.    What is your title or position there?
5    A.    My title is Claims Manager.
6    Q.    How long have you held that position?
7    A.    Now for almost three years.
8    Q.    Did you have a title before that?
9    A.    I was not working with the company before that.
10   Q.    Let me get your educational background.
11   A.    I was a high school graduate from Burbank High
12   School. I went to junior college, but did not finish. So
13   I have a couple of semesters of junior college.
14   Q.    Where did you work prior to going to Wal-Mart?
15   A.    One year I worked at the Best Western Hotel as the
16   desk clerk.
17   Q.    Where did you work prior to that?
18   A.    Prior to that I live in Cancun, Mexico. Out of the
19   country for 25 years. I was a stay-at-home mom for 15
20   years and I was a journalist for the International Miami
21   Herald, plus a house wife.
22   Q.    And other than the jobs that you described, have you
23   held any other jobs?
24   A.    No. Well, I've owned businesses.
25   Q.    What kind of business?

3

PAGE 4

1    A.    When my husband died in 1995, I took over a bungee
2    jump, five condominiums and an optical store and
3    laboratory.
4    Q.    You went from Best Western to CMI; is that correct?
5    A.    Yes.
6    Q.    And had you ever worked in the insurance industry
7    before you went with CMI?
8    A.    No.
9    Q.    And you were hired in as a Claims Manager?
10   A.    Yes.
11   Q.    Tell me what training you had when you went to work.
12   A.    When I went to work for them I had three months
13   training in their Training Department.
14   Q.    Where's the Training Department located?
15   A.    There in the same building.
16   Q.    Tell me what form of training you went through.
17   A.    First, on their computer to get to know their system,
18   which at that time was the David system. I learned
19   adjusting for the State of Arkansas. I took the state
20   exam to get my state license.
21   Q.    What kind of license do you hold?
22   A.    I hold an Arkansas State License, adjuster's license,
23   insurance adjuster's license.
24   Q.    Did you take that one time?
25   A.    Yes, and I hold an Illinois -- well, that's out of

4

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA KEPPES    4-13-06

PAGE 5  SHEET 2

```
 1    state.  I have an Alabama State license.
 2    Q.    As an adjuster?
 3    A.    Yes.
 4    Q.    You know, I didn t now that they required adjuster s
 5    to have a license.
 6    A.    Yes.  The only requirement is for a eight hour
 7    seminar one time a year.
 8    Q.    But you did have to take an exam in Alabama, also?
 9    A.    No.
10    Q.    You just applied?
11    A.    Yes.
12    Q.    Now, you referenced something called the David
13    system; what is that?
14    A.    That is the computer system for files that the
15    company used at the time.
16    Q.    In other words, it teaches you how to notate notes in
17    the file and things of that nature?
18    A.    It is the notepad where you note things in the file.
19    Q.    You said that it was the David system at that time,
20    has it changed to something else now?
21    A.    In October of 2004 it changed  - they discontinued
22    the David system and started a new system called Claim
23    Zone.
24    Q.    Called claim what?
25    A.    Claim Zone.
                         5
```

PAGE 6

```
 1    Q.    So Mr. Brown s records were entered, basically, under
 2    the Claim Zone format, if his injury was in September of
 3    2004?
 4    A.    We started the Claim Zone about the second week in
 5    October, because we all went to a week class to learn the
 6    new system.
 7    Q.    Was the format different than the David system?
 8    A.    Yes.
 9    Q.    So if something had come in on September the 29th,
10    2004, then it would have been entered on the David system?
11    A.    I don t remember.
12    Q.    Now, as far as your training on the David system, was
13    that training geared to you individually to be a claims
14    manager or was that something everybody would have been
15    trained on?
16    A.    Everybody.
17    Q.    What training did you have to become a claims
18    manager?
19    A.    State laws in --
20    Q.    State laws in --
21    A.    -- in insurance.
22    Q.    But, I mean, did you study different states?
23    A.    No, just Arkansas at the time.
24    Q.    To become a claims manager?
25    A.    Yes.
                         6
```

PAGE 7

```
 1    Q.    Other than training on state laws, what other
 2    specific training did you have to become a claims manager?
 3    A.    Company requirements, how they trained us for that,
 4    for my job position.
 5    Q.    Was there any kind of book or manual --
 6    A.    How to manage claims, workman s compensation claims.
 7    Q.    Is that the particular kind of claims that you were
 8    going to be exclusively dealing with when you came to
 9    work?
10    A.    Yes.
11    Q.    Did you have any books or manuals that you utilized
12    in that three month training period?
13    A.    Yes.
14    Q.    Tell me the names of those.
15    A.    It is our company and it s their manuals that they
16    give to us.  I still have it at my desk.
17    Q.    You do?  How many different books is it?
18    A.    Well, it s not a book, per se, it s just a thick
19    folder of several different types of areas; research,
20    claims management, files, the associate, different parts
21    of how to work --
22    Q.    What do you call that book?  If I wanted your
23    attorney to produce it.
24    A.    Training manual.
25    Q.    It s a training manual?
                         7
```

PAGE 8

```
 1    A.    CMI Training Manual.
 2    Q.    Was there any other manual like that that they gave
 3    you to use in your study to become a claims manager?
 4    A.    I have State Law for Alabama.
 5    Q.    Is that something that s just given to you to act as
 6    a reference or is that something that you re actually
 7    trained in?
 8    A.    It s something given to me as a reference as I m in
 9    training for the --
10    Q.    How big is your CMI Training Manual?
11    A.    How big is it?
12    Q.    How thick?
13    A.    It s about four inches.
14    Q.    Four inches thick?
15    A.    Uh-huh.
16    Q.    And you said it s got different sections like setting
17    a reserve, claims management, files.  What else can you
18    think of?
19    A.    That s all right now.  My mind is kind of blank.
20    Q.    If I picked out something like --
21    A.    Medical management, that would be another area.
22    Q.    These are just going to be tab sections in the
23    manual?
24    A.    Yes.
25    Q.    What all would be included under medical management,
                         8
```

PAGE 9  SHEET 3

1    for instance?

2    A.    What type of doctors we use, what the doctors

3    specialties are, what type of treatments.  Most of the

4    injuries that I d probably see in my work --

5    Q.    Is rotator cuff one of those?

6    A.    Yes.

7    Q.    So there s a section in that that deals with rotator

8    cuffs?

9    A.    Maybe.  I can t say, because I don t remember

10    exactly.

11    Q.    As far as that book, for instance, if I would ask you

12    is there anything in any training literature that tells

13    you the response time or the goal as to the time frame

14    within which you respond to something, is there something

15    in there about that?

16    A.    I have --

17         MR. BROWN: Object to form.  You can answer.

18    A.    For one thing, I do have charts at my desk that are

19    given to me on all the muscles and bones in the body.  The

20    skeletal  - the nurse s  - she s not here with us anymore,

21    but she trained us all on showing us exactly what parts of

22    the body, what nerves, where the rotator cuff is, if it s

23    in the front of the shoulder, the back of the shoulder.

24    Now would you please tell me the question again?

25    MR. TINNEY:

9

PAGE 10

1    Q.    The question was is there anything in the training

2    manuals that talks about your response time to issues that

3    become before you?

4         MR. BROWN: Objection.  That s vague.

5    A.    I guess it s just from --

6    MR. TINNEY:

7    Q.    I ve seen other training manuals in other cases that

8    say, you know, our goal is to respond to this within 24

9    hours or something like that.

10    A.    Oh, yeah, definitely.

11    Q.    So is that  - what is the section of the manual

12    that s contained in?

13    A.    Claims management.

14    Q.    And as best you can remember, what is the goal that

15    the company has as far as response time to various

16    matters?

17    A.    My goal is the sundown rule.

18    Q.    What is that?

19    A.    The sundown rule means that the first date that I

20    have an injury come to me that is put in my computer,

21    assigned to me, it s called a lost time, that I contact

22    the store, that I contact the claimant and that I contact

23    the doctor.  I get response from all three of those.  I do

24    my investigation to determine if it s a compensable claim.

25    If it really happened at the store.  I want to talk to the

10

PAGE 11

1    person.  Besides having an associate s statement in the

2    pack that they fill out, I want to talk to the person, see

3    how they re feeling, how  - I listen to the tone of voice.

4    Q.    Now, does the sundown rule only apply to the initial

5    report or does the sundown rule go all the way through

6    your handling of the file?

7    A.    Just the initial report.

8    Q.    Now my next question is, is there anything as far as

9    a response time in the training manuals, as far as the

10    response time once you get notice that a person, for

11    instance, needs surgery, as to what you do to respond to

12    that?

13    A.    What I do is immediately when the doctor calls me --

14    Q.    Right now, I think you re misunderstanding my

15    question.  I m asking you about is there anything in the

16    manual?  We ll get to what you do in a minute.

17         MR. BROWN: So is there a printed time that says

18              that you get a surgical or any indicator that

19              somebody wants to do surgery, is there a set

20              period of time within which they must take some

21              action in response?

22    MR. TINNEY:

23    Q.    That the manual says you should response to such, as

24    Jeff was saying, within a certain length of time?

25    A.    I don t remember.

11

PAGE 12

1    Q.    If it was in the manual, it would be in the claims

2    management section?

3    A.    Yes.

4    Q.    You mentioned a file section, what is in the file

5    section?

6    A.    I think it would be probably the same section.

7    Q.    Files and claim management?

8    A.    Yeah.

9    Q.    So you get training in this book, you said you had

10    nurses talk to you  - once you went through this did you

11    have to pass any kind of test or anything before you

12    became a claims manager?

13    A.    I had to go to several classes.

14    Q.    Where were the classes conducted?

15    A.    They were at CMI.

16    Q.    And who conducted those?

17    A.    Authorized, trained adjusters already.

18    Q.    Did you have any video tapes that you had to watch

19    concerning various aspects of claims management?

20    A.    Probably, but I don t recall at the time.

21    Q.    Did you have any training or a hands on training

22    period after you got through the three month period before

23    they actually designated you as a claims manager and

24    turned over cases to you?

