PAGE 81  SHEET 21

1  entry, sequence code?
2  A.  48.  It's down towards the bottom.
3  Q.  Now what tells you that that's the date you went to
4  her?
5  A.  It says right here on top, on 10-26-04.
6  Q.  At 14:20?
7  A.  Yes.
8  Q.  What is that?
9  A.  That's the time.
10 Q.  I'm not military person.
11 A.  Medical time.
12 Q.  What time is that?
13 A.  2:00.
14 Q.  2:00 in the afternoon, 2:20?
15 A.  Uh-huh.
16 Q.  What is your work schedule, normal work schedule?
17 A.  7:00 in the morning until 5:00 in the afternoon.
18 Q.  Five days a week?
19 A.  Uh-huh.
20 Q.  What is NCM?
21 A.  Nurse Case Manager.
22 Q.  So was this Sequence Code Number 48 entered by you or
23 by Ms. Abbott?
24 A.  It was authorized and entered by Ms. Abbott.  It was
25 created by Ms. Abbott, D.J. Abbott, and she put in medical

81

PAGE 82

1  review.
2  Q.  So anybody that works on the file can go pull up the
3  records on that particular file and make an entry that's
4  going to show up on your file; is that correct?
5  A.  Uh-huh.  It'll show up in the file.
6  Q.  And how would she know where to go to make an entry
7  on Mr. Brown's records?
8       MR. BROWN:  Object to form.  Don't testify to
9       what you think somebody --
10 MR. TINNEY:
11 Q.  How would you know where to go to?
12 A.  Would you --
13 Q.  Did you give her Mr. Brown's claim number?
14 A.  I don't recall.
15 Q.  Could a person pull up Mr. Brown's records by having
16 his name, absent a claim number?
17 A.  Yes.  I can pull it up.
18 Q.  I'm looking at this Sequence Number 48 that Ms.
19 Abbott apparently entered, and it says, file reviewed and
20 adjuster notified that we have medical record of MRI, but
21 no other medical reports.  This appears, the way that is
22 worded, that she was the one contacting you as opposed to
23 you contacting her about the MRI; is that correct?
24 A.  No.
25 Q.  You actually physically took it over to her?

82

PAGE 83

1  A.  Uh-huh.
2  Q.  Printed it out; is that correct?
3  A.  Yes.
4  Q.  Now, it says, recommended case manager get other
5  medical records that assessment cannot be made without
6  medical.  Tell me what your discussion about that was
7  with Ms. Abbott.
8  A.  She asked me if I had any more - that we'd need the
9  medical records from Dr. Howorth before any type of
10 surgery could be reviewed and I did not have them.
11 Q.  So how could she talk to you about Dr. Howorth if he
12 had not even seen Dr. Howorth as of that time?
13 A.  Because I had gotten the report of the MRI and I
14 wanted to have knowledge of what was in the MRI.
15 Q.  But why were you discussing Dr. Howorth if Mr. Brown
16 had never seen Dr. Howorth at that time?
17 A.  Well, then maybe I was just discussing Dr. Shirah.
18 Q.  So you had records on Dr. Shirah as of that time,
19 didn't you?  Medical records?
20 A.  No, because she says here recommend on get the
21 medical records, that assessment cannot be made without
22 medical.
23 Q.  So tell me when was the first date when you received
24 any medical records about Mr. Brown from Dr. Shirah?
25 While you're looking at that, let me ask you a general

83

PAGE 84

1  question.  Why are these entries so mixed up?  Do you know
2  why they're not in sequence?
3  A.  Well, it seems like - I don't know why.
4       MR. BROWN:  You've answered the question.
5  MR. TINNEY:
6  Q.  If you had to go to your computer right now and print
7  it off, is it not going to print it off in chronological
8  order?  You need to answer out loud.
9  A.  No.
10 Q.  It will print it off mixed up like this?
11 A.  Uh-huh.
12 Q.  I'm looking at Page 14 of 19, Entry Number 19.
13 Sequence Code 19, is that it; 19 and 20?
14 A.  That was my conversation with him.
15 Q.  With who?
16 A.  It looks like I documented his office visit and the
17 follow up.
18 Q.  This entry was made on October the 6th, Sequence Code
19 Number 19; is that right?
20 A.  Yes.
21 Q.  How did you find out that the claimant was seen for
22 initial evaluation by company medical doctor Shirah on 10-
23 4-04?
24 A.  I'd called the store and talked with Charlotte Woody
25 and Charlotte would make an appointment with him for a

84

PAGE 85  SHEET 22

1  follow up visit with Dr. Shirah.
2  Q. Then I see on Sequence Code Number 20, you've got
3  another entry and it says, category TAD program. What
4  does TAD stand for?
5  A. TAD.
6  Q. I know, but what does that mean?
7  A. TAD means temporary alternative duty.
8  Q. And who was it that created — is that Becky
9  Quizenberry that created that, Sequence Number 20? Where
10  it says created by B-E-Q-U-I-S? I'm not asking your
11  attorney, I'm asking you.
12  A. Well, it's not her complete — I don't know.
13  Q. Now, there's Dr. Shirah's telephone number in here so
14  on that date did you talk to Dr. Shirah's office?
15  A. Would you say that again, please.
16  Q. It looks like we've got in Sequence Code Number 20,
17  it says it's got Dr. Shirah's telephone number here.
18  Adjuster spoke with Ken.
19  A. That's me and I put my initials in there. V A Hep,
20  that's my call sign. So I documented that.
21  Q. Where are you talking about your initials?
22  A. On Sequence 20. I'm talking about right here. You
23  see where it says V-A Hep?
24  Q. So you made that entry?
25  A. Yes.

85

PAGE 86

1  Q. So you actually called and spoke with —
2  A. Yes.
3  Q. — With Ken? Do you recall what Ken told you?
4  A. That Dr. Shirah had kept him off until the follow up
5  visit on the 8th, on October 8th.
6  Q. Now it looks like you made the next entry, Number 21,
7  category TAD program. Is that your entry?
8  A. Yes.
9  Q. I don't see a time of these entries. Some of them
10  have a time and some don't. Do you know why there's no
11  time on this?
12  A. No, I do not.
13  Q. Who is Amy Shelley?
14  A. Amy Shelley was a TAD specialist that was assigned to
15  our unit.
16  Q. Tell what her duties and responsibilities were, to
17  your knowledge.
18  A. She was new at the time. It was a new program that
19  we were starting to — when we have a person off of work
20  she is to help us follow up with the doctor, get medical
21  records, follow up with the return to work, with
22  restrictions, if any. That was the starting of that
23  program.
24  Q. So she was on the job as of October 6th, of 2004?
25  A. I don't know exactly when she started.

86

PAGE 87

1  Q. Well, that day —
2  A. Yes.
3  Q. — I assume she was —
4  A. Yes.
5  Q. Tell me again what the TAD stands for.
6  A. TAD, temporary alternative duties.
7  Q. Temporary alternative what?
8  A. Duties.
9  Q. That's, I guess, when somebody needs to go on light
10  duty?
11  A. Yes.
12  Q. Now, you also said that she helps with medical
13  records?
14  A. That was the start, yeah.
15  Q. So if you couldn't get something, you would go to her
16  and ask for her assistance?
17  A. I would task her on it or she'd e-mail me or I could
18  go to her and ask for her assistance, yes.
19  Q. When you say you would task her on it, does that mean
20  you would tell her to do it and that was what she was
21  supposed to do?
22  A. Well, I don't know all of what her job —
23  Q. No, I'm talking about you used the word task. You
24  said, I would task her on it. What do you mean?
25  A. When a person is off of work I task our TAD

87

PAGE 88

1  specialist to also follow up with the doctor, if she can,
2  and I tell them that the person was taken off of work at a
3  certain date, when the follow up is and give the doctor's
4  phone number.
5  Q. So what did you ask her to do with respect to Emory
6  Brown? I guess, the first question would be, you said —
7  your note, in Sequence Code Number 22, Page 14 of 19, it
8  says you diaried it to her for 10-7?
9  A. Uh-huh.
10  Q. What do you mean by that?
11  A. That means — well, at that time the TAD specialist
12  had job descriptions, light duty descriptions, forms and
13  things that they would fax to the doctors so that he knew
14  what type of light duty positions was available at the
15  store. So that he could — when I faxed over the TAD
16  form, which shows what restrictions are available or says,
17  for example, how much lifting, how many pounds lifting or
18  push pulling, or no use of right arm or no use of left
19  arm, for what days and things, that type of form is what I
20  fax over. But she also has certain type of forms that
21  they fax over on the job descriptions and things that he
22  may feel more comfortable about being able to look as far
23  as a sick person going back to work in a light duty
24  position.
25  Q. So when it says you diaried it to her for 10-7, what

88

PAGE 89  SHEET 23

**Page 89**

1 does that mean?
2 A. That means I put on a task and put her name on it and
3 asked her to follow up with the doctor on Emory Brown.
4 Q. So where do we get what you diaried to her? Where is
5 that document so we can know what you told her you wanted
6 her to do?
7     MR. BROWN: Object to the form. It assumes that
8     it still exists.
9 MR. TINNEY:
10 Q. I'm sure that CMI would not destroy that, so it would
11 be on something you sent to her to do.
12 A. I would diary it to her, I would diary it in the
13 file. Now as far as -- and then she would take and it
14 would go to her desk.
15 Q. So did you diary in the file anywhere what you sent
16 to her to do?
17 A. No.
18 Q. It's just like an e-mail you send to her, is that
19 what you're saying? Telling her what you want her to do
20 on this file.
21 A. I tell her who the doctor is, when he was taken off
22 of work, why he was taken off of work and I usually --
23 besides e-mailing her that information and the claim
24 number, I usually call and say, I put a task for you on
25 tomorrow, I have somebody that was taken off of work with

**Page 90**

1 an injury and I'd like you to follow up.
2 Q. So did she follow up with you as to what she did?
3 A. I don't know.
4 Q. Well, if she did follow up on you --
5     MR. BROWN: Hold on. Just let her look for a
6     second. Take all the time you need. We've got
7     all day.
8 A. Yes, on Page 13 of 19, Sequence 28, is her notepad.
9 Do you see it there? A L Shelley. It's the second from
10 the top.
11 Q. Yes. Okay, where is says CorVel, what does that
12 mean?
13 A. To my knowledge, it's the company that she works
14 with.
15 Q. She doesn't work for CMI?
16 A. I don't know. She works in my office.
17 Q. Tell me what you know about this CorVel.
18 A. I don't know anything about them.
19 Q. Well, you just said you think it's the company she
20 works for. You don't think she works for CMI?
21 A. I don't know. I can't answer that question.
22 Q. Why does this say that this was created by Becky
23 Quizenberry, or B-E-Q-U-I-S, at the top?
24 A. We had a new system and I don't know why it says
25 that, but I have no knowledge of why --

**Page 91**

1     MR. BROWN: You've answered.
2 MR. TINNEY:
3 Q. When was the first time that you received a report
4 from Dr. Shirah's office indicating that -- well
5 indicating anything about Dr. Shirah's written records
6 concerning Emory Brown?
7     MR. BROWN: Object to the form. It's vague.
8 MR. TINNEY:
9 Q. Let me mark this next exhibit Plaintiff's Exhibit 2.
10 These two documents.
11
12 PLAINTIFF'S DEPOSITION EXHIBIT NUMBER 2, marked for
13 identification. (Return to Work Activity Prescription.
14 Page 209.)
15 MR. TINNEY:
16 Q. I'll ask you if you sent those two documents to Dr.
17 Shirah?
18 A. Yes. This one, the first one, yes.
19 Q. What date did you sent those?
20 A. On October 7th.
21 Q. Show me -- can you refer me in the record -- well, is
22 that on Page 13 of 19 again, Sequence 29, adjuster faxed
23 over TAD restrictions forms to Dr. Shirah? Is that the
24 forms that you're referring to there?
25 A. Yes.

