PAGE 161 SHEET 41

1  Q. You seemed pretty sure of that when you spouted it
2  out.
3  A. On the 23rd of November? How would I know that?
4  Q. Yes.
5  A. Okay. On Page 7 of 19, at the bottom, and Page 8 of
6  19. 7 of 19. Now, if you will hold it like this, sir,
7  here would be the top of the note pad here. It says,
8  Sequence 56.
9  Q. All right.
10 A. Do you see where it says Sequence 56 right here on
11 the bottom of number 7, Page 7 of 19?
12 Q. Yes. I've got Sequence 56.
13 A. Now, it says, 49 year old associate, do you see
14 where it says that?
15 Q. Yes.
16 A. Okay. It says, lost time conversion. It says the
17 date is November 26th, 2004, at 1300 hours and 28 minutes,
18 about 28 after --
19 Q. 1:28.
20 A. 1:28 in the afternoon. At that time, which was right
21 after Thanksgiving, this was Thanksgiving week holiday. I
22 had asked Tisha about surgery. I had gone to her desk on
23 the 23rd. The reason I knew it was on the 23rd is because
24 it was right before she would be gone the next four days
25 for Thanksgiving weekend. I, the low man on the totem

161

PAGE 162

1  pole, get to work that Friday. It's entered on the 26th,
2  because I would have time. The medical providers are not
3  open on that day and I would have time to spend on the
4  file and make sure that all the screens were updated,
5  everything is set, for Emory to do surgery. So on the
6  23rd is the day I went to Tisha. I talked to her about
7  approving it because I said, if I ask the doctor more
8  questions, form questions to the doctors and fax over a
9  letter or anything like that, I'm afraid it is going to
10 take too long. It's taken too long already. He has a
11 legitimate injury at the store. He's been a long-time
12 associate. The mechanism of injury, he has pain, he needs
13 -- the MRI shows that he needs a repair. I think we need
14 to authorize this surgery. She said, If you feel that it
15 needs to be authorized, then let's authorize it. She
16 looked at the surgical request and she looked at the MRI
17 and then she took my word for it. Then what I did
18 immediately on the 23rd is I called Dr. Howorth's office.
19 I told Amy that the surgery has been authorized. I called
20 the store, either to get Emory or to tell the store that
21 the surgery has been authorized, because he's an overnight
22 associate, on second shift, and it's not always possible
23 for me to get a hold of him. Also I had difficulty
24 because he -- I could only leave messages at his mother-
25 in-law's house and he would then get a message back to me.

162

PAGE 163

1  So I called and gave authorization on that date
2  immediately so they could start the ball rolling and get
3  the surgery request as soon as possible. The
4  documentation at the time was not as important on that
5  initial date, on the 23rd, as it was me spending time to
6  put the quality work in the file on the 26th when I had
7  time and the doctors are closed. But that was already in
8  the process. I had already notified him, too, at that day
9  that surgery was being approved and he could do it.
10 Q. So the day that you actually told everybody it was
11 approved was what day?
12 A. The 23rd of November, 2004.
13 Q. There is not anything in the file records whatsoever
14 that you called Dr. Howorth's office, is there?
15 A. No.
16 Q. There is not anything that you called Emory Brown, is
17 there?
18 A. No.
19 Q. There is not any indication on that date that you
20 talked to Ms. Montgomery?
21 A. No.
22 Q. And you said that all it took for you to get this
23 surgery approved was to take the MRI report and Dr.
24 Howorth's office record of October the 27th to Ms.
25 Montgomery to show them to her, and those two documents

163

PAGE 164

1  were the basis of her approving this surgery?
2       MR. BROWN: I'm going to object to the form.
3       It's completely misstated.
4  MR. TINNEY:
5  Q. Did I misunderstand that?
6       MR. BROWN: Yes, you did, because that misstates
7       her --
8       MR. TINNEY: I'm talking about documents.
9       MR. BROWN: Can I object to your question first?
10      MR. TINNEY: Okay.
11      MR. BROWN: Your question misstates her prior
12      testimony.
13      MR. TINNEY: Let me ask it this way.
14      MR. BROWN: It is taking the facts out of
15      context.
16 MR. TINNEY:
17 Q. What documents did you take to Ms. Montgomery at the
18 time that you asked her to approve the surgery?
19 A. I took the MRI report and the request for surgery and
20 the medical notes.
21 Q. You took Plaintiff's Exhibit 11?
22 A. Yes.
23 Q. You took Plaintiff's Exhibit 8?
24 A. Yes.
25 Q. And you took the first page of --

164

PAGE 165 SHEET 42

1  A. The request for surgery.
2  Q. I'm sorry. The first page of Plaintiff's Exhibit 10?
3  A. Yes.
4  Q. Is that right? All three pages of Plaintiff's
5  Exhibit 10?
6  A. Yes.
7      MR. BROWN: Plaintiff's Exhibit 7 is --
8  MR. TINNEY:
9  Q. Did you take any other documents with you?
10 A. I don't remember.
11 Q. She gave your verbal authorization at that time?
12 A. Uh-huh. We discussed it.
13 Q. So why did you not call someone on the 23rd?
14 A. I did.
15 Q. And there's going to be records, I guess, telephone
16 records showing you did that?
17 A. There should be some place.
18 Q. Let's talk a minute about your Sequence Entry Number
19 56. You told me that you made this entry and these are
20 your words; is that correct?
21 A. Yes.
22 Q. We got down to the last of the first paragraph,
23 "acute tear of supraspinatus rotator cuff." Correct?
24 A. Yes.
25 Q. Where did you get the term acute that you entered

165

PAGE 166

1  there?
2  A. I don't know.
3  Q. I've never seen that word appear before you entered
4  it, so why did you choose to use the term acute there?
5  A. I don't know.
6  Q. What does acute mean?
7  A. It means very bad.
8      MR. BROWN: Ask her the question and let her look
9          at the records, because you said you've never
10         seen the word acute tear, and it is in Exhibit
11         Number 11.
12     MR. TINNEY: Well, I stand corrected if it is in
13         there. Is it in there?
14     MR. BROWN: Diagnosis acute tear of supra
15         spinatus rotator cuff. Also ACJOA.
16 MR. TINNEY:
17 Q. So on your entry of November 26th you said, "surgery
18 has been requested by Dr. Howorth," and that had been
19 requested on October 27th; correct?
20 A. It had been asked for.
21 Q. Yes. Requested. So we are, I guess, one day short
22 of a month after he requested it when you are making this
23 entry; correct?
24 A. Uh-huh. Yes.
25 Q. It says, "after receiving all medical records," did

166

PAGE 167

1  you receive any other medical records from Dr. Howorth
2  after October the 27th between that date and the time you
3  wrote this on November the 26th?
4      MR. BROWN: I'm sorry?
5  MR. TINNEY:
6  Q. Did you receive any other medical records from Dr.
7  Howorth between October the 27th and November 26th?
8  A. On November 18th, Sequence 54, Page 8 of 19, I have
9  documented. It says, "MRI scan verbatim". From what the
10 MRI is I know it is from the doctor. Now I put the
11 doctor's name on top, but I know it is from Dr. Howorth
12 because he put the RX at the last line, it says, "RX,
13 Robaxin, Ibuprofen, and Darvocet". Those are the three
14 medications that Dr. Howorth had prescribed for him.
15 Q. Well, I understand, but what I'm asking you is, are
16 you saying that you got another medical record from Dr.
17 Howorth between October 27th and November 26th?
18 A. I have it documented here on the 18th, November 18th.
19 Q. That you received what?
20 A. That I documented in the file. This is a medical --
21 the evaluation from Dr. Howorth. He was only seen once.
22 Q. Well, what records are you referring to that you got
23 from Dr. Howorth?
24 A. I am referring to this one.
25 Q. But what you are pointing to, Code Sequence 54, what

