1  doing on a regular basis for the past five years or
2  so?
3       A.   Yes.
4       Q.   Okay.  On an average day about how many of
5  these precert forms will you do?
6       A.   Four.
7       Q.   Okay.  And tell me again the purpose of the
8  document.
9       A.   For precert information or surgical
10 benefits.
11      Q.   Okay.  And is this a form that is used
12 within your office, or is this provided to you by
13 the insurance carrier?
14      A.   No, it's for our office.
15      Q.   I see on there where it says -- let me see
16 if I can find it.  I believe down towards the bottom
17 it says, "10/27/04, left message for workers' comp
18 to call me back."  Do you see that?
19      A.   Yes.
20      Q.   Is that your initials beside it?
21      A.   Yes.
22      Q.   Okay.  And that's -- you wrote that, I
23 presume, after you called and left a message for
24 Victoria at Claims Management.  Does that sound
25 correct?

1     A.   Correct.
2     Q.   Okay.  According to the records that I
3  have, 10/27/04 would have been the first day that
4  Mr. Brown treated with your office.  Do you have any
5  knowledge if that was his -- the day of his first
6  appointment?
7     A.   I do not, huh-uh.
8     Q.   Okay.  I'll show you this, and I'm not
9  going to mark it as an exhibit.  And I'll show
10 Mr. Tinney.  That's just his records from his first
11 appointment.
12              (Document handed to counsel and
13               witness.)
14    Q.   And I'll just let you look at that.  And
15 notice on the top it says, "Emory is a delightful
16 new patient," and it's dated October 27, 2004.
17    A.   Right.
18    Q.   Does that look like a record that y'all
19 normally keep following a patient's visit?
20    A.   Yes.
21    Q.   And if you need more time to look over it.
22    Does that look like that was produced after his
23 first consultation here at Alexander City
24 Orthopaedics?
25    A.   Yes.

```
 1      Q.   Do you have any records of your telephone
 2   calls with Victoria at Claims Management?
 3      A.   In his chart, yes.
 4      Q.   You do?
 5      A.   Uh-huh.
 6      Q.   Do you think if we take a couple-minute
 7   break, you could go and get those?
 8      A.   He's got his chart.  Dr. Howorth has his
 9   chart.
10      Q.   Okay.
11      A.   The only thing that I have is what's
12   written.
13      Q.   Okay.  Do you think -- would Dr. Howorth
14   let us look at those telephone records?
15      A.   I can ask him.
16           MR. GRUBB:  Okay.  Go off the record for
17       just a second.
18              (A discussion was held off the
19              record.)
20           MR. GRUBB:  We'll go back on the record.
21      Q.   On October 27, 2004, I show four telephone
22   calls.  I'm going to mark this, but I need to do a
23   redacted copy.  I tell you what.  I'm just going to
24   skip that for now.
25           We have -- on 10/27/04 you have a message for
```

```
 1   Victoria to call you back; is that correct?
 2        A.   Correct.
 3        Q.   Okay.  Do you have any record that she
 4   called you back at any point?
 5        A.   Just from where she said that they wanted
 6   him to go through therapy.
 7        Q.   Okay.  And where is that written?
 8        A.   Under her name.
 9        Q.   Okay.  And that looks like by secondary
10   insurance company; is that right?
11        A.   Yes.
12        Q.   Okay.  And just read what that note says.
13        A.   "Work comp wants him to go through therapy
14   first.  Then they will precert surgery."
15        Q.   Okay.  And do you know what time -- what
16   date that note was written on?
17        A.   It should be also 10/27/04.
18        Q.   Okay.  So that would indicate that you
19   talked to her at some point --
20        A.   Yes.
21        Q.   -- that day.
22        And if I had telephone records from Claims
23   Management that show four telephone calls on that
24   day between Alexander City Orthopaedics and Claims
25   Management, would you dispute that?
```

```
 1       A.   No.
 2       Q.   Okay.  Would you be able to say if it's
 3  accurate or not?