25         MR. BROWN: To make sure I understand the

12

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 13   SHEET 4

```
 1            question --
 2    A.   I didn t understand the question either.
 3            MR. BROWN:   - Like an apprentice?
 4    MR. TINNEY:
 5    Q.   Did you, once you got through your three month
 6    training period, did you hit the ground running and you
 7    were a claims manager and you started getting files
 8    immediately?
 9    A.   Yes.
10    Q.   You said that Wal-Mart gave you no test or anything
11    to test your knowledge?
12    A.   State did.
13    Q.   Just the state?
14    A.   Yes.
15    Q.   And that was at the end of the three month period?
16    A.   Yes.
17    Q.   Did the Arkansas test --
18    A.   Well, yeah, state did.
19    Q.   And did the Arkansas test have anything on it
20    relating to handling worker s comp claims in the State of
21    Alabama?
22    A.   No.
23    Q.   Once you became a claims manager, were you assigned
24    to a certain area in the -- I guess in the building where
25    your desk would be?
```
13

PAGE 14

```
 1    A.   Yes.
 2    Q.   And is that where you ve been every since?
 3    A.   No.
 4    Q.   What caused you to change?
 5    A.   Well, they change up the desks and the states all the
 6    time.
 7    Q.   In the same building though?
 8    A.   Yes.
 9    Q.   How many claims managers like you, to your knowledge,
10    work for CMI?
11    A.   300.
12    Q.   Are you assigned a certain state?
13    A.   Yes.
14    Q.   And Alabama is one of your states?
15    A.   Yes.
16    Q.   And it s been one of your states since the beginning?
17    A.   No.
18    Q.   How many other individuals would handle Alabama
19    besides you?
20    A.   Seven to nine.
21    Q.   Who did you report to?
22    A.   I report to - my immediate boss now is Annie Martin.
23    Q.   How long has she been your immediate boss?
24    A.   About a year.
25    Q.   Who was your immediate boss prior to that?
```
14

PAGE 15

```
 1    A.   Tisha Montgomery.
 2    Q.   How long was she your boss?
 3    A.   She was my boss for Alabama for about six months.
 4    Q.   Who was your boss for Alabama before that?
 5    A.   I was with the State of Illinois and my boss before
 6    that was  - and this is team leader, this is immediate
 7    boss, was I think --
 8    Q.   Wait a minute, do I understand that you picked up
 9    Alabama at a point later in time than when you started?
10    A.   I was changed to the Alabama unit, yes.
11    Q.   When did you start with the Alabama unit?
12    A.   I started on April 1, 2004.
13    Q.   And was Ms. Montgomery your immediate boss then?
14    A.   Yes.
15    Q.   And is Ms. Montgomery --
16            MR. BROWN: You said April 1st?
17    A.   Yes, April 1st.
18    MR. TINNEY:
19    Q.   Is Ms. Montgomery still with the company?
20    A.   Yes.
21    Q.   And what is her title?
22    A.   She is a team leader.
23    Q.   Team leader?
24    A.   Uh-huh.
25    Q.   And Ann Martin, is she still with the company?
```
15

PAGE 16

```
 1    A.   Yes.
 2    Q.   She s a team leader also?
 3    A.   Yes.
 4    Q.   Who do the team leaders report to?
 5    A.   Becky Quizenberry, who is our boss over the workman s
 6    comp area.
 7    Q.   How many team leaders would report to her, to your
 8    knowledge?
 9    A.   About 20.
10    Q.   And do you know how many states that would cover,
11    those team leaders?
12    A.   The same, about the same amount of states.
13    Q.   How many states do you handle?
14    A.   Right now, I only handle Alabama.  But I have been
15    helping out with Utah.
16    Q.   So have you, since April 1st, of 2004, only done
17    Alabama worker s comp claims?
18    A.   Yes.
19    Q.   Do you know what Ms. Quizenberry s title is?
20    A.   I know she s a lawyer, but I don t exactly what her
21    title is?
22    Q.   She is a lawyer?
23            MR. BROWN: I don t know if she is or not.  I
24            don t want you to speculate.
25    A.   I don t know.  I don t know.  I can t say that --
```
16

PAGE 17 SHEET 5

```
1     MR. TINNEY:
2     Q.   You think she s a lawyer though?
3     A.   I think, I m not sure.
4     Q.   So you know who she reports to?
5     A.   The boss of the building.
6     Q.   Do you know who that is?
7     A.   It just changed.  I forgot her name, I m sorry.
8     Q.   Do you know who was in that position before him?
9     A.   I m trying to think of her name, but I forgot.
10    Susan.  Susan is her name, but I don t --
11    Q.   Susan?
12    A.   Susan Chambers.
13    Q.   Susan Chambers is the current one?
14    A.   She s just been promoted, so it s now changed, but
15    Susan Chambers has been the boss of the building or over
16    our building since I started to work there.
17    Q.   Do you know what her title is?
18    A.   Not really.
19    Q.   How many active files do you currently have?
20    A.   Today, I have 159 files.
21    Q.   What about during the time frame that was involved in
22    this case, say from September 29th through mid-2005?
23    A.   How many files did I have?
24    Q.   Yeah, just average.
25    A.   Average, I was just getting my legal files handed to
```
17

PAGE 18

```
1     me, so roughly about 125.
2     Q.   Do you handle it after it goes to legal?
3     A.   Yes.
4     Q.   Tell me whether you  - you said something earlier
5     about going through seminars, does the company do seminars
6     periodically, you know, to assist in training?
7     A.   Yes, our company does.  As a matter of fact, I have
8     four scheduled.
9     Q.   And are those --
10    A.   But the seminars I m talking about is the Alabama
11    State Seminar for adjuster s license.
12    Q.   Is that just done once a year?
13    A.   Yes.
14    Q.   Do you go through that every year?
15    A.   Yes.
16    Q.   On the seminars, I think you said the only seminars
17    related to just Alabama --
18    A.   Licensing.  But you asked if the company gave
19    seminars periodically?
20    Q.   Yes, and you told me that various representatives
21    would do that.
22    A.   Yes.
23    Q.   Do you ever get anything on video that you look at,
24    as far as training?
25    A.   No.  Well, there could be, I just don t remember
```
18

PAGE 19

```
1     right now if there was.
2     Q.   Do you ever get seminar material given to you like
3     handouts, you know, anytime you go to a seminar?
4     A.   Uh-huh.
5     Q.   Do you retain those?
6     A.   Yes.
7     Q.   And do you have a separate folder that you retain
8     those in?
9     A.   Yeah.
10    Q.   If I wanted that folder, what would I call it?
11    A.   Probably my work comp adjuster s folder.  I keep
12    everything from my seminars in Alabama just for reference,
13    maps.
14    Q.   You kept all your training materials?
15    A.   Yes.
16    Q.   Tell what kind of medical training the company gave
17    you, other than what you already told me about, that the
18    nurse would tell you, you know, various parts of the body
19    and things like that.
20    A.   That s all.
21    Q.   Did you undergo any kind of medical seminar or
22    training period?  What was the length of time that you may
23    have sat in a class concerning that?
24    A.   I still go through, so I can t answer that period as
25    how long, because I continually go through it.
```
19

PAGE 20

```
1     Q.   Do you have any particular reference books that you
2     utilize when you have questions about medical issues on
3     your desk?
4     A.   Yes.
5     Q.   What are those?
6     A.   It is the, I want to say, MDA guidelines, but it s
7     not the MDA, it s the Medical Guidelines book.  It s about
8     this thick.
9     Q.   Do you know who puts that out?
10    A.   United States of America.
11    Q.   That you just call a Medical Guidelines book?
12    A.   Yeah.
13    Q.   What color is it?
14    A.   It looks like a legal book.  It s probably one that
15    you would have in your office.  It s kind of a burnt brick
16    color.
17    Q.   What do you utilize that for?
18    A.   Well, it has everything in it, as far as if I wanted
19    to look up a rotator cuff, per se, it would tell me
20    everything about it, every area of the rotator cuff.  It
21    would tell me about the surgery.  It would just tell me
22    everything.
23    Q.   Tell me --
24    A.   If I had that much time to retain all the knowledge.
25    Q.   Tell me your best opinion as to how many torn rotator
```
20

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 21  SHEET 6

1  cuffs you have had experience with over your course as

2  claims manager.

3  A.    As far as injuries?

4  Q.    Yes.

5  A.    From the stores?  At that time or today?

6  Q.    Both.

7  A.    At that time probably around 50.

8  Q.    And since then?

9  A.    A couple hundred or more.

10  Q.    Would that couple hundred include the 50 you just

11  mentioned?

12  A.    Yes, maybe.

13  Q.    Had you had any experience in dealing with medical

14  issues concerning rotator cuffs before you became a claims

15  manager?

16  A.    No.

17  Q.    When you received your medical training, we'll call

18  it, from the nurse, did you have a period of time that she

19  discussed in that training session rotator cuff injuries?

20  A.    Yes.

21  Q.    What do recall she discussed about those?

22  A.    Symptoms.

23  Q.    What were those that you remember from your initial

24  training?

25  A.    Popping, pain, immediate pain, popping, loss of

21

PAGE 22

1  movement or range of motion.

2  Q.    Did you recall whether she went into the particular

3  medial name of the areas in the shoulder that would be

4  involved?

5  A.    She could have, but - she could have.

6  Q.    Have you learned over time what the medical name of

7  the various, you know, tendons and areas might be?

8  A.    Some, yes.

9  Q.    What can you recall as far as medical names?  I'm not

10  trying to, you know, say you're a medical doctor, but do

11  you remember any of the names or anything?

12  A.    I'd just be guessing to give you the exact name.

13        MR. BROWN: Don't guess.

14  MR. TINNEY:

15  Q.    What do you understand the function - what do you

16  understand a rotator cuff is?

17  A.    A rotator cuff is the joint between the shoulder and

18  the arm.  The tendons are what holds it all together.

19  Q.    So when somebody says to you this person has a torn

20  rotator cuff, what does that mean to you?

21  A.    That means that he injured himself.

22  Q.    But as far as the injury itself - when you said it's

23  a joint and there are tendons there, what do you

24  understand is torn if somebody's got a torn rotator cuff?

25        MR. BROWN: Object to form.  She's not a doctor.

22

PAGE 23

1  She's established that.

2  MR. TINNEY: I understand.

3  MR. BROWN: I don't think you've laid the

4  foundation that she's qualified.

5  MR. TINNEY: I'm just asking her for general

6  knowledge.