**Page 92**

1 Q. Did you complete or make the entries at the top of
2 the second page of Plaintiff's Exhibit 2 where it says,
3 unknown as to the diagnosis, and all?
4 A. Yes.
5 Q. And what did you use to put that information in as
6 far as the diagnosis unknown?
7 A. Why did I put it in?
8 Q. Yes.
9 A. Because I didn't have a diagnosis at the time.
10 Q. Did you receive this form, it's the second page of
11 Plaintiff's Exhibit 2, back from Dr. Shirah completed?
12     MR. BROWN: If I may reference some other
13     portions that would help things along. Do you
14     have a problem with that?
15 MR TINNEY: No.
16     MR. BROWN: If you will look --
17     MR. TINNEY: I'm looking for --
18     MR. BROWN: -- Look at beginning Page Number 76,
19     please, on the documents I produced to you, up
20     there. It's one of these. How long do you --
21     do you think we'll be another hour?
22     MR. TINNEY: Probably at least another three or
23     four hours.
24     MR. BROWN: My other lady is out here waiting.
25     Can I send her back to work?

PAGE 93 SHEET 24

1  MR. TINNEY: Yeah, you can send them back.
2  Q. I'm going to show you what I marked as Plaintiff's
3  Exhibit 3,
4
5  PLAINTIFF'S DEPOSITION EXHIBIT NUMBER 3, marked for
6  identification. (Return to Work Activity Prescription.
7  Page 211.)
8  MR. TINNEY:
9  Q. I'll ask you if that's the four page response that
10 you received to your request from Dr. Shirah?
11 A. The first two pages are my response as far as I
12 received, it looks like --
13 Q. Let me show you what I've got --
14    MR. BROWN: He's going to give it to you.
15 MR. TINNEY:
16 Q. I have marked as Plaintiff's Exhibit 3, this is the
17 first page, this is the second page, the third page,
18 fourth page. I'll ask you first, are those the four pages
19 that you received from Dr. Shirah in response to the TAD
20 request that you sent?
21 A. Yes.
22 Q. I see at the top of the first page of Plaintiff's
23 Exhibit 3 that there are references, it looks like, to a
24 fax across the top; do you see that?
25 A. Yes.

93

PAGE 94

1  Q. It looks like from, you know, there's Wal-Mart there.
2  Can you interpret what that fax means as to whether it was
3  something you sent or something you received from Dr.
4  Shirah's office?
5  A. As far as the top, it's says Thursday the 7th,
6  October, at 14:07. I sent it on the 7th, so I'm assuming
7  that's the time it was sent.
8  Q. It says, "Page 1 of 4", so did you send him the four
9  pages that we've marked as Plaintiff's Exhibit 3 on that
10 date?
11 A. No.
12 Q. You did not?
13 A. No.
14 Q. You sent him this first page?
15 A. Yes.
16 Q. That's got, somebody wrote to Wal-Mart stores, was
17 that simply sending him something that he could use as a
18 cover sheet to send something back to you?
19 A. Yes. Well, I - this automatically comes through the
20 system. This is what I put on the fax as an attachment.
21 So this goes through the system.
22 Q. Would this first page of Plaintiff's Exhibit 3,
23 that's got Wal-Mart Stores, Inc., at the top, where it
24 says, "fax cover sheet", would that have been the cover
25 sheet for what you sent, the TAD form, to Dr. Shirah?

94

PAGE 95

1  A. It's automatically put in there from the system.
2  Yes.
3  Q. Now, you received four pages back from Dr. Shirah on
4  October the 8th?
5  A. Yes.
6  Q. And those are the four pages that we marked as
7  Plaintiff's Exhibit 3?
8  A. Yes.
9  Q. Did this tell you how long that Emory Brown was going
10 to be out of work?
11 A. It told me when he could return to work with
12 restrictions, on 10-10-04. No use of right arm.
13 Q. Now the third page of Plaintiff's Exhibit 3, which
14 says, "please return ASAP", it looks like a letter from
15 Amy to Dr. Shirah?
16 A. Yes.
17 Q. Had you seen that letter before you got it back?
18 A. No.
19 Q. Did you generate this fourth page, the home
20 restrictions form?
21 A. No.
22 Q. The question that I asked, I believe, earlier was
23 what was the date that you first received copies of Dr.
24 Shirah's office records?
25 A. I don't know.

95

PAGE 96

1  Q. Look at --
2     MR. TINNEY: Jeff, if you need to help her try to
3     find those.
4  MR. TINNEY:
5  Q. I'm going to mark two documents as Plaintiff's
6  Exhibit 4, that appear to be copies of the office records
7  of Dr. Shirah.
8
9  PLAINTIFF'S DEPOSITION EXHIBIT 4, marked for
10 identification, (Dr. Shirah's Records. Page 215.)
11 MR. TINNEY:
12 I'll ask you to look at those and tell me when, if ever,
13 you first received copies of those documents?
14 A. I don't know.
15 Q. I want you to look through all the records that have
16 been produced to see if you can find those.
17 A. This first page is a request for medical care this
18 gives --
19 Q. The questions was when did you receive Plaintiff's
20 Exhibit 4?
21 A. I don't know.
22 Q. I filed a request for production in this case that
23 I'm going to attach to this deposition as Plaintiff's
24 Exhibit Number 5.
25

96

PAGE 97 SHEET 25

1  PLAINTIFF'S DEPOSITION EXHIBIT 5, marked for identifica-
2  tion, (Request for Production of Documents. Page 217.)
3  MR. TINNEY:
4  Q. In that I asked for all records in your file, meaning
5  case management, with respect to your handling of
6  plaintiff's workman's compensation claim that would have
7  been generated by you on or after September 28th, 2004.
8  CMI's attorney gave me a few days ago what's been marked
9  as Plaintiff's Exhibit Number 1, in response to that
10 request. So since what I've marked as Plaintiff's Exhibit
11 Number 4 is not contained within those records, would I be
12 correct in assuming that CMI never had in it's possession
13 Plaintiff's Exhibit Number 4, those records relating –
14 Dr. Shirah's office records concerning Mr. Brown?
15 A. I don't know that. I didn't have them. I can't
16 answer for CMI.
17 Q. Why would you not -- if you were the case manager
18 handling this file, why would you not have requested these
19 office records of Dr. Shirah if you wanted to determine
20 how to handle Mr. Brown's claim?
21 A. I would have requested them.
22 Q. I don't see any request anywhere in any of your diary
23 notes at all that you ever requested Dr. Shirah's records.
24 A. When we first made the phone call on the first day of
25 injury we asked for the medical records to be sent.

97

PAGE 98

1  Automatically, because it's Dr. Shirah, and I've worked
2  with him before, Kenny will send me the medical records
3  automatically. If he forgets, I will follow up on my next
4  task date if I don't receive them in time or something, to
5  follow up with them.
6  Q. So how can you account for the fact that you don't
7  have any records from Dr. Shirah's four visits with Mr.
8  Brown in your file?.
9  A. I can't account for it.
10 Q. So if you say you follow up to get them, there's no
11 evidence in the record that you ever followed up to get
12 them, is there?
13 A. Only at the times of talking with Kenny on the phone.
14 Q. Well, you would have diaried that in the file though,
15 wouldn't you?
16 A. If I talked to him about, well --
17 Q. My question is you would have diaried that in the
18 file, wouldn't you?
19      MR. BROWN: Hold on. Give her time to formulate
20      her answers. If you need to look at something,
21      look at something.
22 A. On Page 10 of 19 I have a request for medical care
23 received from Dr. Shirah.
24 MR. TINNEY:
25 Q. Where is - you said Page 10 of 19?

98

PAGE 99

1  A. Yes. Sequence 44.
2  Q. Now this was an entry that was made by you on October
3  the 25th?
4  A. Yes.
5  Q. And at that point in time you've already been
6  communicating with Ms. Shelley making sure that the TAD
7  form goes out and the TAD form comes back?
8  A. Uh-huh.
9  Q. You'd been doing that, I guess, three weeks before;
10 correct?
11 A. Correct, yes.
12 Q. So finally on October the 25th you're saying that you
13 request medical care of 10-4-04. So did you ask him just
14 for the 10-4-04 medical records?
15 A. That's when I received the request for medical care.
16 The request for medical care is the form here that gives
17 the first doctor's visit, signed by Emory Brown --
18 Q. I'm going to mark as Plaintiff's Exhibit 6 what you
19 refer to as request for medical care form.
20
21 PLAINTIFF'S DEPOSITION EXHIBIT 6, marked for
22 identification, (Request for Medical Care. Page 219.)
23 MR. TINNEY:
24 Q. Where did this come from?
25 A. The request for medical care is in the file that

99

PAGE 100

1  Emory brought back to the store and Charlotte Woody would
2  have faxed it over to me.
3  Q. We see at the top of Plaintiff's Exhibit 6 it says,
4  "mail receive date 10-21-2004".
5  A. Uh-huh.
6  Q. Is that something a hard copy would have come in the
7  mail, since that says mail receive date?
8  A. I don't know.
9  Q. So when are you telling me you received this form,
10 Plaintiff's Exhibit 6? I guess since Dr. Shirah signed it
11 on October the 7th, it would have been after that,
12 wouldn't it?
13 A. Yes.
14 Q. So where you're saying - you told me a minute ago on
15 October the 25th you had a request for medical care 10-4-
16 04, company medical doctor, Dr. Shirah?
17 A. It was documented in the file.
18 Q. Well, it says -- the entry, Sequence Number 44, says,
19 action, correspondence from medical provider ?
20 A. Yes.
21 Q. So you received something from someone?
22 A. Uh-huh.
23 Q. What did you receive that you were referencing?
24 A. The request for medical care.
25 Q. You received Plaintiff's Exhibit Number 6 on October