167

PAGE 168

1  physical records did you receive?
2  A. Physical records?
3  Q. On November the 18th.
4  A. October 27th this is Plaintiff's Deposition Exhibit
5  7.
6  Q. You received that October the 18th?
7  A. November the 18th?
8  Q. I mean, November the 18th.
9  A. Yes, sir.
10 Q. Okay. What else?
11 A. That's all.
12 Q. It says, going back to Page 8 of 19 at the top, it
13 says, "surgery has been requested by Dr. Howorth and after
14 receiving all medical records and formal surgical
15 requests", what are the formal surgical requests that you
16 received?
17 A. This is a formal surgical requests, which is --
18 Q. Plaintiff's Exhibit 10.
19 A. Yes, sir.
20 Q. Are you telling us that if you don't get back what
21 you call the formal surgical request, Plaintiff's Exhibit
22 10, that Mr. Brown would never have been approved for his
23 rotator cuff surgery?
24     MR. BROWN: Object to the form, mischaracterizes
25         prior testimony. It's been asked and answered

168

PAGE 169 SHEET 43

1 three or four times.
2 A. I'm not going to answer that.
3 MR. TINNEY:
4 Q. You have to answer. You're not going to tell a
5 Federal Judge that you're not going to answer.
6 MR. BROWN: Objection.
7 A. Can I talk to my counsel, please?
8 MR. TINNEY:
9 Q. Well, this is about the fifth or sixth time, you
10 know, when we get to a hard question and you want to go
11 out and talk to your lawyer.
12 MR. BROWN: Restate the question.
13 MR. TINNEY:
14 Q. Are you telling me that if you did not get back these
15 formal surgical requests documents that Emory Brown would
16 not have had rotator cuff surgery approved?
17 A. No.
18 Q. Why do you say that?
19 A. Because, number one, if Dr. Howorth had not gotten me
20 the surgical requests back in a timely manner, which was
21 pretty much going on the edge of time there, I mean to my
22 time limit, I would have offered Emory Brown a panel of
23 choice and said, this doctor is not working well with us,
24 he's not getting us what we need, would you like a panel
25 for another choice of authorized orthopedic specialists?

169

PAGE 170

1 You have a choice of a panel of four, would you like that?
2 Q. So you're saying you do have to have the formal
3 request?
4 A. Yes.
5 Q. From either the treating physician or from another
6 panel doctor?
7 A. Yes.
8 Q. Then it says, adjuster has converted screens to
9 reflect lost time, what did you do there?
10 A. Well, when a claim comes in and it is medically only,
11 we're still treating the medical, but the minute we get a
12 surgical request and it has been authorized and we have
13 all the medical notes and all the paperwork and everything
14 is in place and the approval has been given, then I can go
15 in and change from medical only to lost time, and I change
16 on one page in the file -- it's several pages of the file
17 in several different areas. I make sure that it's the
18 doctor's phone numbers, addresses, what facility he is
19 going to use is in there, make sure that where it says TTD
20 or permanent partial, it goes to TTD. I turn it to TTD,
21 because now the file is -- that's why I said I like to
22 take time in doing that. Sometimes I take two hours
23 because I like to get 100 percent.
24 Q. What do you mean you like to get 100 percent?
25 A. I like to get 100 percent. One of the things my

170

PAGE 171

1 performance is graded on is how well I medically manage,
2 in a timely fashion, and get medical records and approvals
3 and documentation and everything in the file when I do a
4 lost time conversion and how I manage the file.
5 Q. Do you get a grade on every file you handle?
6 A. Only lost time conversions.
7 Q. So what kind of grade did you get on Mr. Brown?
8 A. I don't remember.
9 Q. Well, who gives you the grade?
10 A. My team leader would give me the grade.
11 Q. And who would have given you this grade?
12 A. My team leader at the time was Tisha Montgomery.
13 Q. How do you learn what your grade is?
14 A. She would hand me the Q A, it's called, which is
15 questions and answers on various things that have to be in
16 the file. You get graded. Some of them are not
17 applicable in our State of Alabama, but most of them are
18 applicable. Have you made the 24 hour contact? Have you
19 called the doctor? Have you spoken with the claimant?
20 Things like that. Have you gotten all the medical, the
21 request for surgery. All the things --
22 Q. So this is a form that you fill out for her?
23 A. No. It's a form that when she goes through the file,
24 she goes through every area of the file to make sure I
25 reserve right, make sure of everything, and I get graded

171

PAGE 172

1 on it.
2 Q. Then she gives her grading back to you?
3 A. Yes.
4 Q. What is the form in which she gives the grading back
5 to you?
6 A. It's called Q and A.
7 Q. How does it come to you? Is it emailed to you or
8 what?
9 A. Sometimes it's given to me on paper, but we're trying
10 to be a paperless company, so it can come either way. I
11 do keep a copy of every Q and A I have in my file, that I
12 get. She doesn't do it on every one, but she will pick
13 one if we happen to have a lot at the time.
14 Q. So you've got the Q and A on Mr. Brown?
15 A. I don't know.
16 Q. Well, you just said you have it on every file?
17 A. No. I said she doesn't pick every file that we have
18 a lost time conversion. She'll pick one file. I do not
19 know if I had a Q and A on him. But if she did choose
20 this file I would want to get 100 percent. So I would
21 want to have everything done in the file. So what I would
22 do is on that day of lost time conversion -- that's why I
23 number one through seven. Nowadays you'll see my lost
24 time conversions will go one through 21 or one through 24,
25 because I'll show more documentation as far as what I'm

172

PAGE 173 SHEET 44

1  doing and what they can expect, what's happening in the
2  lost time conversion, what I've done and what the
3  justification is that it is being converted to lost time
4  for surgery.
5  Q.  Can you show me where you did anything on the file,
6  based on these records, that says you converted screens to
7  reflect lost time prior to November the 26th?
8  A.  Yes.  It's on Page 15 of Page 19, Sequence 25.
9  Q.  What does it say?
10 A.  It says, file came in lost time.  Do you see where
11 I'm talking about?
12 Q.  Yes, I see that.  So what did you do on November the
13 26th to convert it or is this just referring to what you
14 had done back on October the 6th?
15 A.  Well, it had already been converted to lost time, but
16 I wanted to document it in the file, surgery has been
17 approved, who was doing the surgery and that the reserves
18 were going to be set and everything and that all screens
19 were updated.  At that time he had gone back to work.  He
20 had been at work in a light duty position until he was
21 going to be taking off the day of surgery.  Now, he had
22 already met his waiting period, which is the grace period,
23 the first three days after his injury.  The store always
24 pays them for the day of injury and this accident happened
25 about 4:30 in the morning, so he was paid for that whole
                                    173

PAGE 174

1  day.  So if his waiting period -- when his waiting period
2  starts is the next day.
3  Q.  What does this mean, calculated TTD for payment?
4  A.  That was --
5  Q.  Where you had already paid him everything you were
6  supposed to pay him?
7  A.  You know, that should be 10-8 instead of 10-18.  I
8  made an error there.
9  Q.  Where?
10 A.  On the approval, Sequence 24, still on Page 15, where
11 it says, approved TTD.  Is that where you're looking?
12 Q.  No.  I'm back on Page 8 of 19.
13 A.  Calculated TTD means I have reserved in the file
14 because of the request for surgery here, the time frame
15 that Dr. Howorth feels -- okay, the Request for Surgery,
16 Exhibit 10, Dr. Howorth says -- here's the question posed
17 to him, what if any physical restrictions will be
18 recommended in regards to employment and activities of
19 daily living after surgery?  The next question, what is
20 the expected time frame of return to work in a modified
21 duty capacity after surgery?  It says, one to two
22 weeks.  So when I calculate TTD I have already calculated
23 in the file, in that area, what his average weekly wages
24 before the date of injury, what he was making, his hourly
25 wage, because I have confirmed that with the store and his
                                    174