 4       A.   I don't remember.
 5       Q.   Okay.  Now, on the bottom of that form I
 6  see a note.  And tell me what that says about
 7  "approved."
 8       A.   "Approved on 11/16/04."
 9       Q.   Okay.  So that's the date that the surgery
10  was approved?
11       A.   Right.
12       Q.   And that's by Victoria at Claims
13  Management?
14       A.   Right.
15       Q.   Okay.  And then it looks like you signed it
16  and dated it on that date?
17       A.   Right.
18       Q.   And that's your initials out there again,
19  A.M.?
20       A.   Yes.
21       Q.   So is it correct to say this form shows
22  your initial contact with Victoria on October 27,
23  2004, and then that the surgery was approved on
24  November 16th?
25       A.   Yes.
```

```
 1      Q.   Okay.  I have here a second document.  I'm
 2  going to label it Defendant's Exhibit No. 2.  And it
 3  is four pages long.  It appears to be a surgery
 4  request form.
 5              (Defendant's Exhibit 2 was marked for
 6              identification.)
 7              (Document handed to counsel and
 8              witness.)
 9      Q.   Is that something that you received from
10  Claims Management?
11      A.   Yes.
12      Q.   Okay.  And does it indicate what date you
13  received that on?
14      A.   It's dated 10/27/04.
15      Q.   Okay.  And would you say that's the date
16  that you received it on?
17      A.   I don't recall.
18      Q.   Okay.  Would you have -- would you have any
19  reason to think that it came on a different date?
20      A.   No.
21      Q.   Okay.  Is that something that would have
22  been faxed to you?
23      A.   Yes.
24      Q.   Okay.  So that was faxed to you by Victoria
25  Greenspan?
```

```
 1         A.   Yes.
 2         Q.   Okay.  And you believe that was on
 3    10/27/04?
 4         A.   Yes.
 5         Q.   Okay.  Tell me what that surgery request
 6    form is.
 7         A.   It looks like that it's a form for the
 8    physician to fill out on -- for the surgical
 9    procedure:  whether it's inpatient or outpatient;
10    where it will be completed; physical restrictions
11    for after surgery; release to return to work in
12    modified duty after surgery; will physical therapy
13    be expected; projected MMI; permanent impairment
14    rating expected afterwards; should this patient
15    choose not to proceed with surgery, what permanent
16    impairment would he have; and is surgical
17    intervention requested in whole or part due to the
18    reported work injury; and his signature.
19         Q.   Okay. And is some of this form -- is any
20    of this form in your handwriting?
21         A.   It looks like the second question, the
22    third question, the fourth and fifth question, and
23    then it's the physical therapy referral.
24         Q.   So those questions, the first one -- I just
25    want to make sure I have got this right.  The first
```

Case 3:05-cv-00681-WKW-CSC    Document 36-18    Filed 08/23/2006    Page 8 of 20

28

```
 1    one again, "Is this patient a good, fair, or poor
 2    candidate?"  Or the second question, the first one
 3    with your handwriting.
 4         A.   Yes.
 5         Q.   And the next one with your handwriting is
 6    "surgical procedure"?
 7         A.   Right.
 8         Q.   And then the next one with your handwriting
 9    is, "Will the procedure be completed on an
10    outpatient or inpatient basis?"
11         A.   Yes.
12         Q.   And then the final question that you
13    responded to in your handwriting is "name, address,
14    and phone number of the facility."
15         A.   There's one more at the bottom.
16         Q.   Okay.  I see that one.  The last question
17    on this page, which is labeled at the top "Claims
18    Management, Incorporated"; and it says, "Is a
19    physical therapy referral or home exercise program
20    expected postoperatively?"  You wrote "yes" on that?
21         A.   Right.
22         Q.   Okay.  Who filled out the remaining
23    questions and the answers on this?
24         A.   Dr. Howorth.
25         Q.   Okay.  And is that his signature on the
```

*Post Office Box 81*
*Columbus, Georgia 31902*
*(706) 317-3111*

```
 1   bottom?