7  MR. BROWN: Well, I think she's told you her

8  general knowledge is that she has reference

9  books and she has things that she looks at.  I

10  don't want her speculating and guessing as to

11  what --

12  MR. TINNEY:  I'm not asking her to guess.  I

13  mean, she's fine, she's given me an answer of

14  what she understands it is and I'm just trying

15  to ask her what she understands it to be.

16  MR. BROWN: We're talking about the adjusting of

17  a rotator cuff.  Her medical knowledge as a

18  nurse or however, I don't think, since she is

19  not one - go ahead, if you know, answer the

20  question.  I just think that it's getting a

21  little far a field.

22  MR. TINNEY:

23  Q.    The question is if somebody, you know, has on paper

24  what a doctor says is a torn rotator cuff, what picture

25  comes in to your mind as to what is wrong with that

23

PAGE 24

1  person?

2  A.    A shoulder injury.

3  Q.    Do you think that something is torn inside the

4  shoulder?

5  A.    Could be.  It could be if it's a shoulder injury.

6  Q.    If a doctor says it's a torn rotator cuff, does that

7  indicate to you, when you see that word, torn rotator

8  cuff, those words, that there is something torn in there?

9  A.    Yes.

10  Q.    Based on your training, knowledge and expertise

11  you've gained in, I guess, some 250 of these, do you know

12  what generally is torn when you see the phrase torn

13  rotator cuff?

14  A.    Uh-huh.

15        MR. BROWN: Object to form.

16  MR. TINNEY:

17  Q.    And what is that?

18  A.    It would be one of the ligaments in the shoulder.

19  Q.    Based on your training, knowledge and expertise that

20  you have gained or that you had gained up to the time that

21  you dealt with Mr. Brown, would torn rotator cuffs heal

22  themselves, to your knowledge?

23        MR. BROWN: Object to the form.  Not laid a

24        foundation.

25  A.    I don't know.

24

BROWN VS CLAIMS MANAGEMENT      DEPOSITION OF VICTORIA HEPPES      4-13-06

PAGE 25  SHEET 7

1    MR. TINNEY:
2    Q.    Had you ever, before Mr. Brown s case, dealt with a
3    rotator cuff injury where it was not dealt with
4    surgically, but it was just either left or healed itself?
5    A.    No.
6    Q.    Of the 50 rotator cuff tears that you said that you
7    had dealt with before Mr. Brown, were all of those cases
8    that required surgical intervention?
9    A.    I don t know.
10   Q.    Give me you best judgment.
11   A.    I would not like to guesstimate on that.
12   Q.    What about the 200 that you handled, you know, all
13   together, would those have required surgical intervention?
14   A.    But I can t guesstimate on the answer, the outcome of
15   each one of those either if I had to give the claim over
16   to somebody else when I left the state.  So I m not going
17   to answer that question as far as have they all been
18   surgically --
19   Q.    What about the ones that you dealt with?  The ones
20   that you actually followed up from the time that the
21   report came in until the time that you know, that --
22   A.    Yes.
23   Q.    What do you mean yes?
24   A.    Yes, they were surgically --
25   Q.    Required surgical intervention?

25

PAGE 26

1    A.    Required surgery.
2    Q.    Tell me what the relationship between claims
3    management and Blue Cross Blue Shield is, if any.
4    A.    We bill through Blue Cross Blue Shield in Alabama.
5    Q.    Now, what do you mean by you bill through Blue Cross
6    Blue Shield?
7    A.    They re our insurance carrier  - a billing process
8    for the insurance carrier.  They either have a private
9    insurance or they have workman s comp.  They pay the work
10   related bills.
11   Q.    I m still not understanding  - Is Claims Management
12   an insurance company?
13   A.    Uh-huh.
14   Q.    Is there an agreement or something between Claims
15   Management and Blue Cross about how workman s comp
16   injuries will be paid in the State of Alabama?
17        MR. BROWN: I want to object to the form.
18   A.    I don t know.
19   MR. TINNEY:
20   Q.    Well, I noticed there are references in these records
21   to Blue Cross Blue Shield paying, for instance, Dr.
22   Howorth s surgical charge?
23   A.    Yes.
24   Q.    If it is a workman s comp injury then why does Blue
25   Cross Blue Shield pay that instead of the workman s comp

26

PAGE 27

1    coverage?
2    A.    I send it to Blue Cross Blue Shield authorizing
3    payment.
4    Q.    So does Blue Cross Blue Shield handle the payment of
5    claims for Claims Management?
6    A.    In Alabama, yes.
7    Q.    Would Blue Cross Blue Shield handle the payment of
8    all medical relating to Mr. Brown on his workman s comp
9    injury?
10   A.    Yes.
11   Q.    Do you, as the claims manager of Mr. Brown s file
12   during the operative, have to approve and give direction
13   to Blue Cross as to what it can and cannot pay?
14   A.    Yes.
15   Q.    Do you know if there is any contractual agreement
16   between Blue Cross and Blue Shield and CMI about how that
17   works?
18   A.    No, I don t know.
19   Q.    How do you go about authorizing a payment from Blue
20   Cross?  You know, what is the physical means by which you
21   do it?  Let s just use Dr. Howorth s bill, $1,294.00, for
22   his surgery.
23   A.    If it was electronically submitted to Blue Cross Blue
24   Shield it comes across their website.  I open up the
25   website to my adjuster number and there s the social

27

PAGE 28

1    security number with the bill on it and the date of
2    service.  I check it by the file to make sure that I have
3    the medical records and that was a true date of service
4    and that that s the treating physician and I authorize the
5    bill.
6    Q.    I got lost a little --
7    A.    For payment.
8    Q.    I got lost a little bit.  When you say that if it
9    shows up on a website?
10   A.    Uh-huh.
11   Q.    Are you saying that Dr. Howorth s office would have
12   submitted a bill electronically to Blue Cross Blue Shield?
13   A.    Either to them or they can send it to me and I will
14   then send it to Blue Cross Blue Shield.
15   Q.    Is it generally sent, as far as a doctor like Dr.
16   Howorth, directly to you or directly to Blue Cross?
17   A.    Either one.
18   Q.    I notice that Dr. Howorth apparently was recognized
19   as a workman s comp approved physician for Wal-Mart; is
20   that correct?
21   A.    Before I used him?
22   Q.    Yes.
23   A.    I don t know.
24   Q.    Well, let s talk about Dr. Shirah.  He was a company
25   doctor; is that correct?

28

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 29  SHEET 8

1    A.   Uh-huh.

2    Q.   How did he become a company doctor, if you know?

3    A.   I don t know.

4    Q.   Do you have list that you can refer to that s given

5    to you as to who are approved physicians for a particular

6    area?

7    A.   Yes.

8    Q.   Do you remember whether Dr. Howorth was on that list?

9    A.   No.

10   Q.   What is the policy as to whether you approve a

11   physician that the company doctor refers someone to?

12         MR. BROWN: Object to form, facts not in

13         evidence.

14   MR. TINNEY:

15   Q.   For instance, if Dr. Shirah referred Mr. Brown to Dr.

16   Howorth and he s not on the list, how do you determine

17   whether you authorize that referral to that orthopedist?

18   A.   How would I determine? Well, I like to work with

19   doctors that I know and I did not know Dr. Howorth at that

20   time. So I referred him to Gadsden, one of my physicians

21   in Gadsden.

22   Q.   Who was that physician, if you remember?

23   A.   It would have been one of the orthopedic specialist

24   in Gadsden, that I ve been given the names of when I

25   transferred to that state, that have worked with the

29

PAGE 30

1    adjusters before me.

2    Q.   So what is the mechanism by which you let the

3    referring doctor know where to send somebody to?

4    A.   They call me if they feel that the patient needs to

5    be referred out to an orthopedic specialist and I like to

6    ask what type of orthopedic or what type of doctor they

7    need or specialist they need to be referred out to and get

8    them a doctor conveniently located for their treatment.

9    Preferably someone that I have worked with.

10   Q.   Isn t it a company requirement that when you are

11   contacted by someone you notate it on the file?

12         MR. BROWN: Object to form.

13   A.   Yes.

14   MR. TINNEY:

15   Q.   For instance, when Dr. Shirah s office would have

16   contacted you and said we need to refer him to an

17   orthopedic that would be in the file somewhere that they

18   called you?

19   A.   Yes.

20   Q.   At that point, when you said you had a person in

21   Gadsden did you tell Shirah s office that you wanted him

22   to refer him to the Gadsden orthopedist?

23   A.   Uh-huh.

24         MR. BROWN: You need to say yes or no.

25   A.   Yes.

30

PAGE 31

1    MR. TINNEY:

2    Q.   Did it come back to you at a point later in time that

3    somebody didn t want to go to Gadsden?

4    A.   Yes.

5    Q.   How did you learn that?

6    A.   I don t remember. I don t remember if it was Kenny

7    at Dr. Shirah s office that said that or if I talked with

8    Emory.

9    Q.   But either one that you talked to, there should be a

10   note in the file reflecting that?

11   A.   There should be.

12   Q.   How did you come up with Dr. Howorth?

13   A.   Emory didn t want to go to Gadsden. It was a little

14   too far for him and I didn t know any doctors closer in

15   the area, so I d asked Kenny at Dr. Shirah s office if he

16   knew of any doctors, good orthopedic specialists that were

17   close and he named Dr. Howorth. I had never worked with

18   Dr. Howorth before. I don t like to work with doctors I

19   don t know, because you never know who you re going to be

20   dealing with. So I called a store that s close to the

21   area and I asked the Wal-Mart store there, I asked the

22   manager if he knew of this Dr. Howorth or, if it s a small

23   community, if he had heard of him and he said, yes, he

24   had. As a matter of fact he has used him himself.

25   Q.   You called Alexander City Wal-Mart?

31

PAGE 32

1    A.   Uh-huh.

2    Q.   You need to answer out load?

3    A.   Yes.

4    Q.   Do you recall the name of the person you talked to

5    there?

6    A.   No, I don t.

7    Q.   When you make calls around referencing things like

8    that, those are things that, according to policy, would be

9    notated in the file?

10         MR. BROWN: Object to form. If you know what the

11         policy is --

12         MR. TINNEY: She s already stated she is to

13         document everything, so what are you - it s on

14         the record, the record speaks for itself.