100

PAGE 101 SHEET 26

1  the 25th?
2  A. Yes.
3  Q. All right. The question I had asked you was when did
4  you request medical records from Dr. Shirah, so you must
5  not have understood my question a minute ago. As a claims
6  manager, is it important for you to have medical records
7  from Dr. Shirah so you could adequately fulfill your
8  duties to Emory Brown?
9  A. No.
10 Q. Why is that?
11 A. Because Dr. Shirah, I have worked with for a while at
12 that point and if Dr. Shirah said that Emory Brown needed
13 something and I didn't have the written medical records in
14 front of me, I would go on his word, because he's the
15 medical provider, on his assumption -- not his assumption,
16 his word. If he felt that he needed to be referred out
17 immediately, then I would refer him out immediately before
18 I got the documentation, before I got the medical records
19 by a phone call.
20 Q. So do you have any knowledge or recollection that you
21 spoke directly with Dr. Shirah at any time concerning Mr.
22 Brown's treatment?
23 A. Directly? I speak with Kenny, if Dr. Shirah's in the
24 --
25 Q. Right, I'm asking you do you have a note, any record

101

PAGE 102

1  anywhere that shows that you spoke to Dr. Shirah himself
2  about Mr. Brown? Do you have any personal recollection of
3  it or was it always with Kenny?
4  A. No, it's always with Kenny, because when I call it's
5  during business hours and he's usually in with a claimant
6  or in with a patient.
7  Q. So you're telling me that you did not deem it
8  important to see Dr. Shirah's office records as to his
9  care and treatment of Mr. Brown at any time during your
10 handling of his file?
11 A. I did deem it important.
12 Q. So why didn't you get them?
13 A. More important was the action of the care, first, on
14 his word.
15 Q. What do you mean by that? I don't understand.
16 A. They are important to be put in the file, but as far
17 as medical treatment, if he needs immediate medical
18 treatment that's what I'm going to give him. That's what
19 my job is. And on Dr. Shirah's word, before I get them in
20 the file -- I do think they're important. Why I didn't
21 receive them first is not - I took it on his word that
22 that's what he needed and so I acted on his word, on Dr.
23 Shirah's word. The medical records can come later, but as
24 far as -- my responsibility is to get him the quickest and
25 best medical attention possible.

102

PAGE 103

1  Q. So when you say you acted on his word, what word were
2  you acting on from Dr. Shirah?
3  A. I was acting on Kenny - when I
4  MR. BROWN: Wait, let him finish his question.
5  MR. TINNEY:
6  Q. What word were you acting on from Dr. Shirah's
7  office?
8  A. On what date?
9  Q. At any time.
10 A. From what the doctor had said that Emory needs.
11 Q. Well, we've got, on Plaintiff's Exhibit 4, four
12 visits to Dr. Shirah, October the 4th, October the 8th,
13 October 15th, October 22nd. So are you telling met that
14 you called Dr. Shirah's office and talked with Kenny after
15 each one of these visits and got a report from him?
16 A. Uh-huh. Verbal report.
17 Q. A verbal report? Would you have called him on the
18 day that Mr. Brown went to see him?
19 A. Yes.
20 Q. And would that have been diaried in your file?
21 A. Yes.
22 Q. So there should be something in the diaries that
23 we've got right here showing that you spoke with Kenny
24 after each one of these visits? I'm just asking if it
25 should be there.

103

PAGE 104

1  A. It should be there.
2  Q. I see that from the first entry of October the 4th,
3  you're telling me you talked to Kenny verbally about that?
4  A. Yes.
5  Q. Around October the 4th?
6  A. Let me look, because I want to see if that was
7  documented. What day was October the 4th on?
8  MR. BROWN: Day of the week?
9  A. Yes. Day of the week.
10 MR. BROWN: Monday.
11 MR. TINNEY:
12 Q. So we'll take your attorneys word that it was a
13 Monday. You know, I'm not seeing any entry at all in your
14 notes for October the 4th.
15 A. No, I see the 6th.
16 Q. What I'm seeing that we go from September the 29th to
17 October the 6th. I'm sorry I take that back, there's an
18 October 1st entry.
19 A. October 4th would have been the day that I came back
20 to work after vacation and I would have had that tasked to
21 me on that date that he had a follow up visit.
22 Q. And you would have what? I'm sorry, I missed that.
23 A. I would have received the task that he had a follow
24 up visit with Dr. Shirah on the 4th.
25 Q. But I'm not seeing any entry where you've spoke with

104

PAGE 105 SHEET 27

1  Kenny or anyone on October the 4th or 5th.
2  A.  No. Since they are mixed up, I want to go through
3  each one to make sure. There is no documentation that I
4  called Dr. Shirah's office on the 4th.
5  Q.  Or the 5th?
6  A.  Or the 5th.
7  Q.  Or the 6th?
8  A.  On the 6th, yes.
9  Q.  Where is the indication you called on the 6th?
10 A.  On 10-6, it's on Page 15 of 19. When the file was
11 converted to lost time.
12 Q.  What entry is that, what sequence code?
13 A.  25.
14 Q.  Where does that entry say that you talked with
15 anybody at Dr. Shirah's office?
16 A.  It doesn't say. It just says that claimant was seen
17 at Dr. Shirah's office on --
18 Q.  So are you saying that that says that you talked to
19 Dr. Shirah that day or Kenny?
20 A.  On the 6th. 10-6 on Page 14 of 19 -- on 10-6,
21 Sequence 20.
22 Q.  Which sequence?
23 A.  Sequence Number 20. The third from the top.
24 Q.  Let me ask you, at that point in time where he is
25 taken out of work and we're over the three day waiting

105

PAGE 106

1  period, what is your responsibility to see that money
2  starts going to Mr. Brown?
3  A.  As I explained before, my responsibility at that
4  time, when he is over his waiting period is to change the
5  file to a lost time and set out the correct diary dates to
6  pay him. Customarily, the first 14 days I would set it
7  out for 10 days.
8  Q.  So the Entry Number 25 on Page 15 of 19 is where you
9  converted it to lost time?
10 A.  Yes.
11 Q.  Now, on the entry - since you talked with Kenny on
12 October the 6th about his condition, I'm going to show you
13 again Plaintiff's Exhibit 4, the entry of Dr. Shirah for
14 October the 4th and I'll ask you if that is the
15 information that Kenny related to you?
16 A.  Let me finish. Yes, on October 4th.
17 Q.  So he would have told you that when Mr. Brown
18 experienced his injury that he felt a pop in his right
19 shoulder, followed by pain. That he states the pain is
20 primarily in his right shoulder, radiates down to the
21 elbow and that he has restricted range of motion,
22 secondary to pain. Would any of those symptoms, based on
23 your understanding of rotator cuff injuries as of that
24 time that you were talking in October, would any of those
25 symptoms have led you to think this person may have a

106

PAGE 107

1  rotator cuff tear?
2      MR. BROWN: Object to form. Instruct her not
3      answer. Calls for a medical opinion and she's
4      not --
5  MR. TINNEY:
6  Q.  I'm not asking you as a doctor to give me a
7  diagnosis. I'm just asking you, based on your training up
8  to that point in time, and your rotator cuffs, 50 or so
9  that you've dealt with, were those the type things that
10 you experienced people who had rotator cuff injuries to be
11 suffering from?
12 A.  I'm still not - I don't - can I talk with you for a
13 minute? I don't want to answer the question, because it
14 is a medical question that I can't --
15 Q.  If you can't answer it, you can't answer it. Just
16 tell me you can't answer it.
17 A.  I can't answer it.
18 Q.  You can't answer it?
19 A.  Yeah.
20 Q.  Had you talked to Kenny after the October the 8th
21 visit? If you look on Page 11 of 19, Sequence Code 30, it
22 looks like that's where we're getting to October the 9th.
23 A.  11 of 19?
24 Q.  Page 11 of 19.
25 A.  Do I see what?

107

PAGE 108

1  Q.  Sequence Code Number 30 at the bottom of the page.
2  A.  Yes.
3  Q.  And it says, authorized by C-o-m-b-a-d-j.
4  A.  Uh-huh.
5  Q.  Do you know who that is?
6  A.  No.
7  Q.  It's got category medical. Is this an entry that you
8  made on that day?
9  A.  No.
10 Q.  Do you know who else might have been working on Mr.
11 Brown's file as of that time?
12 A.  No.
13 Q.  Do you know why Randolph County Medical's Center, Dr.
14 Shirah's number, is in there?
15 A.  Because that's where he's been to treat so far.
16 Q.  But you don't know who made that entry?
17 A.  No.
18 Q.  Based on your handling of files, who else would have
19 been working on Mr. Brown's file besides you as of that
20 point in time?
21 A.  I don't know.
22 Q.  Well, do you have like a team that would be assigned
23 to Mr. Brown?
24 A.  No. I'm assigned to Mr. Brown.
25 Q.  And you don't have any idea who C-o-m-b-a-d-j is?

108

PAGE 109  SHEET 28

1  A.  No.
2  Q.  Have you ever seen that before on any entries?
3  A.  In this file?
4  Q.  In any file.
5  A.  I've seen it before on a file, but I don't know who
6  it is.
7  Q.  Were you curious as to who made an entry at that
8  time?
9  A.  Yes.
10 Q.  Did you enquire of anyone why you're putting
11 something in this file?
12 A.  Well, a lot of people have - I mean, it's the
13 company so I - I don't know every little thing about who
14 all goes into the file. It's worked on by many people. I
15 mean, I'm the adjuster on it, but --
16 Q.  To your knowledge, is there anyone periodically
17 reviewing your work?
18 A.  Well, I would think so. To my knowledge, my boss,
19 Annie Martin, reviews my work now.
20 Q.  Well, it looks like the next entry after 10-9 is 10-
21 11?
22 A.  Uh-huh.
23 Q.  I'm trying to find Sequence Code 31. Well, 31's
24 below that, but --
25 A.  You know, this was a new system at the time, so

109

PAGE 110

1  documentation was being put in the system. This is the
2  month that we got Claim Zone. I'm sorry, what was the
3  question you were asking?
4  Q.  The next entry I see on any diary is 10-11, by you,
5  Sequence Code Number 37?
6  A.  Uh-huh.
7  Q.  On Page 11 of 19; is that correct?
8  A.  Yes.
9  Q.  Sequence Code 37 you approved temporary total
10 disability; correct?
11 A.  Yes.
12 Q.  I see Sequence Code 38 concerns a state form, you
13 sent something to the State of Alabama?
14 A.  Yes.
15 Q.  And what is FROI?
16 A.  That's FROI, the first report of injury.
17 Q.  And what is combo?
18 A.  That's combination form is a W -- workman's comp
19 three and four. It's a State form. An Alabama state form
20 to start and stop TTD, temporary total disability
21 payments.
22 Q.  Now, I see the entry number Sequence Code 39, is the
23 nurse case manager RTW, return to work, so was Ms. Shelley
24 a nurse?
25 A.  To my knowledge, yes.