PAGE 175

1  comp rate.  Now the comp rate, what we put in there is for
2  one week.
3  Q.  Let's move on.  What is this address WT notepad?
4  What is that?
5  A.  That's waiting period notepad.
6  Q.  What is a waiting period notepad?
7  A.  Waiting period notepad is back here.  Because the
8  file was converted to lost time, it came in lost time, it
9  says here --
10 Q.  What page are you on?
11 A.  I'm on Page 15 of Page 19.  That's the correction.
12 Let me see where the notepad is.  Page 14 of Page 19.  The
13 last sequence at the bottom, Sequence 22, this was the
14 correction.
15 Q.  What do those dates mean?
16 A.  The dates mean to me that he went to Randolph Medical
17 Center ER on the 29th or 30th in the morning.  They took
18 him off work on the 30th and the 1st.
19 Q.  What is crossed out?  You don't have to tell me what
20 it is, but is that something relating to the reserve?
21         MR. BROWN:  Yes.
22 MR. TINNEY:
23 Q.  That's what that is, where you changed the reserve?
24 You need to answer that on the record.  Is that where you
25 changed the reserve?  Back on Page 8 of 19.  What's
                                    175

PAGE 176

1  blacked out.
2         MR. BROWN:  Off the record.
3  (Off the record discussion.)
4  MR. TINNEY:
5  Q.  What is entered as Number 4, is that indicating that
6  you changed the reserve on the file?
7  A.  It says, "Number 4", and it's blacked out so I can't
8  answer the question correctly.
9  Q.  Well, I don't want you to talk numbers with me.  All
10 I'm asking is did you change the reserve on the file and
11 that's where you're talking about it?
12 A.  It could -- well, it's blacked out so I can't give
13 you a yes answer.
14 Q.  You don't know.  On Number 5, you say, documented
15 all medical records and MRI report.  How did you document
16 all medical records?
17 A.  I put it in the file, in notepad.
18 Q.  Well, why do we n't have Dr. Shirah's records in the
19 file?
20 A.  Because we haven't got those yet.
21 Q.  You never got them.  You didn't turn them over to me
22 as being part of your file, so you never got them, did
23 you?
24 A.  Yes.
25 Q.  Yes, you got them?
                                    176

PAGE 177  SHEET 45

1  A. No.
2  Q. No, you did not get them. This last entry where it
3  says, I've called claimant and advised of surgery
4  approval, even though you made this entry on November
5  26th, you're sure you did it on November 23rd?
6  A. Called, yes.
7  Q. Let's go back now to the October 27th time frame. We
8  sent the surgical request to Dr. Howorth and you expected
9  it right back. Tell me what the next date was that you
10  had any communication with Dr. Howorth's office trying to
11  get or understand why you hadn't gotten it back or asking
12  for the form back?
13  A. I think we went through that.
14  Q. We keep getting side tracked with various issues.
15  A. No, we did. We did. After the 27th, again, on Page
16  9 of 19, Sequence 51, where it says --
17  Q. Sequence 51?
18  A. Yes. Close to the top of the page. Second down from
19  the top. I have faxed over surgical request for the
20  second time. Claimant needs surgery and is six weeks out
21  from injury. MRI report, but no medical records.
22  Q. When you had your conversation with -- I think you
23  talked to Amy, at Dr. Howorth's, on the 27th; is that
24  correct?
25  A. Yes.

177

PAGE 178

1  Q. You said Amy gave you the information on Plaintiff's
2  Exhibit 11. What did you believe that Dr. Howorth meant
3  when he said it is much better to proceed with rotator
4  cuff reconstruction within the first six weeks during the
5  acute phase, as the results are more predictable.
6  A. She never told me that. She told me that surgery was
7  -- that he needed surgery. So I said I'd fax over a
8  request for surgery and that I needed the medical records
9  for the evaluation. Amy is not a doctor either so she
10  couldn't -- if she didn't have the notes on that date
11  because he had just done them, done the evaluation, and
12  usually it takes a couple of days, she could not go
13  verbatim what he said on there. A lot of the doctor's
14  notes from the room, when he goes in to see him, you know,
15  you can't read a lot of doctors' notes. You have to wait
16  until they are transcribed. No, she didn't say verbatim
17  what it says on there.
18  Q. Well, let me just ask you if you had been told on or
19  around October 27th that Dr. Howorth says that since he is
20  four weeks out already it is much better to proceed with
21  rotator cuff reconstruction within the first six weeks
22  during the acute phase as the results are more
23  predictable, what different course of action, if any,
24  would you have taken than what you did concerning Mr.
25  Brown's surgery?

178

PAGE 179

1  A. I still would have faxed them the request for surgery
2  immediately, like I did.
3  Q. So does that mean you wouldn't have done anything any
4  differently?
5  A. No.
6  Q. You would not have done anything any differently?
7  A. No.
8  Q. That's not going to be clear on the record. If your
9  answer is --
10  A. Well, first of all you gave me an if question and I
11  don't answer ifs.
12  Q. You are going to have to answer ifs. I can assure
13  you, you will have to answers ifs.
14  A. Okay. Because if is like --
15  Q. I just want to get it clear on the record. If your
16  answer to me is I would not have done anything any
17  differently, please state that.
18  A. Yes. I would not have done anything differently.
19  Q. We were talking about when you didn't get anything
20  back from Dr. Howorth after the 27th. I asked you what
21  you did after that and you referred me to Code 51 on Page
22  9 of 19. There's 13 days between October 27th and
23  November the 8th; a 13 day period there. What did you do
24  in that 13 days to try to call the doctor's office again
25  or to followup to get what you needed? That's almost two

179

PAGE 180

1  weeks.
2  A. Personally, because it was a surgical request, I'd
3  like to call daily. I did try to call at least every
4  couple of days or every week, at least, because the ball
5  was in their court. When he finally sends the paper --
6  you know, when I'd call and talk with Amy she would say,
7  yes, he's got it. I confirmed that they received it on
8  the 27th, because I called to let her known it was coming
9  and that he needed to fill it out and get it back to me as
10  soon as possible. I authorized the physical therapy also
11  on that day, upstairs, three times a week for three weeks,
12  12 visits authorized with Lake Martin Physical Therapy.
13  So I would like to get back at least -- if I haven't heard
14  by my next diary date --
15  MR. BROWN: You've answered the question.
16  MR. TINNEY:
17  Q. It looks like Dr. Howorth, on Plaintiff's Exhibit 10,
18  signed this form on October the 30th, of 2004; do you see
19  that?
20  A. Yes.
21  Q. If I understand, you're calling his office at least
22  every other day?
23  A. Well, I can't be sure. That's what I -- several
24  times.
25  Q. It says, please fax this completed form back. That

180

PAGE 181 SHEET 46

1  number, is that the number you gave me earlier?
2  A. On the fax cover sheet of the surgical request it
3  says, please fax the form to my attention upon
4  completion, the fax number if 479-273-8020". Yes, it is
5  the phone number I gave you earlier.
6  Q. Again, there's no record or note that you called Dr.
7  Howorth's office at all between October 27th and November
8  the 8th, contained in the file?
9  A. No.
10 Q. Why do you think you would not notate that if you're
11 doing it every other day, which would be five or six
12 times. Why would you not notate that in your file if
13 that's your custom and practice to do so?
14 A. Sometimes when Emory would call me or I would call
15 over there I would not always get to document every phone
16 call. It would be my custom and practice. I'd love to do
17 it. Also, because it was a new system, even if I had and
18 -- I'm saying that's what I do because it was a surgical
19 request. If I had and it was a new system and it's not in
20 there, that's all I can say. I could have documented it
21 but it could not have been saved, because it was a new
22 system.
23 Q. Now, you told me that you were telling Emory that you
24 had to get this CorVel Company to do a precertification.
25 How many times do you think you told him that?
                                181