 2       A.   It is.
 3       Q.   Okay.  And then did he date that?
 4       A.   Yes.
 5       Q.   Okay.  What date is that?
 6       A.   10/30/04.
 7       Q.   So this would indicate he completed the
 8   surgical request form on 10/30/04?
 9       A.   Yes.
10       Q.   Okay.  Is this something that y'all do on a
11   regular basis, completing this type of paperwork?
12       A.   Yes.
13       Q.   And this is part of your normal duties, to
14   help fill out this paperwork?
15       A.   Yes.
16       Q.   Okay.  And is it also part of your normal
17   duties to receive the forms from the insurance
18   carrier and then return those forms to them once
19   they are complete?
20       A.   Yes.
21       Q.   Okay.  Is this a fairly -- is this form
22   fairly typical as far as the ones that --
23       A.   Yes.
24       Q.   -- you come across?
25            Is this the standard form for Claims
```

```
 1   Management, Incorporated?
 2        A.   I don't recall.
 3        Q.   Okay.  So we've said that it appears that
 4   Victoria Greenspan faxed this form to you on October
 5   27.
 6        A.   Right.
 7        Q.   And it appears that the doctor signed and
 8   dated the form on October 30th.
 9        A.   Right.
10        Q.   Okay.  Okay.  Let me look at that exhibit
11   again.
12                 (Document handed to counsel.)
13        Q.   On the first page of Exhibit 2, which
14   appears to be the fax cover sheet that's labeled
15   "Surgery Request," there's a handwritten note down
16   towards the bottom right-hand corner as you are
17   looking at the page.  Is that your handwriting?
18        A.   Yes.
19        Q.   What does that say?
20        A.   "11/15/04 faxed" and my initials.
21        Q.   Okay.  Does that indicate that you faxed
22   that surgery request form on that date, 11/15/04?
23        A.   Yes.
24        Q.   Is there any other record that you have of
25   any other faxes that you sent to Claims Management
```

```
 1   of that surgery request form?
 2       A.   No.
 3       Q.   Okay.  Then if we go back to Exhibit 1, the
 4   precert information sheet, it shows that the surgery
 5   was approved on 11/16/04; is that correct?
 6       A.   Right.
 7       Q.   And that's in your handwriting at the
 8   bottom?
 9       A.   Yes.
10       Q.   So just to construct a time line here from
11   what we have gone over so far -- and I'll just ask
12   you to tell me if this is correct -- it appears that
13   Emory Brown first presented for treatment on October
14   27th, 2004 --
15       A.   Right.
16       Q.   -- at Alexander City Orthopaedics?
17       A.   Right.
18       Q.   Okay.  And on October 27, 2004, you made
19   contact with Victoria at Claims Management?
20       A.   Yes.
21       Q.   On October 27, 2004, there's a record of a
22   fax sent from Claims Management?
23       A.   Yes.
24       Q.   And that fax is a surgery request form?
25       A.   Yes.
```

```
 1        Q.   That fax was filled out, dated and signed
 2   by Dr. Howorth on October 30, 2004; is that correct?
 3        A.   Yes.
 4        Q.   And then there's a note on Defendant's
 5   Exhibit No. 2 that you faxed the surgery request
 6   back to Claims Management on November 15, 2004?
 7        A.   Yes.
 8        Q.   And on Defendant's Exhibit No. 1, there's a
 9   note that the surgery was approved on November 16,
10   2004?
11        A.   Right
12        Q.   Okay.  Do you have on there -- or do you
13   know the date on which Mr. Brown's surgery actually
14   took place?
15        A.   No.
16        Q.   Okay.  If I said November 29, 2004, does
17   that sound right to you?
18        A.   Yes.
19        Q.   Okay.  Do you have any knowledge as to why
20   there was a 13-day gap between when the surgery was
21   approved on November 16th and the surgery actually
22   taking place on November 29, 2004?
23        A.   No.
24        Q.   Okay.  What date does Dr -- Dr. Howorth,
25   you said he normally performs his surgery on what
```

1  days?