15   Q.   The question is, I think, if I understood you

16   earlier, when you speak with someone you are to document

17   it in the file?

18   A.   Yes.

19   Q.   Now, after you talked to the Alexander City guy, what

20   did you do next?

21   A.   I then called Dr. Howorth s office. Got his phone

22   number and called Dr. Howorth s office to schedule an

23   examination.

24   Q.   Do you actually set up the time that a person is to

25   go and then notify the claimant when to go there?

32

PAGE 33  SHEET 9

1    A.    Yes.

2    Q.    That s part of your job?

3    A.    Yes.  If he needs to change that, he can to suit his

4    schedule.  But if he does need to change it, he needs to

5    call me and let me know so I can put it in the file.

6    Q.    In a given day during the time frame of September of

7    04 through, say, March of  05, how many files, on the

8    average, would you deal with per day?

9    A.    I m sorry you ll have to give me that again.

10   Q.    Back during the time frame you were dealing with Mr.

11   Brown s claim, about how many different files would you

12   average dealing with per day?

13   A.    It just depends, you know.  15, maybe more.

14   Q.    Now, you referenced Dr. Shirah as being a company

15   doctor.  To your knowledge, is there any contract between

16   the company doctor and CMI or Wal-Mart that the doctor

17   enters into when he becomes a company doctor?

18   A.    To my knowledge, I don t know.

19   Q.    You don t know?  Do you customarily  - you dealt with

20   Dr. Shirah many times before Mr. Brown?

21   A.    Yes.

22   Q.    And were you satisfied that he was competent and knew

23   what he was doing?

24   A.    Yes.

25   Q.    And would you rely upon the opinions that he provided

33

PAGE 34

1    to you as to treatment?

2    A.    Yes.

3    Q.    Now, tell me what your duties and responsibilities as

4    a claims manager are?

5    A.    Well, you know, we just talked a minute ago about --

6    you asked me if everything  - requirements for

7    documentation is important and in a perfect world I d like

8    to say that I can do that, but I do the best I can.  I

9    keep handwritten notes and I try to document as much as

10   possible.  Please ask me the question again.  I probably

11   got off track there.

12   Q.    Yeah, you got off track a little bit.  Since you got

13   off track I ll chase another rabbit a minute.  You said

14   you keep handwritten notes?

15   A.    Yes, sir.

16   Q.    Do you retain those?

17   A.    No.  They re recycled.

18   Q.    I asked you to tell me what your duties and

19   responsibilities as a claims manager are.

20   A.    My duties and responsibilities are from the moment an

21   associate is injured at the Wal-Mart store to maintain and

22   monitor his medical progress until he is at baseline or at

23   MMI, which is maximum medical improvement, from his work

24   related injury.

25   Q.    What responsibility do you have in paying the comp

34

PAGE 35

1    benefit to the claimant?

2    A.    Yes.

3    Q.    I mean, is that within your responsibility?

4    A.    Yes.

5    Q.    What is your -- or how are you trained as to how

6    quickly you get a comp check to a claimant when you know

7    he s been out on temporary total disability?

8    A.    We like to schedule it bi-weekly.  Like he would be

9    receiving a paycheck bi-weekly.  As close to that as

10   possible.  The waiting period, which is the first three

11   days after injury, it s a grace period, you pay on the

12   21st day he is out of work with a doctor s note.  Then it

13   turns retro, you pay those first three days.  Alabama has

14   a three day waiting period, 21 day retro.  I pay --

15   workman s compensation wage is .6667 percent of your

16   salary, just about two-thirds.

17   Q.    If somebody has been out and you know they ve been

18   out because of their workman s comp injury, is it your

19   duty and responsibility to see that once every 14 days, if

20   it s bi-weekly, your going to review that file and see

21   that a check is sent to the claimant for the money that is

22   owed to him for his workman s comp?

23   A.    Not once every 14 days.

24   Q.    All right.  Tell me  - I thought you said it s done

25   bi-weekly.

35

PAGE 36

1    A.    Well, if he s out of work for that 14 days with a

2    doctor s note.  If he s out of work less time and returns

3    to work with restrictions, then I will pay him

4    immediately.  When he s put back on the schedule at the

5    store, I will issue him a check before two o clock on that

6    date so he gets it at least in the next three or four

7    days.

8    Q.    What about Mr. Brown when he went out for surgery on

9    the 29th, what was your duty and responsibility to compute

10   or determine how much comp should have been paid to him

11   after he had surgery?

12   A.    He had already met his waiting period -- no, he

13   hadn t met his waiting period.  He had been out  - it came

14   in lost time, because he was taken out from the hospital.

15   So my responsibilities were every 14 days  - before that

16   14 day period, what I do is schedule a diary date to pay

17   it, issue it, about the 10th day.  Assuming that he will

18   be out until his post-op visit or whenever that is, or the

19   14th day.

20   Q.    When you get a note from the doctor that a person is

21   going to be out, you know, two or three weeks, and you get

22   that note, you know, ahead of time, how do you diary your

23   file to see that you re going to get a check to the

24   injured party?

25   A.    I would diary it on the 10th day from the day he was

36

PAGE 37  SHEET 10

1    taken out on surgery, about the 10th day, so that he would
2    receive it at his home by at least the 14th day.  If he s
3    going to be out for three weeks.
4    Q.    What is the method by which when you diary something,
5    and I assume it s in the computer, that it comes back to
6    you, that you need to do something this day on this claim?
7    A.    It s on my computer screen for my tasks for the day.
8    Q.    For your tasks for the day?
9    A.    Uh-huh.
10   Q.    What is your retention time on the information that s
11   contained on your computer?
12   A.    As long as it stays there, you mean?
13   Q.    Yes.
14          MR. BROWN: Object to form.  If she knows.
15   A.    The only one that can change my diary dates are me.
16   I would think that they would stay in there, if they re
17   not -- but my job requires that  – my personal goals and
18   my job requires that I finish my task dates by the end of
19   the week.
20   MR. TINNEY:
21   Q.    Do you indicate it in your file whether you actually
22   finished the task?
23   A.    I would mark complete, yes, and mark it off.
24   Q.    So on your computer today, if you want to go back and
25   pull up all your records concerning Mr. Brown, you can do

37

PAGE 38

1    that?
2    A.    I can pull up the file.
3    Q.    And you can pull up your diary also?
4          MR. BROWN: Are you asking can she pull up
5          individual tasks on individual days to determine
6          if they were or were not done?
7          MR. TINNEY: No.  I asked her can you pull up
8          your diaries.
9    A.    It would be in the file.
10   Q.    So you could actually pull up your diary for a
11   particular day that may have Mr. Brown on it?
12   A.    Yeah, but I don t know how to do it.
13   Q.    But it s there?
14   A.    Yeah.
15   Q.    Then, for instance, you could pull it up and where
16   you wrote complete on it, it would be on the diary?
17   A.    Yeah.
18   Q.    How do you write complete on it when it s, you know,
19   on the screen?  What do you do?
20   A.    For what?
21   Q.    For when you have a task for a given day, if it says
22   contact Dr. Howorth today.  How do you write or notate
23   that you have completed that task?
24   A.    There s a complete click on.  You click on that.
25   Q.    So there s a little bar after it to whether it s

38

PAGE 39

1    complete, not complete?
2    A.    Uh-huh.
3    Q.    What are your choices on those bars?
4    A.    The choices it would give today s date if it was
5    completed.
6    Q.    Is there any other choice?  Not complete, review or
7    diary again?
8    A.    I could diary it again for myself in the future.  If
9    it was an appointment with him and I had called then what
10   I would usually do, my next thing would be I would diary
11   myself at least a week to two weeks out, depends on what
12   it is, for medical records.  Have the medical records been
13   received and documented in the file from this date of
14   service and what is the next office visit with a question
15   mark.
16   Q.    What is your company policy, to your knowledge, when
17   you are awaiting a fax from somebody and you do not get
18   that fax as to the follow-up time on that when you don t
19   receive it?
20   A.    There is no company policy on it.
21   Q.    What is your rule you utilize?
22   A.    My rule?  I ll give a call back my next diary date
23   or before that.
24   Q.    So when you call somebody and you re expecting --
25   A.    Usually it would be on my next diary date unless it s

39

PAGE 40

1    something very important.
2          MR. BROWN: Let s take five minutes.
3    (Deposition resumed.)
4    MR. TINNEY:
5    Q.    Tell me what kind of training you had with respect to
6    use of the computer system at CMI.
7    A.    To open a file, set my task dates, put notepads in.
8    They trained me on the system, on the Claim Zone system.
9    Q.    Have you ever been criticized over your knowledge of
10   the use of the system?
11          MR. BROWN: In those respects?
12   MR. TINNEY:
13   Q.    No, in any respect.  Have you ever been written up
14   because you did something wrong on the computer?
15   A.    No.
16   Q.    Have you ever had reprimands from your employer that
17   have been notated in your personnel file, to your
18   knowledge, that relate to your handling of claims?
19   A.    No.
20   Q.    Have you ever been suspended or placed on leave for
21   any reason?
22   A.    No.
23   Q.    Now, as far as the computer system itself, did I
24   understand you earlier to say that there is no hard copy
25   file on Mr. Brown s claim anywhere?