110

PAGE 111

1  Q.  And she signed off on the file?
2  A.  Because she put nurse in there.
3  Q.  We've got on October the 13th it says WC 3 and 4,
4  what does that mean?
5  A.  WC 3 and 4, that is also the workman's -- WC 3 and 4
6  is the combo form below.
7  Q.  So there's no entry -- well, we're up to October the
8  13th now and you don't have any entry of any report on the
9  second visit with Dr. Shirah in your file, do you?
10 A.  Well, I don't know. Let's see, because they're not
11 in order.
12 Q.  So I guess we're looking 10-8 or after.
13 A.  You asked if I had documentation of my speaking with
14 Dr. Shirah's office?
15 Q.  Yes.
16    MR. BROWN:  Was the question if she had any
17    contact with them?
18 MR. TINNEY:
19 Q.  Well, I'm looking at these records and I've gone
20 through them and we have as indicated by Plaintiff's
21 Exhibit 4 that Mr. Brown saw Dr. Shirah October the 8th,
22 and I do not see any entry whatsoever in any of the
23 records indicating you spoke with Kenny or anyone about
24 what happened on the October the 8th visit.
25    MR. BROWN:  Okay, that is not about the October

111

PAGE 112

1  the 8th visit. I was looking one ahead of that.
2  MR. TINNEY:
3  Q.  We go from, it looks like, 10-9 to 10-11. Then 10-12
4  entries, 10-13 entries, there is no reference and we go
5  from 10-13 to 10-15. If you'll look on Page 10 of 19,
6  look at the bottom. You've got 10-15 entry, 10-18 entry,
7  10-25, well, it looks like 10-25 says, request medical
8  care 10-4, Dr. Shirah.
9  A.  Yes, sir.
10 Q.  And again you referenced me before, a minute ago,
11 that that entry related to Plaintiff's Exhibit 6?
12 A.  Yes.
13 Q.  So how did you know what happened at the October 8th
14 or October 15th meeting or even the October 22nd meeting
15 with Dr. Shirah?
16 A.  On Page 11 of 19, Sequence 39, Amy Shelley put in
17 claimant is returned to work, will sign off file.
18 Q.  That's Ms. Shelley's entry?
19 A.  Ms. Shelley's.
20 Q.  Correct. I'm asking about, you know --
21 A.  How did I know?
22 Q.  Yeah. We don't have record, there's no indication
23 that you did anything to determine what happened on the
24 October the 8th visit, October 15th or October 22nd visit
25 through calling the office, talking to Kenny, or anything?

112

PAGE 113 SHEET 29

1  A.  Uh-huh. There's no record of it, but I call.
2  Q.  So what you are telling us is not supported by what
3  your custom and practice should have been, based on these
4  records, is it?
5  A.  No.
6       MR. BROWN: Object to the form.
7  MR. TINNEY:
8  Q.  But you knew it was important for you to find out
9  what Dr. Shirah was finding on these followup visits; is
10 that correct?
11 A.  Yes.
12 Q.  So, again, if I give you Plaintiff's Exhibit 4, I'm
13 going to ask you, did someone from Dr. Shirah's office on
14 October the 15th -- October the 8th, 15th and 22nd, tell you
15 what is contained on Dr. Shirah's office records?
16 A.  Yes.
17 Q.  So on October the 8th there's an entry from Dr.
18 Shirah's records that you say you were told that
19 assessment, that we've got a severe sprain to the right
20 shoulder, cannot rule out rotator cuff tear.
21 A.  Yes.
22 Q.  On October the 8th you knew there was a possibility
23 this man had a rotator cuff tear?
24 A.  Yes.
25 Q.  Based on your experience in dealing with individuals

113

PAGE 114

1  who have rotator cuff tears, are those painful?
2       MR. BROWN: Object to the form. Don't speculate
3       on what other people feel.
4  MR. TINNEY:
5  Q.  Based on your experience in dealing with Mr. -- the
6  records that you were aware of concerning Mr. Brown, do
7  all the records indicate this man was in pain?
8  A.  He had immediate pain.
9  Q.  Every medical record in your file reflects that every
10 time he saw a medical provider he was in pain, wasn't he?
11 A.  Sure. Yes.
12 Q.  What role does pain play in your handling of a file
13 such as Mr. Brown's, as to whether you provide the injured
14 employee with what he is entitled to under workman's comp?
15      MR. BROWN: Object to the form. I don't
16      understand your question.
17      MR. TINNEY: I will rephrase it. She didn't say
18      she didn't understand it.
19      MR. BROWN: I object to the form because you are
20      talking about -- go ahead. You are just
21      misstating the evidence.
22 MR. TINNEY:
23 Q.  My question is, what role does the fact that you have
24 an injured employee in pain bear to what your duty to that
25 person is?

114

PAGE 115

1  A.  I still don't understand the question. It seems like
2  there's two in there. Can you make them a little --
3  Q.  All right. If a man is in pain and he tells you he
4  is in pain, or someone tells you he is pain and needs
5  help, is that going to cause you to pay more attention to
6  the file and to see that you provide what he is entitled
7  to under the Comp Act?
8  A.  Yes.
9  Q.  Would you believe that you have a duty to an injured
10 worker who is in pain to see that you provide the quickest
11 relief possible to him?
12 A.  Yes.
13      MR. BROWN: Object to the form. It's a legal
14      opinion.
15 MR. TINNEY:
16 Q.  I neglected to ask you earlier if you had ever had
17 your deposition taken before.
18 A.  Yes. I have once.
19 Q.  What was that case concerning?
20 A.  It was Heppes versus Yellow Cab. It was a personal
21 injury case in the State of California.
22 Q.  You were the client?
23 A.  Yes.
24 Q.  But you've never had it taken in connection with any
25 work with CMI?

115

PAGE 116

1  A.  No.
2  Q.  Now, from what you told me earlier, based on Dr.
3  Shirah's records, you would have learned on or about
4  October the 8th that Dr. Shirah could not rule out a
5  rotator cuff tear?
6  A.  Yes.
7  Q.  Now, the next visit of Mr. Brown to Dr. Shirah was
8  October the 15th, and you said you were aware of the
9  contents of that record. I assume that would have been
10 through conversations with Kenny?
11 A.  Uh-huh. And the fourth.
12 Q.  The fourth, too. We have already gone over that. On
13 the 15th, Dr. Shirah says again a severe sprain of the
14 right shoulder and possible rotator cuff tear. So, again,
15 that confirmed to you the second time that he had a
16 possible rotator cuff tear?
17 A.  Yes.
18 Q.  And you were aware of that as of October the 15th,
19 2004?
20 A.  Yes.
21 Q.  You were also aware that he was still having pain
22 extending from the shoulder down into the arm; is that
23 correct?
24 A.  Uh-huh.
25 Q.  And that he could not abduct his -- well, it says,

116

PAGE 117 SHEET 30

1  patient has active abduction to approximately 90 degrees,
2  at which point he experiences moderate pain. Do you know
3  what that means? Do you know what active abduction means?
4  A. Not abduction as far as he is using it. I mean, the
5  word abduction, I know what that means, but --
6  Q. Do you know what it means when he says to
7  approximately 90 degrees?
8  A. I would think it would mean the arm.
9  Q. It says, no crepitus. Do you know what that is?
10 A. Huh-uh.
11 Q. Then on October 22nd, again, you were aware of what
12 Dr. Shirah's records indicated, based on your
13 conversations with Kenny?
14 A. Yes.
15 Q. On the 22nd the entry by Dr. Shirah appears to be,
16 right shoulder pain is unchanged.
17 A. Uh-huh.
18 Q. So that would indicate to you that he is continuing
19 with pain, if it is unchanged?
20 A. Uh-huh. Yes.
21 Q. Then it says, exam is essentially unchanged. But
22 he adds, MRI shows a tear of the anterior portion of the
23 supraspinatus tendon.
24 A. Yes.
25 Q. You were aware of that?

117

PAGE 118

1  A. Yes.
2  Q. And you understand that to be a torn rotator cuff?
3  A. Yes.
4  Q. It says, also noted is a tear of the anterosuperior
5  aspect of the labrum. Do you know what that is?
6  A. Not exactly, but I do know it is in the shoulder. I
7  cannot point out to you which one it is.
8  Q. If you were informed of these records -- and the
9  assessment, of course, on the 15th is right rotator cuff
10 tear?
11 A. Uh-huh. The assessment I always -- that's layman's
12 terms for me, that that is what he has.
13 Q. As you look at the entry by Dr. Shirah on the 15th,
14 if that information was related to you, does that appear
15 that there are two tears or one tear in his shoulder, as
16 you look at that record?
17 A. It's still a shoulder strain and possible rotator
18 cuff, so it doesn't indicate anything --
19 Q. I'm talking about the 22nd.
20 A. Oh, I thought you were talking about the 15th.
21 Q. I'm sorry. The 22nd.
22 A. It says anterior portion, which would be one tear,
23 and then it says, anterosuperior of the labrum, which
24 would be also noted so on the word also, that says to me
25 that that would be a second tear.

118

PAGE 119

1  Q. Okay. So would you, with that knowledge that you had
2  on October 22nd, indicate to you that this man had a torn
3  rotator cuff?
4  A. Yes.
5  Q. And Dr. Shirah was the physician that you said you
6  believed and would rely upon to convey to you a proper
7  diagnosis?
8  A. Yes.
9  Q. So do you believe that as of October 22nd and the
10 information that you had as of October 22nd that you had a
11 diagnosis that told you this man has a torn rotator cuff?
12 A. I believed as of the 15th when I talked with Kenny,
13 called the doctor's office -- because I always call the
14 doctor's office. So whether it is documented in the file
15 or not, I make a practice, because that's my personal
16 policy is to call the doctor's office, especially when I
17 have somebody out of work with a work-related injury, to
18 make sure the injury fits the pain. When Dr. Shirah, who
19 I worked with for a long time, says he is staying out of
20 work, there's a reason for it. On the 15th, when I talked
21 with Kenny, Kenny says Dr. Shirah wants an MRI. I
22 immediately hung up with him and I called for an MRI, to
23 approve an MRI with One Call Medical. That's who I use.
24 Now, I wouldn't say immediately. It could have been the
25 next day.