PAGE 182

1  A. I don't know, probably several. Every time he
2  called, probably.
3  Q. What was your understanding, that CorVel would do
4  what?
5  A. I think I've already answered that. But a
6  precertification is they do a certification on whether the
7  surgery is medically necessary, meets the criteria of the
8  mechanism of injury. They do a research on it. They call
9  the doctor. They go over the medical notes. They make
10 sure the facility is the correct facility. You know,
11 because on the format you have to ask for -- one of the
12 questions is, who is the doctor, what is his specialty,
13 what is his phone number, where's he going to do it and
14 what's the phone number. They want to know because they
15 are going to call there too.
16 Q. All right. Now, looking again at Sequence 51 on Page
17 9 of 19. It says that you have faxed the surgery request
18 over for the second time.
19 A. Yes.
20 Q. When you sent the surgery request over the second
21 time did you send all of the forms again for the second
22 time?
23 A. That's all one complete package.
24 Q. I see that was done at 8:31. Is it just a
25 coincidence that Emory called you two minutes later after
                                182

PAGE 183

1  you did that?
2  A. I think so.
3  Q. You think that's just a coincidence?
4  A. Yes.
5  Q. So after November the 8th when you faxed it --
6  A. He called me at 8:33, is that what you're telling me?
7  Q. Yes. And see it looks like you made a phone call to
8  the medical provider at 8:31; correct?
9  A. Well, it was documented at 8:31.
10 Q. When was the next time you tried to get what you
11 needed from Dr. Howorth's office after November the 8th?
12 A. Did I try after the 8th?
13 Q. I'm asking what did you do to try to get back the
14 information you had been asking earlier for?
15 A. The same thing I did after November 8th after I faxed
16 for the second time. I would be calling there often. I'm
17 not going to say everyday, but calling often.
18 Q. What is the next documentation that shows you did
19 anything?
20 A. That same page, on 9 of 19.
21 Q. Sequence Code 53?
22 A. Yes, sir. It says, Dr. Howorth, adjuster is waiting
23 for surgical request, faxed failed. This will be third
24 attempt for surgical request in writing for claimant.
25 Adjuster will call again.
                                183

PAGE 184

1  Q. What does this mean, fax failed?
2  A. Because when I send a fax on my desktop it will
3  confirm that the fax has been sent or it has failed, to
4  this number, and then I delete it.
5  Q. So when the fax failed, what did you do?
6  A. It says here, adjuster is waiting for surgical
7  request and the fax failed. This will be the third
8  attempt for surgical request in writing. So I sent it
9  again for the third time, is what I'm assuming.
10 Q. How would you have sent it?
11 A. By fax. I would have still had it there on my
12 desktop until I get that confirmation. It was already
13 filled out.
14 Q. Then the next entry is on November the 18th.
15 A. Sequence 54, is that the one you're talking about?
16 Q. Yes.
17 A. Let me see if there is anything else. That was on
18 the 8th -- no, 15th. Yes, sir.
19 Q. I'm talking about 11-18.
20 A. Yes, sir.
21 Q. What is that, approval? What does that mean?
22 A. I probably put it in wrong. It should have said
23 medical records, because this was the medical records from
24 Dr. Howorth, from his evaluation. Like we've talked
25 before, it was verbatim what the MRI said except for the
                                184

PAGE 185 SHEET 47

1  pharmaceutical, which says, Rx Robaxin, Ibuprofen and
2  Darvocet. That's why I knew that it was from his office.
3  Q. You're saying this is a reference to Plaintiff's
4  Exhibit 7?
5  A. Yes, sir.
6  Q. What does that mean, approval? Why does it say
7  approval on there? What are you approving?
8  A. It was a scroll down and I put the wrong
9  documentation. I should have put medical records, but I
10 didn't know that it was there at the time or I put the
11 wrong thing. It didn't mean I was approving anything.
12 The only reason we use the word approval is for paying
13 TTD. So that's the code that we use. Evidently in the
14 category where you put that in, in the notepad, it scrolls
15 down and you go down to whatever it is. It may be it says
16 approval -- it should have either been medical record or
17 -- today I would put medical record there, because I'm
18 much more used to the system, or adjuster correspondence,
19 medical provider. Adjuster is close to approval, under
20 the A's, so it could be the next one.
21 Q. Your next entry, 55, is where you were authorizing
22 payment of the MRI.
23 A. Independent laboratory, that was from the 19th. Yes,
24 sir. That's a lab workup. That's not the MRI bill. The
25 19th was the date of service for the MRI, but that is the

185

PAGE 186

1  lab work.
2  Q. What do you mean lab work?
3  A. Well, it says, independent laboratory. Now, I
4  could have documented it wrong, because I'm new there, but
5  --
6  Q. The MRI was the only thing done on the 19th?
7  A. Yes, that's why it is very strange that -- and the
8  price is about right for what they usually bill us at, but
9  so the independent lab, I'd have to -- I don't know. I'm
10 sure it's the MRI, because of the date of service and it
11 was sent to Blue Cross Blue Shield. I can look through
12 the bills if you'd like me to. I can confirm that.
13 Q. What is the date you said you finally received
14 Exhibit 10, on the 23rd of November?
15 A. 15th.
16 Q. The 15th of November?
17 A. Yes, sir.
18 Q. Did you get that in the mail from Dr. Howorth or was
19 it faxed?
20 A. Faxed. Mail received. Mail received.
21 Q. What are you looking at now that would indicate how
22 you got it?
23          MR. BROWN: Page Number 24.
24 MR. TINNEY:
25 Q. I'm going to mark as Plaintiff's Exhibit 12 this

186

PAGE 187

1  document.
2
3       PLAINTIFF'S DEPOSITION EXHIBIT NUMBER 12, marked for
4       identification. (Fax, Dr. Howorth. Page 228.)
5  MR. TINNEY:
6  Q. I'll ask you if that is what you're referring to?
7  A. Yes, sir.
8  Q. What are the two pages behind that in your records,
9  Number 25 and 26?
10 A. 25 is a piece of scratch paper, that I used to write
11 some of my notes down. 26 is from Alexander City
12 Orthopedics, October 27.
13 Q. So what about Plaintiff's Exhibit 12 indicates to you
14 that you received this on November 15th?
15 A. Because it's dated November 15th, '04, the fax cover
16 sheet. Total pages include three. Cover sheet including
17 three.
18 Q. I know what the second one is, that's the October
19 27th. What is the third page of that?
20 A. Page Number 26, is that the one you're referring to?
21 Q. That's Number 2, the October 27th letter. So what is
22 the third page that was sent by Dr. Howorth? I guess it
23 would be -- what have you got as Page Number 27. That's
24 the second page of October 27th.
25          MR. BROWN: Those were not sequentially

187

PAGE 188

1  numbered, so I don't know.
2  MR. TINNEY:
3  Q. It looks like Dr. Howorth sent you, on November the
4  15th, three pages; correct?
5  A. Uh-huh.
6  Q. That's going to be what we've marked as Plaintiff's
7  Exhibit 12, and then the October 27th two page report;
8  correct?
9  A. It looks like it, correct.
10 Q. So that doesn't say anything about him sending you
11 Plaintiff's Exhibit 10 on November the 15th, does it?
12 A. No.
13 Q. How do you know it was on November 15th that you got
14 Plaintiff's Exhibit 10, when there's no reference to it
15 anywhere?
16 A. Because it says 11-15.
17 Q. I know that. But it is not the surgery request forms
18 that you wanted. It's not them. I asked you when you got
19 them and you said November the 15th.
20 A. I don't know if I got this on November 15th, the
21 surgical request.
22 Q. Well, how do we know that you didn't get it on
23 October the 27th?
24 A. Because I had called after that on the 8th and also
25 faxed on the -- what does it say here, on the 15th, for