2       A.  Monday and Thursday mornings.
3       Q.  Would that schedule have been altered at
4  all by the Thanksgiving holiday falling within that
5  time in late November?
6       A.  I don't recall.
7       Q.  Okay.  Do you have any records of any
8  telephone conversations with Claims Management from
9  that period between November 16th through the 29th?
10      A.  No.
11      Q.  Okay.  Do you have any records of the
12 conversations between Claims Management or between
13 your office and Claims Management between October
14 30th, when Dr. Howorth signed that surgery request,
15 to November 15th?
16      A.  No.
17      Q.  Okay.  Do you have any record that
18 Mr. Brown's surgery was ever scheduled for an
19 earlier time and then was canceled?
20      A.  Not in front of me.  I don't recall.
21      Q.  Okay.  So you don't recall whether that
22 ever happened?
23      A.  No.
24      Q.  Okay.  Have you seen any type of record
25 that would lead you to believe that has happened?

1   A.   No.  I don't see where he rescheduled.
2   Q.   Was that -- where it said "approved on
3   11/16/04," would you have been able to schedule a
4   surgery before it was approved?
5   A.   No, we don't.
6        MR. GRUBB:  Okay.  If I could take a break
7   for just a couple minutes.
8           (Brief break)
9   Q.   All right.  Back on the record.
10  Ms. Miller, who schedules the surgeries for
11  Dr. Howorth's office?
12  A.   I do.
13  Q.   Okay.  Did you schedule the surgery for
14  Mr. Emory Brown?
15  A.   I'm sure I did.  I don't recall.
16  Q.   Okay.  Was that part of your normal
17  duties --
18  A.   Yes.
19  Q.   -- at that time?
20  Okay.  Is that something you do on a daily
21  basis?
22  A.   Yes.
23  Q.   Okay.  Tell me -- tell me how you go about
24  scheduling a surgery.
25  A.   I look at our surgery schedule and give

1  them the first spot that's open.
2      Q.  Okay.  As we discussed a few minutes ago,
3  it looks like Mr. Brown's surgery was approved on
4  November 16th; is that right?
5      A.  Right.
6      Q.  What -- do you recall what you did upon
7  receiving that approval as far as scheduling the
8  surgery goes?
9      A.  No.
10     Q.  What would you normally do?
11     A.  I would get out the surgery schedule,
12 surgery book, and put him in the first spot, fill
13 out his paperwork.  Dr. Howorth signs it.  And I fax
14 it over to surgery.
15     Q.  Okay.  Once surgery is approved by the
16 insurance carrier, do they do anything to schedule
17 the surgery?
18     A.  No.
19     Q.  Okay.  Once Mr. Brown's surgery was
20 approved, did Victoria have any input as far as what
21 date and time his surgery would be?
22     A.  I don't know.
23     Q.  Okay.  Would that have been unusual if she
24 did have such input?
25     A.  I don't know really.

```
 1        Q.   Do you understand what I'm saying?
 2        A.   I don't know.  I don't think so.
 3        Q.   Is that something you would normally do on
 4   your own?  You know, Victoria approves the surgery
 5   and then it would be you that would schedule it?
 6        A.   Right.
 7        Q.   Okay.  And you schedule for the first
 8   available slot?
 9        A.   Yes.
10        Q.   Do you have any type of record, either in
11   front of you or in the office, that would show when
12   that surgery actually went on the books with Russell
13   hospital?
14        A.   No.
15        Q.   Okay.  Are all your surgeries with Russell
16   hospital?
17        A.   Yes.
18        Q.   Okay.  So you can't tell me today when you
19   would have scheduled -- scheduled a surgery after it
20   was approved?
21        A.   No.
22        Q.   Okay.  And do you have -- I think you have
23   already answered this one, so I apologize if I ask
24   it again.
25             Do you have any idea why it took 13 days from
```

```
1    the time it was approved for Mr. Brown to have his
2    surgery?