40

BROWN VS CLAIMS MANAGEMENT      DEPOSITION OF VICTORIA HEPPES      4-13-06

PAGE 41  SHEET 11

1    A.    I don t know.
2    Q.    Well, you re the person in charge of handling Mr.
3    Brown s file; correct?
4    A.    On the computer, yes.
5    Q.    Well, is there anybody in charge of handling Mr.
6    Brown s file off of the computer?
7    A.    Everybody in the office.  I mean, as far as my bosses
8    and the computer system, the whole office, they re
9    probably  - I don t for myself, I just  - would you say
10   the question again, please?
11   Q.    I asked you if there is any hard copy of any document
12   relating to Mr. Brown that you have ever seen, let me
13   start out that way, that you have ever seen, concerning
14   Mr. Brown s claim, a hard copy of anything?
15   A.    Which is a piece of paper or what?
16   Q.    A piece of paper.
17   A.    I don t know.  I don t recall.
18   Q.    You re telling me that you can t even recall if you
19   ever got a fax from anybody --
20   A.    Well, faxes, yes.
21   Q.    Is a fax a piece of paper?
22   A.    Well, it comes electronically.
23   Q.    Tell me how a fax comes to you.
24   A.    A fax comes to me -- in the State of Alabama it comes
25   to me in my inbox, which is in the computer --

41

PAGE 42

1    Q.    Your inbox?
2    A.     - Which is my mail that is sent to me through the
3    company --
4    Q.    Well, wait a minute.  When you say sent to you
5    through the company, tell me what you mean by that.
6    A.    Well, it just comes to me  - they process the faxes
7    and/or we have a fax number in our unit and they can dial
8    our fax number, fax it to us and it still comes across my
9    computer.
10   Q.    Let s go back and just use Dr. Howorth s surgical
11   request concerning Mr. Brown.  If you called Dr. Howorth s
12   office and said, I have to have a formal request for
13   surgery from you to authorize this surgery.  I m going to
14   fax you something and you fax it back.  First, what is the
15   number you would tell him to fax it to?
16   A.    479 873 --
17   Q.    479 --
18   A.     - 479 273 8020.
19   Q.    I m sorry, 272?
20   A.    479 273 8020, attention Victoria.
21   Q.    And would that have been the fax number that you
22   would have given to anybody during the time frame you were
23   working on Mr. Brown s file as to where to fax a document
24   to?
25          MR. BROWN: Object to the form.

42

PAGE 43

1    A.    I don t - yes.
2    MR. TINNEY:
3    Q.    What is your telephone number.  If you told Mr. Brown
4    to call, if you have any problem, call me.  What is the
5    number you would have given him?
6    A.    The 1-800 number.
7    Q.    Tell me what that is, please.
8    A.    1-800 -- I forgot.
9    Q.    527?
10   A.    527-0566.
11   Q.    And what is your extension?
12   A.    20776.
13   Q.    20776?
14   A.    Yes.
15   Q.    Or 766?
16   A.    776.
17   Q.    So, again getting back to the question concerning an
18   example.  If you asked for a faxed formal request for
19   surgery from Dr. Howorth and you gave him this number that
20   you just gave me, how would it get to you?  If his office
21   went and put it in the fax machine and dialed that number,
22   how does it get to you?
23   A.    I look on my e-mails.  I open up the computer and
24   it s in the computer.
25   Q.    So this is a number that if I sent a fax to you it s

43

PAGE 44

1    going to go directly to your e-mail?
2    A.    Uh-huh.
3    Q.    How do you determine whether or not a fax fails to
4    get through?  Is there any indication that comes up on
5    your computer as to whether or not there s a failure to
6    get something through?
7          MR. BROWN: Hold on.  Object to the form.  Are
8          you talking about failed to get through on an
9          outgoing or incoming?
10         MR. TINNEY: Incoming.
11   Q.    On an incoming fax, is there anything that would come
12   on to your computer screen if you re expecting a fax that
13   says that a fax has failed?
14   A.    No.
15   Q.    If you have an outgoing fax to someone, how do you
16   fax that to someone?
17   A.    On my computer.
18   Q.    If you want to send to Dr. Howorth a surgical request
19   form, how do you get that form to him?
20   A.    I put it as an attachment and I put his fax number on
21   the top of the sheet at Wal-Mart dot com, I put Emory
22   Brown s name at the bottom and I press send.
23   Q.    So you send all of your requests electronically to
24   doctors, hospitals; is that correct?
25   A.    Yes.

44

PAGE 45 SHEET 12

1    Q.   Going back to record keeping.  Have you ever seen any
2    paper document relating to Emory Brown since you've been
3    working on his file?
4            MR. BROWN: Object to form.
5    A.   I don't understand the question.
6    MR. TINNEY:
7    Q.   Have you ever seen a piece of paper that relates to
8    anything that you did concerning Mr. Brown while you were
9    working on his file?
10           MR. BROWN: Same objection.
11   A.   I don't - a piece of paper?
12   MR. TINNEY:
13   Q.   Yes, any piece of paper, whether it's a medical
14   authorization, medical request --
15   A.   I don't know.
16   Q.    - Something from the company?
17   A.   I don't know.
18   Q.   What did you review in preparation for this
19   deposition today?
20   A.   What did I review?
21   Q.   Yes.
22   A.   I reviewed my file, reviewed my diary of the file,
23   looked it over.
24   Q.   Did you print something out and is that what you've
25   got there in front of you?

45

PAGE 46

1    A.   Yes.
2    Q.   That's your diary of the file?
3    A.   Uh-huh.
4    Q.   Is that something that you generated off of your
5    computer?
6    A.   Yes.
7            MR. BROWN: Hold on.  This is something that was
8            done - this is after the lawsuit's been filed.
9            The things that she reviewed were materials that
10           have been produced to you.
11           MR. TINNEY: No, she just said she reviewed that,
12           that you've got in your hand that we have in
13           this room today.  She said she generated that
14           off of her computer and that that is what she
15           reviewed in preparation for this deposition.
16           MR. BROWN: And I was with her when she prepared
17           for the deposition and I know what she reviewed.
18           MR. TINNEY: All right, just for the record,
19           Jeff, tell me how many pages that document is
20           that you've got.
21           MR. BROWN: I'm looking at some pages that are
22           all dated after the date you filed your lawsuit.
23           MR. TINNEY: Well, I understand what you're
24           saying, but, you know, it's obvious we're going
25           to have a hearing at some point in time on a

46

PAGE 47

1            Motion to Compel.  I just want it on the record,
2            so we can identify what you're holding that it's
3            obvious you're not going to let me see.  I just
4            want to know how many pages that is that she
5            printed off.
6            MR. BROWN: These are nine pages of documents
7            that post date the filing of your lawsuit that
8            are --
9            MR. TINNEY: All right, so you're representing,
10           as an officer of the Court, that every single
11           reference on that document you hold is
12           referenced to after the filing of this lawsuit?
13           MR. BROWN: The last one on here is dated 6-14-
14           2005.
15           MR. TINNEY:  What is the first one, just for the
16           purposes of the record?
17           MR. BROWN:  The latest one, the most recent is
18           March 30, 2006.
19           MR. TINNEY:  But you're saying that there is
20           nothing in that diary that goes back to the
21           September to March time frame?
22           MR. BROWN: What I am telling you is absolutely
23           correct,  that I am looking at the materials
24           that were generated after the lawsuit was filed.
25           MR. TINNEY: That's fine.

47

PAGE 48

1            MR. BROWN:  Hold on.  Which is the materials
2            that were generated after the lawsuit was filed,
3            which we therefore contend are absolutely work
4            product.
5            MR. TINNEY: I understand.
6            MR. BROWN:  And it also contained attorney
7            client information in them and you have been
8            given the materials that pre-dated the lawsuit,
9            or actually the last one that you got was dated
10           June 21st, 2004, which was the date the lawsuit
11           was received.  And at that point in time, after
12           that, then I believe it goes into a different
13           echelon.  So that is my position.
14           MR. TINNEY:  Okay.
15           MR. BROWN:  So if she reviewed these pages, it
16           was in addition to the 100 pages --
17           MR. TINNEY:  No, that's not what she testified
18           to.
19   Q.   I just asked you what you reviewed, so you didn't
20   include this information that your Wal-Mart's attorneys
21   supplied to me in what you reviewed.  You told me that you
22   reviewed those records that you had in front of you in
23   preparation for the deposition.  Did I misunderstand you?
24           MR. BROWN:  Let's try to simplify this.
25   A.   Yeah.

48

PAGE 49  SHEET 13

1   MR. TINNEY:
2   Q.   Let s go back to the initial question.  What did you
3   review in preparation for this deposition today?  Now your
4   attorney has now put another set of documents in front of
5   you.
6   A.   This is the file.  I ve reviewed the file since the
7   day of injury.
8   Q.   Now, tell me what the first date that you anticipated
9   litigation in this case to be.  I want a date.  Was it
10  when you received the lawsuit?
11  A.   Yes.
12  Q.   That was the first date that CMI anticipated
13  litigation in this case; is that correct?
14  A.   Yes.
15  Q.   So everything that you did before that was done in
16  the ordinary course of your business; is that correct?
17  A.   Yes.
18  Q.   So anytime you made computer entries, diary entries,
19  or any entries that are stored electronically before the
20  lawsuit was filed, that was done in the ordinary course of
21  business and not in anticipation of litigation; is that
22  correct?
23  A.   Yes.
24          MR. BROWN: For the record, that is, I think, in
25          connection and absolutely in line with what we

49

PAGE 50

1           have represented to you by producing and not
2           objecting to the production of those diary notes
3           that were prior to the lawsuit.
4           MR. TINNEY: Well, we can, you know, get to that
5           in a minute.
6   Q.   Now, going back to your knowledge of whether there is
7   printed material, what you have got in front of you is a
8   stack of records about an inch thick that, I guess, you
9   generated or someone with the company generated to supply
10  to me in response to Request For Production; is that
11  correct?
12  A.   Yes.
13  Q.   Who generated those documents?
14          MR. BROWN: What do you mean generated?
15  MR. TINNEY:
16  Q.   Who actually printed them out?
17          MR. BROWN: For the record, I did.
18  A.   I don t know.
19  MR. TINNEY:
20  Q.   You didn t --
21  A.   I don t remember.
22  Q.   All right.  So you actually didn t print them out?
23  A.   I don t remember.
24  Q.   Would you have had the ability to print out these
25  documents that you reviewed, that you have in front of

50

PAGE 51

1   you?
2   A.   Yes.
3   Q.   I m going to mark as Plaintiff s Exhibit 1 the --
4           MR. BROWN: Hold on a minute.  That s my copy so
5           if you want copies you re going to need to get
6           some copies of it made, because that s not my
7           copy that I m giving up for.
8           MR. TINNEY: All right.  I think they ll
9           probably have something here that we can get
10          copies made.  And if we don t you can just keep
11          them, as far as I m concerned.
12  Q.   I m going to attach this sticker as Plaintiff s
13  Exhibit 1 to the top of these documents you ve got in
14  front of you.
15
16  PLAINTIFF S DEPOSITION EXHIBIT 1, marked for
17  identification (File.  Retained by Defense Counsel.  Not
18  attached to deposition transcript.)
19  MR. TINNEY:
20  Q.   As I understand it, you reviewed these in preparation
21  for this deposition?  You need to answer out load.
22  A.   Yes.
23  Q.   And these were given to you by CMI s attorney to
24  review?
25  A.   Yes.