119

PAGE 120

1  Q. What did you tell One Call Medical when you called
2  them?
3  A. I authorized an MRI of the shoulder. Let's see if it
4  was the right or left shoulder. Left shoulder. And what
5  to rule out, diagnose. Diagnosis or to rule out is a
6  rotator cuff tear. Diagnosis is shoulder pain.
7  Q. Did you send anything to them, as far as your
8  authorization, or was it something done on the telephone?
9  A. Verbal authorization. That's when I called him.
10 Q. Look on, again, Plaintiff's Exhibit 1, Page 10 of 19,
11 entry Sequence Number 43, which says, authorization given
12 for MRI on right arm.
13 A. Yes.
14 Q. It says, phone call from medical provider. Who was
15 that a phone call from?
16 A. Diagnosis means -- well, I got a call from them.
17 Q. From One Call?
18 A. No. From Dr. Shirah. Or I called Dr. Shirah. This
19 was a new -- I could have printed this wrong or put in
20 phone call from the wrong -- I'm human. I make errors.
21 This is a new system and I'm still learning the system at
22 this point, because this is still October now. We had
23 just gotten the system two weeks before. So right under
24 phone call from, it says, phone call to, so I may have
25 made a mistake there. But when either I call him or he

120

PAGE 121 SHEET 31

1  calls me and says -- Kenny could have called me and said
2  -- I had been waiting for the call -- that Dr. Shirah
3  wants an MRI. I said, okay. When Dr. Shirah says that
4  that's what he feels, you know, or Kenny relates that, I
5  had no question as far as calling One Call Medical and
6  setting up an MRI.
7  Q. So we've got a statement to you on October 22nd that
8  he has a right rotator cuff tear. Dr. Shirah is telling
9  you that the MRI shows that he has a right rotator cuff
10 tear.
11 A. Yes.
12 Q. Tell me what your duty and responsibility to Mr.
13 Brown was at that time to provide treatment for him.
14 A. My first duty is to fax over -- when I talk with
15 Kenny and he says, he has a right rotator cuff tear and he
16 needs surgery, then I fax over a request for surgery to
17 the doctor for the doctor to fill -- oh, no. On the 22nd?
18 Q. Right.
19 A. He said that he needs to be referred to an orthopedic
20 specialist.
21 Q. That is when you started your seeking of an
22 orthopedic specialist; is that right?
23 A. Yes.
24 Q. Let me show you what I'm going to mark as Plaintiff's
25 Exhibit 8, and I will ask you to identify this, please,

121

PAGE 122

1  ma'am.
2  
3  PLAINTIFF'S DEPOSITION EXHIBIT NUMBER 8, marked for
4  Identification. (MRI Report. Page 221.)
5  A. Plaintiff's Exhibit 8 is the MRI report from Open MRI
6  Diagnostics Imaging.
7  MR. TINNEY:
8  Q. Does that show when you received that report?
9  A. It says on the top, it says, "October 21st, 2004".
10 Q. When you had spoken with -- did you talk to Open MRI?
11 A minute ago you said something about One Call Medical.
12 Is that Open MRI?
13 A. It is the service that sets up an MRI in the closest
14 location to Emory Brown or to the doctor. No. More to
15 Emory Brown.
16 Q. Now, this says, to One Call Medical, up at the top,
17 so what date did you receive -- you said October 21st is
18 when you received the MRI?
19 A. That's what the fax says on top. Now, let's see what
20 date I received the report. I documented it in the file
21 on the 26th here.
22 Q. Where are you looking?
23 A. Page 10 of 19.
24 Q. Page 10 or 9?
25 A. Of 19.

122

PAGE 123

1  Q. Did you say Page 10 or 9?
2  A. Page 10. Let me look to see if I have it earlier.
3  Q. What sequence number are you looking at?
4  A. I'm looking at Sequence Number 46. That's when it
5  was documented in the file. Do you see that?
6  Q. Yes. Does that indicate when you reviewed it or when
7  you received it? It looks like the 21st is on the fax
8  indication on the top of the exhibit.
9  A. I could have gotten it on the 21st, which that's what
10 it says, the fax. Now, when I get an MRI report, because
11 I know that a patient is in need of one, and I need to
12 know immediately, One Call Medical will fax me over the
13 report as soon as they get it. Sometimes it takes them a
14 little bit of time and sometimes it takes them longer, but
15 documentation I read it first, and then I have it --
16 Q. Let me show you what I have marked as Plaintiff's
17 Exhibit 7, and I will ask you if that is your handwriting
18 in the lower right-hand corner of that document.
19 A. No.
20 
21 PLAINTIFF'S DEPOSITION EXHIBIT NUMBER 7, marked for
22 identification. (Alexander City Orthopedics. Page 220.)
23 MR. TINNEY:
24 Q. Do you know whose handwriting that is?
25 A. No.

123

PAGE 124

1  Q. Have you ever seen that document before?
2        MR. BROWN: That was some notes that my associate
3        made on a yellow sticky pad and when they copied
4        it they didn't take it off, so that's -- I would
5        like to have that back, so I can white out or
6        take off what my associate wrote. I think it is
7        some indications of things that he put on there.
8  MR. TINNEY:
9  Q. Going back to your Page 10 of 19 on Plaintiff's
10 Exhibit 1, and this is an entry made by you; correct?
11 A. Yes.
12 Q. It was made at 7:33 in the morning.
13 A. Uh-huh.
14 Q. On October the 26th. What does it mean at the end of
15 this where it says, "acromion is Type 11"?
16 A. I think it should be Type 2, but I'm not sure, and I
17 do not know what an acromion is.
18 Q. What is an a-c-r-o-m-i-o-n? Acromion or what?
19 A. Acromion? I don't know what that is.
20 Q. Didn't you type that in?
21 A. I did because that's what the medical note said, but
22 I don't always have -- I don't have a medical dictionary.
23 There is one --
24 Q. What medical note are you talking about?
25 A. I'm talking about that one, the MRI report, right

124

PAGE 125 SHEET 32

1  above it on 10 of 19.
2  Q.  I got you. So you just typed in what was on there?
3  A.  Yes.
4  Q.  Was there any reason you didn't type in on there torn
5  rotator cuff?
6  A.  I just typed what it said.
7  Q.  Well, it says -- okay. When did you first try to get
8  him, after you got the MRI report, to an orthopedic?
9  A.  Dr. Shirah would have read it on the 22nd.
10  Q.  Do you have any indication in the records, because it
11  looks like I go from October the 18th to the next entry
12  which is October 25th. I'm on Page 10 of 19.
13  A.  Okay. I want to say it was on the 22nd. He had his
14  office visit on the 25th, his evaluation.
15  Q.  You are talking about --
16  A.  With Dr. Howorth. Dr. Shirah on the 22nd.
17  Q.  Well, we know we've got Dr. Shirah from the records
18  that you don't have in your file?
19  A.  Yes.
20  Q.  So what I'm asking you now, where is the entry where
21  you are trying to get him to somebody in Gadsden, that you
22  are calling a medical provider, or telling anybody to send
23  him to Gadsden, because I don't see anything between 10-18
24  and 10-25, and I've looked at these records twice.
25  A.  Then it's not in there. But that was phone

125

PAGE 126

1  conversations.
2  Q.  Well, why do you not -- you've told us, you know,
3  what you document, and we've got 50 or 60 entries of
4  telephone calls. So why did you not deem it important
5  enough to diary your file or document that you were
6  calling trying to get him with an orthopedic?
7       MR. BROWN: I object to the form of the question.
8       I think it misstates the previous testimony and
9       I think it is a vague and misleading question.
10      Subject to that objection, you may answer.
11  A.  There may not be some documentation in the file
12  because it was a new system. Some of the note pads that
13  we were getting were being lost at the time.
14  MR. TINNEY:
15  Q.  What now?
16  A.  There may not have been some documentation in the
17  file, but I always call. Now, when I call to make an
18  appointment, I like to document it in the file and who I
19  was going to -- after I finally made the doctor's choice,
20  or what doctor he is going to go to, I will document it in
21  the file, when his evaluation is and what doctor he is
22  going to. Now, this was a brand new system. It had not
23  had all the bugs worked out yet.
24  Q.  Well, you've certainly got 30 or more entries before
25  this, don't you?

126

PAGE 127

1  A.  Yeah, that's true.
2  Q.  And you knew how to use the system, didn't you?
3  A.  Not completely. I had only been using --
4  Q.  Tell me what training you had been given.
5  A.  Two weeks.
6  Q.  You had been using it for two weeks up to this point
7  in time, so you had been familiar with it for a month.
8  A.  I had been using it. Yes. But the system itself had
9  bugs in it yet. It had not been completely formulated, I
10  suppose.
11  Q.  So tell me how the system caused any inaction on your
12  part as concerns providing care and treatment for Mr.
13  Brown?
14      MR. BROWN: Object. I think that's not what her
15      testimony was.
16  A.  I'm not going to answer it.
17  MR. TINNEY:
18  Q.  What do you mean you're not going to answer it?
19  A.  Well, can you rephrase the question for me.
20  Q.  Did the system cause you to fail in the care you
21  provided for Mr. Brown?
22  A.  No.
23  Q.  How do you know when you tried to call an orthopedic
24  to get him to an orthopedic?
25  A.  How do I know when?

127

PAGE 128

1  Q.  Yes.
2  A.  Because I talked with Kenny and I saved the report
3  and I know that is the next step for me is to -- when he
4  is being referred out to an orthopedic specialist, I don't
5  have to wait for the medical notes to come across that say
6  referral to. I call immediately to make an appointment
7  with an orthopedic specialist.
8  Q.  Why do you have to have it come to you with a written
9  request to refer him to an orthopedic?
10  A.  The written request can come later. The patient is
11  more important now.
12  Q.  So why didn't you get him surgery without having an
13  authorization from the doctor? You knew the doctor said
14  he needed it immediately.
15  A.  Because the doctor was a new doctor that I had not
16  worked with before, number one. Number two, I didn't even
17  have the surgical codes, so what am I going to approve.
18  Number two, the surgical request says definite different
19  questions that I need to know to bring it to approval to
20  anybody, even for myself to even take responsibility of
21  somebody's health. I need to have that documentation in
22  front of me. Not as far as our doctor that I have worked
23  with before, when he says, and I see the MRI report, that
24  he needs to go to a doctor and needs to go to an ortho, I
25  will automatically get on the phone and find him the

128

PAGE 129 SHEET 33

1  doctor he needs, set up the closest appointment I can for
2  him, and that was on the 27th of October.
3  Q. Are you telling me that taking this MRI report that
4  we have marked as Plaintiff's Exhibit 8 --
5  A. And I told him to bring his film.
6  Q. Let me finish the question.
7  A. I'm sorry.
8  Q. You are telling me that taking this MRI report that
9  we have documented as Plaintiff's Exhibit 8, along with
10 the records that you have already testified you were aware
11 of from Dr. Shirah's office, marked Plaintiff's Exhibit 4,
12 that you did not have enough information to go to your
13 supervisor to get this man surgery?
14 A. No.
15 Q. What else did you need?
16 A. I needed what doctor. I needed to know if he was a
17 specialist. I needed to know what facility he was going
18 to use. If it's a registered facility in the State of
19 Alabama. I needed to know what kind of surgical codes he
20 has, that he wants to do. I have never worked with Dr.
21 Howorth before. How do I know he doesn't just go in and
22 do surgery on something that may not -- he may be wanting
23 to do surgery on the wrong thing. If I don't have it
24 documented or see it in front of me, why am I going to
25 authorize anything that I can't see in front of me. I
                                129

PAGE 130

1  wouldn't authorize any.
2  Q. When was the first time that you learned that Dr.
3  Howorth said that this man needs surgery?
4  A. When Emory called me, I think, or when I -- after his
5  doctor's visit.
6  Q. Well, you knew he was going to Dr. Howorth; right?
7  A. Yes.
8  Q. And your custom and practice is, you are going to
9  call the provider, the doctor, the day that he goes and
10 finds out what the recommendation is.
11 A. Yes.
12 Q. So did you do that with Dr. Howorth?
13 A. I think I called too early and he hadn't come in yet,
14 because I didn't document what time his appointment was.
15 Q. Well, you don't have any record in your file
16 whatsoever that when he saw Dr. Howorth on October 27th,
17 that you spoke with anybody at Dr. Howorth's, do you?
18 A. On the 27th, the day of the evaluation, I had spoken
19 with Amy --
20 Q. I'm talking about your documentation of what you did.
21 Do you have something in your files showing what you did?
22 A. I already told you that it's not always in there,
23 because it's a brand new system.
24 Q. Most of what you did concerning Mr. Brown is not in
25 there, is it?
                                130