188

PAGE 189 SHEET 48

1    the third time.
2    Q.   So after November the 18th -- I guess we need
3    Sequence Code Number 56. Let's go up to Page 7 of 19.
4    That was just correspondence, on the reserve that you had
5    set, from your manager. Code 57.
6    A.   At the top it says, category reserve, action is
7    correspondence from, object is my manager, Sequence 57,
8    created by Victoria A. Heppes, authorized by Victoria A.
9    Heppes on November 26th, of 04, at 13:42".
10   Q.   Do you set the reserve or does your manager?
11   A.   I don't know, because it is blacked out.
12   Q.   Do you ever set reserves?
13   A.   Yes.
14   Q.   Now, the next one, Sequence Code 58, that doesn't say
15   anything about a reserve. It talks about approval. Why
16   is it blacked out?
17   A.   I don't know.
18         MR. BROWN:   It's all about numbers and dollars.
19         MR. TINNEY:  That's all that's in there?
20         MR. BROWN:   Yes. If you take issue with it I'll
21         be glad to show it to the Court in camera. I
22         just don't think it is discoverable.
23   MR. TINNEY:
24   Q.   On Sequence Code Number 60 you got a phone call from
25   Emory; is that correct?

189

PAGE 190

1    A.   Number?
2    Q.   60 on Page 7. Do you see that, on the surgery
3    report? Where would you get the information that says the
4    doctor is concerned?
5    A.   On Sequence 60, let me finish reading that.
6    Q.   Is that a statement that he made to you that the
7    doctor was concerned or what?
8    A.   It says, surgical report, claimant, phone call from
9    Victoria Heppes on November 30th, 2001. Yes.
10   Q.   What did you tell me WP stood for?
11   A.   Waiting period. Surgery was done on the 29th.
12   Q.   On Page 6 of 19 there is a reference to Sequence Code
13   63, it says, object monitoring, what does that mean?
14   A.   Sequence 63?
15   Q.   Yes.
16   A.   It says, post-op visit --
17   Q.   No, I'm talking about the object, it says,
18   monitoring, up at the top of Sequence 63?
19   A.   I don't know. I've never used that word before.
20   It's probably something that could be -- let's see what
21   date this is. It is the 8th. He was returned to work on
22   the 9th. It was a work status. Correspondence from
23   object monitoring. If the post-op visit was on the 8th,
24   which it says, post-op visit 12-8-04", that means I
25   called there and I was monitoring his progress and return

190

PAGE 191

1    to work at light duty position. Like it says, date
2    returned to work full duty expected four to six weeks.
3    May return to work with restrictions 12-9-04. No use of
4    right arm.
5    Q.   Come over to Page 4 of 19. We've got Sequence Code
6    74 in the middle of the page and Russell Hospital, an
7    amount, and then you've got recovery room anesthesia M13.
8    What does M13 mean?
9    A.   M13 means diagnostic, which is an x-ray. So that
10   bill includes recovery room, anesthesia, M13, which is an
11   x-ray for diagnostic testing and Rx, which means his
12   prescriptions.
13   Q.   Come over to Page 2 of 19, Sequence Code 87, and it
14   says, created by -- who is that? Is it E-a-s-e-l-i-g?
15   A.   It's S-a-s-e-l-i-g. It's Stacy Sledge. Which is my
16   team leader now. Her name is Annie Martin. Her name is
17   Annie Stacy Sledge Martin. So her married name is Martin.
18   Q.   What does it mean, TL comments?
19   A.   Team leader comments. That means she reviewed the
20   file.
21   Q.   So is that something that was sent to you?
22   A.   That was put in the file.
23   Q.   Was it addressed to you?
24   A.   Yes.
25   Q.   What did you do where it says, when you monitor TAD

191

PAGE 192

1    -- tell me again what TAD was?
2    A.   TAD, which means temporary alternative duty.
3    Q.   When you monitor temporary alternative disposition
4    please follow up on obtaining -- is that OS?
5    A.   OS means outstanding medical, which are medical
6    records.
7    Q.   -- And set up an appropriate date to follow up on
8    that as well as a future date to review for closure. Has
9    this file been closed.
10   A.   No, sir.
11   Q.   Then on Page 1 of 19, Sequence Code 89, again I guess
12   from your team leader.
13   A.   TL diary. It goes like this.
14   Q.   Okay. So this indicates the claimant had still not
15   been fully released; correct? Where it says, set a TAD
16   task to follow up on -- what is ID work?
17         MR. BROWN:   I think it's LD.
18   MR. TINNEY:
19   Q.   LD, what does that mean?
20   A.   Light duty.
21   Q.   As claimant has not been fully released. Then it
22   says, send a letter to the MD asking when MD expects
23   MMI, did you do that?
24   A.   Not yet.
25   Q.   That was on April the 26th, of 2005. We are almost a

192

PAGE 193 SHEET 49

1  year down the road. When do you intend to do that?
2  A. Well, I would have probably done it after his April
3  25th visit, but that's when he called me and told me the
4  doctor said that he needed another surgery.
5  Q. A different one, not related to workman's comp; is
6  that what you're talking about?
7  A. Okay. This was after the lawsuit was filed. This
8  was here to let me know --
9  Q. We didn't file the lawsuit until June.
10       MR. BROWN: Correct.
11 A. 4-26. That was something to do for the future. If I
12 hadn't had a date in there timely -- now, for example,
13 closing the claim where she put on the last one where you
14 asked --
15 MR. TINNEY:
16 Q. Pursue FD release, is that final disposition?
17 A. Full duty.
18 Q. Full duty release, did you do that?
19 A. Let me see. Pursue full duty release. I haven't yet
20 because he is not at full duty yet. I still have him on
21 restrictions from Dr. Howorth.
22 Q. On Page 1 of 19, is there some kind of an agreement
23 that you have with Dr. Shirah that if an attorney asks for
24 somebody's medical records, workman's comp medical
25 records, that they've got to have your approval?

193

PAGE 194

1  A. No.
2  Q. Do you know why they called you and asked you?
3  A. I have no idea. Probably to see if you were who you
4  say you were, you know.
5  Q. What now?
6  A. That you are who you say you are, because you
7  probably --
8       MR. BROWN: You've answered the question.
9  MR. TINNEY:
10 Q. Since I represent Dr. Shirah, I think he knows who I
11 am.
12 A. Oh, I didn't know. I don't know.
13 Q. Who is Berneta J. Boyle?
14 A. She's a person that works at CMI.
15 Q. What does she do? What are her responsibilities?
16 A. From what I know, when a new loss comes into the
17 system it goes to her first and she keys it into our
18 system. I do not know what all her job duties are.
19 Q. I see a lot of bar codes applied on these records.
20 Do you know where these bar codes come from or what they
21 relate to?
22 A. No.
23 Q. Let me show you what I've marked as 9. I think I
24 skipped Exhibit 9. This is a document that was presented
25 to us, ISO Claim Search Match Report.