3         A.   No.
4         Q.   Is that an unusual length of time for
5    someone to wait after being approved for surgery?
6         A.   No.
7         Q.   Okay.  What is the average patient's wait
8    to have surgery with Dr. Howorth after they are
9    approved?
10        A.   I would say 10 to 14 days.
11        Q.   Okay.  So this is within the normal flow of
12   his schedule.
13        A.   Yes.
14        Q.   Once you are approved, it takes ten days to
15   two weeks to actually go into the operating room?
16        A.   Most of the time.
17        Q.   Are there any circumstances where a surgery
18   can be expedited; in other words, Dr. Howorth might
19   say this one needs to go first?
20        A.   For extreme pain.
21        Q.   Okay.  Did you receive any indication from
22   Dr. Howorth that this one needed to be expedited?
23        A.   I don't know.
24        Q.   You can't remember?
25        A.   Huh-uh.
```

```
 1        Q.   I guess it's fair to say it was not
 2   expedited, if it took 13 days from the date it was
 3   approved; is that right?
 4        A.   Yes.
 5        Q.   Okay.  So this was maybe not considered to
 6   be extreme pain?
 7        A.   I don't know the circumstances.
 8        Q.   Okay.  You just know you didn't get any --
 9   or you don't even know whether you got any
10   information about that or not.
11        A.   Right.  It may be he may not have known
12   that it was approved.
13        Q.   Okay.  And tell me what happens once a
14   surgery approves.  Then what do you do as far as
15   notifying the doctor or so forth?
16        A.   He's not notified until he signs the
17   orders.
18        Q.   Okay.  And, for instance, in Mr. Brown's
19   case -- and I know -- just as an example.  I'm not
20   going to ask you to testify exactly what happened in
21   Mr. Brown's case unless you know.  But if he's the
22   run-of-a-mill patient that's approved on the 16th
23   and his surgery is on the 29th --
24        A.   Uh-huh.
25        Q.   -- when would Dr. Howorth typically sign
```

```
 1    the orders?
 2         A.    Usually two days before.
 3         Q.    Okay.  So in a typical case, he may not
 4    know for 10 or 12 days that that patient's surgery
 5    has been approved.
 6         A.    Right.
 7         Q.    Okay.  Is there any type of paperwork that
 8    is generated by your office in connection with this
 9    scheduling of a surgery?
10         A.    I have a surgery scheduling form that we
11    fill out and fax to surgery at the hospital.
12         Q.    Okay.  Do you have a copy of Mr. Brown's
13    surgery scheduling form?
14         A.    In his chart maybe.
15         Q.    Okay.
16         A.    There's no dates on it, though.  Only the
17    date of surgery is the only date that goes on them.
18         Q.    Okay.  And would there be any particular
19    reason why I haven't received that as far as my
20    request for his records goes?
21         A.    No.
22         Q.    Okay.  I mean, do you know it was -- would
23    it be your job or someone else's to handle sending
24    out medical records?
25         A.    It's mine.
```

```
 1        Q.   Okay.  Do you think it would be possible to
 2   get a copy of that surgery request form?
 3        A.   If I have one, yes.
 4        Q.   Okay.
 5        A.   It's fairly new.  To be honest, I don't
 6   know if we were doing it then.
 7        Q.   Okay.  Because this was October 2004.
 8        A.   Right.
 9        Q.   Do you know when you started that?
10        A.   I don't.
11        Q.   Is it possible you could have been doing it
12   then?
13        A.   It's possible.
14        Q.   Do you mind, could you run down and check
15   real quick?
16        A.   I can look, uh-huh.
17             MR. GRUBB:  If we could take just a couple-
18        minute break.
19                  (Brief break)
20             MR. GRUBB:  We're back on the record.  And
21        Ms. Miller has retrieved a form which I'm
22        marking as Defendant's Deposition Exhibit 3.
23                  (Defendant's Exhibit 3 was marked for
24                  identification.)
25             MR. GRUBB:  And it's Russell Medical Center
```