51

PAGE 52

1   Q.   Did you have your own personal copy of these
2   documents?
3   A.   No.
4   Q.   When was the first time that you reviewed these
5   documents in preparation of this deposition?
6           MR. BROWN: The documents or the information
7           contained in the documents?
8           MR. TINNEY: The documents.
9   Q.   Did you actually have a hard copy in front of you to
10  look at?
11  A.   No.
12  Q.   I asked when was the first time that you had a hard
13  copy in front of you to look at?
14  A.   Right now.
15  Q.   Well, I guess I m not being clear.  You said that you
16  reviewed those documents to prepare for this deposition
17  and all I m asking you is did you look at them yesterday,
18  two days ago, a week ago or when, or have you never looked
19  at them?
20  A.   This hard copy?
21  Q.   Yes.
22  A.   I looked at it yesterday.
23  Q.   The first time you saw it was yesterday?
24  A.   I have it on the computer.
25  Q.   So you had looked at it on the computer before you

52

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 53  SHEET 14

1    met with CMI s attorney?

2    A.    Can I talk with you a minute?

3          MR. BROWN:  Sure.

4    (Deposition Resumed.)

5    MR. TINNEY:

6    Q.    I must have asked a hard question.

7    A.    Ask me again, please.

8    Q.    Did you review things on your computer before you saw

9    what I ve marked as Plaintiff s Exhibit 1 in preparation

10   of the deposition?

11   A.    On my computer.  When I reviewed the file, I review

12   it once a month, but I did a complete review of it for

13   myself in December, last December.

14   Q.    And before yesterday, it had been December since you

15   had actually looked at the file?

16   A.    No.

17   Q.    For what purpose would you have been reviewing it

18   between December and yesterday?

19   A.    To monitor medical, to monitor  - because I monitor

20   claims, that s my job.

21   Q.    Has Mr. Brown s file been closed?

22   A.    No.

23   Q.    Has it ever been closed?

24   A.    No.

25   Q.    What determines whether you close a file?

53

PAGE 54

1    A.    What determines whether we close a file is if he has

2    reached maximum medical improvement, if he is at baseline

3    --

4    Q.    What do you mean by baseline?

5    A.    Baseline from his work related injury.

6    Q.    I don t understand what you mean by baseline.

7    A.    Baseline means if he is where he would have been

8    before the injury occurred, the work injury occurred.

9    Q.    Has Mr. Brown, to your knowledge, based on the

10   medical records that you have, ever got past his baseline?

11   A.    No.

12   Q.    Has he ever reached maximum medical improvement,

13   based on the records that you have before you?

14   A.    No.

15   Q.    What is your duty and responsibility as the claims

16   manager on his file to communicate with Mr. Brown to

17   determine if he has reached maximum medical improvement?

18          MR. BROWN: Object to the form.  Whether he s

19          represented or unrepresented.

20   MR. TINNEY:

21   Q.    Let s take it if a person does not have an attorney,

22   what is your duty and responsibility, as you understand

23   it, to communicate with the claimant about whether he has

24   reached the maximum medical improvement?

25   A.    That would be determined by the doctor.

54

PAGE 55

1    Q.    But I asked what is your duty and responsibility to

2    ask the doctor or to communicate with Mr. Brown about we

3    need to know whether you have reached maximum medical

4    improvement?  Do you have any duty or responsibility in

5    that regard?

6    A.    Yes.

7    Q.    And what is that duty and responsibility?

8    A.    To get the claimant back to good health.

9    Q.    But my question is  - I m talking about information.

10   What is your responsibility to follow up to determine if a

11   person has reached maximum medical improvement?

12          MR. BROWN: Object to the form.  I don t think

13          that she can answer that question based on the

14          facts of this case because you re -- I mean, if

15          you re asking globally, she s trying to answer

16          specifically to this case.

17          MR. TINNEY:  Yeah, I m asking her about this

18          case.

19          MR. BROWN:  No, you re not.  You re asking what

20          is your, an employee -- I mean, if you ask her

21          about Emory Brown --

22          MR. TINNEY: I ll rephrase it.

23          MR. BROWN:  I mean, because I think there s a

24          distinction between contact made between CMI,

25          whether he was represented by someone or not

55

PAGE 56

1          represented by someone.

2          MR. TINNEY:  I understand.  That s a good point,

3          so I ll ask the question again.

4    Q.    Did you treat Emory Brown any differently than you

5    would have treated any Wal-Mart workman s compensation

6    case?

7    A.    No.

8    Q.    So would all the answers that you re giving me today,

9    be answers that you would apply to every workman s comp

10   case in Alabama?

11   A.    Yes.

12   Q.    So you re not going to treat Mr. Brown differently?

13   A.    No.

14   Q.    Now, the question is what is your responsibility as

15   the claims manager on his case, if he has no attorney that

16   has contacted you saying I represent Mr. Brown on his

17   workman s comp injury --

18          MR. BROWN: I m going to object to the form of

19          the question and instruct her not to answer

20          that, because that s not the facts of this case.

21          Those are not the facts of this case.  You --

22          MR. TINNEY:  All right.  Let me --

23          MR. BROWN:  Let me state my objection, because

24          I m not trying to be difficult, but the records

25          that you have been provided indicate, and your

56

BROWN VS CLAIMS MANAGEMENT          DEPOSITION OF VICTORIA HEPPES      4-13-06

PAGE 57  SHEET 15

1       client testified Monday, that in March of 2005
2       he went out on a leave of absence for non-injury
3       related medical conditions, cardiac conditions
4       and peripheral vascular disease.  At the time
5       you filed the lawsuit in June of 2005, he was
6       still out of work and he testified that he was
7       not able to do anything and he was still out on
8       a leave of absence.  So you can ask what would
9       or should have been done or something of that
10      nature up to the point in time that you filed
11      the lawsuit, but I think after that it takes on
12      a completely different landscape.
13          MR. TINNEY:  Maybe we can clear it up this way.
14      Q.  Tell me when you first had notice from an attorney
15      that they represented, that any attorney represented Mr.
16      Brown on his workman s compensation claim against Wal-
17      Mart.
18      A.  I guess it was when it was filed.
19      Q.  You re talking about this lawsuit, that s not even
20      filed against Wal-Mart, is what you re claiming to be
21      notice --
22      A.  I don t know.  The lawsuit was sent to my boss.
23      Q.  Which boss?
24      A.  Annie Martin and she notified me that there was a
25      lawsuit on this case.

57

PAGE 58

1       Q.  To your knowledge, has any attorney ever notified CMI
2       that they represent Mr. Brown on his workman s
3       compensation case against Wal-Mart?
4       A.  Not to my knowledge.
5       Q.  So why have you treated this file as if Mr. Brown has
6       a lawyer for his workman s compensation case against Wal-
7       Mart?
8           MR. BROWN: Object to form.  Don t answer the
9           question.  You stated before we went on the
10          record that you represented him on the worker s
11          comp.  I mean, I don t understand --
12          MR. TINNEY:  I can talk to you, Jeff.  I mean, I
13          can put on record things that you say that, you
14          know, aren t admissible or whatever.  You asked
15          me if I was going to represent him on this comp
16          case and I said, yes, I will, but I have a right
17          to know -- she already testified that there s no
18          lawyer that s ever notified her that they
19          represent Mr. Brown on his workman s comp case.
20          She s already testified to that and I m just
21          following up on that and asking her.
22      Q.  This is the question on the table; did you treat Mr.
23      Brown, as far as his workman s compensation claim goes, as
24      if you had been notified by an attorney claiming that they
25      represented him on the workman s compensation at any time?

58

PAGE 59

1           MR. BROWN:  Object to the form.  If you know the
2           answer.
3       A.  Yes, I did.
4       Q.  Tell me who the attorney is that notified you that
5       they represented Mr. Brown on his workman s compensation
6       claim?
7       A.  No attorney notified me.  I ve not gotten a letter of
8       representation.
9       Q.  So based on your training, would you treat Mr.
10      Brown s case as if he had an attorney on his workman s
11      compensation case or did not have an attorney on his
12      workman s compensation case?
13      A.  I would treat him as if he did have an attorney on
14      his workman s compensation case.
15      Q.  And what do you base that on, seeing that you have no
16      letter of representation from anyone?
17      A.  Because a lawsuit was filed.
18      Q.  Was a lawsuit filed for workman s compensation
19      benefits?
20      A.  I don t know.
21      Q.  Well, has anybody ever told you that --
22      A.  Because I don t remember.
23      Q.  Has anybody ever told you that Mr. Brown has filed a
24      claim against Wal-Mart for workman s compensation
25      benefits?