PAGE 131

1       MR. BROWN: Don't answer that. The records speak
2  for themselves.
3       MR. TINNEY: They sure do.
4       MR. BROWN: You can talk about the records and
5  she can talk about what she recalls and from
6  other independent sources and she can testify to
7  that.
8  MR. TINNEY:
9  Q. The question on the table is, where is the record
10 that shows me your communication with Dr. Howorth's office
11 on October the 27th to find out what this man, who was in
12 constant pain, needed?
13 A. For one thing, on the surgical request there is a fax
14 date, and that fax meant that I sent that fax on the 27th.
15 The 27th was the day of his evaluation. I always call.
16 Now, if they requested surgery and I called them and/or if
17 Amy called me, there would be, I'm sure, some type of
18 phone records. Even the telephone company has records of
19 who you call.
20 Q. You said that you faxed a surgery request to Amy on
21 October the 27th?
22 A. Yes.
23 Q. I am going to show you what was given to me as part
24 of the records that we subpoenaed and I will mark those as
25 Plaintiff's Exhibit 10, three documents.
                                131

PAGE 132

1       PLAINTIFF'S DEPOSITION EXHIBIT NUMBER 10, marked for
2  Identification. (Surgery Request. Page 224.)
3  MR. TINNEY:
4  Q. Do you see those?
5  A. Uh-huh. Yes.
6  Q. Is it your testimony that these are the three
7  documents that you faxed to Dr. Howorth's office on
8  October the 27th?
9  A. Yes.
10 Q. I see up at the top that it says, on what I've marked
11 as Plaintiff's Exhibit 10, Pages 3 of 6, 5 of 6, and 6 of
12 6. Where are pages 1 of 6, 2 of 6 and 4 of 6?
13 A. I don't know.
14 Q. Why do you have three and not all six?
15 A. This form is in my forms in our desk, on our desktop.
16 Actually, it's in the Alabama unit from our boss, all the
17 state forms and surgical requests and things. What I did
18 was, I pulled it out of there and I put it on my desktop
19 under his name. Then I opened it up and I put exactly --
20 I put his claim number on top and his name on top on Page
21 Number 5. Do you see that? Emory Brown claim. And then
22 Dr. Howorth's name, because I have to insert these, you
23 see. This is a standard form and I have to insert what
24 the doctor is and who the claimant is and what the claim
25 number is. Then what I do is I put it in my e-mail on a
                                132

PAGE 133 SHEET 34

1   fax cover -- I mean, on the e-mail as an attachment. I
2   put my signature underneath and I put their fax number at
3   walmartfax.com. I highlight it, underline it, and then I
4   put Emory Brown, surgical request, and I press send. Now,
5   Page 1, 2 and 3, that must be some place in the system
6   that goes out on automatically, that must be the cover
7   sheets.
8   Q.  So who printed this out, Plaintiff's Exhibit 10?
9   A.  I don't know.
10  Q.  So you don't have any explanation as to why we don't
11  have 1, 2 and 4 of this fax?
12  A.  No.
13  Q.  You don't know what they are?
14  A.  No.
15  Q.  Do you think they would be around somewhere that we
16  could generate them and see what they were?
17  A.  No. The only explanation I would probably have would
18  be that fax cover sheet that you showed me a little while
19  ago that has my name on it, this, would be the automatic
20  standard that would go out electronically.
21  Q.  That would be one. What about 2 and 4?
22  A.  I don't know the rest.
23  Q.  What I'm curious about is how you can pull up 3, 5
24  and 6 and not be able to pull up 1, 2 and 4.
25  A.  I don't know.

133

PAGE 134

1   Q.  You don't know?
2   A.  I don't know.
3   Q.  But you think you would still be able to -- since
4   you've got 3, 5 and 6, that you ought to be able to go
5   back and find what 1, 2 and 4 would be, don't you?
6   A.  No.
7       MR. BROWN: Object to the form of the question.
8   MR. TINNEY:
9   Q.  You don't know. Now, I'm going to show you what I've
10  marked as Plaintiff's Exhibit 11.
11
12  PLAINTIFF'S DEPOSITION EXHIBIT NUMBER 11, marked for
13  Identification. (Dr. Howorth Note. Page 227.)
14  MR. TINNEY:
15  Q.  You had in your possession before you sent the
16  surgery request this document telling you he needed
17  surgery; correct? You would have had no reason to send a
18  surgery request if they hadn't sent you a surgery request
19  or a statement showing that he needed surgery, would you?
20      MR. BROWN: I object to the form. That's not
21      what her testimony has been. Do not answer the
22      question, that's an argumentative question. You
23      can ask her questions about this.
24      MR. TINNEY: I will ask her to answer my question
25      first.

134

PAGE 135

1   Q.  When did you first get Plaintiff's Exhibit 11?
2   A.  What was the question when --
3       MR. BROWN: Stop. Hold it. That is not the
4       entire record from --
5   MR. TINNEY:
6   Q.  When did you first get Plaintiff's Exhibit 11?
7       MR. BROWN: Until he gives you the entire record,
8       you are not to answer the question. That is not
9       an entire document. She is not going to testify
10      to that without it being an entire document.
11      MR. TINNEY: What?
12      MR. BROWN: This is Page 2 of a two page chart
13      entry, or Page 3. This is Page 3.
14      MR. TINNEY: I know it and I have a right -- I
15      don't have to ask my questions the way you want
16      me to. I want to know when she got that page.
17      MR. BROWN: She can have the record, if it helps
18      refresh her recollection.
19      MR. TINNEY: Well, look in her records then.
20  Q.  It came from you. Look in your records. Tell me
21  when you first saw Plaintiff's Exhibit 11.
22  A.  When I first saw Plaintiff's -- a record from Dr.
23  Howorth, the evaluation that I had been calling for --
24  Q.  I'm talking about Plaintiff's Exhibit 11, that is
25  what I'm asking you the question about.

135

PAGE 136

1       MR. BROWN: If you will let her answer the
2       question, I think that is what she is trying to
3       do.
4   A.  When I first saw Dr. Howorth's evaluation was on
5   November 18th.
6   MR. TINNEY:
7   Q.  All right. You said you called and spoke with
8   someone at Dr. Howorth's office on October the 27th. And
9   they told you that he needed surgery and that prompted you
10  to send the surgery request form.
11  A.  Yes, sir.
12  Q.  So just as you have told us from Dr. Shirah's
13  records, I will now show you Plaintiff's Exhibit 11, and I
14  will ask you if that information was not relayed to you on
15  October the 27th?
16  A.  The information was relayed to me. Yes.
17  Q.  Now, so when you get Plaintiff's Exhibit 11, and you
18  know that he needs surgery that day; is that correct?
19  A.  I know that he needs surgery.
20  Q.  You know that he needs surgery. And you, CMI, have
21  been the ones to select Dr. Howorth to send him to; is
22  that correct?
23  A.  Yes.
24  Q.  Mr. Brown did not select Dr. Howorth, did he?
25  A.  No.

136

PAGE 137  SHEET 35

1   Q.  So you choose Dr. Howorth.  Since you chose Dr.
2   Howorth, did you have confidence in the abilities of Dr.
3   Howorth?
4   A.  No.
5   Q.  So you are telling me and you are going to tell the
6   jury that you sent him to a man, to an orthopedist that
7   you did not have confidence in?
8   A.  I had never worked with him before.
9   Q.  So, again, you are going to tell the jury in this
10  case that you sent this man to an orthopedist that you did
11  not have any confidence in?
12  A.  I had asked if people had used him before.  That's
13  why I called the store in the city and -- I have to have
14  confidence in everybody.  I take face value.  So when I
15  called and asked if anybody had heard of Dr. Howorth at
16  the Wal-Mart store there and I had heard yes, and Kenny
17  had referred him, verbally said, Dr. Howorth is a good
18  person.  Then I had confidence in him, yes.  But to take
19  the responsibility of authorizing a surgery with no
20  direction as far as what type of surgery he wanted to do
21  -- although I know what it is, I need to have everything
22  -- because I have to go to a higher authority for
23  approval.  I can't just approve a surgery on my own.
24  Q.  You were Emory Brown's higher authority, weren't you?
25          MR. BROWN: Object to the form.  It's a legal

137

PAGE 138

1           conclusion.  Don't answer the question.
2   MR. TINNEY:
3   Q.  Weren't you?
4           MR. BROWN: Don't answer the question.
5           MR. TINNEY: What?
6           MR. BROWN: You are asking her a legal
7           conclusion.
8           MR. TINNEY: No.  She used the term higher
9           authority.  I'm just asking her if she
10          considered herself to be what you call higher
11          authority for Emory Brown.
12          MR. BROWN: I thought you said hired.  I'm sorry.
13          MR. TINNEY: No.  Higher authority.
14  Q.  Who was Emory Brown's higher authority at CMI that he
15  was looking to, to get him help?
16  A.  Higher authority, no.  I consider myself an equal of
17  any person I work with and I give good customer service.
18  My customer service is to, number one, get the best
19  medical attention for a person who is hurting.  My
20  interaction with them is to get them prompt medical
21  attention, get the paperwork back and get what I have to
22  do as the middle person to manage the file, to show reason
23  and what needs to be done by the doctor, when I need to,
24  for example, authorize a surgery, which needs to go in for
25  a formal precertification, which would take from 48 to 72

138

PAGE 139

1   hours.  That's a long time, but I have to have all this
2   first.
3   Q.  Why is it a long time?
4   A.  Why do I feel it is a long time?
5   Q.  Yeah.
6   A.  If a person needs surgery immediately --
7   Q.  If he is in pain?
8   A.  Yes.
9   Q.  That's a long time, isn't it?  72 hours is a long
10  time?
11  A.  You're right.
12  Q.  12 hours is a long time if you are in pain, isn't it?
13  A.  Yes, it is.
14  Q.  And you knew this man was in pain then, didn't you?
15  A.  Yes, I did.
16  Q.  And you knew he needed -- the doctor was saying he
17  needed immediate surgery, didn't he?
18  A.  Yes, he did.
19  Q.  What does immediate mean to you?
20  A.  Just what it means, sir.  Immediate.
21  Q.  Within your definition of immediate, how many hours
22  would that be?
23  A.  I'm not going to say hours, because immediate surgery
24  to me is that it cannot be postponed six months or two
25  months or three months.  It cannot be postponed.  As soon

139

PAGE 140

1   as I can get approval for surgery it's what needs to be
2   done.  That's my job.
3   Q.  So what is your duty and responsibility to see if a
4   doctor says get it done immediately?  What is your duty to
5   Emory Brown to see that it gets done immediately?
6   A.  My duty to Emory Brown is first get what his
7   disposition -- what his physician wants to do, how he
8   wants to do it, where he wants to do it, how far away it
9   is from his house, the surgical codes, what facility he is
10  going to use, what time frame he feels that it is going to
11  be, what conservative treatment, if any, has been tried.
12  Those are all standard questions that are on my guidelines
13  to go by for surgery, because I'm not a medical doctor.
14  So I have to have these filled out by the medical doctor.
15  Q.  All right.  Let's go back to the question about, you
16  said you had no confidence in Dr. Howorth; correct?
17  A.  I said that I didn't -- I had never worked with him
18  before.
19  Q.  Did you have confidence in his abilities as an
20  orthopedic surgeon?
21  A.  From a referral from Kenny, yes.
22  Q.  What did you have to have present before you before
23  you would have thought he was a competent orthopedic
24  surgeon?
25          MR. BROWN: Object.  It's already been asked and