194

PAGE 195

1  PLAINTIFF'S DEPOSITION EXHIBIT 9, marked for
2  Identification. (Claim Search Report. Page 222.)
3  MR. TINNEY:
4  Q. Can you identify that for me and tell me what that
5  is?
6  A. This is a state report that shows if Emory Brown has
7  filed any insurance claims.
8  Q. Any previous workman's comp claims?
9  A. Or anything else from insurance.
10 Q. And did it indicate whether he had?
11 A. Let me see.
12 Q. Well, it will speak for itself.
13 A. This is the one that's there's one match and that is
14 the one of the injury there at the store on 9-29.
15 Q. I'll show you what I've marked as Plaintiff's Exhibit
16 13, which appears to be something called a Presurveillance
17 Checklist, with some documents after it.
18
19 PLAINTIFF'S DEPOSITION EXHIBIT NUMBER 13, marked for
20 Identification. (Presurveillance Checklist. Page 231.)
21 MR. TINNEY:
22 Q. What is that?
23 A. That is something I put wrong in the file.
24 Q. What do you mean you put it wrong in the file?
25 A. Well, I was scanning it -- as a matter of fact, I

195

PAGE 196

1  noticed it in the file the other day and I thought I have
2  probably, some place down the line, touched the wrong
3  button and put the wrong thing in the file. This is
4  something that I would fill out if I wanted surveillance
5  and send it in to a surveillance person for outside
6  surveillance. This has not been filled out or anything,
7  so I may have just pulled off the wrong thing to put into
8  the file. I did pull off the wrong thing.
9  Q. Did you ever at any time intend to have outside
10 surveillance conducted of Mr. Brown?
11 A. No.
12 Q. So it's another mistake that this is in the file.
13 A. Yes.
14 Q. I'll show you what I've marked as Plaintiff's Exhibit
15 14 and I'll ask you to identify what this is, please,
16 ma'am?
17 A. I don't know.
18
19 PLAINTIFF'S DEPOSITION EXHIBIT NUMBER 14, marked for
20 Identification. (Factel. Page 235.)
21 MR. TINNEY:
22 Q. Well, it's something that you put in the file or was
23 contained in the file. Have you ever seen that?
24 A. No.
25 Q. I'll show you what is marked as Plaintiff's Exhibit

196

PAGE 197 SHEET 50

1  15 and I'll ask you to identify this, please, ma'am.
2  A. I don't know.
3
4  PLAINTIFF'S DEPOSITION EXHIBIT NUMBER 15, marked for
5  identification. (Map. Page 236.)
6  MR. TINNEY:
7  Q. Do you know what Factel is?
8  A. Factel, that's surveillance. I think.
9  Q. I'll show you what's marked as Plaintiff's Exhibit 16
10 and I'll ask you what that is, ma'am?
11 A. It says it's a Global Security Document.
12
13 PLAINTIFF'S DEPOSITION EXHIBIT NUMBER 16, marked for
14 identification. (Global Security. Page 237.)
15 MR. TINNEY:
16 Q. Do you know what that is or why you would have
17 printed that off?
18 A. No.
19 Q. Have you ever printed those off before?
20 A. No.
21 Q. So this is the only case you've ever printed
22 surveillance information off in?
23 A. I didn't do it in this one for a reason. It was a
24 mistake.
25 Q. Did you have to have Mr. Brown's medical records

197

PAGE 198

1  reviewed by another physician in order for him to have
2  surgery approved?
3  A. Did I or did I have to?
4  Q. Did you have to?
5  A. To answer that question, and I think I've answered it
6  before, in a precert, to send a formal precert in, that's
7  what they are, is medical. There's a medical doctor or
8  medical group there that does the precertification.
9  Because I took it upon myself to go to my team leader with
10 it, without sending it in for a formal precert.
11 Q. We've gone through that. But I'm just asking you if
12 we're talking about this CorVel, do you know if they use
13 medical doctors or what their review process is?
14 A. It's medical doctors, yes. At the time I don't
15 remember his name.
16 Q. When you get something back from CorVel is it a
17 statement from a physician?
18 A. Yes.
19 Q. So did you tell Mr. Brown that his case had to be
20 reviewed by a doctor before he could get approval for
21 surgery?
22 A. I may have.
23 Q. Did you tell him it had to be reviewed by two doctors
24 before he could get approval for surgery?
25 A. No.

198

PAGE 199

1  Q. Have you, in your manuals and all that you referred
2  to earlier, seen a statement anywhere that says surgery
3  must be approved by CorVel before it's done?
4  A. I'm sorry. Can you say that question again?
5  Q. In the manuals and training information that you have
6  referenced earlier in the deposition, have you seen any
7  statement that says surgery must be approved by CorVel
8  before surgery can be authorized?
9  A. In the manual, my work manual, that's the procedure.
10 Q. Did you have any records in your file at any time
11 that you believed indicated that rotator cuff surgery was
12 not medically necessary for Mr. Brown?
13 A. No.
14 Q. Why didn't you tell Mr. Brown that you believed that
15 he needed the surgery too?
16 A. Because he had a legitimate injury at the store. He
17 was told, was told by me, that he needed surgery because I
18 saw the MRI report and it doesn't say normal.
19 Q. But I'm saying why didn't you tell Mr. Brown --
20 A. Why didn't I tell?
21 Q. Yes. Why did you not tell him that you thought he
22 needed this surgery to be done too?
23 A. Because I think that's a little too personal. I need
24 to go by guidelines and the guidelines say what I should
25 do. Do I feel that he needed surgery, yes, and I

199

PAGE 200

1  sympathize with all my associates, but I'm not going to
2  tell him that it didn't need to be done.
3  Q. Did you tell him that you had not received the
4  records from Howorth?
5  A. At what date?
6  Q. Any time?
7  A. Oh, I'm sure I did. And after I got off the phone
8  with him I immediately called Amy and I said, do you know
9  what -- if I had called her already that day and he
10 happened to call me that day, I'd tell him, yes, I just
11 called and she said they are on their way, or I'll call
12 right now and bug Amy again and see if she can get them
13 sent over. I haven't received them yet. I'll check my
14 faxes.
15 Q. Did you ever tell Mr. Brown that -- I think it was
16 Ms. Abbott stated that she could not say that his surgery
17 was medically necessary?
18 A. No.
19 Q. Did anyone ever send you these photographs of Mr.
20 Brown?
21 A. I don't recall, no.
22 Q. Is there another branch of CMI located anywhere other
23 than in Rogers?
24 A. In this state?
25 Q. In the country.

200

PAGE 201 SHEET 51

1  A.  We have a Bartlesville office, I think.
2  Q.  You don't know the state it's in?
3  A.  No.
4  Q.  Did you ever ask Dr. Howorth for a disability rating?
5  A.  On the surgery request, Page 6 of 6, it says, what
6  permanent impairment rating do you anticipate following
7  surgery, do you see where I'm talking about?
8  Q.  What did he say?
9  A.  It says, e-s-t, period, two to four percent -- I
10 can't read that word -- body as a whole, five to 10
11 percent arm.
12 Q.  What duty do you have as his claim's manager to get
13 back in touch with Mr. Brown and discuss with him whether
14 he has any entitlement to workman's compensation?
15 A.  It is in the process of medical -- it is my duty.
16 After the doctor has seen if that is -- after surgery,
17 after we've gone through physical therapy, usually we have
18 a FCE exam and that FCE exam would then be reviewed by the
19 treating physician and the treating physician will at that
20 time give the exact rating that he has chosen or that the
21 claimant has and if there are any permanent restrictions.
22 I cannot know that until after he has reached MMI.
23 Q.  Did you ever have the physical therapy records sent
24 to you?
25 A.  I don't know if I have it in the file.  I always

201

PAGE 202

1  followup on physical therapy.
2  Q.  I haven't seen anything, in what you gave me, on
3  physical therapy.
4         MR. BROWN:  I don't know that there is.
5  A.  No, I don't think there is any.
6  MR. TINNEY:
7  Q.  Did you request any?
8  A.  I think I did.  I'm sure I did.
9  Q.  Did you followup on it?
10 A.  When I authorized the evaluation I asked that
11 progress reports be sent periodically to my office so that
12 I could put them in the file.  That doesn't mean that they
13 do them and I don't call on those like I would on medical
14 notes or surgical requests.  It's not that they are not
15 important, but --
16        MR. BROWN:  You've answered the question.
17 MR. TINNEY:
18 Q.  Once the CorVel report comes back does somebody,
19 either team leader or somebody higher than you, still have
20 to approve the surgery?
21 A.  No.  If it's certified it comes right to me and they
22 immediately email it to me.
23 Q.  Does CMI adjust workman's comp for any client other
24 than Wal-Mart, to your knowledge?
25 A.  No.