59

PAGE 60

1       A.  No.
2       Q.  So if nobody s ever told you that, would you have any
3       reason to treat Mr. Brown s claim as if he had an
4       attorney?
5           MR. BROWN: Objection to the form.
6       A.  I think I just answered the question.
7       MR. TINNEY:
8       Q.  What was the answer?  Maybe I didn t understand it.
9       What was the answer?
10      A.  That I would treat him that he had an attorney,
11      because a lawsuit was filed.
12      Q.  So what is the difference in the treatment that you
13      would provide to Mr. Brown if he had an attorney on
14      workman s comp as opposed to him not having an attorney on
15      workman s comp?
16      A.  As far as medical treatment, none.  I would
17      communicate through the attorney.  The attorney would
18      usually notify me.  We don t contact the claimant.  The
19      attorney would usually notify me.
20      Q.  Why have you not contacted Mr. Brown individually on
21      his workman s comp claim?  Let me withdraw that.  When was
22      the last time you talked to Mr. Brown about his workman s
23      comp claim?
24      A.  I don t remember.
25      Q.  Can you look on your file or the information that

60

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 61 SHEET 16

1   you ve got in front of you and tell us that? There s some
2   19 pages that it looks like it may have come off your
3   computer that you might want to turn to in Exhibit 1, if
4   you need that to help you tell us that date. Are you
5   familiar with the 19 pages, that appear to be print offs
6   of a screen, that I m talking about?
7   A.   Yes.
8   Q.   Can you look at those 19 pages and tell us when the
9   last time you had any communication with Mr. Brown was?
10  A.   It would be around his appointment of March 25th,
11  2005, with Dr. Howorth.
12  Q.   Why did you terminate your communications with Mr.
13  Brown after that or why did you have no more
14  communications with him after that?
15          MR. BROWN: I m going to object to the form.
16          You re asking her to review the documents that
17          pre-dated the lawsuit. You listen to his
18          question. Have you talked to him and have you
19          had any contact or communication or anything
20          after the lawsuit was filed?
21          MR. TINNEY: That wasn t my question, Jeff. She
22          answered my question. When was the last time
23          you had any communication with Mr. Brown and she
24          told me it was in March.
25          MR. BROWN: No, she was  - but you re referring

61

PAGE 62

1          her to matters that we ve already established
2          pre-dated the lawsuit.
3          MR. TINNEY: Let s go back.
4          MR. BROWN: So you re asking the question about
5          anywhere, but you re specifically referring to
6          things beforehand.
7          MR. TINNEY: No.
8   Q.   I wanted you to tell me when was the last
9   communication you had of any form with Mr. Brown,
10  directly, about his workman s compensation claim?
11  A.   I don t remember.
12          MR. BROWN: From today s date?
13  MR. TINNEY:
14  Q.   Well, you ve got the records, so we ll take as much
15  time as you need for you to look at those records right
16  there and tell me.
17          MR. BROWN: We ll take 10 minutes and take a
18          break.
19  (Deposition resumed.)
20  MR. TINNEY:
21  Q.   The last question I asked was when was the last
22  communication that you had with Steve Brown and you
23  weren t sure. Have you now determined when that was?
24  A.   It would be around his office visit with Dr. Howorth
25  on March 25th, 2004.

62

PAGE 63

1   Q.   How did you determine that?
2   A.   Because I would always follow up with him after the
3   doctor or he would call me. I always asked if they would
4   call me to let me know how they are, to let me know how
5   their visit was and if they have any new prescriptions.
6   That was the last time I talked to him.
7   Q.   So what caused you when we just took a break to
8   remember that?
9   A.   Because that was the time of his doctor s visit.
10  Q.   Do you have something in your records that would
11  indicate that was the last time of your communication with
12  him?
13  A.   Well, possibly.
14  Q.   Well, you told me that the company and your rule is
15  that you document all calls?
16  A.   Yes. That s the company  - they would like  - in a
17  perfect world I would like to document everything, but I
18  don t get to document all phone calls.
19  Q.   When you say in a perfect world, I mean, you ve got
20  responsibilities to your company and you ve got
21  responsibilities to the claimants; correct?
22  A.   Yes.
23  Q.   And you re trained to document all calls; is that
24  correct?
25  A.   The important things.

63

PAGE 64

1   Q.   So how do you classify whether something is important
2   or not important?
3   A.   I think everything is important.
4   Q.   Calls from claimants would be important, wouldn t it?
5   A.   Yes, sir.
6   Q.   And you would document those?
7   A.   Yes or --
8   Q.   And calls to claimants?
9   A.   I document my own.
10  Q.   And calls to claimants?
11  A.   Yes.
12  Q.   And your file would indicate those; correct?
13          MR. BROWN: Object to the form.
14  MR. TINNEY:
15  Q.   Correct? Isn t that correct?
16          MR. BROWN: Are you talking about everybody or
17          Emory Brown?
18          MR. TINNEY: Emory Brown.
19          MR. BROWN: Ask about Emory Brown s file, please.
20  MR. TINNEY:
21  Q.   Emory Brown?
22  A.   Emory Brown s file, I didn t get to document
23  everything I would have liked to have.
24  Q.   Do you record all calls that come to you?
25  A.   No, as far as --

64

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 65  SHEET 17

1   MR. BROWN: Stop. There again we re here
2   talking about Emory Brown.
3   MR. TINNEY: Yes.
4   Q. Do you record all the calls that would have come to
5   you about Emory Brown?
6   A. No.
7   Q. To your knowledge, does Wal-Mart have a system that
8   records those calls?
9   A. Recording as of what type of recording are you
10  talking about?
11  Q. Recording of telephone conversations.
12  A. Tape recording or --
13  Q. Any electronic recording, any kind of recording that
14  you may be aware of?
15  A. I don t know.
16  Q. Has anybody ever told you that Wal-Mart would monitor
17  the calls that you receive or that you make?
18  MR. BROWN: Object to the form. This is not a
19  lawsuit against Wal-Mart.
20  MR. TINNEY:
21  Q. I m sorry. Has CMI ever told you that they would
22  monitor calls you made or calls that come to you?
23  A. They ve never told me that. It s part of their
24  system.
25  Q. What do you mean it s part of their system?

65

PAGE 66

1   A. I m sure all ingoing in outgoing calls are monitored.
2   I have never seen it myself.
3   Q. I know, but have you been told that?
4   MR. BROWN: Object to the form.
5   MR. TINNEY:
6   Q. Have you been told that?
7   MR. BROWN: There again, please don t speculate.
8   MR. TINNEY:
9   Q. I know these are tough questions, but have you been
10  told that? You have, haven t you?
11  A. Yes.
12  Q. And what causes you to tell someone whether their
13  call or conversation with you is being monitored?
14  MR. BROWN: Object to the form, first. Can you
15  establish whether she does tell them that?
16  MR. TINNEY: I asked her what causes you to tell
17  someone that a call is being monitored, if you
18  do it?
19  MR. BROWN: Okay, that s fine, because your
20  first question assumes that she tells them. She
21  is not to assume things. So I would prefer, if
22  you want to ask her the second, please ask her
23  the first one.
24  MR. TINNEY:
25  Q. Let me rephrase the question. On what occasions

66

PAGE 67

1   would you advise someone in a conversation with you that
2   the call may be monitored?
3   MR. BROWN: Object to the form. You have not
4   laid the foundation as to whether she ever tells
5   somebody that.
6   MR. TINNEY:
7   Q. You re shaking your head, not answering.
8   A. I don t ever tell anybody that.
9   Q. Well, for instance, I know your attorney has told me
10  that they have a transcript of your conversation with Mr.
11  Brown. Did you advise Mr. Brown that you were recording
12  the conversation?
13  A. I did not record a conversation.
14  Q. So how do they have a transcript of your conversation
15  with Mr. Brown, if you know?
16  MR. BROWN: Well, can I point her to the direct
17  entry.
18  MR. TINNEY: Sure. Tell me what document number
19  it is.
20  MR. BROWN: I m looking at Page Number 56.
21  Sequence 7.
22  MR. TINNEY:
23  Q. I m sorry, Sequence Number 7?
24  A. Yes, Sequence Number 7. It says that the notepad is
25  put in by Kimberly West, K R West. Do you see that?

67

PAGE 68

1   Q. Yes.
2   A. And she did the first documentation here and it says,
3   contact of the claimant and he agreed to a recorded
4   interview R I .
5   Q. So you didn t record an interview with him?
6   A. No.
7   Q. Is it the company policy, to your knowledge, if they
8   are going to record an interview that they advise the
9   person they re talking to that it is being monitored or
10  recorded?
11  A. Yes.
12  Q. Would that apply to medical providers also?
13  A. Yes.
14  Q. Have you ever had an occasion to advise a medical
15  provider that you are recording the conversation?
16  MR. BROWN: Hold on a minute. Why don t we take
17  a break and let s call the phone number and let
18  you here what the introductory phrase, because
19  you re asking if each individual adjuster -
20  you re asking if a claims examiner gets on the
21  phone with Dr. Timmons and says, oh, by the way,
22  this call might be recorded; is that what you re
23  asking?
24  MR. TINNEY: No. I asked the question, Jeff,
25  that I thought was, you know, easy to

68

PAGE 69  SHEET 18

```
1              understand.
2                  MR. BROWN: I don t understand the question.
3                  MR. TINNEY:  Let me ask it again.
4       Q.   Have you ever had an occasion to advise a medical
5       provider that you were recording your conversation with
6       them?
7       A.   No.
8       Q.   Have you ever had an occasion to advise a claimant
9       when they call in that you are going to record your
10      conversation with them, other than what they may hear when
11      they call the number?
12      A.   Are you talking about Emory Brown?
13      Q.   Yes.
14      A.   I had never advised him that I was going to record
15      with him, because I never recorded.
16      Q.   We got sidetracked a minute ago when we were talking
17      about the paper documentation.  You said that you had
18      never seen the papers that we marked as Plaintiff s
19      Exhibit 1 until yesterday; is that correct?
20      A.   We had gone over the file once when the lawsuit was
21      filed, when I first met --
22                  MR. BROWN:  That s enough.
23      MR. TINNEY:
24      Q.   You don t give me any conversations you ve had with
25      your attorneys or anything.  But the question that I just
```
69

PAGE 70

```
1       asked you was, you told me and maybe I misunderstood you,
2       but you told me that the first time you saw --
3       A.   Yes, was yesterday.
4       Q.    - Those papers was yesterday; is that correct?
5       A.   Uh-huh.
6       Q.   Before yesterday, had you ever seen any hard copy
7       papers relating to Jeff Brown from any source.  Not Jeff
8       Brown.  Steve Brown from any source?
9       A.   Emory Brown.  I don t remember.
10      Q.   Would all the communications that you received from
11      Dr. Shirah s office, to your knowledge, have come
12      electronically?
13      A.   Yes.
14      Q.   Does the fax number that you gave me go straight to
15      your desk and to no other source?
16      A.   No.
17      Q.   So how does that fax number that you give out, if it
18      doesn t come straight to you, get to your desk as opposed
19      to everybody else s desk?
20                  MR. BROWN:  Object to the form.
21      MR. TINNEY:
22      Q.   You can answer.
23      A.   It comes to our unit and I see it on my desk
24      computer.  I can t explain how it gets there or anything.
25      I m not a technician.
```
70