140

PAGE 141 SHEET 36

```
 1             answered.
 2     A.   I can't answer that one.
 3         MR. TINNEY:
 4     Q.   Well, did you have, from any source, any information
 5     that Dr. Howorth was not a competent orthopedic surgeon
 6     that could properly diagnose Mr. Brown's problem?
 7     A.   No.
 8     Q.   When you first were aware, as you have previously
 9     testified, of the content of Plaintiff's Exhibit 11, and
10     we have the plan that was to recommend immediate
11     arthroscopic and rotator cuff repair, you were aware of
12     that?
13     A.   Yes.
14         MR. BROWN: Asked and answered.
15         MR. TINNEY:
16     Q.   And you first said that your duty then at that point
17     in time to Mr. Brown was to determine from the physician
18     what he was going to do, that's number one.
19     A.   Yes.
20     Q.   So did he tell you what he was going to do?
21     A.   Amy told me what he -- that he requested surgery.
22     Q.   Okay. I'm just asking. Did he tell you? So was
23     question one answered?
24     A.   Yes.
25     Q.   And was answered October the 27th?
                           141
```

PAGE 142

```
 1     A.   Yes.
 2     Q.   The second question is how.
 3     A.   By the telephone.
 4     Q.   No. You said I must determine what first, how. What
 5     did you mean by how?
 6     A.   Well, how is probably -- that would be the surgical
 7     codes on what type of surgery he wants to do.
 8     Q.   No. You said surgical codes -- I listed as you read
 9     everything that you are required to do.
10     A.   How, for example, if he feels that it is an open
11     reduction or a closed. If it's an arthroscopic or an
12     open.
13     Q.   He said arthroscopic.
14     A.   Well, she didn't say that.
15     Q.   Does that answer how?
16     A.   It would. Yes.
17     Q.   So we've got what and how and where. So what did you
18     do to determine where he wanted to do the surgery?
19     A.   I faxed over the request for medical -- request for
20     surgery for him to fill out.
21     Q.   We've got the three page document that we marked as
22     Plaintiff's Exhibit 10. Can you get those three pages in
23     front of you?
24     A.   I have them right here.
25         MR. BROWN: What are the numbers on the bottom of
                           142
```

PAGE 143

```
 1     the page?
 2         MR. TINNEY: Your numbers are 60, 61 and 62.
 3     Q.   Where on any one of these three forms are you asking
 4     at what facility this is going to be done?
 5     A.   It would be here, the fifth question from the top,
 6     which is the name, address and phone number of the
 7     facility where surgery will be completed.
 8     Q.   So you got that sent back to you and you were aware
 9     of that as of the 27th?
10     A.   Yes.
11         MR. BROWN: That's not what her answer is. You
12         said as of the 27th. You asked her when she got
13         this back. She faxed it to him on the 27th.
14         MR. TINNEY:
15     Q.   Well, when did you learn, or did you not learn from
16     Amy where it was going to be done?
17     A.   No.
18     Q.   Did you ask Amy on the telephone the question, where
19     do you want to get this done?
20     A.   No.
21     Q.   Did you ask her or where on this form does it say how
22     far is this from Mr. Brown's home?
23     A.   No. I didn't ask her that, either.
24     Q.   Well, you said that was one of your criteria, wasn't
25     it?
                           143
```

PAGE 144

```
 1     A.   It would be in the long run. Yes.
 2     Q.   What do you mean in the long run?
 3     A.   After I got this back, if the facility wasn't close
 4     enough -- nut it would be a facility that he would be --
 5     that would be close with him there, because I'm assuming
 6     that he is on -- that he would be on the roster of that
 7     facility.
 8     Q.   Where do you have the question as to what the medical
 9     code is?
10     A.   Two questions above that. Surgical procedures
11     including ICD9 codes.
12     Q.   Is it your testimony that there was no way that Mr.
13     Brown would have ever gotten approval from CMI for
14     insurance without that code being provided, approval for
15     it?
16     A.   Yes.
17     Q.   Could you not simply pick up the phone --
18     A.   Without this being returned to me.
19     Q.   All right. You testified earlier -- your attorney
20     said that you didn't get this form back until when?
21     A.   November 15th, 2004.
22     Q.   So you send it out on October 27th. Now, let's talk
23     about what your actions were -- well, first, did you tell
24     Dr. Howorth's office that you needed this form sent back
25     before surgery could be authorized?
                           144
```

PAGE 145 SHEET 37

1  A.  Yes.
2  Q.  So what was your duty to Mr. Brown to see that this
3  form, or that CMI received the necessary information?
4  A.  Again, first of all --
5  Q.  My question was, what was your duty to Mr. Brown to
6  see that you got this back?
7      MR. BROWN: Object to the form. Calls for a
8      legal conclusion. You are asking about duties.
9      That's a legal standard.
10 MR. TINNEY:
11 Q.  You can answer the question.
12     MR. BROWN: You can ask her what she did and
13     whether that --
14 MR. TINNEY:
15 Q.  Let me ask it like this. Did you feel like you had a
16 responsibility to Mr. Brown to see that this surgery
17 request came back in a timely fashion?
18 A.  Yes.
19 Q.  What would have been your definition of a timely
20 fashion?
21 A.  As soon as I could get it. My definition?
22 Q.  Yes.
23 A.  As soon as I could get it.
24 Q.  And what does that mean, as soon as I could get it?
25 A.  When I was told that surgery needed to be done and he

145

PAGE 146

1  was already at Dr. Howorth's for the evaluation. I had
2  spoken with Amy that day. I called his office. I faxed
3  over the request for surgery. I called Amy back to make
4  sure she got the fax to confirm that she got the surgical
5  request. She then knew, because I told her, that it
6  needed to be filled out and sent back immediately before
7  any approval for surgery can be -- the process can go on
8  for approval. And I need the medical records from the
9  evaluation of Dr. Howorth.
10 Q.  Can you show me any record on October the 27th, other
11 than Sequence Code Number 49, that apparently related to
12 physical therapy, where you had any communication with
13 anybody on October the 27th?
14 A.  In the file?
15 Q.  Yes.
16 A.  I had approved Lake Martin for physical therapy the
17 same day on the 27th. It is on Page 9 of 19, Sequence 49.
18 Q.  How did you approve that?
19 A.  I called over there.
20 Q.  What did you tell them?
21 A.  When I spoke with Amy, I said, should I set him up in
22 the -- I like to make sure that I call the physical
23 therapist, that I set up the evaluation and I like to set
24 up the appointment. Now, if the claimant, if Emory needs
25 to change that appointment when I give him the time and

146

PAGE 147

1  date, or they call him and set him up, but I know it is
2  very difficult to get through to him because I had to call
3  his mother-in-law's house to get through to him. So I
4  said, is there a facility close, the doctor would like to
5  set him up, and she said, yes, right here, Lake Martin
6  facility. This is the first time I had used it. I said,
7  would you like for me to set it up or would you like to
8  have them call me for authorization? She said, I will set
9  it up. I will send them up an order and either I called
10 them or they called me. I don't remember which.
11 Q.  So are you setting up physical therapy after the
12 surgery?
13 A.  No.
14 Q.  What are you setting up physical therapy for?
15 A.  The day of -- immediately the day that he requested
16 surgery. The reason why I was setting up physical therapy
17 -- I know where it is. I've just got to find it. For
18 conservative treatment until the surgery could be
19 approved. Let me look.
20 Q.  Was it because of what had been sent to you on
21 Plaintiff's Exhibit 11, that statement number one?
22 A.  Again, that had not been sent to me.
23 Q.  So what are you basing the physical therapy on?
24 A.  The phone call with Amy.
25 Q.  And Amy told you what?

147

PAGE 148

1  A.  Number one, that the doctor, Dr. Howorth, wanted to
2  do surgery, and number two, to set up physical therapy. I
3  said there is a process until I get the surgical request
4  back. I have the MRI report and I need the medical notes
5  from Dr. Howorth for his evaluation on what needs to be
6  fixed and how he needs to fix it, you know, his
7  evaluation. Until the process of approval for surgery can
8  be done, can we try -- would physical therapy be an
9  option?
10 Q.  What did she say?
11 A.  Well, let's see.
12 Q.  You don't have any entry, do you?
13 A.  I don't know. Let me look.
14 Q.  Well, the only entry I see on October 27th is on Page
15 9 of 19, and I've looked through these and looked through
16 them and looked through them. That's the only page that
17 there is any entry on October 27th. No conversation with
18 Amy. No reference of sending any forms to Amy.
19 A.  There's a reference right here, so I know that I --
20 Q.  On your diary?
21 A.  No. Not on my diary.
22 Q.  Again, your custom and practice would have been, if
23 you did it, you would have entered it on your diary.
24     MR. BROWN: Object to the form.
25 MR. TINNEY:

148

PAGE 149 SHEET 38

1  Q.  Correct? You can answer the question.
2      MR. BROWN: Subject to the objection.
3  MR. TINNEY:
4  Q.  Is that correct?
5  A.  I will not answer the question.
6  Q.  Why?
7  A.  Because I have already answered it.
8  Q.  No, you haven't.
9  A.  Yes, I have.
10 Q.  I am now asking you why it is not diaried on October
11     27th, when you said that it was your custom and practice to
12     diary everything; correct?
13 A.  I've already answered the question several times.
14 Q.  You have not answered that question ever. I said
15     October the 27th your custom and practice was if you
16     called a doctor you were to diary it in your file and give
17     it a sequence number; isn't that true?
18 A.  Yes.
19 Q.  And we don't see it here, do we?
20 A.  No.
21 Q.  As a matter of fact, the next entry you make on your
22     diary is November the 3rd, right up above it, Sequence
23     Number 50.
24 A.  Yes.
25 Q.  You said you expected the surgery request to come

149

PAGE 150

1      back within a reasonable time; correct?
2  A.  Uh-huh.
3  Q.  You knew Mr. Brown was in pain; correct?
4  A.  Uh-huh. Yes.
5  Q.  You had a responsibility to him to see that the
6      surgery got approved?
7  A.  Yes.
8  Q.  So tell us what you did when you did not get this
9      faxed immediately back to you to secure it?
10 A.  I called Amy.
11 Q.  So where is the record between October the 26th --
12     October the 27th and any time that you called Amy?
13 A.  It is not in the file. I faxed our request -- I have
14     faxed our request. Okay, Page 9 of 19, Sequence 51,
15     November 8th, of 2004, at 8:30.
16 Q.  Don't we have to go back to eight to get the start of
17     Sequence 51?
18 A.  No. That's Sequence 55 and 56 -- 54 and 55.
19 Q.  Oh, I'm sorry. I see. Okay. We are up to November
20     the 8th?
21 A.  Yes, sir. That's my next documentation.
22 Q.  Why did you feel like you needed to fax the surgery
23     request for the second time?
24 A.  I task myself out for each file to maintain each
25     file. If it's -- If I'm waiting for something -- now,