202

PAGE 203

1  Q.  You don't know or they don't?
2  A.  CMI is -- no, I don't know.
3  Q.  Did you ever personally talk to Dr. Howorth?
4  A.  Just Amy.  I think I only talked to Amy.
5  Q.  Have you referred anyone else to Dr. Howorth since
6  Mr. Brown?
7  A.  Yes.
8  Q.  After Mr. Brown was treated?
9  A.  During the same time frame.
10 Q.  Have you ever been reprimanded or criticized by your
11 team leader or superiors for not logging calls made or
12 received by you?
13       MR. BROWN:  At what point in time?
14       MR. TINNEY:  At any time.
15       MR. BROWN:  I'm going to object then to anything
16       after the fact as being something that's not
17       relevant.  Before the fact, she can answer.
18 A.  Reprimanded, no.
19 MR. TINNEY:
20 Q.  Have you been talked to about it?
21 A.  I think that's a harsh word, reprimanded.
22 Q.  Well, did they talk to you about it?
23 A.  Yes.
24 Q.  Who talked to you?
25 A.  My team leader.

203

PAGE 204

1  Q.  What did she say to you?
2  A.  Remember that documentation is very important and try
3  to document everything.
4  Q.  Did you ever have to file any long, narrative report
5  about Mr. Brown's case, before the lawsuit was filed, with
6  anyone?
7  A.  No.
8  Q.  Did you ever change any of the entries in the records
9  after the lawsuit was filed?
10 A.  No.
11 Q.  Do you have any judgment or opinion as to why these
12 diary entries are so out of sequence and out of order?
13 A.  Because when somebody else goes in the file and pulls
14 up the notepad to look at and read, it seems to go back in
15 the system not in sequence.
16       MR. BROWN:  You didn't answer his question.  If
17       you know, tell him.  If you don't know, you
18       don't know.
19 A.  I don't know.
20 MR. TINNEY:
21 Q.  You mentioned that you would always have to call
22 Steve's mother-in-law's house?
23 A.  Emory.
24 Q.  Well, Emory's mother-in-law's house.
25 A.  Yes.

204

PAGE 205  SHEET 52

1   Q.   You never called his house?
2   A.   He doesn't have a phone number.
3   Q.   Did you ever talk to his wife about his case?
4   A.   I don't remember.
5   Q.   Emory testified that Dr. Howorth told him -- in his
6   deposition, that Dr. Howorth told him he had to have
7   surgery and set him up to do it, I think, on the following
8   Monday and before he even got home you had cancelled the
9   surgery.  Did you cancel his surgery?
10  A.   I needed this medical request, so it was -- did I
11  cancel it, I said, wait until we get the medical request
12  so that it can be approved.  It has to be approved before
13  it can be scheduled.
14  Q.   So you did stop the surgery?
15          MR. BROWN:  Object to form.
16  A.   I don't remember.
17  MR. TINNEY:
18  Q.   You just said that you made that statement that you
19  just told us about.  Who did you make that statement to?
20  A.   That's my process.  So if they had ordered surgery I
21  said that I needed the surgical request back and the
22  medical notes before it could be approved and that we
23  would -- if I did say that, I'd say we have to postpone it
24  until all the medical records are in.
25  Q.   Emory said you called his house before he even got
                                    205

PAGE 206

1   home and told someone that you had canceled it or stopped
2   it; is that correct?
3   A.   Yes.
4   Q.   Unless you have a question you want me to ask you, I
5   think I'm through.
6   A.   I don't think so.
7           MR. TINNEY:  That's all.
8
9               CROSS EXAMINATION
10  MR. BROWN:
11  Q.   Ms. Heppes, are you part of any computer systems or
12  Information Technologies Department at CMI?
13  A.   No.
14  Q.   So as to whether documents are retained on a computer
15  or if they can be retrieved from a computer, if you said
16  something can be done, would you defer to somebody in
17  Information Technologies.
18  A.   Yes.
19          MR. BROWN:  That's the only two questions I
20          have.
21          MR. TINNEY:  We have agreed that defense counsel
22          will retain what is marked in Ms. Heppes
23          deposition as Plaintiff's Exhibit 1, which
24          consist of pages numbered in the lower right-
25          hand corner, by Jeff Brown, as being pages one
                                    206

PAGE 207

1           through 100, that was presented in Response to
2           Request For Production of Documents as being all
3           the records that Wal-Mart had.
4           MR. BROWN:  I want to add a caveat.  All the
5           records that have been provided to me up until
6           the date the production was made, which was
7           April 10th, 2006.
8   (Deposition Concluded.)
                                    207

# CMI



PLAINTIFF'S DEPOSITION EXHIBIT 2

P.O. Box 1288
Bentonville, AR 72712-1288

Phone# 479)621-2900
Fax#    479)273-8066

## Fax

| | |
|---|---|
| **To:** Attn: Dr. Shirah | **From:** Victoria Heppes Greenspan |
| **Fax:** 334-863-2361 | **Pages:** 2 |
| **Re:** same | **Date:** 10/07/04 |

Comments: Please have Dr. Shirah address a return to work with restrictions at next office visit 10/08/04. Thank you Victoria Heppes-Greenspan

209

7

Please return via fax-
ATTN: Victoria Heppes
Fax: 479-273-8020

## Wal-Mart AND Sam's Club
## RETURN TO WORK ACTIVITY PRESCRIPTION
## TEMPORARY ALTERNATE DUTY AVAILABLE

*Wal-Mart believes strongly that an early return to work promotes the healing process and has an excellent return to work program. Please review the following restrictions and write a return to work activity prescription that provides a guide for the store. The store will attempt to find a temporary alternate duty position that meets the criteria you specify. Your assistance in this matter will allow the associate to safely recover at work and earn a full wage.*

**Associate** Emory Brown _____ **Date of Injury:** 09/29/04

**Diagnosis:** (unknown) **Date of physician visit:** 10/08/04

*who completed*

**Associate may return to work:** *Please date applicable option*

With no restrictions on: _____
(date)

With restrictions on: _____
(date)

If returned to work with restrictions, please specify:
**Maximum lifting limit:** _____ lbs.

____ Alternate sitting/standing    ____ No squatting       No:    ____ Pushing    ____ Pulling
____ Sitting work only             ____ No bending         No use: ____ Rt. Hand  ____ Lft. Hand
____ Standing work only            ____ No stooping               ____ Rt. Arm   ____ Lft. Arm
____ No overhead reaching          ____ No twisting               ____ No weight bearing
____ No above the shoulder work    ____ No ladder work

*Please write any additional restrictions necessary:*
_____
_____

**Associate is authorized off work:** _____
(date)

*Please explain the medical necessity of not allowing a return to work and list proposed treatment plan:*
_____
_____
_____

Associate will be reevaluated: _____
(date)

Anticipated return to regular duty: _____
(date)


_____         _____
(Physician's Signature)                          (date)

210
8
pl 2

Case 3:05-cv-00681-WKW-CSC   Document 36-14   Filed 08/23/2006   Page 15 of 20

FROM : WalMart          FAX NO. :                    Oct. 08 2004 06:29PM P1
(Thu. 7 Oct 2004 14:07:44 -0500) (aee1a5207b4040bbaf97Ce329ba78c10) Fax 13348632361  Page 1 of 4

To

# Wal-Mart Stores Inc.

### Fax Coversheet

**Date:** Thu, 7 Oct 2004 14:07:44 -0500
~~From~~: Victoria Heppes Greenspan
**Email:** Victoria.Heppes@cmiw.com

To

~~To~~: From — Kenneth Rowland.
**Fax:** 13348632361
**Subject:** Emory Brown

This fax and any files transmitted with it are CONFIDENTIAL and intended solely for the individual or entity to whom they are addressed. If you have received this in error please destroy it immediately.