PAGE 71

```
1       Q.   But it s your understanding that it comes into a
2       single source and then it s divided out and goes to you?
3       A.   Yes.
4       Q.   Is that why you put attention Victoria or ask them to
5       put attention Victoria on it?
6       A.   Yes.
7       Q.   Do you know, based on  - how many years did you say
8       you ve been there now?
9       A.   Almost three.
10      Q.   Three.  Is there an area of the building, to your
11      knowledge, where faxes come in and are sorted out?
12      A.   I don t know.
13      Q.   You don t know that?  To the best of your
14      recollection, would any paper document have ever come to
15      you during the course of your handling Emory Brown s case
16      between September and March?
17      A.   I don t know.
18      Q.   You don t know or you don t remember?
19      A.   I don t know.
20      Q.   What type of documents customarily would be available
21      to you to pull up concerning Mr. Brown s claim that would
22      have been entered on your computer between September of
23      04, and March of  05?
24      A.   Again, please?
25      Q.   What kind of documents would customarily be contained
```
71

PAGE 72

```
1       within your computer file on Mr. Brown that you would have
2       gotten between September and March?
3       A.   Medical records and faxes, mail, yeah, everything  -
4       those.  Whatever s contained in the file stayed.
5       Q.   Are you required to report to your supervisor on a
6       file periodically?
7       A.   Not required.
8       Q.   Do you, as a matter of policy, maybe your policy,
9       report to your supervisor every so often about where you
10      are on a file?
11                  MR. BROWN:  Object.  Are we talking now or at
12                  the time of --
13                  MR. TINNEY:  At the time of the incident in
14                  question.
15      A.   Yes.
16      Q.   How do you do that?  Do you send e-mails?
17      A.   I m a people person.  I like to go over and talk
18      personally with them.
19      Q.   When you go over and talk with them, like Ms.
20      Quizenberry, would you, if she was  - what did you say the
21      name of your supervisor was?
22      A.   At the time?
23      Q.   Yes, at the time.
24      A.   Tisha Montgomery, my team leader.
25      Q.   It was who?
```
72

PAGE 73  SHEET 19

1    A.   Becky Quizenberry is the --

2         MR. BROWN: Your team leader was?

3    A.   Tisha Montgomery.

4    MR. TINNEY:

5    Q.   Did you ever go over and talk to Tisha about Emory

6    Brown?

7    A.   Yes.

8    Q.   When you go talk to her do you carry documents with

9    you or when you re talking to her do you pull  - does she

10   pull things up on her screen that relate to the case, or

11   how does that usually go?

12   A.   I usually familiarize myself with what I need, what

13   questions I need to be answered or direction I need to

14   take and she would pull it up on the computer or I could

15   have it right there, e-mail it to her.

16   Q.   If you e-mail something to her do you store that on

17   your computer also?

18        MR. BROWN: Store what?

19        MR. TINNEY: The e-mail.

20   A.   Not for very long.

21   Q.   Do you delete your e-mails.

22   A.   Yeah.

23   Q.   Do you personally do that or is that something the

24   system does?

25   A.   I personally do that.

73

PAGE 74

1    Q.   You don t have any expertise in the area of how Wal-

2    Mart stores information electronically, do you?

3    A.   No.

4    Q.   Have you ever been told that your e-mails would be

5    retained?

6    A.   No.

7    Q.   When you get an e-mail from someone, such as Ms.

8    Quizenberry, do you diary your file on that customarily?

9         MR. BROWN: Object to form.  She didn t testify

10        that she got anything from Ms. Quizenberry.

11        MR. TINNEY: I didn t ask her, you know.

12   A.   Yes, you did.

13        MR. BROWN: Yes, you did.  You said, do you store

14        e-mails from Ms. Quizenberry.

15   MR. TINNEY:

16   Q.   Do you store e-mails from Ms. Quizenberry customarily

17   if you get something from her about a file?

18   A.   No.

19   Q.   How often, maybe you didn t tell me, is there a

20   number of days that you like to go and discuss a case with

21   your supervisor every so often; a certain number of days?

22   A.   No.

23   Q.   Do you have the authority as the claims management

24   person to authorize surgery without having it reviewed by

25   your superiors?

74

PAGE 75

1         MR. BROWN:  Object to form.  Can I again ask are

2         you talking about Emory Brown s case.  I mean,

3         your --

4         MR. TINNEY:  I ll rephrase it so I m clear,

5         because I m here to talk about Mr. Brown.

6         MR. BROWN:  Well, let s then, if we can, try to

7         say that every question relates to the conduct

8         with regard to Mr. Brown.

9         MR. TINNEY:  That s fine, because she s told me

10        that she treats everybody the same, so I guess

11        we know it s the same for everybody.

12        MR. BROWN:  Well, let s talk about what --

13   MR. TINNEY:

14   Q.   Every question I ask you about this case is going to

15   be about Emory brown.  Can we have that understanding?  Is

16   that fair?

17   A.   Is that fair?

18        MR. BROWN:  Yeah, it s about Emory Brown.

19        That s the only reason we re here today.

20   MR. TINNEY:

21   Q.   So did you have the authority, without going to a

22   supervisor concerning Mr. Brown, to authorize surgery for

23   him?

24   A.   No.

25   Q.   What is the custom and practice, as you understand

75

PAGE 76

1    it, that causes you to have to go to a supervisor to get

2    approval for surgery?

3         MR. BROWN: Object to form.  You re asking is,

4         you re talking about present tense and I don t

5         know if you re talking about --

6    MR. TINNEY:

7    Q.   How have you been trained as to who you have to go to

8    to get approval for surgery?

9    A.   Approval is usually given through a pre-certification

10   process.  If I feel that the surgery needs to be done I

11   can go ask my boss, what should I do?  It depends on if

12   I ve used the doctor before.  It depends on many things,

13   but I cannot personally approve any surgery.  I always go

14   and ask for guidance.  What should I do?

15   Q.   So you ve been trained, you as a claim manager, how

16   to go to your boss when you have surgery involved to get

17   their okay to authorize it?

18   A.   Yes.

19   Q.   Do you have to notate in your file, as you have been

20   trained, when you are given that approval by your boss?

21   A.   Yes.

22   Q.   Do you notate in your file when you go to your boss

23   and ask for approval for a surgery?

24   A.   I try to.  It s not a yes or no question, but I try

25   to.

76

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 77  SHEET 20

```
1     Q.   Based on your training as of the time frame that
2     we're talking about concerning Mr. Brown, what would you
3     have to carry to your boss to get approval for surgery?
4     A.   I would have to have - carry to her?  I wouldn't
5     have to carry anything.
6     Q.   Because it's all stored in the computer?
7     A.   Yes.
8     Q.   So do you physically walk over to her desk and ask
9     her or give her the scenario and say, can we do this, or
10    do you send her an e-mail customarily or what do you do?
11    A.   It just depends.
12              MR. BROWN: Well, no, stop.  You're talking about
13              Emory Brown.  He's asking what do you do when in
14              actuality it should be what did you do.
15    A.   What I did do is I gathered the information --
16    MR. TINNEY:
17    Q.   Well, when you say you gathered the information,
18    you've got information on your computer, you didn't print
19    anything out, did you?  That's a yes or no question.  Did
20    you print anything out?
21    A.   I printed the MRI report out.
22    Q.   Did you print out anything else other than the MRI
23    report?
24    A.   I don't recall.
25    Q.   Well, did you need -- to your knowledge, based on
```
77

PAGE 78

```
1     your review of the records in your dealing with Mr. Brown,
2     did you need anything else other than the MRI report?
3     A.   For surgery?
4     Q.   Yes.
5     A.   Oh, yes.
6     Q.   What?
7     A.   I need the surgical request filled out by the doctor
8     that gives surgical codes, a treatment plan, what the
9     procedures will be, the reason why he needs the surgery.
10    Q.   Did you do that with respect to Mr. Brown?
11    A.   I don't think I printed out the surgical request.  I
12    do know that I had the MRI report with me.
13    Q.   So you took that over to Ms. Quizenberry?
14    A.   No.
15    Q.   Who did you take it to?
16    A.   When I first got the MRI report, I took it over to
17    the Medical Department.  I was walking over  - I had a
18    couple of surgeries that I wanted the Medical Department
19    to look at.  Dana Abbott is her name.  She's our new
20    nurse.  I was walking over to her to discuss a surgical
21    request with her and --
22    Q.   On Mr. Brown?
23    A.   No, on someone else.  I had Mr. Brown's MRI report
24    with me.
25    Q.   Why did you take it over there?
```
78

PAGE 79

```
1     A.   Because I had just received it.  Dr. Shirah had taken
2     him out of work because  - I've worked with Dr. Shirah so
3     I know he's a good doctor.  When he feels that  - when
4     Emory needed an MRI I approved it immediately.  I had the
5     report with me, because I'm not a medical expert and I
6     wanted her to take a look at it with me.  I just wanted to
7     talk with her about it.
8     Q.   Let me divert just a minute.  You said you took it
9     the Medical Department.  Tell me what the Medical
10    Department is?
11    A.   We have some nurses in our office that work in the
12    CMI system.
13    Q.   How many nurses are there in the Medical Department,
14    to your knowledge?
15    A.   I don't know.
16    Q.   More than 10?
17    A.   I don't know.
18    Q.   Well, how many  - do you have one particular nurse
19    that you work with in that department?
20    A.   Yes, now.
21    Q.   Ms. Abbott was the one at that time?
22    A.   Yes.
23    Q.   Is she still there?
24    A.   No.
25    Q.   Do you know where she is now?
```
79

PAGE 80

```
1     A.   No.
2     Q.   Do you know how long ago she left?
3     A.   No.
4     Q.   Was she an RN?
5     A.   Yes.
6     Q.   Are there any MD's back there, to your knowledge?
7     A.   I don't know.
8     Q.   Is she the one that you had been told, if you have
9     any medical questions go to her?
10    A.   Yes.
11    Q.   So you go to her  - first, what is the date that
12    we're talking about?
13              MR. BROWN: And if you need to refer to any
14              materials, you may refer to materials.
15    A.   October 26th, 2004.
16    MR. TINNEY:
17    Q.   What are you looking at to determine that?
18    A.   I'm looking at a notepad from the nurse case manager.
19    Q.   What is the page number at the top of that page?
20    A.   Page 9 of 19.
21              MR. BROWN: The bottom right-hand corner of the
22              hand numbered --
23    A.   I'm sorry.
24    MR. TINNEY:
25    Q.   Well, I'm asking for the top right.  9 of 19.  What
```
80