150

PAGE 151

1      it's already been faxed to him. If I call daily -- I
2      don't always get a chance to call daily. My task is set
3      out for at least a week. If I have not heard or gotten a
4      fax back by then with the surgical request by that time,
5      then I call again. My entry is on November 8th, because
6      that would be just about a week, five days, after the last
7      time. From the 27th, the 8th would be my next diary date
8      out. I had not received the request for medical care back
9      yet, so what I said -- I documented it. I have faxed over
10     surgical request for the second time. Claimant needs
11     surgery and is six weeks out from injury. MRI report but
12     no medical records.
13 Q.  Let me go back down to Sequence Code 48 on that page,
14     on October 26th, it says, medical review by D.J. Abbott.
15     Who is D.J. Abbott?
16 A.  Dana Abbott.
17 Q.  Who is she?
18 A.  She was the NCM. NCM is Nurse Case Manager.
19 Q.  Who requested that she review it?
20 A.  I had walked over there with another surgery in my
21     hand to have her look at the request for surgery for
22     another person. I had his MRI report in my hand, because
23     I had just gotten it. I walked over to her because I had
24     questions about -- I'm not a medical doctor. She is in
25     the medical field. I just wanted to -- I wanted to know,

151

PAGE 152

1      for my own self, what the next process would probably be
2      for his surgery, for Emory. So I had the MRI report with
3      me. Yes. I printed it out and I had a copy with me and I
4      brought it over to her. I could have e-mailed it to her,
5      but it was a long time ago. I really don't remember.
6  Q.  Well, it says that, CM, that's you, requests to
7      assess medical necessity for shoulder SX. What is SX?
8  A.  Surgery.
9  Q.  Shoulder surgery?
10 A.  Uh-huh.
11 Q.  On the 26th the day before Dr. Howorth even said he
12     needed surgery, you were already anticipating that he
13     needed surgery?
14 A.  Yes.
15 Q.  So what do you mean by you wanted her to assess the
16     medical necessity for the shoulder surgery?
17 A.  She may have worded that wrong, because I only had
18     the report in my hand and nobody had asked for surgery
19     yet, but I had the surgery for the other person, so she
20     may have worded that wrong because I said, would you take
21     a look at this and explain to me what these different
22     things are. That's why I wanted to educate myself a
23     little bit. We have medical books there and things that I
24     can go and read, but it takes a long time and I have a lot
25     of people I work with. So I am a more hands-on person. I

152

PAGE 153 SHEET 39

1  will get up and I will walk over to the desk and I will
2  say, show me, tell me, explain it to me, and sometimes I
3  need to be explained a couple of times, you know. Even if
4  I have had 50 claims like that, each one is different.
5  Each person is different and each person deserves special
6  care.
7  Q.  Special care. Including Mr. Brown.
8  A.  Including Mr. Brown. No matter what.
9  Q.  So that's why you went over to ask her, is this
10 shoulder surgery medically necessary?
11 A.  I said, what do you think of this? And I handed her
12 this MRI report and she said, well -- she took a look at
13 it and she said, get the medical records because I can't
14 review anything without the medical records.
15 Q.  So when she said to get the medical records, you
16 needed to get Dr. Shirah's records, didn't you?
17 A.  I needed Dr. -- Dr. Shirah was not requesting
18 medical -- I needed to get everybody's.
19 Q.  So you didn't even attempt to get Dr. Shirah's
20 records, did you?
21 A.  Yes. I had asked on the phone when I talked with
22 Kenny to please send the medical records when they were
23 ready.
24 Q.  So when they didn't come in, what did you do to
25 follow up?

153

PAGE 154

1  A.  Probably called again. I usually would.
2  Q.  It's not in there that you called at all.
3  A.  No, it's not.
4  Q.  Another time you didn't document?
5  A.  Another time, yes.
6  Q.  When you dial out a long distance number, do you dial
7  a one in front of it?
8  A.  Yes.
9  Q.  And then you put in the area code?
10 A.  1 and then 9, the area code and the phone number.
11 Q.  1, 9, the area code and the phone number?
12 A.  Uh-huh.
13 Q.  And you make those calls from that same phone and
14 that extension that you referred to earlier? That same
15 number?
16 A.  Yes. I log in my phone number early in the morning
17 when I get there.
18 Q.  What do you mean you log it in?
19 A.  Log it in and turn on the phone. I make my voice
20 mail for the day. Good morning, I will get to you during
21 the course of the day before 5:00 o'clock.
22 Q.  So you always tell anybody that calls you on your
23 voice mail if you don't answer that you are getting back
24 to them before 5:00 o'clock?
25 A.  Yes.

154

PAGE 155

1  Q.  Do you do that always?
2  A.  Yes.
3  Q.  Does that include Mr. Brown?
4  A.  Yes.
5  Q.  I noticed in here that you don't have but two calls
6  documented from Mr. Brown, do you?
7  A.  No.
8  Q.  Did you get more calls from Mr. Brown than that?
9  A.  Yes.
10 Q.  How many do you think you got from Mr. Brown?
11 A.  I don't know.
12 Q.  Lots and lots?
13 A.  Lots of them.
14 Q.  He was telling you he was in pain every time he
15 called, didn't he?
16 A.  Yes. He was yelling sometimes.
17 Q.  Yelling?
18 A.  Uh-huh. At me.
19 Q.  Because he was very upset that he wasn't getting
20 medical care and treatment, wasn't he?
21 A.  Yes.
22 Q.  And he wanted his surgery, didn't he?
23 A.  Yes.
24 Q.  And you kept telling him, I have to get two opinions,
25 didn't you?

155

PAGE 156

1  A.  No.
2  Q.  You never told him that?
3  A.  No.
4  Q.  Never told him you had to get an opinion from
5  anybody, did you?
6  A.  An opinion? No. Approval and opinion are different.
7  Q.  Well, did you tell him that you had to get -- what?
8  A.  Approval and opinion are different.
9  Q.  Well, did you tell him you had to get approval?
10 A.  Yes.
11 Q.  Who did you tell him you had to get approval from?
12 A.  Well, I could explain to him that we sent it in for a
13 precertification, but really to authorize any surgery,
14 first, I need the medical records.
15 Q.  Tell me what you told Mr. Brown when he was yelling
16 over the phone, screaming in pain, or whatever, I want my
17 surgery, what did you tell him?
18 A.  I told him that I am waiting for the surgical request
19 to come back, so that I can send in the process for
20 approval, get the ball in motion for approval, and the
21 medical records from Dr. Howorth.
22 Q.  Did you ever tell him at any time that anybody was
23 reviewing his medical records?
24 A.  No.
25 Q.  Did you ever tell him that anybody had to review his

156

## PAGE 157 SHEET 40

1  medical records before he could be approved for surgery?
2  A. Yes.
3  Q. Tell me what you told him.
4  A. That there is a precertification process and it needs
5  to go in for a precertification process for approval, I
6  need all the medical records and the surgical request
7  first.
8  Q. Let's talk about the precertification approval
9  process. What is that?
10 A. That is an outside company. It was CorVel at the
11 time.
12 Q. I thought you said you didn't know who CorVel was?
13 A. No. You asked me a different question. You asked me
14 if they are part of CMI, and I don't know that.
15 Q. So what is CorVel?
16 A. CorVel is -- all I know is that we were sending --
17 their letterhead was on the precertification. We would
18 fill out the form and we would send it in to be reviewed
19 and approved or denied. It takes a 48 hour process. We
20 pay a certain fee for each precertification process.
21 Q. How much is the fee?
22 A. It runs $150.00.
23 Q. And you did that on Mr. Brown?
24 A. No.
25 Q. You didn't?

157

## PAGE 158

1  A. No.
2  Q. Why?
3  A. Because by the time I had gotten the request for
4  surgery back it was -- I had taken into my hands the
5  medical notes, the request for surgery and the MRI report
6  and I walked it over to the Medical Department to see if I
7  could get it approved or for them to look at it to see if
8  it would pass approval without having to sent it in for
9  formal precert, because it had taken so long for him to
10 get me back the request for surgery.
11 Q. Who did you go to?
12 A. I went to Dana Abbott.
13 Q. What did she tell you?
14 A. She said that there was more questions that I would
15 probably have to ask the doctor to be clarified,
16 especially, for example, the first question here. It is
17 asked, have all conservative measures been exhausted?
18 Please explain. He put, tear on MRI. Needs surgery
19 repair ASAP. He does not tell what conservative
20 treatments have been tried; that's number one. Now, these
21 all have to be answered and this is all part of when they
22 do an approval they are going to talk to him about.
23 Q. Talk to who about?
24 A. Dr. Howorth. That's part of their approval process.
25 I don't know all what they do, but they talk with the

158

## PAGE 159

1  doctor. They go through for medical necessity. Number
2  one, he never answered this question.
3  Q. He never answered?
4  A. What conservative measures have been exhausted.
5  Q. So you are telling me that when you carried, I assume
6  these three documents that you finally received marked
7  Plaintiff's Exhibit 10, to Dana Abbott that she told you
8  that the surgery could still not be authorized because you
9  needed more information?
10 A. She told me that not all the questions were answered
11 and I needed some more information for it to be sent in
12 for approval, for a formal precertification.
13 Q. So what else did she tell you that she needed?
14 A. That's all.
15 Q. All she needed was an answer to number one, have all
16 conservative measures been exhausted?
17 A. There was probably a couple more questions. I didn't
18 ask her what questions. She said there was probably some
19 more things we would have to ask him.
20 Q. Well, where in the file did you notate that
21 conversation with Dana Abbott?
22 A. I didn't.
23 Q. So how do you know what Dana told you she needed for
24 you to do?
25 A. Okay. At that point, when she told me what she

159

## PAGE 160

1  thinks that I needed to do, to send it in for formal pre-
2  certification, I thought it was too long, because Dr.
3  Howorth had spent such a long time getting me back the
4  request for surgery, that Emory needed surgery as soon as
5  possible. I thought it would take too long. So I took
6  the request for surgery, I took the MRI report that I had,
7  and I walked across the street to my -- across the desk to
8  my team leader and I said, you know, I said, Emory has got
9  an injury at the store, he needs surgery, he has a rotator
10 cuff repair, Dr. Howorth wants to --
11 Q. Who are you talking to?
12 A. I'm talking to my team leader, Tisha Montgomery.
13 Q. You said she is still there?
14 A. She is in the office. Yes.
15     MR. TINNEY: Is she the one we've got lined up
16     to do?
17     MR. BROWN: No. I just learned her identity
18     yesterday.
19 A. I walked over to her. I said, Tisha, I said --
20 MR. TINNEY:
21 Q. What day are we talking about now?
22 A. Same day. The 23rd of November.
23 Q. What did you look at to determine that?
24 A. Let me just make sure. Now, you've asked me -- oh,
25 oh, did I --

160