PLAINTIFF'S DEPOSITION EXHIBIT 3

211
76

FROM : Wal-Mart   FAX NO. :   Oct. 08 2004 06:30PM P2

(Thu, 7 Oct 2004 14:07:44 -0500)

Please return via fax-
ATTN: Victoria Heppes
Fax: 479-273-8020

## Wal-Mart AND Sam's Club
### RETURN TO WORK ACTIVITY PRESCRIPTION
### TEMPORARY ALTERNATE DUTY AVAILABLE

*Wal-Mart believes strongly that an early return to work promotes the healing process and has an excellent return to work program. Please review the following restrictions and write a return to work activity prescription that provides a guide for the store. The store will attempt to find a temporary alternate duty position that meets the criteria you specify. Your assistance in this matter will allow the associate to safely recover at work and earn a full wage.*

**Associate** Emory Brown   **Date of Injury:** 09/29/04

**Diagnosis:** unknown   **Date of physician visit:** 10/08/04

**Associate may return to work:** *Please date applicable option*

With no restrictions on: _____ (date)

With restrictions on: __10/10/04__ (date)

If returned to work with restrictions, please specify:
**Maximum lifting limit:** _____ lbs.

___ Alternate sitting/standing     ___ No squatting     No: ___ Pushing     ___ Pulling
___ Sitting work only              ___ No bending       No use: ___ Rt. Hand   ___ Lft. Hand
___ Standing work only             ___ No stooping             ✓ Rt. Arm      ___ Lft. Arm
___ No overhead reaching           ___ No twisting             ___ No weight bearing
___ No above the shoulder work     ___ No ladder work

*Please write any additional restrictions necessary:*
_____
_____

**Associate is authorized off work:** _____ (date)

*Please explain the medical necessity of not allowing a return to work and list proposed treatment plan:*
_____
_____

Associate will be reevaluated: __10/15/04__ (date)

Anticipated return to regular duty: __10/22/04__ (date)

_____ Shish, MD   __10/8/04__
(Physician's Signature)                (date)

212
77

## PLEASE RETURN A.S.A.P

Dear Dr. Shirah                                              10/07/2004

It is my understanding that Emory Brown has been taken out of work per a work comp injury. The store can place him in a **SEDENTARY OR LIGHT DUTY POSITION WITH THE FOLLOWING RESTRICTIONS:**

1. One handed job that will not allow any use of the upper extremity
2. Etc. (please see paragraph below)

Restrictions are not limited to the above. The position can be further modified if needed with any restrictions that you feel are necessary to facilitate recovery.

Please make a choice below to the work restrictions you feel Emory can be placed under during his recovery time. *Keep in mind that unless the patient is on complete bed rest we have jobs that will accommodate the recovery process. Please note that Emory does not accrue benefits and does not receive a full paycheck while out of work!*

1. ___ may perform sedentary job duties with restrictions to the following:
   _____ No use of R arm _____

2. ✓ may perform light duty job duties with restrictions to the following:
   _____ No use of R arm _____

3. ___ may not perform any job duties due to the following reasons:
   _____

DATE OF NEXT OFFICE VISIT: _10/15/04_

_Shirah, MD_      _10/8/04_
Physician's signature       Date

I have attached a letter explaining Wal-Mart / CorVel / CMI Temporary Alternative Duty program (also known as T.A.D.) for you and your office to view. When you are finished with your response, **please fax back to Amy Shelley at 1-479-621-2106.**

I would like to thank you for your time and attention on this matter! If you have any questions please feel free to contact me at 1-479-621-2205.

Sincerely,

Amy Shelley T.A.D. Specialist

213

78

FROM :                          FAX NO. :                    Oct. 08 2004 06:30PM P4

## HOME RESTRICTIONS

*Please complete this form if the patient is UNABLE to return to work!*

Please mark below daily functions that the patient is able to do at home.

___ pick up a gallon of milk             ___ alternate sit/stand /walk

___ sit and watch T.V                    ___ use a telephone

___ blow dry/ style hair                 ___ drive a car

___ walk distance of 500 YD.             ___ lift a 15 lb child/pet

___ grocery shop                         ___ shower/bath w/o assistance

___ house hold chores                    ___ shower/ bath with assistance
( mop, dust, vacuum, laundry, dishes)

---

Please list below any restrictions that you have given the patient at home:

1. _____      4. _____

2. _____      5. _____

3. _____      6. _____

comments: _____
_____
_____

**DATE OF NEXT OFFICE VISIT:** _____


_____   _____
Physicians Signature        Date

214

79

**Workmen's Compensation Claim**
Employer:   Wal-Mart
Employee:   Emory Brown
Date:       October 04, 2004



PLAINTIFF'S DEPOSITION EXHIBIT
4

P: Right shoulder pain.
S: Patient was seen in the ER five days ago for a work related injury. He states he was unloading a 50 pound sack of potatoes which he accidentally dropped. When he tried to catch them, he reached with his right arm suddenly and felt a "pop" in the right shoulder followed by pain. He was seen in the ER where x-rays were done and were negative for fracture or dislocation. He was treated with Lortab 5/500 prn pain and advised to follow up in a few days. He states the pain is primarily about the right shoulder. It occasionally radiates to the right elbow. No definite paresthesias.
O: Exam of the right shoulder reveals restricted ROM secondary to pain. Mild to moderate diffuse tenderness about the shoulder. Neurovascular intact of the right upper extremity.

Assessment:   Severe sprain of the right shoulder.

Plan: Start Motrin 600 mg p.o. and h.s. and Robaxin 750 mg two q.i.d. for three days followed by one q.i.d. Darvocet N 100 one or two q4-6h prn pain. Moist heat as directed. He is not to return to work until follow up in four days.
MSadb


**Workmen's Compensation Claim**
Employer:   Wal-Mart
Employee:   Emory Brown
Date:       October 08, 2004

P: Follow up.
S: Patient states the pain is better but he still can't use his right upper extremity. Pain is located anteriorly and posteriorly in the right shoulder. Complains of a "pulling" with movement of the right upper extremity.
O: Exam essentially unchanged.

Assessment:   Severe sprain of the right shoulder.
              Cannot rule out rotator cuff tear.

Plan: Continue present medications. Consider MRI if symptoms persist without improvement. Patient may return to light duty on 10-10-04. Return here in one week.
MSadb

215

**Workmen's Compensation Claim**
Employer: Wal-Mart
Employee: Emory Brown
Date: October 15, 2004

P: Follow up.
S: Patient still having pain extending from the shoulder to the mid portion of the right upper arm.
O: Patient has active abduction to approximately 90° at which point he experiences moderate pain. No crepitus. Neurovascular still intact.

Assessment:   Severe sprain of the right shoulder with possible rotator cuff tear.

Plan: Continue present medications. MRI is scheduled. Continue light duties at work. Return here in one week.
MSadb

**Workmen's Compensation Claim**
Employer: Wal-Mart
Employee: Emory Brown
Date: October 22, 2004

P: Follow up.
S: Right shoulder pain is unchanged.
O: Exam is essentially unchanged. MRI shows a tear of the anterior portion of the supraspinatus tendon. A subchondral cyst is noted in the greater tuberosity. Also noted is a tear of the anterosuperior aspect of the labrum. Advanced degenerative changes of the AC joint are noted with impingement as well as subacromial bursitis.

Assessment:   Right rotator cuff tear.

Plan: Patient is referred to an orthopedist of the company's choice. Return here prn.
MSadb

216