# EXHIBIT

# 1

*IN THE UNITED STATES DISTRICT COURT*
*MIDDLE DISTRICT OF ALABAMA*
*EASTERN DIVISION*

COPY

**EMORY STEVE BROWN**                 **PLAINTIFF**

     **VS.**            **NO: 3:05 CV0681-C**

**CLAIMS MANAGEMENT, INC.**          **DEFENDANT**

**DEPOSITION OF:**

**VICTORIA HEPPES**

**GIVEN AT EMBASSY SUITES**
**ROGERS, ARKANSAS**

**APRIL 13, 2006**

**APPEARANCES:**

**MR. JEFFREY A. BROWN, OF**
**CARLOCK, COPELAND, SEMLER & STAIR**
**ATTORNEYS AT LAW**
**1214 FIRST AVENUE**
**COLUMBUS, GA**             **FOR DEFENDANT**

**MR. JOHN A. TINNEY,**
**ATTORNEY AT LAW**
**739 MAIN STREET**
**ROANOKE, AL**             **FOR PLAINTIFF**

*NORTHWEST ARKANSAS COURT REPORTING, INC.*

*P.O. BOX 444*
*FAYETTEVILLE, AR 72702*
*(479) 521-6607*

1      S T I P U L A T I O N

2

3    MR. TINNEY:  It is hereby stipulated and agreed

4 by and between Jeffrey A. Brown and John A. Tinney,

5 attorneys representing the respective parties hereto, that

6 the deposition testimony of VICTORIA HEPPES, taken

7 pursuant to and in accordance with the Federal Rules of

8 Civil Procedure, for use as permitted by said Rules in the

9 trial of the matter presently pending in the United States

10 District Court, Middle District of Alabama, Eastern

11 Division, wherein; Emory Steve Brown is Plaintiff and

12 Claims Management, Inc., is Defendant, shall this day be

13 taken before JOAN MORGAN PORTER, Certified Court Reporter

14 and Notary Public, and by her transcribed.

15    All formalities in the taking, transcribing,

16 forwarding, filing and notice of filing of said deposition

17 are hereby waived.

18    The right to object, except as to the form of

19 the question, is hereby expressly reserved for hearing, in

20 accordance with the Federal Rules of Civil Procedure.

21    MR. BROWN:  It is agreed.

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 1 SHEET 1

1    VICTORIA HEPPES, being called upon to testify and having
2    been first duly sworn, testified as follows:
3
4                    DIRECT EXAMINATION
5    MR. TINNEY:
6    Q.    State your name please?
7    A.    My name is Victoria Heppes.
8    Q.    Where do you live, Ms. Heppes?
9    A.    I live at 1905 South 9th Street in Rogers.
10   Q.    Arkansas?
11   A.    Arkansas.
12   Q.    Ms. Heppes, as you know, my name is John Tinney and
13   I m representing Mr. Brown in this case. I m here to ask
14   you questions concerning your work on this file. I d like
15   it understood, for the record, that any answer you give
16   today would be the same answer I would expect at the time
17   of trial in this case. Do you understand that?
18   A.    Yes, sir.
19   Q.    If there s anything that I say that s not clear to
20   you, just ask me again and we ll stop and try to clear it
21   up so that everything is understood by you.
22   A.    Yes, sir.
23   Q.    Where are you employed?
24   A.    I m employed at CMI, Claims Management Incorporated
25   for Wal-Mart Stores on - it s North or East Walnut Street
                              1

PAGE 2

1    in Rogers, Arkansas.
2    Q.    Tell me what CMI is, to your knowledge.
3    A.    Claims Management Incorporated is the insurance
4    carrier for the Wal-Mart Company.
5          MR. BROWN: What are our stipulations?
6          MR. TINNEY: The usual stipulations. Do you want
7          to have her read and sign?
8          MR. BROWN: I do want to read and sign, yes,
9          please.
10         MR. TINNEY: Okay. And then all objections,
11         except as to the form of the question, we
12         reserve until the time of trial?
13         MR. BROWN: And responsiveness of the answer,
14         yes, sir. The same ones we had during Mr.
15         Brown. And I apologize.
16         MR. TINNEY: No, that s okay.
17   Q.    Tell me what your understanding of who the company is
18   again.
19   A.    The company is the insurance carrier for the Wal-Mart
20   Store. Workman s Compensation carrier on one side of the
21   office. The other side is general liability.
22   Q.    Do you know who owns CMI?
23   A.    Wal-Mart, I guess.
24         MR. BROWN: Object. I don t want you speculating
25         or guessing on anything. If you don t know,
                              2

PAGE 3

1          tell him you don t.
2    A.    I don t know.
3    MR. TINNEY:
4    Q.    What is your title or position there?
5    A.    My title is Claims Manager.
6    Q.    How long have you held that position?
7    A.    Now for almost three years.
8    Q.    Did you have a title before that?
9    A.    I was not working with the company before that.
10   Q.    Let me get your educational background.
11   A.    I was a high school graduate from Burbank High
12   School. I went to junior college, but did not finish. So
13   I have a couple of semesters of junior college.
14   Q.    Where did you work prior to going to Wal-Mart?
15   A.    One year I worked at the Best Western Hotel as the
16   desk clerk.
17   Q.    Where did you work prior to that?
18   A.    Prior to that I live in Cancun, Mexico. Out of the
19   country for 25 years. I was a stay-at-home mom for 15
20   years and I was a journalist for the International Miami
21   Herald, plus a house wife.
22   Q.    And other than the jobs that you described, have you
23   held any other jobs?
24   A.    No. Well, I ve owned businesses.
25   Q.    What kind of business?
                              3

PAGE 4

1    A.    When my husband died in 1995, I took over a bungee
2    jump, five condominiums and an optical store and
3    laboratory.
4    Q.    You went from Best Western to CMI; is that correct?
5    A.    Yes.
6    Q.    And had you ever worked in the insurance industry
7    before you went with CMI?
8    A.    No.
9    Q.    And you were hired in as a Claims Manager?
10   A.    Yes.
11   Q.    Tell me what training you had when you went to work.
12   A.    When I went to work for them I had three months
13   training in their Training Department.
14   Q.    Where s the Training Department located?
15   A.    There in the same building.
16   Q.    Tell me what form of training you went through.
17   A.    First, on their computer to get to know their system,
18   which at that time was the David system. I learned
19   adjusting for the State of Arkansas. I took the state
20   exam to get my state license.
21   Q.    What kind of license do you hold?
22   A.    I hold an Arkansas State License, adjuster s license,
23   insurance adjuster s license.
24   Q.    Did you take that one time?
25   A.    Yes, and I hold an Illinois -- well, that s out of
                              4

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 5  SHEET 2

```
1    state.  I have an Alabama State license.
2    Q.   As an adjuster?
3    A.   Yes.
4    Q.   You know, I didn t now that they required adjuster s
5    to have a license.
6    A.   Yes.  The only requirement is for a eight hour
7    seminar one time a year.
8    Q.   But you did have to take an exam in Alabama, also?
9    A.   No.
10   Q.   You just applied?
11   A.   Yes.
12   Q.   Now, you referenced something called the David
13   system; what is that?
14   A.   That is the computer system for files that the
15   company used at the time.
16   Q.   In other words, it teaches you how to notate notes in
17   the file and things of that nature?
18   A.   It is the notepad where you note things in the file.
19   Q.   You said that it was the David system at that time,
20   has it changed to something else now?
21   A.   In October of 2004 it changed  — they discontinued
22   the David system and started a new system called Claim
23   Zone.
24   Q.   Called claim what?
25   A.   Claim Zone.
```

5

PAGE 6

```
1    Q.   So Mr. Brown s records were entered, basically, under
2    the Claim Zone format, if his injury was in September of
3    2004?
4    A.   We started the Claim Zone about the second week in
5    October, because we all went to a week class to learn the
6    new system.
7    Q.   Was the format different than the David system?
8    A.   Yes.
9    Q.   So if something had come in on September the 29th,
10   2004, then it would have been entered on the David system?
11   A.   I don t remember.
12   Q.   Now, as far as your training on the David system, was
13   that training geared to you individually to be a claims
14   manager or was that something everybody would have been
15   trained on?
16   A.   Everybody.
17   Q.   What training did you have to become a claims
18   manager?
19   A.   State laws in —
20   Q.   State laws in —
21   A.   -- In Insurance.
22   Q.   But, I mean, did you study different states?
23   A.   No, just Arkansas at the time.
24   Q.   To become a claims manager?
25   A.   Yes.
```

6

PAGE 7

```
1    Q.   Other than training on state laws, what other
2    specific training did you have to become a claims manager?
3    A.   Company requirements, how they trained us for that,
4    for my job position.
5    Q.   Was there any kind of book or manual --
6    A.   How to manage claims, workman s compensation claims.
7    Q.   Is that the particular kind of claims that you were
8    going to be exclusively dealing with when you came to
9    work?
10   A.   Yes.
11   Q.   Did you have any books or manuals that you utilized
12   in that three month training period?
13   A.   Yes.
14   Q.   Tell me the names of those.
15   A.   It is our company and it s their manuals that they
16   give to us.  I still have it at my desk.
17   Q.   You do?  How many different books is it?
18   A.   Well, it s not a book, per se, it s just a thick
19   folder of several different types of areas; research,
20   claims management, files, the associate, different parts
21   of how to work --
22   Q.   What do you call that book?  If I wanted your
23   attorney to produce it.
24   A.   Training manual.
25   Q.   It s a training manual?
```

7

PAGE 8

```
1    A.   CMI Training Manual.
2    Q.   Was there any other manual like that that they gave
3    you to use in your study to become a claims manager?
4    A.   I have State Law for Alabama.
5    Q.   Is that something that s just given to you to act as
6    a reference or is that something that you re actually
7    trained in?
8    A.   It s something given to me as a reference as I m in
9    training for the --
10   Q.   How big is your CMI Training Manual?
11   A.   How big is it?
12   Q.   How thick?
13   A.   It s about four inches.
14   Q.   Four inches thick?
15   A.   Uh-huh.
16   Q.   And you said it s got different sections like setting
17   a reserve, claims management, files.  What else can you
18   think of?
19   A.    That s all right now.  My mind is kind of blank.
20   Q.   If I picked out something like --
21   A.   Medical management, that would be another area.
22   Q.   These are just going to be tab sections in the
23   manual?
24   A.   Yes.
25   Q.   What all would be included under medical management,
```

8

PAGE 9  SHEET 3

1  for instance?
2  A.  What type of doctors we use, what the doctors
3  specialties are, what type of treatments.  Most of the
4  injuries that I'd probably see in my work --
5  Q.  Is rotator cuff one of those?
6  A.  Yes.
7  Q.  So there's a section in that that deals with rotator
8  cuffs?
9  A.  Maybe.  I can't say, because I don't remember
10  exactly.
11  Q.  As far as that book, for instance, if I would ask you
12  is there anything in any training literature that tells
13  you the response time or the goal as to the time frame
14  within which you respond to something, is there something
15  in there about that?
16  A.  I have --
17         MR. BROWN: Object to form.  You can answer.
18  A.  For one thing, I do have charts at my desk that are
19  given to me on all the muscles and bones in the body.  The
20  skeletal - the nurse's - she's not here with us anymore,
21  but she trained us all on showing us exactly what parts of
22  the body, what nerves, where the rotator cuff is, if it's
23  in the front of the shoulder, the back of the shoulder.
24  Now would you please tell me the question again?
25  MR. TINNEY:

9

PAGE 10

1  Q.  The question was is there anything in the training
2  manuals that talks about your response time to issues that
3  become before you?
4         MR. BROWN: Objection.  That's vague.
5  A.  I guess it's just from --
6  MR. TINNEY:
7  Q.  I've seen other training manuals in other cases that
8  say, you know, our goal is to respond to this within 24
9  hours or something like that.
10  A.  Oh, yeah, definitely.
11  Q.  So is that - what is the section of the manual
12  that's contained in?
13  A.  Claims management.
14  Q.  And as best you can remember, what is the goal that
15  the company has as far as response time to various
16  matters?
17  A.  My goal is the sundown rule.
18  Q.  What is that?
19  A.  The sundown rule means that the first date that I
20  have an injury come to me that is put in my computer,
21  assigned to me, it's called a lost time, that I contact
22  the store, that I contact the claimant and that I contact
23  the doctor.  I get response from all three of those.  I do
24  my investigation to determine if it's a compensable claim.
25  If it really happened at the store.  I want to talk to the

10

PAGE 11

1  person.  Besides having an associate's statement in the
2  pack that they fill out, I want to talk to the person, see
3  how they're feeling, how - I listen to the tone of voice.
4  Q.  Now, does the sundown rule only apply to the initial
5  report or does the sundown rule go all the way through
6  your handling of the file?
7  A.  Just the initial report.
8  Q.  Now my next question is, is there anything as far as
9  a response time in the training manuals, as far as the
10  response time once you get notice that a person, for
11  instance, needs surgery, as to what you do to respond to
12  that?
13  A.  What I do is immediately when the doctor calls me --
14  Q.  Right now, I think you're misunderstanding my
15  question.  I'm asking you about is there anything in the
16  manual?  We'll get to what you do in a minute.
17         MR. BROWN: So is there a printed time that says
18              that you get a surgical or any indicator that
19              somebody wants to do surgery, is there a set
20              period of time within which they must take some
21              action in response?
22  MR. TINNEY:
23  Q.  That the manual says you should response to such, as
24  Jeff was saying, within a certain length of time?
25  A.  I don't remember.

11

PAGE 12

1  Q.  If it was in the manual, it would be in the claims
2  management section?
3  A.  Yes.
4  Q.  You mentioned a file section, what is in the file
5  section?
6  A.  I think it would be probably the same section.
7  Q.  Files and claim management?
8  A.  Yeah.
9  Q.  So you get training in this book, you said you had
10  nurses talk to you - once you went through this did you
11  have to pass any kind of test or anything before you
12  became a claims manager?
13  A.  I had to go to several classes.
14  Q.  Where were the classes conducted?
15  A.  They were at CMI.
16  Q.  And who conducted those?
17  A.  Authorized, trained adjusters already.
18  Q.  Did you have any video tapes that you had to watch
19  concerning various aspects of claims management?
20  A.  Probably, but I don't recall at the time.
21  Q.  Did you have any training or a hands on training
22  period after you got through the three month period before
23  they actually designated you as a claims manager and
24  turned over cases to you?
25         MR. BROWN: To make sure I understand the

12

BROWN VS CLAIMS MANAGEMENT     DEPOSITION OF VICTORIA HEPPES     4-13-06

PAGE 13 SHEET 4

1           question --
2     A.   I didn't understand the question either.
3           MR. BROWN:   - Like an apprentice?
4     MR. TINNEY:
5     Q.   Did you, once you got through your three month
6     training period, did you hit the ground running and you
7     were a claims manager and you started getting files
8     immediately?
9     A.   Yes.
10    Q.   You said that Wal-Mart gave you no test or anything
11    to test your knowledge?
12    A.   State did.
13    Q.   Just the state?
14    A.   Yes.
15    Q.   And that was at the end of the three month period?
16    A.   Yes.
17    Q.   Did the Arkansas test --
18    A.   Well, yeah, state did.
19    Q.   And did the Arkansas test have anything on it
20    relating to handling worker's comp claims in the State of
21    Alabama?
22    A.   No.
23    Q.   Once you became a claims manager, were you assigned
24    to a certain area in the -- I guess in the building where
25    your desk would be?

13

PAGE 14

1     A.   Yes.
2     Q.   And is that where you've been every since?
3     A.   No.
4     Q.   What caused you to change?
5     A.   Well, they change up the desks and the states all the
6     time.
7     Q.   In the same building though?
8     A.   Yes.
9     Q.   How many claims managers like you, to your knowledge,
10    work for CMI?
11    A.   300.
12    Q.   Are you assigned a certain state?
13    A.   Yes.
14    Q.   And Alabama is one of your states?
15    A.   Yes.
16    Q.   And it's been one of your states since the beginning?
17    A.   No.
18    Q.   How many other individuals would handle Alabama
19    besides you?
20    A.   Seven to nine.
21    Q.   Who did you report to?
22    A.   I report to - my immediate boss now is Annie Martin.
23    Q.   How long has she been your immediate boss?
24    A.   About a year.
25    Q.   Who was your immediate boss prior to that?

14

PAGE 15

1     A.   Tisha Montgomery.
2     Q.   How long was she your boss?
3     A.   She was my boss for Alabama for about six months.
4     Q.   Who was your boss for Alabama before that?
5     A.   I was with the State of Illinois and my boss before
6     that was - and this is team leader, this is immediate
7     boss, was I think --
8     Q.   Wait a minute, do I understand that you picked up
9     Alabama at a point later in time than when you started?
10    A.   I was changed to the Alabama unit, yes.
11    Q.   When did you start with the Alabama unit?
12    A.   I started on April 1, 2004.
13    Q.   And was Ms. Montgomery your immediate boss then?
14    A.   Yes.
15    Q.   And is Ms. Montgomery --
16          MR. BROWN: You said April 1st?
17    A.   Yes, April 1st.
18    MR. TINNEY:
19    Q.   Is Ms. Montgomery still with the company?
20    A.   Yes.
21    Q.   And what is her title?
22    A.   She is a team leader.
23    Q.   Team leader?
24    A.   Uh-huh.
25    Q.   And Ann Martin, is she still with the company?

15

PAGE 16

1     A.   Yes.
2     Q.   She's a team leader also?
3     A.   Yes.
4     Q.   Who do the team leaders report to?
5     A.   Becky Quizenberry, who is our boss over the workman's
6     comp area.
7     Q.   How many team leaders would report to her, to your
8     knowledge?
9     A.   About 20.
10    Q.   And do you know how many states that would cover,
11    those team leaders?
12    A.   The same, about the same amount of states.
13    Q.   How many states do you handle?
14    A.   Right now, I only handle Alabama.  But I have been
15    helping out with Utah.
16    Q.   So have you, since April 1st, of 2004, only done
17    Alabama worker's comp claims?
18    A.   Yes.
19    Q.   Do you know what Ms. Quizenberry's title is?
20    A.   I know she's a lawyer, but I don't exactly what her
21    title is?
22    Q.   She is a lawyer?
23          MR. BROWN: I don't know if she is or not.  I
24          don't want you to speculate.
25    A.   I don't know.  I don't know.  I can't say that --

16

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 17 SHEET 5

```
1    MR. TINNEY:
2    Q.   You think she s a lawyer though?
3    A.   I think, I m not sure.
4    Q.   So you know who she reports to?
5    A.   The boss of the building.
6    Q.   Do you know who that is?
7    A.   It just changed.  I forgot her name, I m sorry.
8    Q.   Do you know who was in that position before him?
9    A.   I m trying to think of her name, but I forgot.
10   Susan.  Susan is her name, but I don t --
11   Q.   Susan?
12   A.   Susan Chambers.
13   Q.   Susan Chambers is the current one?
14   A.   She s just been promoted, so it s now changed, but
15   Susan Chambers has been the boss of the building or over
16   our building since I started to work there.
17   Q.   Do you know what her title is?
18   A.   Not really.
19   Q.   How many active files do you currently have?
20   A.   Today, I have 159 files.
21   Q.   What about during the time frame that was involved in
22   this case, say from September 29th through mid-2005?
23   A.   How many files did I have?
24   Q.   Yeah, just average.
25   A.   Average, I was just getting my legal files handed to
                            17
```

PAGE 18

```
1    me, so roughly about 125.
2    Q.   Do you handle it after it goes to legal?
3    A.   Yes.
4    Q.   Tell me whether you  - you said something earlier
5    about going through seminars, does the company do seminars
6    periodically, you know, to assist in training?
7    A.   Yes, our company does.  As a matter of fact, I have
8    four scheduled.
9    Q.   And are those --
10   A.   But the seminars I m talking about is the Alabama
11   State Seminar for adjuster s license.
12   Q.   Is that just done once a year?
13   A.   Yes.
14   Q.   Do you go through that every year?
15   A.   Yes.
16   Q.   On the seminars, I think you said the only seminars
17   related to just Alabama --
18   A.   Licensing.  But you asked if the company gave
19   seminars periodically?
20   Q.   Yes, and you told me that various representatives
21   would do that.
22   A.   Yes.
23   Q.   Do you ever get anything on video that you look at,
24   as far as training?
25   A.   No.  Well, there could be, I just don t remember
                            18
```

PAGE 19

```
1    right now if there was.
2    Q.   Do you ever get seminar material given to you like
3    handouts, you know, anytime you go to a seminar?
4    A.   Uh-huh.
5    Q.   Do you retain those?
6    A.   Yes.
7    Q.   And do you have a separate folder that you retain
8    those in?
9    A.   Yeah.
10   Q.   If I wanted that folder, what would I call it?
11   A.   Probably my work comp adjuster s folder.  I keep
12   everything from my seminars in Alabama just for reference,
13   maps.
14   Q.   You kept all your training materials?
15   A.   Yes.
16   Q.   Tell what kind of medical training the company gave
17   you, other than what you already told me about, that the
18   nurse would tell you, you know, various parts of the body
19   and things like that.
20   A.   That s all.
21   Q.   Did you undergo any kind of medical seminar or
22   training period?  What was the length of time that you may
23   have sat in a class concerning that?
24   A.   I still go through, so I can t answer that period as
25   how long, because I continually go through it.
                            19
```

PAGE 20

```
1    Q.   Do you have any particular reference books that you
2    utilize when you have questions about medical issues on
3    your desk?
4    A.   Yes.
5    Q.   What are those?
6    A.   It is the, I want to say, MDA guidelines, but it s
7    not the MDA, it s the Medical Guidelines book.  It s about
8    this thick.
9    Q.   Do you know who puts that out?
10   A.   United States of America.
11   Q.   That you just call a Medical Guidelines book?
12   A.   Yeah.
13   Q.   What color is it?
14   A.   It looks like a legal book.  It s probably one that
15   you would have in your office.  It s kind of a burnt brick
16   color.
17   Q.   What do you utilize that for?
18   A.   Well, it has everything in it, as far as if I wanted
19   to look up a rotator cuff, per se, it would tell me
20   everything about it, every area of the rotator cuff.  It
21   would tell me about the surgery.  It would just tell me
22   everything.
23   Q.   Tell me --
24   A.   If I had that much time to retain all the knowledge.
25   Q.   Tell me your best opinion as to how many torn rotator
                            20
```

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 21  SHEET 6

1    cuffs you have had experience with over your course as
2    claims manager.
3    A.   As far as injuries?
4    Q.   Yes.
5    A.   From the stores? At that time or today?
6    Q.   Both.
7    A.   At that time probably around 50.
8    Q.   And since then?
9    A.   A couple hundred or more.
10   Q.   Would that couple hundred include the 50 you just
11   mentioned?
12   A.   Yes, maybe.
13   Q.   Had you had any experience in dealing with medical
14   issues concerning rotator cuffs before you became a claims
15   manager?
16   A.   No.
17   Q.   When you received your medical training, we ll call
18   it, from the nurse, did you have a period of time that she
19   discussed in that training session rotator cuff injuries?
20   A.   Yes.
21   Q.   What do you recall she discussed about those?
22   A.   Symptoms.
23   Q.   What were those that you remember from your initial
24   training?
25   A.   Popping, pain, immediate pain, popping, loss of

21

PAGE 22

1    movement or range of motion.
2    Q.   Did you recall whether she went into the particular
3    medial name of the areas in the shoulder that would be
4    involved?
5    A.   She could have, but — she could have.
6    Q.   Have you learned over time what the medical name of
7    the various, you know, tendons and areas might be?
8    A.   Some, yes.
9    Q.   What can you recall as far as medical names? I m not
10   trying to, you know, say you re a medical doctor, but do
11   you remember any of the names or anything?
12   A.   I d just be guessing to give you the exact name.
13        MR. BROWN: Don t guess.
14   MR. TINNEY:
15   Q.   What do you understand the function — what do you
16   understand a rotator cuff is?
17   A.   A rotator cuff is the joint between the shoulder and
18   the arm. The tendons are what holds it all together.
19   Q.   So when somebody says to you this person has a torn
20   rotator cuff, what does that mean to you?
21   A.   That means that he injured himself.
22   Q.   But as far as the injury itself — when you said it s
23   a joint and there are tendons there, what do you
24   understand is torn if somebody s got a torn rotator cuff?
25        MR. BROWN: Object to form. She s not a doctor.

22

PAGE 23

1    She s established that.
2    MR. TINNEY: I understand.
3    MR. BROWN: I don t think you ve laid the
4    foundation that she s qualified.
5    MR. TINNEY: I m just asking her for general
6    knowledge.
7    MR. BROWN: Well, I think she s told you her
8    general knowledge is that she has reference
9    books and she has things that she looks at. I
10   don t want her speculating and guessing as to
11   what —
12   MR. TINNEY: I m not asking her to guess. I
13   mean, she s fine, she s given me an answer of
14   what she understands it is and I m just trying
15   to ask her what she understands it to be.
16   MR. BROWN: We re talking about the adjusting of
17   a rotator cuff. Her medical knowledge as a
18   nurse or however, I don t think, since she is
19   not one — go ahead, if you know, answer the
20   question. I just think that it s getting a
21   little far a field.
22   MR. TINNEY:
23   Q.   The question is if somebody, you know, has on paper
24   what a doctor says is a torn rotator cuff, what picture
25   comes in to your mind as to what is wrong with that

23

PAGE 24

1    person?
2    A.   A shoulder injury.
3    Q.   Do you think that something is torn inside the
4    shoulder?
5    A.   Could be. It could be if it s a shoulder injury.
6    Q.   If a doctor says it s a torn rotator cuff, does that
7    indicate to you, when you see that word, torn rotator
8    cuff, those words, that there is something torn in there?
9    A.   Yes.
10   Q.   Based on your training, knowledge and expertise
11   you ve gained in, I guess, some 250 of these, do you know
12   what generally is torn when you see the phrase torn
13   rotator cuff?
14   A.   Uh-huh.
15        MR. BROWN: Object to form.
16   MR. TINNEY:
17   Q.   And what is that?
18   A.   It would be one of the ligaments in the shoulder.
19   Q.   Based on your training, knowledge and expertise that
20   you have gained or that you had gained up to the time that
21   you dealt with Mr. Brown, would torn rotator cuffs heal
22   themselves, to your knowledge?
23        MR. BROWN: Object to the form. Not laid a
24        foundation.
25   A.   I don t know.

24

BROWN VS CLAIMS MANAGEMENT   · DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 25  SHEET 7

1  MR. TINNEY:
2  Q.  Had you ever, before Mr. Brown s case, dealt with a
3  rotator cuff injury where it was not dealt with
4  surgically, but it was just either left or healed itself?
5  A.  No.
6  Q.  Of the 50 rotator cuff tears that you said that you
7  had dealt with before Mr. Brown, were all of those cases
8  that required surgical intervention?
9  A.  I don t know.
10  Q.  Give me you best judgment.
11  A.  I would not like to guesstimate on that.
12  Q.  What about the 200 that you handled, you know, all
13  together, would those have required surgical intervention?
14  A.  But I can t guesstimate on the answer, the outcome of
15  each one of those either if I had to give the claim over
16  to somebody else when I left the state.  So I m not going
17  to answer that question as far as have they all been
18  surgically --
19  Q.  What about the ones that you dealt with?  The ones
20  that you actually followed up from the time that the
21  report came in until the time that you know, that --
22  A.  Yes.
23  Q.  What do you mean yes?
24  A.  Yes, they were surgically --
25  Q.  Required surgical intervention?

25

PAGE 26

1  A.  Required surgery.
2  Q.  Tell me what the relationship between claims
3  management and Blue Cross Blue Shield is, if any.
4  A.  We bill through Blue Cross Blue Shield in Alabama.
5  Q.  Now, what do you mean by you bill through Blue Cross
6  Blue Shield?
7  A.  They re our insurance carrier  - a billing process
8  for the insurance carrier.  They either have a private
9  insurance or they have workman s comp.  They pay the work
10  related bills.
11  Q.  I m still not understanding  - is Claims Management
12  an insurance company?
13  A.  Uh-huh.
14  Q.  Is there an agreement or something between Claims
15  Management and Blue Cross about how workman s comp
16  injuries will be paid in the State of Alabama?
17       MR. BROWN: I want to object to the form.
18  A.  I don t know.
19  MR. TINNEY:
20  Q.  Well, I noticed there are references in these records
21  to Blue Cross Blue Shield paying, for instance, Dr.
22  Howorth s surgical charge?
23  A.  Yes.
24  Q.  If it is a workman s comp injury then why does Blue
25  Cross Blue Shield pay that instead of the workman s comp

26

PAGE 27

1  coverage?
2  A.  I send it to Blue Cross Blue Shield authorizing
3  payment.
4  Q.  So does Blue Cross Blue Shield handle the payment of
5  claims for Claims Management?
6  A.  In Alabama, yes.
7  Q.  Would Blue Cross Blue Shield handle the payment of
8  all medical relating to Mr. Brown on his workman s comp
9  injury?
10  A.  Yes.
11  Q.  Do you, as the claims manager of Mr. Brown s file
12  during the operative, have to approve and give direction
13  to Blue Cross as to what it can and cannot pay?
14  A.  Yes.
15  Q.  Do you know if there is any contractual agreement
16  between Blue Cross and Blue Shield and CMI about how that
17  works?
18  A.  No, I don t know.
19  Q.  How do you go about authorizing a payment from Blue
20  Cross?  You know, what is the physical means by which you
21  do it?  Let s just use Dr. Howorth s bill, $1,294.00, for
22  his surgery.
23  A.  If it was electronically submitted to Blue Cross Blue
24  Shield it comes across their website.  I open up the
25  website to my adjuster number and there s the social

27

PAGE 28

1  security number with the bill on it and the date of
2  service.  I check it by the file to make sure that I have
3  the medical records and that was a true date of service
4  and that that s the treating physician and I authorize the
5  bill.
6  Q.  I got lost a little --
7  A.  For payment.
8  Q.  I got lost a little bit.  When you say that if it
9  shows up on a website?
10  A.  Uh-huh.
11  Q.  Are you saying that Dr. Howorth s office would have
12  submitted a bill electronically to Blue Cross Blue Shield?
13  A.  Either to them or they can send it to me and I will
14  then send it to Blue Cross Blue Shield.
15  Q.  Is it generally sent, as far as a doctor like Dr.
16  Howorth, directly to you or directly to Blue Cross?
17  A.  Either one.
18  Q.  I notice that Dr. Howorth apparently was recognized
19  as a workman s comp approved physician for Wal-Mart; is
20  that correct?
21  A.  Before I used him?
22  Q.  Yes.
23  A.  I don t know.
24  Q.  Well, let s talk about Dr. Shirah.  He was a company
25  doctor; is that correct?

28

BROWN VS CLAIMS MANAGEMENT          DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 29  SHEET 8

1   A.   Uh-huh.
2   Q.   How did he become a company doctor, if you know?
3   A.   I don t know.
4   Q.   Do you have list that you can refer to that s given
5   to you as to who are approved physicians for a particular
6   area?
7   A.   Yes.
8   Q.   Do you remember whether Dr. Howorth was on that list?
9   A.   No.
10  Q.   What is the policy as to whether you approve a
11  physician that the company doctor refers someone to?
12          MR. BROWN: Object to form, facts not in
13          evidence.
14  MR. TINNEY:
15  Q.   For instance, if Dr. Shirah referred Mr. Brown to Dr.
16  Howorth and he s not on the list, how do you determine
17  whether you authorize that referral to that orthopedist?
18  A.   How would I determine? Well, I like to work with
19  doctors that I know and I did not know Dr. Howorth at that
20  time. So I referred him to Gadsden, one of my physicians
21  in Gadsden.
22  Q.   Who was that physician, if you remember?
23  A.   It would have been one of the orthopedic specialist
24  in Gadsden, that I ve been given the names of when I
25  transferred to that state, that have worked with the

29

PAGE 30

1   adjusters before me.
2   Q.   So what is the mechanism by which you let the
3   referring doctor know where to send somebody to?
4   A.   They call me if they feel that the patient needs to
5   be referred out to an orthopedic specialist and I like to
6   ask what type of orthopedic or what type of doctor they
7   need or specialist they need to be referred out to and get
8   them a doctor conveniently located for their treatment.
9   Preferably someone that I have worked with.
10  Q.   Isn t it a company requirement that when you are
11  contacted by someone you notate it on the file?
12          MR. BROWN: Object to form.
13  A.   Yes.
14  MR. TINNEY:
15  Q.   For instance, when Dr. Shirah s office would have
16  contacted you and said we need to refer him to an
17  orthopedic that would be in the file somewhere that they
18  called you?
19  A.   Yes.
20  Q.   At that point, when you said you had a person in
21  Gadsden did you tell Shirah s office that you wanted him
22  to refer him to the Gadsden orthopedist?
23  A.   Uh-huh.
24          MR. BROWN: You need to say yes or no.
25  A.   Yes.

30

PAGE 31

1   MR. TINNEY:
2   Q.   Did it come back to you at a point later in time that
3   somebody didn t want to go to Gadsden?
4   A.   Yes.
5   Q.   How did you learn that?
6   A.   I don t remember. I don t remember if it was Kenny
7   at Dr. Shirah s office that said that or if I talked with
8   Emory.
9   Q.   But either one that you talked to, there should be a
10  note in the file reflecting that?
11  A.   There should be.
12  Q.   How did you come up with Dr. Howorth?
13  A.   Emory didn t want to go to Gadsden. It was a little
14  too far for him and I didn t know any doctors closer in
15  the area, so I d asked Kenny at Dr. Shirah s office if he
16  knew of any doctors, good orthopedic specialists that were
17  close and he named Dr. Howorth. I had never worked with
18  Dr. Howorth before. I don t like to work with doctors I
19  don t know, because you never know who you re going to be
20  dealing with. So I called a store that s close to the
21  area and I asked the Wal-Mart store there, I asked the
22  manager if he knew of this Dr. Howorth or, if it s a small
23  community, if he had heard of him and he said, yes, he
24  had. As a matter of fact he has used him himself.
25  Q.   You called Alexander City Wal-Mart?

31

PAGE 32

1   A.   Uh-huh.
2   Q.   You need to answer out load?
3   A.   Yes.
4   Q.   Do you recall the name of the person you talked to
5   there?
6   A.   No, I don t.
7   Q.   When you make calls around referencing things like
8   that, those are things that, according to policy, would be
9   notated in the file?
10          MR. BROWN: Object to form. If you know what the
11          policy is --
12          MR. TINNEY: She s already stated she is to
13          document everything, so what are you - it s on
14          the record, the record speaks for itself.
15  Q.   The question is, I think, if I understood you
16  earlier, when you speak with someone you are to document
17  it in the file?
18  A.   Yes.
19  Q.   Now, after you talked to the Alexander City guy, what
20  did you do next?
21  A.   I then called Dr. Howorth s office. Got his phone
22  number and called Dr. Howorth s office to schedule an
23  examination.
24  Q.   Do you actually set up the time that a person is to
25  go and then notify the claimant when to go there?

32

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-86

PAGE 33 SHEET 9

1    A.   Yes.

2    Q.   That s part of your job?

3    A.   Yes.  If he needs to change that, he can to suit his

4    schedule.  But if he does need to change it, he needs to

5    call me and let me know so I can put it in the file.

6    Q.   In a given day during the time frame of September of

7    84 through, say, March of 85, how many files, on the

8    average, would you deal with per day?

9    A.   I m sorry I ll have to give me that again.

10   Q.   Back during the time frame you were dealing with Mr.

11   Brown s claim, about how many different files would you

12   average dealing with per day?

13   A.   It just depends, you know.  15, maybe more.

14   Q.   Now, you referenced Dr. Shirah as being a company

15   doctor.  To your knowledge, is there any contract between

16   the company doctor and CMI or Wal-Mart that the doctor

17   enters into when he becomes a company doctor?

18   A.   To my knowledge, I don t know.

19   Q.   You don t know?  Do you customarily — you dealt with

20   Dr. Shirah many times before Mr. Brown?

21   A.   Yes.

22   Q.   And were you satisfied that he was competent and knew

23   what he was doing?

24   A.   Yes.

25   Q.   And would you rely upon the opinions that he provided

33

PAGE 34

1    to you as to treatment?

2    A.   Yes.

3    Q.   Now, tell me what your duties and responsibilities as

4    a claims manager are?

5    A.   Well, you know, we just talked a minute ago about —

6    you asked me if everything — requirements for

7    documentation is important and in a perfect world I d like

8    to say that I can do that, but I do the best I can.  I

9    keep handwritten notes and I try to document as much as

10   possible.  Please ask me the question again.  I probably

11   got off track there.

12   Q.   Yeah, you got off track a little bit.  Since you got

13   off track I ll chase another rabbit a minute.  You said

14   you keep handwritten notes?

15   A.   Yes, sir.

16   Q.   Do you retain those?

17   A.   No.  They re recycled.

18   Q.   I asked you to tell me what your duties and

19   responsibilities as a claims manager are.

20   A.   My duties and responsibilities are from the moment an

21   associate is injured at the Wal-Mart store to maintain and

22   monitor his medical progress until he is at baseline or at

23   MMI, which is maximum medical improvement, from his work

24   related injury.

25   Q.   What responsibility do you have in paying the comp

34

PAGE 35

1    benefit to the claimant?

2    A.   Yes.

3    Q.   I mean, is that within your responsibility?

4    A.   Yes.

5    Q.   What is your — or how are you trained as to how

6    quickly you get a comp check to a claimant when you know

7    he s been out on temporary total disability?

8    A.   We like to schedule it bi-weekly.  Like he would be

9    receiving a paycheck bi-weekly.  As close to that as

10   possible.  The waiting period, which is the first three

11   days after injury, it s a grace period, you pay on the

12   21st day he is out of work with a doctor s note.  Then it

13   turns retro, you pay those first three days.  Alabama has

14   a three day waiting period, 21 day retro.  I pay —

15   workman s compensation wage is .6667 percent of your

16   salary, just about two-thirds.

17   Q.   If somebody has been out and you know they ve been

18   out because of their workman s comp injury, is it your

19   duty and responsibility to see that once every 14 days, if

20   it s bi-weekly, your going to review that file and see

21   that a check is sent to the claimant for the money that is

22   owed to him for his workman s comp?

23   A.   Not once every 14 days.

24   Q.   All right.  Tell me — I thought you said it s done

25   bi-weekly.

35

PAGE 36

1    A.   Well, if he s out of work for that 14 days with a

2    doctor s note.  If he s out of work less time and returns

3    to work with restrictions, then I will pay him

4    immediately.  When he s put back on the schedule at the

5    store, I will issue him a check before two o clock on that

6    date so he gets it at least in the next three or four

7    days.

8    Q.   What about Mr. Brown when he went out for surgery on

9    the 29th, what was your duty and responsibility to compute

10   or determine how much comp should have been paid to him

11   after he had surgery?

12   A.   He had already met his waiting period — no, he

13   hadn t met his waiting period.  He had been out — it came

14   in lost time, because he was taken out from the hospital.

15   So my responsibilities were every 14 days — before that

16   14 day period, what I do is schedule a diary date to pay

17   it, issue it, about the 18th day.  Assuming that he will

18   be out until his post-op visit or whenever that is, or the

19   14th day.

20   Q.   When you get a note from the doctor that a person is

21   going to be out, you know, two or three weeks, and you get

22   that note, you know, ahead of time, how do you diary your

23   file to see that you re going to get a check to the

24   injured party?

25   A.   I would diary it on the 18th day from the day he was

36

PAGE 37 SHEET 10

1  taken out on surgery, about the 10th day, so that he would
2  receive it at his home by at least the 14th day. If he s
3  going to be out for three weeks.
4  Q. What is the method by which when you diary something,
5  and I assume it s in the computer, that it comes back to
6  you, that you need to do something this day on this claim?
7  A. It s on my computer screen for my tasks for the day.
8  Q. For your tasks for the day?
9  A. Uh-huh.
10 Q. What is your retention time on the information that s
11 contained on your computer?
12 A. As long as it stays there, you mean?
13 Q. Yes.
14    MR. BROWN: Object to form. If she knows.
15 A. The only one that can change my diary dates are me.
16 I would think that they would stay in there, if they re
17 not -- but my job requires that - my personal goals and
18 my job requires that I finish my task dates by the end of
19 the week.
20 MR. TINNEY:
21 Q. Do you indicate it in your file whether you actually
22 finished the task?
23 A. I would mark complete, yes, and mark it off.
24 Q. So on your computer today, if you want to go back and
25 pull up all your records concerning Mr. Brown, you can do
37

PAGE 38

1  that?
2  A. I can pull up the file.
3  Q. And you can pull up your diary also?
4     MR. BROWN: Are you asking can she pull up
5     individual tasks on individual days to determine
6     if they were or were not done?
7     MR. TINNEY: No. I asked her can you pull up
8     your diaries.
9  A. It would be in the file.
10 Q. So you could actually pull up your diary for a
11 particular day that may have Mr. Brown on it?
12 A. Yeah, but I don t know how to do it.
13 Q. But it s there?
14 A. Yeah.
15 Q. Then, for instance, you could pull it up and where
16 you wrote complete on it, it would be on the diary?
17 A. Yeah.
18 Q. How do you write complete on it when it s, you know,
19 on the screen? What do you do?
20 A. For what?
21 Q. For when you have a task for a given day, if it says
22 contact Dr. Howorth today. How do you write or notate
23 that you have completed that task?
24 A. There s a complete click on. You click on that.
25 Q. So there s a little bar after it to whether it s
38

PAGE 39

1  complete, not complete?
2  A. Uh-huh.
3  Q. What are your choices on those bars?
4  A. The choices it would give today s date if it was
5  completed.
6  Q. Is there any other choice? Not complete, review or
7  diary again?
8  A. I could diary it again for myself in the future. If
9  it was an appointment with him and I had called then what
10 I would usually do, my next thing would be I would diary
11 myself at least a week to two weeks out, depends on what
12 it is, for medical records. Have the medical records been
13 received and documented in the file from this date of
14 service and what is the next office visit with a question
15 mark.
16 Q. What is your company policy, to your knowledge, when
17 you are awaiting a fax from somebody and you do not get
18 that fax as to the follow-up time on that when you don t
19 receive it?
20 A. There is no company policy on it.
21 Q. What is your rule you utilize?
22 A. My rule? I ll give a call back my next diary date
23 or before that.
24 Q. So when you call somebody and you re expecting --
25 A. Usually it would be on my next diary date unless it s
39

PAGE 40

1  something very important.
2     MR. BROWN: Let s take five minutes.
3  (Deposition resumed.)
4  MR. TINNEY:
5  Q. Tell me what kind of training you had with respect to
6  use of the computer system at CMI.
7  A. To open a file, set my task dates, put notepads in.
8  They trained me on the system, on the Claim Zone system.
9  Q. Have you ever been criticized over your knowledge of
10 the use of the system?
11    MR. BROWN: In those respects?
12 MR. TINNEY:
13 Q. No, in any respect. Have you ever been written up
14 because you did something wrong on the computer?
15 A. No.
16 Q. Have you ever had reprimands from your employer that
17 have been notated in your personnel file, to your
18 knowledge, that relate to your handling of claims?
19 A. No.
20 Q. Have you ever been suspended or placed on leave for
21 any reason?
22 A. No.
23 Q. Now, as far as the computer system itself, did I
24 understand you earlier to say that there is no hard copy
25 file on Mr. Brown s claim anywhere?
40

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 41 SHEET 11

```
1      A.   I don t know.
2      Q.   Well, you re the person in charge of handling Mr.
3      Brown s file; correct?
4      A.   On the computer, yes.
5      Q.   Well, is there anybody in charge of handling Mr.
6      Brown s file off of the computer?
7      A.   Everybody in the office.  I mean, as far as my bosses
8      and the computer system, the whole office, they re
9      probably  - I don t for myself, I just - would you say
10     the question again, please?
11     Q.   I asked you if there is any hard copy of any document
12     relating to Mr. Brown that you have ever seen, let me
13     start out that way, that you have ever seen, concerning
14     Mr. Brown s claim, a hard copy of anything?
15     A.   Which is a piece of paper or what?
16     Q.   A piece of paper.
17     A.   I don t know.  I don t recall.
18     Q.   You re telling me that you can t even recall if you
19     ever got a fax from anybody --
20     A.   Well, faxes, yes.
21     Q.   Is a fax a piece of paper?
22     A.   Well, it comes electronically.
23     Q.   Tell me how a fax comes to you.
24     A.   A fax comes to me -- in the State of Alabama it comes
25     to me in my inbox, which is in the computer --
                           41
```

PAGE 42

```
1      Q.   Your inbox?
2      A.   - Which is my mail that is sent to me through the
3      company --
4      Q.   Well, wait a minute.  When you say sent to you
5      through the company, tell me what you mean by that.
6      A.   Well, it just comes to me  - they process the faxes
7      and/or we have a fax number in our unit and they can dial
8      our fax number, fax it to us and it still comes across my
9      computer.
10     Q.   Let s go back and just use Dr. Howorth s surgical
11     request concerning Mr. Brown.  If you called Dr. Howorth s
12     office and said, I have to have a formal request for
13     surgery from you to authorize this surgery.  I m going to
14     fax you something and you fax it back.  First, what is the
15     number you would tell him to fax it to?
16     A.   479 873 --
17     Q.   · 479 --
18     A.   - 479 273 8020.
19     Q.   I m sorry, 222?
20     A.   479 273 8020, attention Victoria.
21     Q.   And would that have been the fax number that you
22     would have given to anybody during the time frame you were
23     working on Mr. Brown s file as to where to fax a document
24     to?
25              MR. BROWN: Object to the form.
                           42
```

PAGE 43

```
1      A.   I don t  - yes.
2      MR. TINNEY:
3      Q.   What is your telephone number.  If you told Mr. Brown
4      to call, if you have any problem, call me.  What is the
5      number you would have given him?
6      A.   The 1-800 number.
7      Q.   Tell me what that is, please.
8      A.   1-800 -- I forgot.
9      Q.   527?
10     A.   527-0566.
11     Q.   And what is your extension?
12     A.   20776.
13     Q.   20776?
14     A.   Yes.
15     Q.   Or 766?
16     A.   776.
17     Q.   So, again getting back to the question concerning an
18     example.  If you asked for a faxed formal request for
19     surgery from Dr. Howorth and you gave him this number that
20     you just gave me, how would it get to you?  If his office
21     went and put it in the fax machine and dialed that number,
22     how does it get to you?
23     A.   I look on my e-mails.  I open up the computer and
24     it s in the computer.
25     Q.   So this is a number that if I sent a fax to you it s
                           43
```

PAGE 44

```
1      going to go directly to your e-mail?
2      A.   Uh-huh.
3      Q.   How do you determine whether or not a fax fails to
4      get through?  Is there any indication that comes up on
5      your computer as to whether or not there s a failure to
6      get something through?
7               MR. BROWN: Hold on.  Object to the form.  Are
8               you talking about failed to get through on an
9               outgoing or incoming?
10              MR. TINNEY:  Incoming.
11     Q.   On an incoming fax, is there anything that would come
12     on to your computer screen if you re expecting a fax that
13     says that a fax has failed?
14     A.   No.
15     Q.   If you have an outgoing fax to someone, how do you
16     fax that to someone?
17     A.   On my computer.
18     Q.   If you want to send to Dr. Howorth a surgical request
19     form, how do you get that form to him?
20     A.   I put it as an attachment and I put his fax number on
21     the top of the sheet at Wal-Mart dot com, I put Emory
22     Brown s name at the bottom and I press send.
23     Q.   So you send all of your requests electronically to
24     doctors, hospitals; is that correct?
25     A.   Yes.
                           44
```

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 45 SHEET 12

1  Q.  Going back to record keeping.  Have you ever seen any
2  paper document relating to Emory Brown since you ve been
3  working on his file?
4        MR. BROWN: Object to form.
5  A.  I don t understand the question.
6  MR. TINNEY:
7  Q.  Have you ever seen a piece of paper that relates to
8  anything that you did concerning Mr. Brown while you were
9  working on his file?
10       MR. BROWN: Same objection.
11  A.  I don t - a piece of paper?
12  MR. TINNEY:
13  Q.  Yes, any piece of paper, whether it s a medical
14  authorization, medical request --
15  A.  I don t know.
16  Q.  - Something from the company?
17  A.  I don t know.
18  Q.  What did you review in preparation for this
19  deposition today?
20  A.  What did I review?
21  Q.  Yes.
22  A.  I reviewed my file, reviewed my diary of the file,
23  looked it over.
24  Q.  Did you print something out and is that what you ve
25  got there in front of you?

45

PAGE 42

1        Motion to Compel.  I just want it on the record,
2  so we can identify what you re holding that it s
3  obvious you re not going to let me see.  I just
4  want to know how many pages that is that she
5  printed off.
6        MR. BROWN: These are nine pages of documents
7  that post date the filing of your lawsuit that
8  are --
9        MR. TINNEY:  All right, so you re representing,
10  as an officer of the Court, that every single
11  reference on that document you hold is
12  referenced on after the filing of this lawsuit?
13       MR. BROWN: The last one on here is dated 6-14-
14  2005.
15       MR. TINNEY:  What is the first one, just for the
16  purposes of the record?
17       MR. BROWN:  The latest one, the most recent is
18  March 30, 2006.
19       MR. TINNEY:  But you re saying that there is
20  nothing in that diary that goes back to the
21  September to March time frame?
22       MR. BROWN: What I am telling you is absolutely
23  correct,  that I am looking at the materials
24  that were generated after the lawsuit was filed.
25       MR. TINNEY: That s fine.

47

PAGE 46

1  A.  Yes.
2  Q.  That s your diary of the file?
3  A.  Uh-huh.
4  Q.  Is that something that you generated off of your
5  computer?
6  A.  Yes.
7        MR. BROWN: Hold on.  This is something that was
8  done - this is after the lawsuit s been filed.
9  The things that she reviewed were materials that
10  have been produced to you.
11       MR. TINNEY: No, she just said she reviewed that,
12  that you ve got in your hand that we have in
13  this room today.  She said she generated that
14  off of her computer and that that is what she
15  reviewed in preparation for this deposition.
16       MR. BROWN: And I was with her when she prepared
17  for the deposition and I know what she reviewed.
18       MR. TINNEY: All right, just for the record,
19  Jeff, tell me how many pages that document is
20  that you ve got.
21       MR. BROWN: I m looking at some pages that are
22  all dated after the date you filed your lawsuit.
23       MR. TINNEY:  Well, I understand what you re
24  saying, but, you know, it s obvious we re going
25  to have a hearing at some point in time on a

46

PAGE 48

1        MR. BROWN:  Hold on.  Which is the materials
2  that were generated after the lawsuit was filed,
3  which we therefore contend are absolutely work
4  product.
5        MR. TINNEY: I understand.
6        MR. BROWN: And it also contained attorney
7  client information in them and you have been
8  given the materials that pre-dated the lawsuit,
9  or actually the last one that you got was dated
10  June 21st, 2004, which was the date the lawsuit
11  was received.  And at that point in time, after
12  that, then I believe it goes into a different
13  echelon.  So that is my position.
14       MR. TINNEY:  Okay.
15       MR. BROWN:  So if she reviewed these pages, it
16  was in addition to the 100 pages --
17       MR. TINNEY:  No, that s not what she testified
18  to.
19  Q.  I just asked you what you reviewed, so you didn t
20  include this information that your Wal-Mart s attorneys
21  supplied to me in what you reviewed.  You told me that you
22  reviewed those records that you had in front of you in
23  preparation for the deposition.  Did I misunderstand you?
24       MR. BROWN:  Let s try to simplify this.
25  A.  Yeah.

48

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

1    MR. TINNEY:
2    Q.  Let s go back to the initial question. What did you
3    review in preparation for this deposition today? Now your
4    attorney has now put another set of documents in front of
5    you.
6    A.  This is the file. I ve reviewed the file since the
7    day of injury.
8    Q.  Now, tell me what the first date that you anticipated
9    litigation in this case to be. I want a date. Was it
10   when you received the lawsuit?
11   A.  Yes.
12   Q.  That was the first date that CMI anticipated
13   litigation in this case; is that correct?
14   A.  Yes.
15   Q.  So everything that you did before that was done in
16   the ordinary course of your business; is that correct?
17   A.  Yes.
18   Q.  So anytime you made computer entries, diary entries,
19   or any entries that are stored electronically before the
20   lawsuit was filed, that was done in the ordinary course of
21   business and not in anticipation of litigation; is that
22   correct?
23   A.  Yes.
24        MR. BROWN: For the record, that is, I think, in
25        connection and absolutely in line with what we
                        49

1        have represented to you by producing and not
2        objecting to the production of those diary notes
3        that were prior to the lawsuit.
4        MR. TINNEY: Well, we can, you know, get to that
5        in a minute.
6    Q.  Now, going back to your knowledge of whether there is
7    printed material, what you have got in front of you is a
8    stack of records about an inch thick that, I guess, you
9    generated or someone with the company generated to supply
10   to me in response to Request For Production; is that
11   correct?
12   A.  Yes.
13   Q.  Who generated those documents?
14        MR. BROWN: What do you mean generated?
15   MR. TINNEY:
16   Q.  Who actually printed them out?
17        MR. BROWN: For the record, I did.
18   A.  I don t know.
19   MR. TINNEY:
20   Q.  You didn t --
21   A.  I don t remember.
22   Q.  All right. So you actually didn t print them out?
23   A.  I don t remember.
24   Q.  Would you have had the ability to print out these
25   documents that you reviewed, that you have in front of
                        50

1    you?
2    A.  Yes.
3    Q.  I m going to mark as Plaintiff s Exhibit 1 the --
4        MR. BROWN: Hold on a minute. That s my copy so
5        if you want copies you re going to need to get
6        some copies of it made, because that s not my
7        copy that I m giving up for.
8        MR. TINNEY: All right. I think they ll
9        probably have something here that we can get
10       copies made. And if we don t you can just keep
11       them, as far as I m concerned.
12   Q.  I m going to attach this sticker as Plaintiff s
13   Exhibit 1 to the top of these documents you ve got in
14   front of you.
15
16   PLAINTIFF S DEPOSITION EXHIBIT 1, marked for
17   identification (File. Retained by Defense Counsel. Not
18   attached to deposition transcript.)
19   MR. TINNEY:
20   Q.  As I understand it, you reviewed these in preparation
21   for this deposition? You need to answer out load.
22   A.  Yes.
23   Q.  And these were given to you by CMI s attorney to
24   review?
25   A.  Yes.
                        51

1    Q.  Did you have your own personal copy of these
2    documents?
3    A.  No.
4    Q.  When was the first time that you reviewed these
5    documents in preparation of this deposition?
6        MR. BROWN: The documents or the information
7        contained in the documents?
8        MR. TINNEY: The documents.
9    Q.  Did you actually have a hard copy in front of you to
10   look at?
11   A.  No.
12   Q.  I asked when was the first time that you had a hard
13   copy in front of you to look at?
14   A.  Right now.
15   Q.  Well, I guess I m not being clear. You said that you
16   reviewed those documents to prepare for this deposition
17   and all I m asking you is did you look at them yesterday,
18   two days ago, a week ago or when, or have you never looked
19   at them?
20   A.  This hard copy?
21   Q.  Yes.
22   A.  I looked at it yesterday.
23   Q.  The first time you saw it was yesterday?
24   A.  I have it on the computer.
25   Q.  So you had looked at it on the computer before you
                        52

PAGE 53 SHEET 14

1    met with CHI s attorney?
2    A.   Can I talk with you a minute?
3         MR. BROWN:  Sure.
4    (Deposition Resumed.)
5    MR. TINNEY:
6    Q.   I must have asked a hard question.
7    A.   Ask me again, please.
8    Q.   Did you review things on your computer before you saw
9    what I ve marked as Plaintiff s Exhibit 1 in preparation
10   of the deposition?
11   A.   On my computer.  When I reviewed the file, I review
12   it once a month, but I did a complete review of it for
13   myself in December, last December.
14   Q.   And before yesterday, it had been December since you
15   had actually looked at the file?
16   A.   No.
17   Q.   For what purpose would you have been reviewing it
18   between December and yesterday?
19   A.   To monitor medical, to monitor  - because I monitor
20   claims, that s my job.
21   Q.   Has Mr. Brown s file been closed?
22   A.   No.
23   Q.   Has it ever been closed?
24   A.   No.
25   Q.   What determines whether you close a file?

53

PAGE 54

1    A.   What determines whether we close a file is if he has
2    reached maximum medical improvement, if he is at baseline
3    --
4    Q.   What do you mean by baseline?
5    A.   Baseline from his work related injury.
6    Q.   I don t understand what you mean by baseline.
7    A.   Baseline means if he is where he would have been
8    before the injury occurred, the work injury occurred.
9    Q.   Has Mr. Brown, to your knowledge, based on the
10   medical records that you have, ever got past his baseline?
11   A.   No.
12   Q.   Has he ever reached maximum medical improvement,
13   based on the records that you have before you?
14   A.   No.
15   Q.   What is your duty and responsibility as the claims
16   manager on his file to communicate with Mr. Brown to
17   determine if he has reached maximum medical improvement?
18        MR. BROWN:  Object to the form.  Whether he s
19        represented or unrepresented.
20   MR. TINNEY:
21   Q.   Let s take it if a person does not have an attorney,
22   what is your duty and responsibility, you understand
23   it, to communicate with the claimant about whether he has
24   reached the maximum medical improvement?
25   A.   That would be determined by the doctor.

54

PAGE 55

1    Q.   But I asked what is your duty and responsibility to
2    ask the doctor or to communicate with Mr. Brown about we
3    need to know whether you have reached maximum medical
4    improvement?  Do you have any duty or responsibility in
5    that regard?
6    A.   Yes.
7    Q.   And what is that duty and responsibility?
8    A.   To get the claimant back to good health.
9    Q.   But my question is  - I m talking about information.
10   What is your responsibility to follow up to determine if a
11   person has reached maximum medical improvement?
12        MR. BROWN:  Object to the form.  I don t think
13        that she can answer that question based on the
14        facts of this case because you re -- I mean, if
15        you re asking globally, she s trying to answer
16        specifically to this case.
17        MR. TINNEY:  Yeah, I m asking her about this
18        case.
19        MR. BROWN:  No, you re not.  You re asking what
20        is your, an employee -- I mean, if you ask her
21        about Emory Brown --
22        MR. TINNEY:  I ll rephrase it.
23        MR. BROWN:  I mean, because I think there s a
24        distinction between contact made between CHI,
25        whether he was represented by someone or not

55

PAGE 56

1         represented by someone.
2         MR. TINNEY:  I understand.  That s a good point,
3         so I ll ask the question again.
4    Q.   Did you treat Emory Brown any differently than you
5    would have treated any Wal-Mart workman s compensation
6    case?
7    A.   No.
8    Q.   So would all the answers that you re giving me today,
9    be answers that you would apply to every workman s comp
10   case in Alabama?
11   A.   Yes.
12   Q.   So you re not going to treat Mr. Brown differently?
13   A.   No.
14   Q.   Now, the question is what is your responsibility as
15   the claims manager on his case, if he has no attorney that
16   has contacted you saying I represent Mr. Brown on his
17   workman s comp injury --
18        MR. BROWN:  I m going to object to the form of
19        the question and instruct her not to answer
20        that, because that s not the facts of this case.
21        Those are not the facts of this case.  You --
22        MR. TINNEY:  All right.  Let me --
23        MR. BROWN:  Let me state my objection, because
24        I m not trying to be difficult, but the records
25        that 'you have been provided indicate, and your

56

BROWN VS CLAIMS MANAGEMENT     DEPOSITION OF VICTORIA HEPPES     4-13-06

PAGE 57  SHEET 15

1    client testified Monday, that in March of 2005
2    he went out on a leave of absence for non-injury
3    related medical conditions, cardiac conditions
4    and peripheral vascular disease.  At the time
5    you filed the lawsuit in June of 2005, he was
6    still out of work and he testified that he was
7    not able to do anything and he was still out on
8    a leave of absence.  So you can ask what would
9    or should have been done or something of that
10   nature up to the point in time that you filed
11   the lawsuit, but I think after that it takes on
12   a completely different landscape.
13         MR. TINNEY:  Maybe we can clear it up this way.
14   Q.   Tell me when you first had notice from an attorney
15   that they represented, that any attorney represented Mr.
16   Brown on his workman s compensation claim against Wal-
17   Mart.
18   A.   I guess it was when it was filed.
19   Q.   You re talking about this lawsuit, that s not even
20   filed against Wal-Mart, is what you re claiming to be
21   notice --
22   A.   I don t know.  The lawsuit was sent to my boss.
23   Q.   Which boss?
24   A.   Annie Martin and she notified me that there was a
25   lawsuit on this case.

57

PAGE 58

1    Q.   To your knowledge, has any attorney ever notified CMI
2    that they represent Mr. Brown on his workman s
3    compensation case against Wal-Mart?
4    A.   Not to my knowledge.
5    Q.   So why have you treated this file as if Mr. Brown has
6    a lawyer for his workman s compensation case against Wal-
7    Mart?
8         MR. BROWN:  Object to form.  Don t answer the
9         question.  You stated before we went on the
10        record that you represented him on the worker s
11        comp.  I mean, I don t understand --
12        MR. TINNEY:  I can talk to you, Jeff.  I mean, I
13        can put on record things that you say that, you
14        know, aren t admissible or whatever.  You asked
15        me if I was going to represent him on this comp
16        case and I said, yes, I will, but I have a right
17        to know -- she already testified that there s no
18        lawyer that s ever notified her that they
19        represent Mr. Brown on his workman s comp case.
20        She s already testified to that and I m just
21        following up on that and asking her.
22   Q.   This is the question on the table; did you treat Mr.
23   Brown, as far as his workman s compensation claim goes, as
24   if you had been notified by an attorney claiming that they
25   represented him on the workman s compensation at any time?

58

PAGE 59

1         MR. BROWN:  Object to the form.  If you know the
2         answer.
3    A.   Yes, I did.
4    Q.   Tell me who the attorney is that notified you that
5    they represented Mr. Brown on his workman s compensation
6    claim?
7    A.   No attorney notified me.  I ve not gotten a letter of
8    representation.
9    Q.   So based on your training, would you treat Mr.
10   Brown s case as if he had an attorney on his workman s
11   compensation case or did not have an attorney on his
12   workman s compensation case?
13   A.   I would treat him as if he did have an attorney on
14   his workman s compensation case.
15   Q.   And what do you base that on, seeing that you have no
16   letter of representation from anyone?
17   A.   Because a lawsuit was filed.
18   Q.   Was a lawsuit filed for workman s compensation
19   benefits?
20   A.   I don t know.
21   Q.   Well, has anybody ever told you that --
22   A.   Because I don t remember.
23   Q.   Has anybody ever told you that Mr. Brown has filed a
24   claim against Wal-Mart for workman s compensation
25   benefits?

59

PAGE 60

1    A.   No.
2    Q.   So if nobody s ever told you that, would you have any
3    reason to treat Mr. Brown s claim as if he had an
4    attorney?
5         MR. BROWN:  Objection to the form.
6    A.   I think I just answered the question.
7    MR. TINNEY:
8    Q.   What was the answer?  Maybe I didn t understand it.
9    What was the answer?
10   A.   That I would treat him that he had an attorney,
11   because a lawsuit was filed.
12   Q.   So what is the difference in the treatment that you
13   would provide to Mr. Brown if he had an attorney on
14   workman s comp as opposed to him not having an attorney on
15   workman s comp?
16   A.   As far as medical treatment, none.  I would
17   communicate through the attorney.  The attorney would
18   usually notify me.  We don t contact the claimant.  The
19   attorney would usually notify me.
20   Q.   Why have you not contacted Mr. Brown individually on
21   his workman s comp claim?  Let me withdraw that.  When was
22   the last time you talked to Mr. Brown about his workman s
23   comp claim?
24   A.   I don t remember.
25   Q.   Can you look on your file or the information that

60

BROWN VS CLAIMS MANAGEMENT     DEPOSITION OF VICTORIA HEPPES     4-13-06

1  you ve got in front of you and tell us that? There s some
2  19 pages that it looks like it may have come off your
3  computer that you might want to turn to in Exhibit 1, if
4  you need that to help you tell us that date. Are you
5  familiar with the 19 pages, that appear to be print offs
6  of a screen, that I m talking about?
7  A.  Yes.
8  Q.  Can you look at those 19 pages and tell us when the
9  last time you had any communication with Mr. Brown was?
10  A.  It would be around his appointment of March 25th,
11  2005, with Dr. Howorth.
12  Q.  Why did you terminate your communications with Mr.
13  Brown after that or why did you have no more
14  communications with him after that?
15          MR. BROWN: I m going to object to the form.
16          You re asking her to review the documents that
17          pre-dated the lawsuit. You listen to his
18          question. Have you talked to him and have you
19          had any contact or communication or anything
20          after the lawsuit was filed?
21          MR. TINNEY: That wasn t my question, Jeff. She
22          answered my question. When was the last time
23          you had any communication with Mr. Brown and she
24          told me it was in March.
25          MR. BROWN: No, she was - but you re referring

61

1          her to matters that we ve already established
2          pre-dated the lawsuit.
3          MR. TINNEY: Let s go back.
4          MR. BROWN: So you re asking the question about
5          anywhere, but you re specifically referring to
6          things beforehand.
7          MR. TINNEY: No.
8  Q.  I wanted you to tell me when was the last
9  communication you had of any form with Mr. Brown,
10  directly, about his workman s compensation claim?
11  A.  I don t remember.
12          MR. BROWN: From today s date?
13  MR. TINNEY:
14  Q.  Well, you ve got the records, so we ll take as much
15  time as you need for you to look at those records right
16  there and tell me.
17          MR. BROWN: We ll take 10 minutes and take a
18          break.
19  (Deposition resumed.)
20  MR. TINNEY:
21  Q.  The last question I asked was when was the last
22  communication that you had with Steve Brown and you
23  weren t sure. Have you now determined when that was?
24  A.  It would be around his office visit with Dr. Howorth
25  on March 25th, 2004.

62

1  Q.  How did you determine that?
2  A.  Because I would always follow up with him after the
3  doctor or he would call me. I always asked if they would
4  call me to let me know how they are, to let me know how
5  their visit was and if they have any new prescriptions.
6  That was the last time I talked to him.
7  Q.  So what caused you when we just took a break to
8  remember that?
9  A.  Because that was the time of his doctor s visit.
10  Q.  Do you have something in your records that would
11  indicate that was the last time of your communication with
12  him?
13  A.  Well, possibly.
14  Q.  Well, you told me that the company and your rule is
15  that you document all calls?
16  A.  Yes. That s the company - they would like - in a
17  perfect world I would like to document everything, but I
18  don t get to document all phone calls.
19  Q.  When you say in a perfect world, I mean, you ve got
20  responsibilities to your company and you ve got
21  responsibilities to the claimants; correct?
22  A.  Yes.
23  Q.  And you re trained to document all calls; is that
24  correct?
25  A.  The important things.

63

1  Q.  So how do you classify whether something is important
2  or not important?
3  A.  I think everything is important.
4  Q.  Calls from claimants would be important, wouldn t it?
5  A.  Yes, sir.
6  Q.  And you would document those?
7  A.  Yes or --
8  Q.  And calls to claimants?
9  A.  I document my own.
10  Q.  And calls to claimants?
11  A.  Yes.
12  Q.  And your file would indicate those; correct?
13          MR. BROWN: Object to the form.
14  MR. TINNEY:
15  Q.  Correct? Isn t that correct?
16          MR. BROWN: Are you talking about everybody or
17          Emory Brown?
18          MR. TINNEY: Emory Brown.
19          MR. BROWN: Ask about Emory Brown s file, please.
20  MR. TINNEY:
21  Q.  Emory Brown?
22  A.  Emory Brown s file, I didn t get to document
23  everything I would have liked to have.
24  Q.  Do you record all calls that come to you?
25  A.  No, as far as --

64

PAGE 65  SHEET 17

1      MR. BROWN:  Stop.  There again we re here
2      talking about Emory Brown.
3      MR. TINNEY:  Yes.
4   Q.   Do you record all the calls that would have come to
5   you about Emory Brown?
6   A.   No.
7   Q.   To your knowledge, does Wal-Mart have a system that
8   records those calls?
9   A.   Recording as of what type of recording are you
10  talking about?
11  Q.   Recording of telephone conversations.
12  A.   Tape recording or --
13  Q.   Any electronic recording, any kind of recording that
14  you may be aware of?
15  A.   I don t know.
16  Q.   Has anybody ever told you that Wal-Mart would monitor
17  the calls that you receive or that you make?
18      MR. BROWN: Object to the form.  This is not a
19      lawsuit against Wal-Mart.
20  MR. TINNEY:
21  Q.   I m sorry.  Has CMI ever told you that they would
22  monitor calls you made or calls that come to you?
23  A.   They ve never told me that.  It s part of their
24  system.
25  Q.   What do you mean it s part of their system?

65

PAGE 66

1   A.   I m sure all ingoing in outgoing calls are monitored.
2   I have never seen it myself.
3   Q.   I know, but have you been told that?
4      MR. BROWN: Object to the form.
5   MR. TINNEY:
6   Q.   Have you been told that?
7      MR. BROWN: There again, please don t speculate.
8   MR. TINNEY:
9   Q.   I know these are tough questions, but have you been
10  told that?  You have, haven t you?
11  A.   Yes.
12  Q.   And what causes you to tell someone whether their
13  call or conversation with you is being monitored?
14      MR. BROWN: Object to the form, first.  Can you
15      establish whether she does tell them that?
16      MR. TINNEY:  I asked her what causes you to tell
17      someone that a call is being monitored, if you
18      do it?
19      MR. BROWN:  Okay, that s fine, because your
20      first question assumes that she tells them.  She
21      is not to assume things.  So I would prefer, if
22      you want to ask her the second, please ask her
23      the first one.
24  MR. TINNEY:
25  Q.   Let me rephrase the question.  On what occasions

66

PAGE 67

1   would you advise someone in a conversation with you that
2   the call may be monitored?
3      MR. BROWN: Object to the form.  You have not
4      laid the foundation as to whether she ever tells
5      somebody that.
6   MR. TINNEY:
7   Q.   You re shaking your head, not answering.
8   A.   I don t ever tell anybody that.
9   Q.   Well, for instance, I know your attorney has told me
10  that they have a transcript of your conversation with Mr.
11  Brown.  Did you advise Mr. Brown that you were recording
12  the conversation?
13  A.   I did not record a conversation.
14  Q.   So how do they have a transcript of your conversation
15  with Mr. Brown, if you know?
16      MR. BROWN:  Well, can I point her to the direct
17      entry.
18      MR. TINNEY:  Sure.  Tell me what document number
19      it is.
20      MR. BROWN:  I m looking at Page Number 56,
21      Sequence 7.
22  MR. TINNEY:
23  Q.   I m sorry, Sequence Number 7?
24  A.   Yes, Sequence Number 7.  It says that the notepad is
25  put in by Kimberly West, K R West.  Do you see that?

67

PAGE 68

1   Q.   Yes.
2   A.   And she did the first documentation here and it says,
3   contact of the claimant and he agreed to a recorded
4   interview R I .
5   Q.   So you didn t record an interview with him?
6   A.   No.
7   Q.   Is it the company policy, to your knowledge, if they
8   are going to record an interview that they advise the
9   person they re talking to that it is being monitored or
10  recorded?
11  A.   Yes.
12  Q.   Would that apply to medical providers also?
13  A.   Yes.
14  Q.   Have you ever had an occasion to advise a medical
15  provider that you are recording the conversation?
16      MR. BROWN: Hold on a minute.  Why don t we take
17      a break and let s call the phone number and let
18      you here what the introductory phrase, because
19      you re asking if each individual adjuster  -
20      you re asking if a claims examiner gets on the
21      phone with Dr. Timmons and says, oh, by the way,
22      this call might be recorded; is that what you re
23      asking?
24      MR. TINNEY:  No.  I asked the question, Jeff,
25      that I thought was, you know, easy to

68

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 71

**PAGE 69**

1  understand.
2  MR. BROWN: I don t understand the question.
3  MR. TINNEY: Let me ask it again.
4  Q.  Have you ever had an occasion to advise a medical
5  provider that you were recording your conversation with
6  them?
7  A.  No.
8  Q.  Have you ever had an occasion to advise a claimant
9  when they call in that you are going to record your
10  conversation with them, other than what they may hear when
11  they call the number?
12  A.  Are you talking about Emory Brown?
13  Q.  Yes.
14  A.  I had never advised him that I was going to record
15  with him, because I never recorded.
16  Q.  We got sidetracked a minute ago when we were talking
17  about the paper documentation. You said that you had
18  never seen the papers that we marked as Plaintiff s
19  Exhibit 1 until yesterday; is that correct?
20  A.  We had gone over the file once when the lawsuit was
21  filed, when I first met --
22  MR. BROWN: That s enough.
23  MR. TINNEY:
24  Q.  You don t give me any conversations you ve had with
25  your attorneys or anything. But the question that I just

69

**PAGE 71**

1  Q.  But it s your understanding that it comes into a
2  single source and then it s divided out and goes to you?
3  A.  Yes.
4  Q.  Is that why you put attention Victoria or ask them to
5  put attention Victoria on it?
6  A.  Yes.
7  Q.  Do you know, based on  – how many years did you say
8  you ve been there now?
9  A.  Almost three.
10  Q.  Three.  Is there an area of the building, to your
11  knowledge, where faxes come in and are sorted out?
12  A.  I don t know.
13  Q.  You don t know that?  To the best of your
14  recollection, would any paper document have ever come to
15  you during the course of your handling Emory Brown s case
16  between September and March?
17  A.  I don t know.
18  Q.  You don t know or you don t remember?
19  A.  I don t know.
20  Q.  What type of documents customarily would be available
21  to you to pull up concerning Mr. Brown s claim that would
22  have been entered on your computer between September of
23  04, and March of  05?
24  A.  Again, please?
25  Q.  What kind of documents would customarily be contained

71

**PAGE 70**

1  asked you was, you told me and maybe I misunderstood you,
2  but you told me that the first time you saw --
3  A.  Yes, was yesterday.
4  Q.  - Those papers was yesterday; is that correct?
5  A.  Uh-huh.
6  Q.  Before yesterday, had you ever seen any hard copy
7  papers relating to Jeff Brown from any source. Not Jeff
8  Brown.  Steve Brown from any source?
9  A.  Emory Brown.  I don t remember.
10  Q.  Would all the communications that you received from
11  Dr. Shirah s office, to your knowledge, have come
12  electronically?
13  A.  Yes.
14  Q.  Does the fax number that you gave me go straight to
15  your desk and to no other source?
16  A.  No.
17  Q.  So how does that fax number that you give out, if it
18  doesn t come straight to you, get to your desk as opposed
19  to everybody else s desk?
20  MR. BROWN: Object to the form.
21  MR. TINNEY:
22  Q.  You can answer.
23  A.  It comes to our unit and I see it on my desk
24  computer.  I can explain how it gets there or anything.
25  I m not a technician.

70

**PAGE 72**

1  within your computer file on Mr. Brown that you would have
2  gotten between September and March?
3  A.  Medical records and faxes, mail, yeah, everything  –
4  those.  Whatever s contained in the file stayed.
5  Q.  Are you required to report to your supervisor on a
6  file periodically?
7  A.  Not required.
8  Q.  Do you, as a matter of policy, maybe your policy,
9  report to your supervisor every so often about where you
10  are on a file?
11  MR. BROWN: Object.  Are we talking now or at
12  the time of --
13  MR. TINNEY: At the time of the incident in
14  question.
15  A.  Yes.
16  Q.  How do you do that?  Do you send e-mails?
17  A.  I m a people person.  I like to go over and talk
18  personally with them.
19  Q.  When you go over and talk with them, like Ms.
20  Quizenberry, would you, if she was  – what did you say the
21  name of your supervisor was?
22  A.  At the time?
23  Q.  Yes, at the time.
24  A.  Tisha Montgomery, my team leader.
25  Q.  It was who?

72

PAGE 73 SHEET 19

1    A.   Becky Quizenberry is the --
2              MR. BROWN: Your team leader was?
3    A.   Tisha Montgomery.
4    MR. TINNEY:
5    Q.   Did you ever go over and talk to Tisha about Emory
6    Brown?
7    A.   Yes.
8    Q.   When you go talk to her do you carry documents with
9    you or when you're talking to her do you pull -- does she
10   pull things up on her screen that relate to the case, or
11   how does that usually go?
12   A.   I usually familiarize myself with what I need, what
13   questions I need to be answered or direction I need to
14   take and she would pull it up on the computer or I could
15   have it right there, e-mail it to her.
16   Q.   If you e-mail something to her do you store that on
17   your computer also?
18             MR. BROWN: Store what?
19             MR. TINNEY: The e-mail.
20   A.   Not for very long.
21   Q.   Do you delete your e-mails.
22   A.   Yeah.
23   Q.   Do you personally do that or is that something the
24   system does?
25   A.   I personally do that.

73

PAGE 74

1    Q.   You don't have any expertise in the area of how Wal-
2    Mart stores information electronically, do you?
3    A.   No.
4    Q.   Have you ever been told that your e-mails would be
5    retained?
6    A.   No.
7    Q.   When you get an e-mail from someone, such as Ms.
8    Quizenberry, do you diary your file on that customarily?
9              MR. BROWN: Object to form. She didn't testify
10             that she got anything from Ms. Quizenberry.
11             MR. TINNEY: I didn't ask her, you know.
12   A.   Yes, you did.
13             MR. BROWN: Yes, you did. You said, do you store
14             e-mails from Ms. Quizenberry.
15   MR. TINNEY:
16   Q.   Do you store e-mails from Ms. Quizenberry customarily
17   if you get something from her about a file?
18   A.   No.
19   Q.   How often, maybe you didn't tell me, is there a
20   number of days that you like to go and discuss a case with
21   your supervisor every so often; a certain number of days?
22   A.   No.
23   Q.   Do you have the authority as the claims management
24   person to authorize surgery without having it reviewed by
25   your superiors?

74

PAGE 75

1              MR. BROWN: Object to form. Can I again ask are
2    you talking about Emory Brown's case. I mean,
3    your --
4              MR. TINNEY: I'll rephrase it so I'm clear,
5    because I'm here to talk about Mr. Brown.
6              MR. BROWN: Well, let's then, if we can, try to
7    say that every question relates to the conduct
8    with regard to Mr. Brown.
9              MR. TINNEY: That's fine, because she's told me
10             that she treats everybody the same, so I guess
11             we know it's the same for everybody.
12             MR. BROWN: Well, let's talk about what --
13   MR. TINNEY:
14   Q.   Every question I ask you about this case is going to
15   be about Emory Brown. Can we have that understanding? Is
16   that fair?
17   A.   Is that fair?
18             MR. BROWN: Yeah, it's about Emory Brown.
19             That's the only reason we're here today.
20   MR. TINNEY:
21   Q.   So did you have the authority, without going to a
22   supervisor concerning Mr. Brown, to authorize surgery for
23   him?
24   A.   No.
25   Q.   What is the custom and practice, as you understand

75

PAGE 76

1    it, that causes you to have to go to a supervisor to get
2    approval for surgery?
3              MR. BROWN: Object to form. You're asking is,
4    you're talking about present tense and I don't
5    know if you're talking about --
6    MR. TINNEY:
7    Q.   How have you been trained as to who you have to go
8    to to get approval for surgery?
9    A.   Approval is usually given through a pre-certification
10   process. If I feel that the surgery needs to be done I
11   can go ask my boss, what should I do? It depends on if
12   I've used the doctor before. It depends on many things,
13   but I cannot personally approve any surgery. I always go
14   and ask for guidance. What should I do?
15   Q.   So you've been trained, you as a claim manager, how
16   to go to your boss when you have surgery involved to get
17   their okay to authorize it?
18   A.   Yes.
19   Q.   Do you have to notate in your file, as you have been
20   trained, when you are given that approval by your boss?
21   A.   Yes.
22   Q.   Do you notate in your file when you go to your boss
23   and ask for approval for a surgery?
24   A.   I try to. It's not a yes or no question, but I try
25   to.

76

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

1    Q.    Based on your training as of the time frame that
2    we re talking about concerning Mr. Brown, what would you
3    have to carry to your boss to get approval for surgery?
4    A.    I would have to have  - carry to her?  I wouldn t
5    have to carry anything.
6    Q.    Because it s all stored in the computer?
7    A.    Yes.
8    Q.    So do you physically walk over to her desk and ask
9    her or give her the scenario and say, can we do this, or
10   do you send her an e-mail customarily or what do you do?
11   A.    It just depends.
12              MR. BROWN: Well, no, stop.  You re talking about
13              Emory Brown.  He s asking what do you do when in
14              actuality it should be what did you do.
15   A.    What I did do is I gathered the information --
16   MR. TINNEY:
17   Q.    Well, when you say you gathered the information,
18   you ve got information on your computer, you didn t print
19   anything out, did you?  That s a yes or no question.  Did
20   you print anything out?
21   A.    I printed the MRI report out.
22   Q.    Did you print out anything else other than the MRI
23   report?
24   A.    I don t recall.
25   Q.    Well, did you need -- to your knowledge, based on

                          77

1    A.    Because I had just received it.  Dr. Shirah had taken
2    him out of work because  - I ve worked with Dr. Shirah so
3    I know he s a good doctor.  When he feels that  - when
4    Emory needed an MRI I approved it immediately.  I had the
5    report with me, because I m not a medical expert and I
6    wanted her to take a look at it with me.  I just wanted to
7    talk with her about it.
8    Q.    Let me divert just a minute.  You said you took it
9    the Medical Department.  Tell me what the Medical
10   Department is?
11   A.    We have some nurses in our office that work in the
12   CMI system.
13   Q.    How many nurses are there in the Medical Department,
14   to your knowledge?
15   A.    I don t know.
16   Q.    More than 10?
17   A.    I don t know.
18   Q.    Well, how many  - do you have one particular nurse
19   that you work with in that department?
20   A.    Yes, now.
21   Q.    Ms. Abbott was the one at that time?
22   A.    Yes.
23   Q.    Is she still there?
24   A.    No.
25   Q.    Do you know where she is now?

                          79

1    your review of the records in your dealing with Mr. Brown,
2    did you need anything else other than the MRI report?
3    A.    For surgery?
4    Q.    Yes.
5    A.    Oh, yes.
6    Q.    What?
7    A.    I need the surgical request filled out by the doctor
8    that gives surgical codes, a treatment plan, what the
9    procedures will be, the reason why he needs the surgery.
10   Q.    Did you do that with respect to Mr. Brown?
11   A.    I don t think I printed out the surgical request.  I
12   do know that I had the MRI report with me.
13   Q.    So you took that over to Ms. Quizenberry?
14   A.    No.
15   Q.    Who did you take it to?
16   A.    When I first got the MRI report, I took it over to
17   the Medical Department.  I was walking over  - I had a
18   couple of surgeries that I wanted the Medical Department
19   to look at.  Dana Abbott is her name.  She s our new
20   nurse.  I was walking over to her to discuss a surgical
21   request with her and --
22   Q.    On Mr. Brown?
23   A.    No, on someone else.  I had Mr. Brown s MRI report
24   with me.
25   Q.    Why did you take it over there?

                          78

1    A.    No.
2    Q.    Do you know how long ago she left?
3    A.    No.
4    Q.    Was she an RN?
5    A.    Yes.
6    Q.    Are there any MD s back there, to your knowledge?
7    A.    I don t know.
8    Q.    Is she the one that you had been told, if you have
9    any medical questions go to her?
10   A.    Yes.
11   Q.    So you go to her  - first, what is the date that
12   we re talking about?
13              MR. BROWN: And if you need to refer to any
14              materials, you may refer to materials.
15   A.    October 26th, 2004.
16   MR. TINNEY:
17   Q.    What are you looking at to determine that?
18   A.    I m looking at a notepad from the nurse case manager.
19   Q.    What is the page number at the top of that page?
20   A.    Page 9 of 19.
21              MR. BROWN: The bottom right-hand corner of the
22              hand numbered --
23   A.    I m sorry.
24   MR. TINNEY:
25   Q.    Well, I m asking for the top right.  9 of 19.  What

                          80

BROWN VS CLAIMS MANAGEMENT     DEPOSITION OF VICTORIA HEPPES     4-13-06

PAGE 81  SHEET 21

```
1    entry, sequence code?
2    A.   48.  It s down towards the bottom.
3    Q.   Now what tells you that that s the date you went to
4    her?
5    A.   It says right here on top, on 10-26-04.
6    Q.   At 14:20?
7    A.   Yes.
8    Q.   What is that?
9    A.   That s the time.
10   Q.   I m not military person.
11   A.   Medical time.
12   Q.   What time is that?
13   A.   2:00.
14   Q.   2:00 in the afternoon, 2:20?
15   A.   Uh-huh.
16   Q.   What is your work schedule, normal work schedule?
17   A.   7:00 in the morning until 5:00 in the afternoon.
18   Q.   Five days a week?
19   A.   Uh-huh.
20   Q.   What is NCM?
21   A.   Nurse Case Manager.
22   Q.   So was this Sequence Code Number 48 entered by you or
23   by Ms. Abbott?
24   A.   It was authorized and entered by Ms. Abbott.  It was
25   created by Ms. Abbott, D.J. Abbott, and she put in medical
                            81
```

PAGE 82

```
1    review.
2    Q.   So anybody that works on the file can go pull up the
3    records on that particular file and make an entry that s
4    going to show up on your file; is that correct?
5    A.   Uh-huh.  It ll show up in the file.
6    Q.   And how would she know where to go to make an entry
7    on Mr. Brown s records?
8             MR. BROWN: Object to form.  Don t testify to
9             what you think somebody --
10   MR. TINNEY:
11   Q.   How would you know where to go to?
12   A.   Would you --
13   Q.   Did you give her Mr. Brown s claim number?
14   A.   I don t recall.
15   Q.   Could a person pull up Mr. Brown s records by having
16   his name, absent a claim number?
17   A.   Yes.  I can pull it up.
18   Q.   I m looking at this Sequence Number 48 that Ms.
19   Abbott apparently entered, and it says, file reviewed and
20   adjuster notified that we have medical record of MRI, but
21   no other medical reports .  This appears, the way that is
22   worded, that she was the one contacting you as opposed to
23   you contacting her about the MRI; is that correct?
24   A.   No.
25   Q.   You actually physically took it over to her?
                            82
```

PAGE 83

```
1    A.   Uh-huh.
2    Q.   Printed it out; is that correct?
3    A.   Yes.
4    Q.   Now, it says,  recommended case manager get other
5    medical records that assessment cannot be made without
6    medical .  Tell me what your discussion about that was
7    with Ms. Abbott.
8    A.   She asked me if I had any more  - that we d need the
9    medical records from Dr. Howorth before any type of
10   surgery could be reviewed and I did not have them.
11   Q.   So how could she talk to you about Dr. Howorth if he
12   had not even seen Dr. Howorth as of that time?
13   A.   Because I had gotten the report of the MRI and I
14   wanted to have knowledge of what was in the MRI.
15   Q.   But why were you discussing Dr. Howorth if Mr. Brown
16   had never seen Dr. Howorth at that time?
17   A.   Well, then maybe I was just discussing Dr. Shirah.
18   Q.   So you had records on Dr. Shirah as of that time,
19   didn t you?  Medical records?
20   A.   No, because she says here recommend on get the
21   medical records, that assessment cannot be made without
22   medical.
23   Q.   So tell me when was the first date when you received
24   any medical records about Mr. Brown from Dr. Shirah?
25   While you re looking at that, let me ask you a general
                            83
```

PAGE 84

```
1    question.  Why are these entries so mixed up?  Do you know
2    why they re not in sequence?
3    A.   Well, it seems like  - I don t know why.
4             MR. BROWN:  You ve answered the question.
5    MR. TINNEY:
6    Q.   If you had to go to your computer right now and print
7    it off, is it not going to print it off in chronological
8    order?  You need to answer out load.
9    A.   No.
10   Q.   It will print it off mixed up like this?
11   A.   Uh-huh.
12   Q.   I m looking at Page 14 of 19, Entry Number 19.
13   Sequence Code 19, is that it; 19 and 20?
14   A.   That was my conversation with him.
15   Q.   With who?
16   A.   It looks like I documented his office visit and the
17   follow up.
18   Q.   This entry was made on October the 6th, Sequence Code
19   Number 19; is that right?
20   A.   Yes.
21   Q.   How did you find out that the claimant was seen for
22   initial evaluation by company medical doctor Shirah on 10-
23   4-04?
24   A.   I d called the store and talked with Charlotte Woody
25   and Charlotte would make an appointment with him for a
                            84
```

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 85  SHEET 22

```
 1    follow up visit with Dr. Shirah.
 2    Q.   Then I see on Sequence Code Number 20, you ve got
 3    another entry and it says, category TAD program . What
 4    does TAD stand for?
 5    A.   TAD.
 6    Q.   I know, but what does that mean?
 7    A.   TAD means temporary alternative duty.
 8    Q.   And who was it that created  - is that Becky
 9    Quizenberry that created that, Sequence Number 20? Where
10    it says created by B-E-Q-U-I-S? I m not asking your
11    attorney, I m asking you.
12    A.   Well, it s not her complete  - I don t know.
13    Q.   Now, there s Dr. Shirah s telephone number in here so
14    on that date did you talk to Dr. Shirah s office?
15    A.   Would you say that again, please.
16    Q.   It looks like we ve got in Sequence Code Number 20,
17    it says it s got Dr. Shirah s telephone number here.
18    Adjuster spoke with Ken.
19    A.   That s me and I put my initials in there. V A Hep,
20    that s my call sign.  So I documented that.
21    Q.   Where are you talking about your initials?
22    A.   On Sequence 20.  I m talking about right here.  You
23    see where it says V-A Hep?
24    Q.   So you made that entry?
25    A.   Yes.
                          85
```

PAGE 86

```
 1    Q.   So you actually called and spoke with --
 2    A.   Yes.
 3    Q.   - With Ken?  Do you recall what Ken told you?
 4    A.   That Dr. Shirah had kept him off until the follow up
 5    visit on the 8th, on October 8th.
 6    Q.   Now it looks like you made the next entry, Number 21,
 7    category TAD program.  Is that your entry?
 8    A.   Yes.
 9    Q.   I don t see a time of these entries.  Some of them
10    have a time and some don t.  Do you know why there s no
11    time on this?
12    A.   No, I do not.
13    Q.   Who is Amy Shelley?
14    A.   Amy Shelley was a TAD specialist that was assigned to
15    our unit.
16    Q.   Tell what her duties and responsibilities were, to
17    your knowledge.
18    A.   She was new at the time.  It was a new program that
19    we were starting to  - when we have a person off of work
20    she is to help us follow up with the doctor, get medical
21    records, follow up with the return to work, with
22    restrictions, if any.  That was the starting of that
23    program.
24    Q.   So she was on the job as of October 6th, of 2004?
25    A.   I don t know exactly when she started.
                          86
```

PAGE 87

```
 1    Q.   Well, that day --
 2    A.   Yes.
 3    Q.   - I assume she was --
 4    A.   Yes.
 5    Q.   Tell me again what the TAD stands for.
 6    A.   TAD, temporary alternative duties.
 7    Q.   Temporary alternative what?
 8    A.   Duties.
 9    Q.   That s, I guess, when somebody needs to go on light
10    duty?
11    A.   Yes.
12    Q.   Now, you also said that she helps with medical
13    records?
14    A.   That was the start, yeah.
15    Q.   So if you couldn t get something, you would go to her
16    and ask for her assistance?
17    A.   I would task her on it or she d e-mail me or I could
18    go to her and ask for her assistance, yes.
19    Q.   When you say you would task her on it, does that mean
20    you would tell her to do it and that was what she was
21    supposed to do?
22    A.   Well, I don t know all of what her job --
23    Q.   No, I m talking about you used the word task.  You
24    said, I would task her on it.  What do you mean?
25    A.   When a person is off of work I task our TAD
                          87
```

PAGE 88

```
 1    specialist to also follow up with the doctor, if she can,
 2    and I tell them that the person was taken off of work at a
 3    certain date, when the follow up is and give the doctor s
 4    phone number.
 5    Q.   So what did you ask her to do with respect to Emory
 6    Brown?  I guess, the first question would be, you said --
 7    your note, in Sequence Code Number 22, Page 14 of 19, it
 8    says you diaried it to her for 10-7?
 9    A.   Uh-huh.
10    Q.   What do you mean by that?
11    A.   That means  - well, at that time the TAD specialist
12    had job descriptions, light duty descriptions, forms and
13    things that they would fax to the doctors so that he knew
14    what type of light duty positions was available at the
15    store.  So that he could -- when I faxed over the TAD
16    form, which shows what restrictions are available or says,
17    for example, how much lifting, how many pounds lifting or
18    push pulling, or no use of right arm or no use of left
19    arm, for what days and things, that type of form is what I
20    fax over.  But she also has certain type of forms that
21    they fax over on the job descriptions and things that he
22    may feel more comfortable about being able to look as far
23    as a sick person going back to work in a light duty
24    position.
25    Q.   So when it says you diaried it to her for 10-7, what
                          88
```

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

```
1    does that mean?
2    A.   That means I put on a task and put her name on it and
3    asked her to follow up with the doctor on Emory Brown.
4    Q.   So where do we get what you diaried to her?  Where is
5    that document so we can know what you told her you wanted
6    her to do?
7         MR. BROWN: Object to the form.  It assumes that
8         it still exists.
9    MR. TINNEY:
10   Q.   I m sure that CMI would not destroy that, so it would
11   be on something you sent to her to do.
12   A.   I would diary it to her, I would diary it in the
13   file.  Now as far as  - and then she would take and it
14   would go to her desk.
15   Q.   So did you diary in the file anywhere what you sent
16   to her to do?
17   A.   No.
18   Q.   It s just like an e-mail you send to her, is that
19   what you re saying?  Telling her what you want her to do
20   on this file.
21   A.   I tell her who the doctor is, when he was taken off
22   of work, why he was taken off of work and I usually  -
23   besides e-mailing her that information and the claim
24   number, I usually call and say, I put a task for you on
25   tomorrow, I have somebody was taken off of work with
                              89
```

```
1    an injury and I d like you to follow up.
2    Q.   So did she follow up with you as to what she did?
3    A.   I don t know.
4    Q.   Well, if she did follow up on you --
5         MR. BROWN: Hold on.  Just let her look for a
6         second.  Take all the time you need.  We ve got
7         all day.
8    A.   Yes, on Page 13 of 19, Sequence 28, is her notepad.
9    Do you see it there?  A L Shelley.  It s the second from
10   the top.
11   Q.   Yes.  Okay, where is says CorVel, what does that
12   mean?
13   A.   To my knowledge, it s the company that she works
14   with.
15   Q.   She doesn t work for CMI?
16   A.   I don t know.  She works in my office.
17   Q.   Tell me what you know about this CorVel.
18   A.   I don t know anything about them.
19   Q.   Well, you just said you think it s the company she
20   works for.  You don t think she works for CMI?
21   A.   I don t know.  I can t answer that question.
22   Q.   Why does this say that this was created by Becky
23   Quizenberry, or B-E-Q-U-I-S, at the top?
24   A.   We had a new system and I don t know why it says
25   that, but I have no knowledge of why  -
                              90
```

```
1         MR. BROWN: You ve answered.
2    MR. TINNEY:
3    Q.   When was the first time that you received a report
4    from Dr. Shirah s office indicating that -- well
5    indicating anything about Dr. Shirah s written records
6    concerning Emory Brown?
7         MR. BROWN: Object to the form.  It s vague.
8    MR. TINNEY:
9    Q.   Let me mark this next exhibit Plaintiff s Exhibit 2.
10   These two documents.
11
12   PLAINTIFF S DEPOSITION EXHIBIT NUMBER 2, marked for
13   identification.  (Return to Work Activity Prescription.
14   Page 209.)
15   MR. TINNEY:
16   Q.   I ll ask you if you sent those two documents to Dr.
17   Shirah?
18   A.   Yes.  This one, the first one, yes.
19   Q.   What date did you sent those?
20   A.   On October 7th.
21   Q.   Show me -- can you refer me in the record  - well, is
22   that on Page 13 of 19 again, Sequence 29, adjuster faxed
23   over TAD restrictions forms to Dr. Shirah?  Is that the
24   forms that you re referring to there?
25   A.   Yes.
                              91
```

```
1    Q.   Did you complete or make the entries at the top of
2    the second page of Plaintiff s Exhibit 2 where it says,
3    unknown as to the diagnosis , and all?
4    A.   Yes.
5    Q.   And what did you use to put that information in as
6    far as the diagnosis unknown?
7    A.   Why did I put it in?
8    Q.   Yes.
9    A.   Because I didn t have a diagnosis at the time.
10   Q.   Did you receive this form, it s the second page of
11   Plaintiff s Exhibit 2, back from Dr. Shirah completed?
12        MR. BROWN: If I may reference some other
13        portions that would help things along.  Do you
14        have a problem with that?
15        MR TINNEY: No.
16        MR. BROWN: If you will look --
17        MR. TINNEY: I m looking for --
18        MR. BROWN:  - Look at beginning Page Number 76,
19        please, on the documents I produced to you, up
20        there.  It s one of these.  How long do you --
21        do you think we ll be another hour?
22        MR. TINNEY: Probably at least another three or
23        four hours.
24        MR. BROWN: My other lady is out here waiting.
25        Can I send her back to work?
                              92
```

PAGE 93  SHEET 24

1       MR. TINNEY:  Yeah, you can send them back.
2    Q.  I m going to show you what I marked as Plaintiff s
3    Exhibit 3,
4
5    PLAINTIFF S DEPOSITION EXHIBIT NUMBER 3, marked for
6    identification. (Return to Work Activity Prescription.
7    Page 211.)
8    MR. TINNEY:
9    Q.  I ll ask you if that s the four page response that
10   you received to your request from Dr. Shirah?
11   A.  The first two pages are my response as far as I
12   received, it looks like --
13   Q.  Let me show you what I ve got --
14       MR. BROWN: He s going to give it to you.
15   MR. TINNEY:
16   Q.  I have marked as Plaintiff s Exhibit 3, this is the
17   first page, this is the second page, the third page,
18   fourth page.  I ll ask you first, are those the four pages
19   that you received from Dr. Shirah in response to the TAD
20   request that you sent?
21   A.  Yes.
22   Q.  I see at the top of the first page of Plaintiff s
23   Exhibit 3 that there are references, it looks like, to a
24   fax across the top; do you see that?
25   A.  Yes.

                        93

PAGE 94

1    Q.  It looks like from, you know, there s Wal-Mart there.
2    Can you interpret what that fax means as to whether it was
3    something you sent or something you received from Dr.
4    Shirah s office?
5    A.  As far as the top, it s says Thursday the 7th,
6    October, at 14:07.  I sent it on the 7th, so I m assuming
7    that s the time it was sent.
8    Q.  It says, Page 1 of 4", so did you send him the four
9    pages that we ve marked as Plaintiff s Exhibit 3 on that
10   date?
11   A.  No.
12   Q.  You did not?
13   A.  No.
14   Q.  You sent him this first page?
15   A.  Yes.
16   Q.  That s got, somebody wrote to Wal-Mart stores, was
17   that simply sending him something that he could use as a
18   cover sheet to send something back to you?
19   A.  Yes. Well, I – this automatically comes through the
20   system. This is what I put on the fax as an attachment.
21   So this goes through the system.
22   Q.  Would this first page of Plaintiff s Exhibit 3,
23   that s got Wal-Mart Stores, Inc., at the top, where it
24   says, fax cover sheet , would that have been the cover
25   sheet for what you sent, the TAD form, to Dr. Shirah?

                        94

PAGE 95

1    A.  It s automatically put in there from the system.
2    Yes.
3    Q.  Now, you received four pages back from Dr. Shirah on
4    October the 8th?
5    A.  Yes.
6    Q.  And those are the four pages that we marked as
7    Plaintiff s Exhibit 3?
8    A.  Yes.
9    Q.  Did this tell you how long that Emory Brown was going
10   to be out of work?
11   A.  It told me when he could return to work with
12   restrictions, on 10-10-04.  No use of right arm.
13   Q.  Now the third page of Plaintiff s Exhibit 3, which
14   says, please return ASAP , it looks like a letter from
15   Amy to Dr. Shirah?
16   A.  Yes.
17   Q.  Had you seen that letter before you got it back?
18   A.  No.
19   Q.  Did you generate this fourth page, the home
20   restrictions form?
21   A.  No.
22   Q.  The question that I asked, I believe, earlier was
23   what was the date that you first received copies of Dr.
24   Shirah s office records?
25   A.  I don t know.

                        95

PAGE 96

1    Q.  Look at --
2        MR. TINNEY: Jeff, if you need to help her try to
3        find those.
4    MR. TINNEY:
5    Q.  I m going to mark two documents as Plaintiff s
6    Exhibit 4, that appear to be copies of the office records
7    of Dr. Shirah.
8
9    PLAINTIFF S DEPOSITION EXHIBIT 4, marked for
10   identification, (Dr. Shirah s Records. Page 215.)
11   MR. TINNEY:
12   I ll ask you to look at those and tell me when, if ever,
13   you first received copies of those documents?
14   A.  I don t know.
15   Q.  I want you to look through all the records that have
16   been produced to see if you can find those.
17   A.  This first page is a request for medical care this
18   gives --
19   Q.  The questions was when did you receive Plaintiff s
20   Exhibit 4?
21   A.  I don t know.
22   Q.  I filed a request for production in this case that
23   I m going to attach to this deposition as Plaintiff s
24   Exhibit Number 5.
25

                        96

PAGE 97  SHEET 25

1    PLAINTIFF'S DEPOSITION EXHIBIT 5, marked for identifica-
2    tion, (Request for Production of Documents. Page 217.)
3    MR. TINNEY:
4    Q.    In that I asked for all records in your file, meaning
5    case management, with respect to your handling of
6    plaintiff's workman's compensation claim that would have
7    been generated by you on or after September 28th, 2004.
8    CMI's attorney gave me a few days ago what's been marked
9    as Plaintiff's Exhibit Number 1, in response to that
10   request. So since what I've marked as Plaintiff's Exhibit
11   Number 4 is not contained within those records, would I be
12   correct in assuming that CMI never had in its possession
13   Plaintiff's Exhibit Number 4, those records relating –
14   Dr. Shirah's office records concerning Mr. Brown?
15   A.    I don't know that. I didn't have them. I can't
16   answer for CMI.
17   Q.    Why would you not -- if you were the case manager
18   handling this file, why would you not have requested these
19   office records of Dr. Shirah if you wanted to determine
20   how to handle Mr. Brown's claim?
21   A.    I would have requested them.
22   Q.    I don't see any request anywhere in any of your diary
23   notes at all that you ever requested Dr. Shirah's records.
24   A.    When we first made the phone call on the first day of
25   injury we asked for the medical records to be sent.

97

PAGE 99

1    A.    Yes. Sequence 44.
2    Q.    Now this was an entry that was made by you on October
3    the 25th?
4    A.    Yes.
5    Q.    And at that point in time you've already been
6    communicating with Ms. Shelley making sure that the TAD
7    form goes out and the TAD form comes back?
8    A.    Uh-huh.
9    Q.    You'd been doing that, I guess, three weeks before;
10   correct?
11   A.    Correct, yes.
12   Q.    So finally on October the 25th you're saying that you
13   request medical care of 10-4-04. So did you ask him just
14   for the 10-4-04 medical records?
15   A.    That's when I received the request for medical care.
16   The request for medical care is the form here that gives
17   the first doctor's visit, signed by Emory Brown --
18   Q.    I'm going to mark as Plaintiff's Exhibit 6 what you
19   refer to as request for medical care form.
20
21   PLAINTIFF'S DEPOSITION EXHIBIT 6, marked for
22   Identification, (Request for Medical Care. Page 219.)
23   MR. TINNEY:
24   Q.    Where did this come from?
25   A.    The request for medical care is in the file that

99

PAGE 98

1    Automatically, because it's Dr. Shirah, and I've worked
2    with him before, Kenny will send me the medical records
3    automatically. If he forgets, I will follow up on my next
4    task date if I don't receive them in time or something, to
5    follow up with them.
6    Q.    So how can you account for the fact that you don't
7    have any records from Dr. Shirah's four visits with Mr.
8    Brown in your file?.
9    A.    I can't account for it.
10   Q.    So if you say you follow up to get them, there's no
11   evidence in the record that you ever followed up to get
12   them, is there?
13   A.    Only at the times of talking with Kenny on the phone.
14   Q.    Well, you would have diaried that in the file though,
15   wouldn't you?
16   A.    If I talked to him about, well --
17   Q.    My question is you would have diaried that in the
18   file, wouldn't you?
19           MR. BROWN: Hold on. Give her time to formulate
20           her answers. If you need to look at something,
21           look at something.
22   A.    On Page 10 of 19 I have a request for medical care
23   received from Dr. Shirah.
24   MR. TINNEY:
25   Q.    Where is – you said Page 10 of 19?

98

PAGE 100

1    Emory brought back to the store and Charlotte Woody would
2    have faxed it over to me.
3    Q.    We see at the top of Plaintiff's Exhibit 6 it says,
4    mail receive date 10-21-2004".
5    A.    Uh-huh.
6    Q.    Is that something a hard copy would have come in the
7    mail, since that says mail receive date?
8    A.    I don't know.
9    Q.    So when are you telling me you received this form,
10   Plaintiff's Exhibit 6? I guess since Dr. Shirah signed it
11   on October the 7th, it would have been after that,
12   wouldn't it?
13   A.    Yes.
14   Q.    So where you're saying – you told me a minute ago on
15   October the 25th you had a request for medical care 10-4-
16   04, company medical doctor, Dr. Shirah?
17   A.    It was documented in the file.
18   Q.    Well, it says -- the entry, Sequence Number 44, says,
19   action, correspondence from medical provider?
20   A.    Yes.
21   Q.    So you received something from someone?
22   A.    Uh-huh.
23   Q.    What did you receive that you were referencing?
24   A.    The request for medical care.
25   Q.    You received Plaintiff's Exhibit Number 6 on October

100

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 101   SHEET 26

```
 1    the 25th?
 2    A.   Yes.
 3    Q.   All right.  The question I had asked you was when did
 4    you request medical records from Dr. Shirah, so you must
 5    not have understood my question a minute ago.  As a claims
 6    manager, is it important for you to have medical records
 7    from Dr. Shirah so you could adequately fulfill your
 8    duties to Emory Brown?
 9    A.   No.
10    Q.   Why is that?
11    A.   Because Dr. Shirah, I have worked with for a while at
12    that point and if Dr. Shirah said that Emory Brown needed
13    something and I didn t have the written medical records in
14    front of me, I would go on his word, because he s the
15    medical provider, on his assumption -- not his assumption,
16    his word.  If he felt that he needed to be referred out
17    immediately, then I would refer him out immediately before
18    I got the documentation, before I got the medical records
19    by a phone call.
20    Q.   So do you have any knowledge or recollection that you
21    spoke directly with Dr. Shirah at any time concerning Mr.
22    Brown s treatment?
23    A.   Directly?  I speak with Kenny, if Dr. Shirah s in the
24    --
25    Q.   Right, I m asking you do you have a note, any record
                            101
```

PAGE 102

```
 1    anywhere that shows that you spoke to Dr. Shirah himself
 2    about Mr. Brown?  DO you have any personal recollection of
 3    it or was it always with Kenny?
 4    A.   No, it s always with Kenny, because when I call it s
 5    during business hours and he s usually in with a claimant
 6    or in with a patient.
 7    Q.   So you re telling me that you did not deem it
 8    important to see Dr. Shirah s office records as to his
 9    care and treatment of Mr. Brown at any time during your
10    handling of his file?
11    A.   I did deem it important.
12    Q.   So why didn t you get them?
13    A.   More important was the action of the care, first, on
14    his word.
15    Q.   What do you mean by that?  I don t understand.
16    A.   They are important to be put in the file, but as far
17    as medical treatment, if he needs immediate medical
18    treatment that s what I m going to give him.  That s what
19    my job is.  And on Dr. Shirah s word, before I get them in
20    the file -- I do think they re important.  Why I didn t
21    receive them first is not - I took it on his word that
22    that s what he needed and so I acted on his word, on Dr.
23    Shirah s word.  The medical records can come later, but as
24    far as -- my responsibility is to get him the quickest and
25    best medical attention possible.
                            102
```

PAGE 103

```
 1    Q.   So when you say you acted on his word, what word were
 2    you acting on from Dr. Shirah?
 3    A.   I was acting on Kenny  - when I
 4         MR. BROWN: Wait, let him finish his question.
 5    MR. TINNEY:
 6    Q.   What word were you acting on from Dr. Shirah s
 7    office?
 8    A.   On what date?
 9    Q.   At any time.
10    A.   From what the doctor had said that Emory needs.
11    Q.   Well, we ve got, on Plaintiff s Exhibit 4, four
12    visits to Dr. Shirah, October the 4th, October the 8th,
13    October 15th, October 22nd.  So are you telling met that
14    you called Dr. Shirah s office and talked with Kenny after
15    each one of these visits and got a report from him?
16    A.   Uh-huh.  Verbal report.
17    Q.   A verbal report?  Would you have called him on the
18    day that Mr. Brown went to see him?
19    A.   Yes.
20    Q.   And would that have been diaried in your file?
21    A.   Yes.
22    Q.   So there should be something in the diaries that
23    we ve got right here showing that you spoke with Kenny
24    after each one of these visits?  I m just asking if it
25    should be there.
                            103
```

PAGE 104

```
 1    A.   It should be there.
 2    Q.   I see that from the first entry of October the 4th,
 3    you re telling me you talked to Kenny verbally about that?
 4    A.   Yes.
 5    Q.   Around October the 4th?
 6    A.   Let me look, because I want to see if that was
 7    documented.  What day was October the 4th on?
 8         MR. BROWN: Day of the week?
 9    A.   Yes.  Day of the week.
10         MR. BROWN: Monday.
11    MR. TINNEY:
12    Q.   So we ll take your attorneys word that it was a
13    Monday.  You know, I m not seeing any entry at all in your
14    notes for October the 4th.
15    A.   No, I see the 6th.
16    Q.   I m seeing that we go from September the 29th to
17    October the 6th.  I m sorry I take that back, there s an
18    October 1st entry.
19    A.   October 4th would have been the day that I came back
20    to work after vacation and I would have had that tasked to
21    me on that date that he had a follow up visit.
22    Q.   And you would have what?  I m sorry, I missed that.
23    A.   I would have received the task that he had a follow
24    up visit with Dr. Shirah on the 4th.
25    Q.   But I m not seeing any entry where you ve spoke with
                            104
```

PAGE 105  SHEET 27

1   Kenny or anyone on October the 4th or 5th.
2   A.   No.  Since they are mixed up, I want to go through
3   each one to make sure.  There is no documentation that I
4   called Dr. Shirah s office on the 4th.
5   Q.   Or the 5th?
6   A.   Or the 5th.
7   Q.   Or the 6th?
8   A.   On the 6th, yes.
9   Q.   Where is the indication you called on the 6th?
10  A.   On 10-6, it s on Page 15 of 19.  When the file was
11  converted to lost time.
12  Q.   What entry is that, what sequence code?
13  A.   25.
14  Q.   Where does that entry say that you talked with
15  anybody at Dr. Shirah s office?
16  A.   It doesn t say.  It just says that claimant was seen
17  at Dr. Shirah s office on --
18  Q.   So are you saying that that says that you talked to
19  Dr. Shirah that day or Kenny?
20  A.   On the 6th.  10-6 on Page 14 of 19 -- on 10-6,
21  Sequence 20.
22  Q.   Which sequence?
23  A.   Sequence Number 20.  The third from the top.
24  Q.   Let me ask you, at that point in time where he is
25  taken out of work and we re over the three day waiting

105

PAGE 106

1   period, what is your responsibility to see that money
2   starts going to Mr. Brown?
3   A.   As I explained before, my responsibility at that
4   time, when he is over his waiting period is to change the
5   file to a lost time and set out the correct diary dates to
6   pay him.  Customarily, the first 14 days I would set it
7   out for 10 days.
8   Q.   So the Entry Number 25 on Page 15 of 19 is where you
9   converted it to lost time?
10  A.   Yes.
11  Q.   Now, on the entry - since you talked with Kenny on
12  October the 6th about his condition, I m going to show you
13  again Plaintiff s Exhibit 4, the entry of Dr. Shirah for
14  October the 4th and I ll ask you if that is the
15  information that Kenny related to you?
16  A.   Let me finish.  Yes, on October 4th.
17  Q.   So he would have told you that when Mr. Brown
18  experienced his injury that he felt a pop in his right
19  shoulder, followed by pain.  That he states the pain is
20  primarily in his right shoulder, radiates down to the
21  elbow and that he had restricted range of motion,
22  secondary to pain.  Would any of those symptoms, based on
23  your understanding of rotator cuff injuries as of that
24  time that you were talking in October, would any of those
25  symptoms have led you to think this person may have a

106

PAGE 107

1   rotator cuff tear?
2           MR. BROWN: Object to form.  Instruct her not
3           answer.  Calls for a medical opinion and she s
4           not --
5   MR. TINNEY:
6   Q.   I m not asking you as a doctor to give me a
7   diagnosis.  I m just asking you, based on your training up
8   to that point in time, and your rotator cuffs, 50 or so
9   that you ve dealt with, were those the type things that
10  you experienced people who had rotator cuff injuries to be
11  suffering from?
12  A.   I m still not - I don t - can I talk with you for a
13  minute?  I don t want to answer the question, because it
14  is a medical question that I can t --
15  Q.   If you can t answer it, you can t answer it.  Just
16  tell me you can t answer it.
17  A.   I can t answer it.
18  Q.   You can t answer it?
19  A.   Yeah.
20  Q.   Had you talked to Kenny after the October the 8th
21  visit?  If you look on Page 11 of 19, Sequence Code 30, it
22  looks like that s where we re getting to October the 9th.
23  A.   11 of 19?
24  Q.   Page 11 of 19.
25  A.   Do I see what?

107

PAGE 108

1   Q.   Sequence Code Number 30 at the bottom of the page.
2   A.   Yes.
3   Q.   And it says,  authorized by C-o-m-b-a-d-j .
4   A.   Uh-huh.
5   Q.   Do you know who that is?
6   A.   No.
7   Q.   It s got category medical.  Is this an entry that you
8   made on that day?
9   A.   No.
10  Q.   Do you know who else might have been working on Mr.
11  Brown s file as of that time?
12  A.   No.
13  Q.   Do you know why Randolph County Medical s Center, Dr.
14  Shirah s number, is in there?
15  A.   Because that s where he s been to treat so far.
16  Q.   But you don t know who made that entry?
17  A.   No.
18  Q.   Based on your handling of files, who else would have
19  been working on Mr. Brown s file besides you as of that
20  point in time?
21  A.   I don t know.
22  Q.   Well, do you have like a team that would be assigned
23  to Mr. Brown?
24  A.   No.  I m assigned to Mr. Brown.
25  Q.   And you don t have any idea who C-o-m-b-a-d-j is?

108

PAGE 109 SHEET 28

```
 1    A.   No.
 2    Q.   Have you ever seen that before on any entries?
 3    A.   In this file?
 4    Q.   In any file.
 5    A.   I've seen it before on a file, but I don t know who
 6    it is.
 7    Q.   Were you curious as to who made an entry at that
 8    time?
 9    A.   Yes.
10    Q.   Did you enquire of anyone why you re putting
11    something in this file?
12    A.   Well, a lot of people have - I mean, it s the
13    company so I - I don t know every little thing about who
14    all goes into the file.  It s worked on by many people.  I
15    mean, I m the adjuster on it, but --
16    Q.   To your knowledge, is there anyone periodically
17    reviewing your work?
18    A.   Well, I would think so.  To my knowledge, my boss,
19    Annie Martin, reviews my work now.
20    Q.   Well, it looks like the next entry after 10-9 is 10-
21    11?
22    A.   Uh-huh.
23    Q.   I m trying to find Sequence Code 31.  Well, 31's
24    below that, but --
25    A.   You know, this was a new system at the time, so
```

109

PAGE 110

```
 1    documentation was being put in the system.  This is the
 2    month that we got Claim Zone.  I m sorry, what was the
 3    question you were asking?
 4    Q.   The next entry I see on any diary is 10-11, by you,
 5    Sequence Code Number 37?
 6    A.   Uh-huh.
 7    Q.   On Page 11 of 19; is that correct?
 8    A.   Yes.
 9    Q.   Sequence Code 37 you approved temporary total
10    disability; correct?
11    A.   Yes.
12    Q.   I see Sequence Code 38 concerns a state form, you
13    sent something to the State of Alabama?
14    A.   Yes.
15    Q.   And what is FROI?
16    A.   That s FROI, the first report of injury.
17    Q.   And what is combo?
18    A.   That s combination form is a W -- workman s comp
19    three and four.  It s a State form.  An Alabama state form
20    to start and stop TTD, temporary total disability
21    payments.
22    Q.   Now, I see the entry number Sequence Code 39, is the
23    nurse case manager RTW, return to work, so was Ms. Shelley
24    a nurse?
25    A.   To my knowledge, yes.
```

110

PAGE 111

```
 1    Q.   And she signed off on the file?
 2    A.   Because she put nurse in there.
 3    Q.   We ve got on October the 13th it says WC 3 and 4,
 4    what does that mean?
 5    A.   WC 3 and 4, that is also the workman s - WC 3 and 4
 6    is the combo form below.
 7    Q.   So there s no entry -- well, we re up to October the
 8    13th now and you don t have any entry of any report on the
 9    second visit with Dr. Shirah in your file, do you?
10    A.   Well, I don t know.  Let s see, because they re not
11    in order.
12    Q.   So I guess we re looking 10-8 or after.
13    A.   You asked if I had documentation of my speaking with
14    Dr. Shirah s office?
15    Q.   Yes.
16         MR. BROWN:  Was the question if she had any
17         contact with them?
18    MR. TINNEY:
19    Q.   Well, I m looking at these records and I ve gone
20    through them and we have as indicated by Plaintiff s
21    Exhibit 4 that Mr. Brown saw Dr. Shirah October the 8th,
22    and I do not see any entry whatsoever in any of the
23    records indicating you spoke with Kenny or anyone about
24    what happened on the October 8th visit.
25         MR. BROWN:  Okay, that is not about the October
```

111

PAGE 112

```
 1         the 8th visit.  I was looking one ahead of that.
 2    MR. TINNEY:
 3    Q.   We go from, it looks like, 10-9 to 10-11.  Then 10-12
 4    entries, 10-13 entries, there is no reference and we go
 5    from 10-13 to 10-15.  If you ll look on Page 10 of 19,
 6    look at the bottom.  You ve got 10-15 entry, 10-18 entry,
 7    10-25, well, it looks like 10-25 says, request medical
 8    care 10-4, Dr. Shirah .
 9    A.   Yes, sir.
10    Q.   And again you referenced me before, a minute ago,
11    that that entry related to Plaintiff s Exhibit 6?
12    A.   Yes.
13    Q.   So how did you know what happened at the October 8th
14    or October 15th meeting or even the October 22nd meeting
15    with Dr. Shirah?
16    A.   On Page 11 of 19, Sequence 39, Amy Shelley put in
17    claimant is returned to work, will sign off file.
18    Q.   That s Ms. Shelley s entry?
19    A.   Ms. Shelley s.
20    Q.   Correct.  I m asking about, you know --
21    A.   How did I know?
22    Q.   Yeah.  We don t have record, there s no indication
23    that you did anything to determine what happened on the
24    October 8th visit, October 15th or October 22nd visit
25    through calling the office, talking to Kenny, or anything?
```

112

PAGE 113  SHEET 29

PAGE 115

**PAGE 113**

1    A.   Uh-huh.  There s no record of it, but I call.

2    Q.   So what you are telling us is not supported by what

3    your custom and practice should have been, based on these

4    records, is it?

5    A.   No.

6             MR. BROWN: Object to the form.

7    MR. TINNEY:

8    Q.   But you knew it was important for you to find out

9    what Dr. Shirah was finding on these followup visits; is

10   that correct?

11   A.   Yes.

12   Q.   So, again, if I give you Plaintiff s Exhibit 4, I m

13   going to ask you, did someone from Dr. Shirah s office on

14   October the 15th -- October the 8th, 15th and 22nd, tell you

15   what is contained on Dr. Shirah s office records?

16   A.   Yes.

17   Q.   So on October the 8th there s an entry from Dr.

18   Shirah s records that you say you were told that

19   assessment, that we ve got a severe sprain to the right

20   shoulder, cannot rule out rotator cuff tear.

21   A.   Yes.

22   Q.   On October the 8th you knew there was a possibility

23   this man had a rotator cuff tear?

24   A.   Yes.

25   Q.   Based on your experience in dealing with individuals

113

**PAGE 114**

1    who have rotator cuff tears, are those painful?

2             MR. BROWN: Object to the form.  Don t speculate

3             on what other people feel.

4    MR. TINNEY:

5    Q.   Based on your experience in dealing with Mr. -- the

6    records that you were aware of concerning Mr. Brown, do

7    all the records indicate this man was in pain?

8    A.   He had immediate pain.

9    Q.   Every medical record in your file reflects that every

10   time he saw a medical provider he was in pain, wasn t he?

11   A.   Sure.  Yes.

12   Q.   What role does pain play in your handling of a file

13   such as Mr. Brown s, as to whether you provide the injured

14   employee with what he is entitled to under workman s comp?

15             MR. BROWN: Object to the form.  I don t

16             understand your question.

17             MR. TINNEY: I will rephrase it.  She didn t say

18             she didn t understand it.

19             MR. BROWN: I object to the form because you are

20             talking about -- go ahead.  You are just

21             misstating the evidence.

22   MR. TINNEY:

23   Q.   My question is, what role does the fact that you have

24   an injured employee in pain bear to what your duty to that

25   person is?

114

**PAGE 115**

1    A.   I still don t understand the question.  It seems like

2    there s two in there.  Can you make them a little --

3    Q.   All right.  If a man is in pain and he tells you he

4    is in pain, or someone tells you he is pain and needs

5    help, is that going to cause you to pay more attention to

6    the file and to see that you provide what he is entitled

7    to under the Comp Act?

8    A.   Yes.

9    Q.   Would you believe that you have a duty to an injured

10   worker who is in pain to see that you provide the quickest

11   relief possible to him?

12   A.   Yes.

13             MR. BROWN: Object to the form.  It s a legal

14             opinion.

15   MR. TINNEY:

16   Q.   I neglected to ask you earlier if you had ever had

17   your deposition taken before.

18   A.   Yes.  I have once.

19   Q.   What was that case concerning?

20   A.   It was Heppes versus Yellow Cab.  It was a personal

21   injury case in the State of California.

22   Q.   You were the client?

23   A.   Yes.

24   Q.   But you ve never had it taken in connection with any

25   work with CMI?

115

**PAGE 116**

1    A.   No.

2    Q.   Now, from what you told me earlier, based on Dr.

3    Shirah s records, you would have learned on or about

4    October the 8th that Dr. Shirah could not rule out a

5    rotator cuff tear?

6    A.   Yes.

7    Q.   Now, the next visit of Mr. Brown to Dr. Shirah was

8    October the 15th, and you said you were aware of the

9    contents of that record.  I assume that would have been

10   through conversations with Kenny?

11   A.   Uh-huh.  And the fourth.

12   Q.   The fourth, too.  We have already gone over that.  On

13   the 15th, Dr. Shirah says again a severe sprain of the

14   right shoulder and possible rotator cuff tear.  So, again,

15   that confirmed to you the second time that he had a

16   possible rotator cuff tear?

17   A.   Yes.

18   Q.   And you were aware of that as of October the 15th,

19   2004?

20   A.   Yes.

21   Q.   You were also aware that he was still having pain

22   extending from the shoulder down into the arm; is that

23   correct?

24   A.   Uh-huh.

25   Q.   And that he could not abduct his -- well, it says,

116

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 117  SHEET 30

PAGE 119

1    patient has active abduction to approximately 90 degrees,
2    at which point he experiences moderate pain.  Do you know
3    what that means?  Do you know what active abduction means?
4    A.   Not abduction as far as he is using it.  I mean, the
5    word abduction, I know what that means, but --
6    Q.   Do you know what it means when he says to
7    approximately 90 degrees?
8    A.   I would think it would mean the arm.
9    Q.   It says, no crepitus.  Do you know what that is?
10    A.   Huh-uh.
11    Q.   Then on October 22nd, again, you were aware of what
12    Dr. Shirah s records indicated, based on your
13    conversations with Kenny?
14    A.   Yes.
15    Q.   On the 22nd the entry by Dr. Shirah appears to be,
16    right shoulder pain is unchanged.
17    A.   Uh-huh.
18    Q.   So that would indicate to you that he is continuing
19    with pain, if it is unchanged?
20    A.   Uh-huh.  Yes.
21    Q.   Then it says, exam is essentially unchanged.  But
22    he adds,  MRI shows a tear of the anterior portion of the
23    supraspinatus tendon.
24    A.   Yes.
25    Q.   You were aware of that?

117

1    Q.   Okay.  So would you, with that knowledge that you had
2    on October 22nd, indicate to you that this man had a torn
3    rotator cuff?
4    A.   Yes.
5    Q.   And Dr. Shirah was the physician that you said you
6    believed and would rely upon to convey to you a proper
7    diagnosis?
8    A.   Yes.
9    Q.   So do you believe that as of October 22nd and the
10    information that you had as of October 22nd that you had a
11    diagnosis that told you this man has a torn rotator cuff?
12    A.   I believed as of the 15th when I talked with Kenny,
13    called the doctor s office -- because I always call the
14    doctor s office.  So whether it is documented in the file
15    or not, I make a practice, because that s my personal
16    policy is to call the doctor s office, especially when I
17    have somebody out of work with a work-related injury, to
18    make sure the injury fits the pain.  When Dr. Shirah, who
19    I worked with for a long time, says he is staying out of
20    work, there s a reason for it.  On the 15th, when I talked
21    with Kenny, Kenny says Dr. Shirah wants an MRI.  I
22    immediately hung up with him and I called for an MRI, to
23    approve an MRI with One Call Medical.  That s who I use.
24    Now, I wouldn t say immediately.  It could have been the
25    next day.

119

PAGE 118

1    A.   Yes.
2    Q.   And you understand that to be a torn rotator cuff?
3    A.   Yes.
4    Q.   It says,  also noted is a tear of the anterosuperior
5    aspect of the labrum.  Do you know what that is?
6    A.   Not exactly, but I do know it is in the shoulder.  I
7    cannot point out to you which one it is.
8    Q.   If you were informed of these records -- and the
9    assessment, of course, on the 15th is right rotator cuff
10    tear?
11    A.   Uh-huh.  The assessment I always -- that s layman s
12    terms for me, that that is what he has.
13    Q.   As you look at the entry by Dr. Shirah on the 15th,
14    if that information was related to you, does that appear
15    that there are two tears or one tear in his shoulder, as
16    you look at that record?
17    A.   It s still a shoulder strain and possible rotator
18    cuff, so it doesn t indicate anything --
19    Q.   I m talking about the 22nd.
20    A.   Oh, I thought you were talking about the 15th.
21    Q.   I m sorry.  The 22nd.
22    A.   It says anterior portion, which would be one tear,
23    and then it says, anterosuperior of the labrum, which
24    would be also noted so on the word also, that says to me
25    that that would be a second tear.

118

PAGE 120

1    Q.   What did you tell One Call Medical when you called
2    them?
3    A.   I authorized an MRI of the shoulder.  Let s see if it
4    was the right or left shoulder.  Left shoulder.  And what
5    to rule out, diagnose.  Diagnosis or to rule out is a
6    rotator cuff tear.  Diagnosis is shoulder pain.
7    Q.   Did you send anything to them, as far as your
8    authorization, or was it something done on the telephone?
9    A.   Verbal authorization.  That s when I called him.
10    Q.   Look on, again, Plaintiff s Exhibit 1, Page 10 of 19,
11    entry Sequence Number 43, which says,  authorization given
12    for MRI on right arm.
13    A.   Yes.
14    Q.   It says,  phone call from medical provider.  Who was
15    that a phone call from?
16    A.   Diagnosis means -- well, I got a call from them.
17    Q.   From One Call?
18    A.   No.  From Dr. Shirah.  Or I called Dr. Shirah.  This
19    was a new -- I could have printed this wrong or put in
20    phone call from the wrong -- I m human.  I make errors.
21    This is a new system and I m still learning the system at
22    this point, because this is still October now.  We had
23    just gotten the system two weeks before.  So right under
24    phone call from, it says,  phone call to, so I may have
25    made a mistake there.  But when either I call him or he

120

PAGE 121 SHEET 31

1  calls me and says -- Kenny could have called me and said
2  -- I had been waiting for the call -- that Dr. Shirah
3  wants an MRI. I said, okay. When Dr. Shirah says that
4  that s what he feels, you know, or Kenny relates that, I
5  had no question as far as calling One Call Medical and
6  setting up an MRI.
7  Q.  So we ve got a statement to you on October 22nd that
8  he has a right rotator cuff tear. Dr. Shirah is telling
9  you that the MRI shows that he has a right rotator cuff
10 tear.
11 A.  Yes.
12 Q.  Tell me what your duty and responsibility to Mr.
13 Brown was at that time to provide treatment for him.
14 A.  My first duty is to fax over -- when I talk with
15 Kenny and he says, he has a right rotator cuff tear and he
16 needs surgery, then I fax over a request for surgery to
17 the doctor for the doctor to fill -- oh, no. On the 22nd?
18 Q.  Right.
19 A.  He said that he needs to be referred to an orthopedic
20 specialist.
21 Q.  That is when you started your seeking of an
22 orthopedic specialist; is that right?
23 A.  Yes.
24 Q.  Let me show you what I m going to mark as Plaintiff s
25 Exhibit 8, and I will ask you to identify this, please,

121

PAGE 122

1  na am.
2
3  PLAINTIFF S DEPOSITION EXHIBIT NUMBER 8, marked for
4  Identification. (MRI Report. Page 221.)
5  A.  Plaintiff s Exhibit 8 is the MRI report from Open MRI
6  Diagnostics Imaging.
7  MR. TINNEY:
8  Q.  Does that show when you received that report?
9  A.  It says on the top, it says, October 21st, 2004*.
10 Q.  When you had spoken with -- did you talk to Open MRI?
11 A minute ago you said something about One Call Medical.
12 Is that Open MRI?
13 A.  It is the service that sets up an MRI in the closest
14 location to Emory Brown or to the doctor. No. More to
15 Emory Brown.
16 Q.  Now, this says, to One Call Medical, up at the top,
17 so what date did you receive -- you said October 21st is
18 when you received the MRI?
19 A.  That s what the fax says on top. Now, let s see what
20 date I received the report. I documented it in the file
21 on the 26th here.
22 Q.  Where are you looking?
23 A.  Page 10 of 19.
24 Q.  Page 10 or 9?
25 A.  Of 19.

122

PAGE 123

1  Q.  Did you say Page 10 or 9?
2  A.  Page 10. Let me look to see if I have it earlier.
3  Q.  What sequence number are you looking at?
4  A.  I m looking at Sequence Number 46. That s when it
5  was documented in the file. Do you see that?
6  Q.  Yes. Does that indicate when you reviewed it or when
7  you received it? It looks like the 21st is on the fax
8  indication on the top of the exhibit.
9  A.  I could have gotten it on the 21st, which s what
10 it says, the fax. Now, when I get an MRI report, because
11 I know that a patient is in need of one, and I need to
12 know immediately, One Call Medical will fax me over the
13 report as soon as they get it. Sometimes it takes them a
14 little bit of time and sometimes it takes them longer, but
15 documentation I read it first, and then I have it --
16 Q.  Let me show you what I have marked as Plaintiff s
17 Exhibit 7, and I will ask you if that is your handwriting
18 in the lower right-hand corner of that document.
19 A.  No.
20
21 PLAINTIFF S DEPOSITION EXHIBIT NUMBER 7, marked for
22 Identification. (Alexander City Orthopedics. Page 220.)
23 MR. TINNEY:
24 Q.  Do you know whose handwriting that is?
25 A.  No.

123

PAGE 124

1  Q.  Have you ever seen that document before?
2  MR. BROWN: That was some notes that my associate
3  made on a yellow sticky pad and when they copied
4  it they didn t take it off, so that s -- I would
5  like to have that back, so I can white out or
6  take off what my associate wrote. I think it is
7  some indications of things that he put on there.
8  MR. TINNEY:
9  Q.  Going back to your Page 10 of 19 on Plaintiff s
10 Exhibit 1, and this is an entry made by you; correct?
11 A.  Yes.
12 Q.  It was made at 7:33 in the morning.
13 A.  Uh-huh.
14 Q.  On October 26th. What does it mean at the end of
15 this where it says, acromion is Type 11*?
16 A.  I think it should be Type 2, but I m not sure, and I
17 do not know what an acromion is.
18 Q.  What is an a-c-r-o-m-l-o-n? Acromion or what?
19 A.  Acromion? I don t know what that is.
20 Q.  Didn t you type that in?
21 A.  I did because that s what the medical note said, but
22 I don t always have -- I don t have a medical dictionary.
23 There is one --
24 Q.  What medical note are you talking about?
25 A.  I m talking about that one, the MRI report, right

124

PAGE 125  SHEET 32

1    above it on 18 of 19.

2    Q.   I got you.  So you just typed in what was on there?

3    A.   Yes.

4    Q.   Was there any reason you didn't type in on there torn

5    rotator cuff?

6    A.   I just typed what it said.

7    Q.   Well, it says -- okay.  When did you first try to get

8    him, after you got the MRI report, to an orthopedic?

9    A.   Dr. Shirah would have read it on the 22nd.

10   Q.   Do you have any indication in the records, because it

11   looks like I go from October the 18th to the next entry

12   which is October 25th.  I'm on Page 18 of 19.

13   A.   Okay.  I want to say it was on the 22nd.  He had his

14   office visit on the 25th, his evaluation.

15   Q.   You are talking about --

16   A.   With Dr. Howorth.  Dr. Shirah on the 22nd.

17   Q.   Well, we know we've got Dr. Shirah from the records

18   that you don't have in your file?

19   A.   Yes.

20   Q.   So what I'm asking you now, where is the entry where

21   you are trying to get him to somebody in Gadsden, that you

22   are calling a medical provider, or telling anybody to send

23   him to Gadsden, because I don't see anything between 10-18

24   and 10-25, and I've looked at these records twice.

25   A.   Then it's not in there.  But that was phone

125

PAGE 126

1    conversations.

2    Q.   Well, why do you not -- you've told us, you know,

3    what you document, and we've got 50 or 60 entries of

4    telephone calls.  So why did you not deem it important

5    enough to diary your file or document that you were

6    calling trying to get him with an orthopedic?

7                MR. BROWN:  I object to the form of the question.

8                I think it misstates the previous testimony and

9                I think it is a vague and misleading question.

10               Subject to that objection, you may answer.

11   A.   There may not be some documentation in the file

12   because it was a new system.  Some of the note pads that

13   we were getting were being lost at the time.

14   MR. TINNEY:

15   Q.   What now?

16   A.   There may not have been some documentation in the

17   file, but I always call.  Now, when I call to make an

18   appointment, I like to document it in the file and who I

19   was going to -- after I finally made the doctor's choice,

20   or what doctor he is going to go to, I will document it in

21   the file, when his evaluation is and what doctor he is

22   going to.  Now, this was a brand new system.  It had not

23   had all the bugs worked out yet.

24   Q.   Well, you've certainly got 30 or more entries before

25   this, don't you?

126

PAGE 127

1    A.   Yeah, that's true.

2    Q.   And you knew how to use the system, didn't you?

3    A.   Not completely.  I had only been using --

4    Q.   Tell me what training you had been given.

5    A.   Two weeks.

6    Q.   You had been using it for two weeks up to this point

7    in time, so you had been familiar with it for a month.

8    A.   I had been using it.  Yes.  But the system itself had

9    bugs in it yet.  It had not been completely formulated, I

10   suppose.

11   Q.   So tell me how the system caused any inaction on your

12   part as concerns providing care and treatment for Mr.

13   Brown?

14               MR. BROWN:  Object.  I think that's not what her

15               testimony was.

16   A.   I'm not going to answer it.

17   MR. TINNEY:

18   Q.   What do you mean you're not going to answer it?

19   A.   Well, can you rephrase the question for me.

20   Q.   Did the system cause you to fail in the care you

21   provided for Mr. Brown?

22   A.   No.

23   Q.   How do you know when you tried to call an orthopedic

24   to get him to an orthopedic?

25   A.   How do I know when?

127

PAGE 128

1    Q.   Yes.

2    A.   Because I talked with Kenny and I saved the report

3    and I know that is the next step for me is to -- when he

4    is being referred out to an orthopedic specialist, I don't

5    have to wait for the medical notes to come across that say

6    referral to.  I call immediately to make an appointment

7    with an orthopedic specialist.

8    Q.   Why do you have to have it come to you with a written

9    request to refer him to an orthopedic?

10   A.   The written request can come later.  The patient is

11   more important now.

12   Q.   So why didn't you get him surgery without having an

13   authorization from the doctor?  You knew the doctor said

14   he needed it immediately.

15   A.   Because the doctor was a new doctor that I had not

16   worked with before, number one.  Number two, I didn't even

17   have the surgical codes, so what am I going to approve.

18   Number two, the surgical request says definite different

19   questions that I need to know to bring it to approval to

20   anybody, even for myself to even take responsibility of

21   somebody's health.  I need to have that documentation in

22   front of me.  Not as far as our doctor that I have worked

23   with before, when he says, and I see the MRI report, that

24   he needs to go to a doctor and needs to go to an ortho, I

25   will automatically get on the phone and find him the

128

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 129  SHEET 33

1  doctor he needs, set up the closest appointment I can for
2  him, and that was on the 27th of October.
3  Q.  Are you telling me that taking this MRI report that
4  we have marked as Plaintiff s Exhibit 8 --
5  A.  And I told him to bring his film.
6  Q.  Let me finish the question.
7  A.  I m sorry.
8  Q.  You are telling me that taking this MRI report that
9  we have documented as Plaintiff s Exhibit 8, along with
10  the records that you have already testified you were aware
11  of from Dr. Shirah s office, marked Plaintiff s Exhibit 4,
12  that you did not have enough information to go to your
13  supervisor to get this man surgery?
14  A.  No.
15  Q.  What else did you need?
16  A.  I needed what doctor.  I needed to know if he was a
17  specialist.  I needed to know what facility he was going
18  to use.  If it s a registered facility in the State of
19  Alabama.  I needed to know what kind of surgical codes he
20  has, that he wants to use.  I have never worked with Dr.
21  Howorth before.  How do I know he doesn t just go in and
22  do surgery on something that may not -- he may be wanting
23  to do surgery on the wrong thing.  If I don t have it
24  documented or see it in front of me, why am I going to
25  authorize anything that I can t see in front of me.  I
                              129

PAGE 130

1  wouldn t authorize any.
2  Q.  When was the first time that you learned that Dr.
3  Howorth said that this man needs surgery?
4  A.  When Emory called me, I think, or when I -- after his
5  doctor s visit.
6  Q.  Well, you knew he was going to Dr. Howorth; right?
7  A.  Yes.
8  Q.  And your custom and practice is, you are going to
9  call the provider, the doctor, the day that he goes and
10  finds out what the recommendation is.
11  A.  Yes.
12  Q.  So did you do that with Dr. Howorth?
13  A.  I think I called too early and he hadn t come in yet,
14  because I didn t document what time his appointment was.
15  Q.  Well, you don t have any record in your file
16  whatsoever that when he saw Dr. Howorth on October 27th,
17  that you spoke with anybody at Dr. Howorth s, do you?
18  A.  On the 27th, the day of the evaluation, I had spoken
19  with Amy --
20  Q.  I m talking about your documentation of what you did.
21  Do you have something in your files showing what you did?
22  A.  I already told you that it s not always in there,
23  because it s a brand new system.
24  Q.  Most of what you did concerning Mr. Brown is not in
25  there, is it?
                              130

PAGE 131

1          MR. BROWN:  Don t answer that.  The records speak
2          for themselves.
3          MR. TINNEY:  They sure do.
4          MR. BROWN:  You can talk about the records and
5          she can talk about what she recalls and from
6          other independent sources and she can testify to
7          that.
8  MR. TINNEY:
9  Q.  The question on the table is, where is the record
10  that shows me your communication with Dr. Howorth s office
11  on October the 27th to find out what this man, who was in
12  constant pain, needed?
13  A.  For one thing, on the surgical request there is a fax
14  date, and that fax meant that I sent that fax on the 27th.
15  The 27th was the day of his evaluation.  I always call.
16  Now, if they requested surgery and I called them and/or if
17  Amy called me, there would be, I m sure, some type of
18  phone records.  Even the telephone company has records of
19  who you call.
20  Q.  You said that you faxed a surgery request to Amy on
21  October the 27th?
22  A.  Yes.
23  Q.  I am going to show you what was given to me as part
24  of the records that we subpoenaed and I will mark those as
25  Plaintiff s Exhibit 10, three documents.
                              131

PAGE 132

1  PLAINTIFF S DEPOSITION EXHIBIT NUMBER 10, marked for
2  identification.  (Surgery Request.  Page 224.)
3  MR. TINNEY:
4  Q.  Do you see those?
5  A.  Uh-huh.  Yes.
6  Q.  Is it your testimony that these are the three
7  documents that you faxed to Dr. Howorth s office on
8  October the 27th?
9  A.  Yes.
10  Q.  I see up at the top that it says, on what I ve marked
11  as Plaintiff s Exhibit 10, Pages 3 of 6, 5 of 6, and 6 of
12  6.  Where are pages 1 of 6, 2 of 6 and 4 of 6?
13  A.  I don t know.
14  Q.  Why do you have three and not all six?
15  A.  This form is in my forms in our desk, on our desktop.
16  Actually, it s in the Alabama unit from our boss, all the
17  state forms and surgical requests and things.  What I did
18  was, I pulled it out of there and I put it on my desktop
19  under his name.  Then I opened it up and I put exactly --
20  I put his claim number on top and his name on top on Page
21  Number 5.  Do you see that?  Emory Brown claim.  And then
22  Dr. Howorth s name, because I have to insert these, you
23  see.  This is a standard form and I have to insert what
24  the doctor is and who the claimant is and what the claim
25  number is.  Then what I do is I put it in my e-mail on a
                              132

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 133  SHEET 34

1   fax cover -- I mean, on the e-mail as an attachment. I
2   put my signature underneath and I put their fax number at
3   valmartfax.com. I highlight it, underline it, and then I
4   put Emory Brown, surgical request, and I press send. Now,
5   Page 1, 2 and 3, that must be some place in the system
6   that goes out on automatically, that must be the cover
7   sheets.
8   Q.   So who printed this out, Plaintiff s Exhibit 10?
9   A.   I don t know.
10  Q.   So you don t have any explanation as to why we don t
11  have 1, 2 and 4 of this fax?
12  A.   No.
13  Q.   You don t know what they are?
14  A.   No.
15  Q.   Do you think they would be around somewhere that we
16  could generate them and see what they were?
17  A.   No. The only explanation I would probably have would
18  be that fax cover sheet that you showed me a little while
19  ago that has my name on it, this, would be the automatic
20  standard that would go out electronically.
21  Q.   That would be one. What about 2 and 4?
22  A.   I don t know the rest.
23  Q.   What I m curious about is how you can pull up 3, 5
24  and 6 and not be able to pull up 1, 2 and 4.
25  A.   I don t know.

133

PAGE 134

1   Q.   You don t know?
2   A.   I don t know.
3   Q.   But you think you would still be able to -- since
4   you ve got 3, 5 and 6, that you ought to be able to go
5   back and find what 1, 2 and 4 would be, don t you?
6   A.   No.
7        MR. BROWN: Object to the form of the question.
8   MR. TINNEY:
9   Q.   You don t know. Now, I m going to show you what I ve
10  marked as Plaintiff s Exhibit 11.
11
12  PLAINTIFF S DEPOSITION EXHIBIT NUMBER 11, marked for
13  identification. (Dr. Howorth Note. Page 227.)
14  MR. TINNEY:
15  Q.   You had in your possession before you sent the
16  surgery request this document telling you he needed
17  surgery; correct? You would have had no reason to send a
18  surgery request if they hadn t sent you a surgery request
19  or a statement showing that he needed surgery, would you?
20       MR. BROWN: I object to the form. That s not
21       what her testimony has been. Do not answer the
22       question, that s an argumentative question. You
23       can ask her questions about this.
24       MR. TINNEY: I will ask her to answer my question
25       first.

134

PAGE 135

1   Q.   When did you first get Plaintiff s Exhibit 11?
2   A.   What was the question when --
3        MR. BROWN: Stop. Hold it. That is not the
4        entire record from --
5   MR. TINNEY:
6   Q.   When did you first get Plaintiff s Exhibit 11?
7        MR. BROWN: Until he gives you the entire record,
8        you are not to answer the question. That is not
9        an entire document. She is not going to testify
10       to that without it being an entire document.
11       MR. TINNEY: What?
12       MR. BROWN: This is Page 2 of a two page chart
13       entry, or Page 3. This is Page 3.
14       MR. TINNEY: I know it and I have a right -- I
15       don t have to ask my questions the way you want
16       me to. I want to know when she got that page.
17       MR. BROWN: She can have the record, if it helps
18       refresh her recollection.
19       MR. TINNEY: Well, look in her records then.
20  Q.   It came from you. Look in your records. Tell me
21  when you first saw Plaintiff s Exhibit 11.
22  A.   When I first saw Plaintiff s -- a record from Dr.
23  Howorth, the evaluation that I had been calling for --
24  Q.   I m talking about Plaintiff s Exhibit 11, that is
25  what I m asking you the question about.

135

PAGE 136

1        MR. BROWN: If you will let her answer the
2        question, I think that is what she is trying to
3        do.
4   A.   When I first saw Dr. Howorth s evaluation was on
5   November 18th.
6   MR. TINNEY:
7   Q.   All right. You said you called and spoke with
8   someone at Dr. Howorth s office on October the 27th. And
9   they told you that he needed surgery and that prompted you
10  to send the surgery request form.
11  A.   Yes, sir.
12  Q.   So just as you have told us from Dr. Shirah s
13  records, I will now show you Plaintiff s Exhibit 11, and I
14  will ask you if that information was not relayed to you on
15  October the 27th?
16  A.   The information was relayed to me. Yes.
17  Q.   Now, so when you get Plaintiff s Exhibit 11, and you
18  know that he needs surgery that day; is that correct?
19  A.   I know that he needs surgery.
20  Q.   You know that he needs surgery. And you, CMI, have
21  been the ones to select Dr. Howorth to send him to; is
22  that correct?
23  A.   Yes.
24  Q.   Mr. Brown did not select Dr. Howorth, did he?
25  A.   No.

136

BROWN VS CLAIMS MANAGEMENT         DEPOSITION OF VICTORIA HEPPES    4-13-86

PAGE 137  SHEET 35

1    Q.   So you choose Dr. Howorth.  Since you chose Dr.
2    Howorth, did you have confidence in the abilities of Dr.
3    Howorth?
4    A.   No.
5    Q.   So you are telling me and you are going to tell the
6    jury that you sent him to a man, to an orthopedist that
7    you did not have confidence in?
8    A.   I had never worked with him before.
9    Q.   So, again, you are going to tell the jury in this
10   case that you sent this man to an orthopedist that you did
11   not have any confidence in?
12   A.   I had asked if people had used him before.  That s
13   why I called the store in the city and -- I have to have
14   confidence in everybody.  I take face value.  So when I
15   called and asked if anybody had heard of Dr. Howorth at
16   the Wal-Mart store there and I had heard yes, and Kenny
17   had referred him, verbally said, Dr. Howorth is a good
18   person.  Then I had confidence in him, yes.  But to take
19   the responsibility of authorizing a surgery with no
20   direction as far as what type of surgery he wanted to do
21   -- although I know what it is, I need to have everything
22   -- because I have to go to a higher authority for
23   approval.  I can t just approve a surgery on my own.
24   Q.   You were Emory Brown s higher authority, weren t you?
25          MR. BROWN: Object to the form.  It s a legal

137

PAGE 138

1          conclusion.  Don t answer the question.
2    MR. TINNEY:
3    Q.   Weren t you?
4          MR. BROWN: Don t answer the question.
5          MR. TINNEY: What?
6          MR. BROWN: You are asking her a legal
7          conclusion.
8          MR. TINNEY: No.  She used the term higher
9          authority.  I m just asking her if she
10         considered herself to be what you call higher
11         authority for Emory Brown.
12         MR. BROWN: I thought you said hired.  I m sorry.
13         MR. TINNEY: No.  Higher authority.
14   Q.   Who was Emory Brown s higher authority at CMI that he
15   was looking to, to get him help?
16   A.   Higher authority, no.  I consider myself an equal of
17   any person I work with and I give good customer service.
18   My customer service is to, number one, get the best
19   medical attention for a person who is hurting.  My
20   interaction with them is to get them prompt medical
21   attention, get the paperwork back and get what I have to
22   do as the middle person to manage the file, to show reason
23   and what needs to be done by the doctor, when I need to,
24   for example, authorize a surgery, which needs to go in for
25   a formal precertification, which would take from 48 to 72

138

PAGE 139

1    hours.  That s a long time, but I have to have all this
2    first.
3    Q.   Why is it a long time?
4    A.   Why do I feel it is a long time?
5    Q.   Yeah.
6    A.   If a person needs surgery immediately --
7    Q.   If he is in pain?
8    A.   Yes.
9    Q.   That s a long time, isn t it?  72 hours is a long
10   time?
11   A.   You re right.
12   Q.   12 hours is a long time if you are in pain, isn t it?
13   A.   Yes, it is.
14   Q.   And you knew this man was in pain then, didn t you?
15   A.   Yes, I did.
16   Q.   And you knew he needed -- the doctor was saying he
17   needed immediate surgery, didn t he?
18   A.   Yes, he did.
19   Q.   What does immediate mean to you?
20   A.   Just what it means, sir.  Immediate.
21   Q.   Within your definition of immediate, how many hours
22   would that be?
23   A.   I m not going to say hours, because immediate surgery
24   to me is that it cannot be postponed six months or two
25   months or three months.  It cannot be postponed.  As soon

139

PAGE 140

1    as I can get approval for surgery it s what needs to be
2    done.  That s my job.
3    Q.   So what is your duty and responsibility to see if a
4    doctor says get it done immediately?  What is your duty to
5    Emory Brown to see that it gets done immediately?
6    A.   My duty to Emory Brown is first get what his
7    disposition -- what his physician wants to do, how he
8    wants to do it, where he wants to do it, how far away it
9    is from his house, the surgical codes, what facility he is
10   going to use, what time frame he feels that it is going to
11   be, what conservative treatment, if any, has been tried.
12   Those are all standard questions that are on my guidelines
13   to go by for surgery, because I m not a medical doctor.
14   So I have to have these filled out by the medical doctor.
15   Q.   All right.  Let s go back to the question about, you
16   said you had no confidence in Dr. Howorth; correct?
17   A.   I said that I didn t -- I had never worked with him
18   before.
19   Q.   Did you have confidence in his abilities as an
20   orthopedic surgeon?
21   A.   From a referral from Kenny, yes.
22   Q.   What did you have to have present before you before
23   you would have thought he was a competent orthopedic
24   surgeon?
25         MR. BROWN: Object.  It s already been asked and

140

PAGE 141 SHEET 36

```
1              answered.
2      A.  I can t answer that one.
3      MR. TINNEY:
4      Q.  Well, did you have, from any source, any information
5      that Dr. Howorth was not a competent orthopedic surgeon
6      that could properly diagnose Mr. Brown s problem?
7      A.  No.
8      Q.  When you first were aware, as you have previously
9      testified, of the content of Plaintiff s Exhibit 11, and
10     we have the plan that was to recommend immediate
11     arthroscopic and rotator cuff repair, you were aware of
12     that?
13     A.  Yes.
14              MR. BROWN: Asked and answered.
15     MR. TINNEY:
16     Q.  And you first said that your duty then at that point
17     in time to Mr. Brown was to determine from the physician
18     what he was going to do, that s number one.
19     A.  Yes.
20     Q.  So did he tell you what he was going to do?
21     A.  Amy told me what he -- that he requested surgery.
22     Q.  Okay.  I m just asking.  Did he tell you?  So was
23     question one answered?
24     A.  Yes.
25     Q.  And was answered October the 27th?
                            141
```

PAGE 142

```
1      A.  Yes.
2      Q.  The second question is how.
3      A.  By the telephone.
4      Q.  No.  You said I must determine what first, how.  What
5      did you mean by how?
6      A.  Well, how is probably -- that would be the surgical
7      codes on what type of surgery he wants to do.
8      Q.  No.  You said surgical codes -- I listed as you read
9      everything that you are required to do.
10     A.  How, for example, if he feels that it is an open
11     reduction or a closed.  If it s an arthroscopic or an
12     open.
13     Q.  He said arthroscopic.
14     A.  Well, she didn t say that.
15     Q.  Does that answer how?
16     A.  It would.  Yes.
17     Q.  So we ve got what and how and where.  So what did you
18     do to determine where he wanted to do the surgery?
19     A.  I faxed over the request for medical -- request for
20     surgery for him to fill out.
21     Q.  We ve got the three page document that we marked as
22     Plaintiff s Exhibit 10.  Can you get those three pages in
23     front of you?
24     A.  I have them right here.
25              MR. BROWN: What are the numbers on the bottom of
                            142
```

PAGE 143

```
1              the page?
2              MR. TINNEY: Your numbers are 60, 61 and 62.
3      Q.  Where on any one of these three forms are you asking
4      at what facility this is going to be done?
5      A.  It would be here, the fifth question from the top,
6      which is the name, address and phone number of the
7      facility where surgery will be completed.
8      Q.  So you got that sent back to you and you were aware
9      of that as of the 27th?
10     A.  Yes.
11              MR. BROWN: That s not what her answer is.  You
12              said as of the 27th.  You asked her when she got
13              this back.  She faxed it to him on the 27th.
14     MR. TINNEY:
15     Q.  Well, when did you learn, or did you not learn from
16     Amy where it was going to be done?
17     A.  No.
18     Q.  Did you ask Amy on the telephone the question, where
19     do you want to get this done?
20     A.  No.
21     Q.  Did you ask her or where on this form does it say how
22     far is this from Mr. Brown s home?
23     A.  No.  I didn t ask her that, either.
24     Q.  Well, you said that was one of your criteria, wasn t
25     it?
                            143
```

PAGE 144

```
1      A.  It would be in the long run.  Yes.
2      Q.  What do you mean in the long run?
3      A.  After I got this back, if the facility wasn t close
4      enough -- not it would be a facility that was close --
5      that would be close with him there, because I m assuming
6      that he is on -- that he would be on the roster of that
7      facility.
8      Q.  Where do you have the question as to what the medical
9      code is?
10     A.  Two questions above that.  Surgical procedures
11     including ICD9 codes.
12     Q.  Is it your testimony that there was no way that Mr.
13     Brown would have ever gotten approval from CMI for
14     insurance without that code being provided, approval for
15     it?
16     A.  Yes.
17     Q.  Could you not simply pick up the phone --
18     A.  Without this being returned to me.
19     Q.  All right.  You testified earlier -- your attorney
20     said that you didn t get this form back until when?
21     A.  November 15th, 2004.
22     Q.  So you send it out on October 27th.  Now, let s talk
23     about what your actions were -- well, first, did you tell
24     Dr. Howorth s office that you needed this form sent back
25     before surgery could be authorized?
                            144
```

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 145    SHEET 37

```
1    A.   Yes.
2    Q.   So what was your duty to Mr. Brown to see that this
3    form, or that CMI received the necessary information?
4    A.   Again, first of all --
5    Q.   My question was, what was your duty to Mr. Brown to
6    see that you got this back?
7              MR. BROWN: Object to the form.  Calls for a
8         legal conclusion.  You are asking about duties.
9         That s a legal standard.
10   MR. TINNEY:
11   Q.   You can answer the question.
12             MR. BROWN: You can ask her what she did and
13        whether that --
14   MR. TINNEY:
15   Q.   Let me ask it like this.  Did you feel like you had a
16   responsibility to Mr. Brown to see that this surgery
17   request came back in a timely fashion?
18   A.   Yes.
19   Q.   What would have been your definition of a timely
20   fashion?
21   A.   As soon as I could get it.  My definition?
22   Q.   Yes.
23   A.   As soon as I could get it.
24   Q.   And what does that mean, as soon as I could get it?
25   A.   When I was told that surgery needed to be done and he
```
145

PAGE 146

```
1    was already at Dr. Howorth s for the evaluation.  I had
2    spoken with Amy that day.  I called his office.  I faxed
3    over the request for surgery.  I called Amy back to make
4    sure she got the fax to confirm that she got the surgical
5    request.  She then knew, because I told her, that it
6    needed to be filled out and sent back immediately before
7    any approval for surgery can be -- the process can go on
8    for approval.  And I need the medical records from the
9    evaluation of Dr. Howorth.
10   Q.   Can you show me any record on October the 27th, other
11   than Sequence Code Number 49, that apparently related to
12   physical therapy, where you had any communication with
13   anybody on October the 27th?
14   A.   In the file?
15   Q.   Yes.
16   A.   I had approved Lake Martin for physical therapy the
17   same day on the 27th.  It is on Page 9 of 19, Sequence 49.
18   Q.   How did you approve that?
19   A.   I called over there.
20   Q.   What did you tell them?
21   A.   When I spoke with Amy, I said, should I set him up in
22   the -- I like to make sure that I call the physical
23   therapist, that I set up the evaluation and I like to set
24   up the appointment.  Now, if the claimant, if Emory needs
25   to change that appointment when I give him the time and
```
146

PAGE 147

```
1    date, or they call him and set him up, but I know it is
2    very difficult to get through to him because I had to call
3    his mother-in-law s house to get through to him.  So I
4    said, is there a facility close, the doctor would like to
5    set him up, and she said, yes, right here, Lake Martin
6    facility.  This is the first time I had used it.  I said,
7    would you like for me to set it up or would you like to
8    have them call me for authorization?  She said, I will set
9    it up.  I will send them up an order and either I called
10   them or they called me.  I don t remember which.
11   Q.   So are you setting up physical therapy after the
12   surgery?
13   A.   No.
14   Q.   What are you setting up physical therapy for?
15   A.   The day of -- immediately the day that he requested
16   surgery.  The reason why I was setting up physical therapy
17   -- I know where it is.  I ve just got to find it.  For
18   conservative treatment until the surgery could be
19   approved.  Let me look.
20   Q.   Was it because of what had been sent to you on
21   Plaintiff s Exhibit 11, that statement number one?
22   A.   Again, that had not been sent to me.
23   Q.   So what are you basing the physical therapy on?
24   A.   The phone call with Amy.
25   Q.   And Amy told you what?
```
147

PAGE 148

```
1    A.   Number one, that the doctor, Dr. Howorth, wanted to
2    do surgery, and number two, to set up physical therapy.  I
3    said there is a process until I get the surgical request
4    back.  I have the MRI report and I need the medical notes
5    from Dr. Howorth for his evaluation on what needs to be
6    fixed and how he needs to fix it, you know, his
7    evaluation.  Until the process of approval for surgery can
8    be done, can we try -- would physical therapy be an
9    option?
10   Q.   What did she say?
11   A.   Well, let s see.
12   Q.   You don t have any entry, do you?
13   A.   I don t know.  Let me look.
14   Q.   Well, the only entry I see on October 27th is on Page
15   9 of 19, and I ve looked through these and looked through
16   them and looked through them.  That s the only page that
17   there is any entry on October 27th.  No conversation with
18   Amy.  No reference of sending any forms to Amy.
19   A.   There s a reference right here, so I know that I --
20   Q.   On your diary?
21   A.   No.  Not on my diary.
22   Q.   Again, your custom and practice would have been, if
23   you did it, you would have entered it on your diary.
24             MR. BROWN: Object to the form.
25   MR. TINNEY:
```
148

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

1    Q.   Correct?  You can answer the question.
2         MR. BROWN: Subject to the objection.
3    MR. TINNEY:
4    Q.   Is that correct?
5    A.   I will not answer the question.
6    Q.   Why?
7    A.   Because I have already answered it.
8    Q.   No, you haven t.
9    A.   Yes, I have.
10   Q.   I am now asking you why it is not diaried on October
11   27th, when you said that it was your custom and practice to
12   diary everything; correct?
13   A.   I ve already answered the question several times.
14   Q.   You have not answered that question ever.  I said
15   October the 27th your custom and practice was if you
16   called a doctor you were to diary it in your file and give
17   it a sequence number; isn t that true?
18   A.   Yes.
19   Q.   And we don t see it here, do we?
20   A.   No.
21   Q.   As a matter of fact, the next entry you make on your
22   diary is November the 3rd, right up above it, Sequence
23   Number 50.
24   A.   Yes.
25   Q.   You said you expected the surgery request to come

149

1    back within a reasonable time; correct?
2    A.   Uh-huh.
3    Q.   You knew Mr. Brown was in pain; correct?
4    A.   Uh-huh.  Yes.
5    Q.   You had a responsibility to him to see that the
6    surgery got approved?
7    A.   Yes.
8    Q.   So tell us what you did when you did not get this
9    faxed immediately back to you to secure it?
10   A.   I called Amy.
11   Q.   So where is the record between October the 26th --
12   October the 27th and any time that you called Amy?
13   A.   It is not in the file.  I faxed our request -- I have
14   faxed our request.  Okay, Page 9 of 19, Sequence 51,
15   November 8th, of 2004, at 8:30.
16   Q.   Don t we have to go back to eight to get the start of
17   Sequence 51?
18   A.   No.  That s Sequence 55 and 56 -- 54 and 55.
19   Q.   Oh, I m sorry.  I see.  Okay.  We are up to November
20   the 8th?
21   A.   Yes, sir.  That s my next documentation.
22   Q.   Why did you feel like you needed to fax the surgery
23   request for the second time?
24   A.   I task myself out for each file to maintain each
25   file.  If it s -- if I m waiting for something -- now,

150

1    it s already been faxed to him.  If I call daily -- I
2    don t always get a chance to call daily.  My task is set
3    out for at least a week.  If I have not heard or gotten a
4    fax back by then with the surgical request by that time,
5    then I call again.  My entry is on November 8th, because
6    that would be just about a week, five days, after the last
7    time.  From the 27th, the 8th would be my next diary date
8    out.  I had not received the request for medical care back
9    yet, so what I said -- I documented it.  I have faxed over
10   surgical request for the second time.  Claimant needs
11   surgery and is six weeks out from injury.  MRI report but
12   no medical records.
13   Q.   Let me go back down to Sequence Code 48 on that page,
14   on October 26th, it says, medical review by D.J. Abbott.
15   Who is D.J. Abbott?
16   A.   Dana Abbott.
17   Q.   Who is she?
18   A.   She was the NCM.  NCM is Nurse Case Manager.
19   Q.   Who requested that she review it?
20   A.   I had walked over there with another surgery in my
21   hand to have her look at the request for surgery for
22   another person.  I had his MRI report in my hand, because
23   I had just gotten it.  I walked over to her because I had
24   questions about -- I m not a medical doctor.  She is in
25   the medical field.  I just wanted to -- I wanted to know,

151

1    for my own self, what the next process would probably be
2    for his surgery, for Emory.  So I had the MRI report with
3    me.  Yes.  I printed it out and I had a copy with me and I
4    brought it over to her.  I could have e-mailed it to her,
5    but it was a long time ago.  I really don t remember.
6    Q.   Well, it says that, CM, that s you, requests to
7    assess medical necessity for shoulder SX.  What is SX?
8    A.   Surgery.
9    Q.   Shoulder surgery?
10   A.   Uh-huh.
11   Q.   On the 26th the day before Dr. Howorth even said he
12   needed surgery, you were already anticipating that he
13   needed surgery?
14   A.   Yes.
15   Q.   So what do you mean by you wanted her to assess the
16   medical necessity for the shoulder surgery?
17   A.   She may have worded that wrong, because I only had
18   the report in my hand and nobody had asked for surgery
19   yet, but I had the surgery for the other person, so she
20   may have worded that wrong because I said, would you take
21   a look at this and explain to me what these different
22   things are.  That s why I wanted to educate myself a
23   little bit.  We have medical books there and things that I
24   can go and read, but it takes a long time and I have a lot
25   of people I work with.  So I am a more hands-on person.  I

152

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 153 SHEET 39

1    will get up and I will walk over to the desk and I will
2    say, show me, tell me, explain it to me, and sometimes I
3    need to be explained a couple of times, you know. Even if
4    I have had 50 claims like that, each one is different.
5    Each person is different and each person deserves special
6    care.
7    Q.    Special care. Including Mr. Brown.
8    A.    Including Mr. Brown. No matter what.
9    Q.    So that s why you went over to ask her, is this
10   shoulder surgery medically necessary?
11   A.    I said, what do you think of this? And I handed her
12   this MRI report and she said, well -- she took a look at
13   it and she said, get the medical records because I can t
14   review anything without the medical records.
15   Q.    So when she said to get the medical records, you
16   needed to get Dr. Shirah s records, didn t you?
17   A.    I needed Dr. -- Dr. Shirah was not requesting
18   medical -- I needed to get everybody s.
19   Q.    So you didn t even attempt to get Dr. Shirah s
20   records, did you?
21   A.    Yes. I had asked on the phone when I talked with
22   Kenny to please send the medical records when they were
23   ready.
24   Q.    So when they didn t come in, what did you do to
25   follow up?

153

PAGE 154

1    A.    Probably called again. I usually would.
2    Q.    It s not in there that you called at all.
3    A.    No, it s not.
4    Q.    Another time you didn t document?
5    A.    Another time, yes.
6    Q.    When you dial out a long distance number, do you dial
7    a one in front of it?
8    A.    Yes.
9    Q.    And then you put in the area code?
10   A.    1 and then 9, the area code and the phone number.
11   Q.    1, 9, the area code and the phone number?
12   A.    Uh-huh.
13   Q.    And you make those calls from that same phone and
14   that extension that you referred to earlier? That same
15   number?
16   A.    Yes. I log in my phone number early in the morning
17   when I get there.
18   Q.    What do you mean you log it in?
19   A.    Log it in and turn on the phone. I make my voice
20   mail for the day. Good morning, I will get to you during
21   the course of the day before 5:00 o clock.
22   Q.    So you always tell anybody that calls you on your
23   voice mail if you don t answer that you are getting back
24   to them before 5:00 o clock?
25   A.    Yes.

154

PAGE 155

1    Q.    Do you do that always?
2    A.    Yes.
3    Q.    Does that include Mr. Brown?
4    A.    Yes.
5    Q.    I noticed in here that you don t have but two calls
6    documented from Mr. Brown, do you?
7    A.    No.
8    Q.    Did you get more calls from Mr. Brown than that?
9    A.    Yes.
10   Q.    How many do you think you got from Mr. Brown?
11   A.    I don t know.
12   Q.    Lots and lots?
13   A.    Lots of them.
14   Q.    He was telling you he was in pain every time he
15   called, didn t he?
16   A.    Yes. He was yelling sometimes.
17   Q.    Yelling?
18   A.    Uh-huh. At me.
19   Q.    Because he was very upset that he wasn t getting
20   medical care and treatment, wasn t he?
21   A.    Yes.
22   Q.    And he wanted his surgery, didn t he?
23   A.    Yes.
24   Q.    And you kept telling him, I have to get two opinions,
25   didn t you?

155

PAGE 156

1    A.    No.
2    Q.    You never told him that?
3    A.    No.
4    Q.    Never told him you had to get an opinion from
5    anybody, did you?
6    A.    An opinion? No. Approval and opinion are different.
7    Q.    Well, did you tell him that you had to get -- what?
8    A.    Approval and opinion are different.
9    Q.    Well, did you tell him you had to get approval?
10   A.    Yes.
11   Q.    Who did you tell him you had to get approval from?
12   A.    Well, I could explain to him that we sent it in for a
13   precertification, but really to authorize any surgery,
14   first, I need the medical records.
15   Q.    Tell me what you told Mr. Brown when he was yelling
16   over the phone, screaming in pain, or whatever, I want my
17   surgery, what did you tell him?
18   A.    I told him that I am waiting for the surgical request
19   to come back, so that I can send in the process for
20   approval, get the ball in motion for approval, and the
21   medical records from Dr. Howorth.
22   Q.    Did you ever tell him at any time that anybody was
23   reviewing his medical records?
24   A.    No.
25   Q.    Did you ever tell him that anybody had to review his

156

PAGE 157  SHEET 40

1    medical records before he could be approved for surgery?
2    A.   Yes.
3    Q.   Tell me what you told him.
4    A.   That there is a precertification process and it needs
5    to go in for a precertification process for approval, I
6    need all the medical records and the surgical request
7    first.
8    Q.   Let s talk about the precertification approval
9    process.  What is that?
10   A.   That is an outside company.  It was CorVel at the
11   time.
12   Q.   I thought you said you didn t know who CorVel was?
13   A.   No.  You asked me a different question.  You asked me
14   if they are part of CMI, and I don t know that.
15   Q.   So what is CorVel?
16   A.   CorVel is -- all I know is that we were sending --
17   their letterhead into the precertification.  We would
18   fill out the form and we would send it in to be reviewed
19   and approved or denied.  It takes a 48 hour process.  We
20   pay a certain fee for each precertification process.
21   Q.   How much is the fee?
22   A.   It runs $150.00.
23   Q.   And you did that on Mr. Brown?
24   A.   No.
25   Q.   You didn t?

157

PAGE 158

1    A.   No.
2    Q.   Why?
3    A.   Because by the time I had gotten the request for
4    surgery back it was -- I had taken into my hands the
5    medical notes, the request for surgery and the MRI report
6    and I walked it over to the Medical Department to see if I
7    could get it approved or for them to look at it to see if
8    it would pass approval without having to sent it in for
9    formal precert, because it had taken so long for him to
10   get me back the request for surgery.
11   Q.   Who did you go to?
12   A.   I went to Dana Abbott.
13   Q.   What did she tell you?
14   A.   She said that there was more questions that I would
15   probably have to ask the doctor to be clarified,
16   especially, for example, the first question here.  It is
17   asked, have all conservative measures been exhausted?
18   Please explain.   He put,  tear on MRI.  Needs surgery
19   repair ASAP.  He does not tell what conservative
20   treatments have been tried; that s number one.  Now, these
21   all have to be answered and this is all part of when they
22   do an approval they are going to talk to him about.
23   Q.   Talk to who about?
24   A.   Dr. Howorth.  That s part of their approval process.
25   I don t know all what they do, but they talk with the

158

PAGE 159

1    doctor.  They go through for medical necessity.  Number
2    one, he never answered this question.
3    Q.   He never answered?
4    A.   What conservative measures have been exhausted.
5    Q.   So you are telling me that when you carried, I assume
6    these three documents that you finally received marked
7    Plaintiff s Exhibit 10, to Dana Abbott that she told you
8    that the surgery could still not be authorized because you
9    needed more information?
10   A.   She told me that not all the questions were answered
11   and I needed some more information for it to be sent in
12   for approval, for a formal precertification.
13   Q.   So what else did she tell you that she needed?
14   A.   That s all.
15   Q.   All she needed was an answer to number one, have all
16   conservative measures been exhausted?
17   A.   There was probably a couple more questions.  I didn t
18   ask her what questions.  She said there was probably some
19   more things we would have to ask him.
20   Q.   Well, where in the file did you notate that
21   conversation with Dana Abbott?
22   A.   I didn t.
23   Q.   So how do you know what Dana told you she needed for
24   you to do?
25   A.   Okay.  At that point, when she told me what she

159

PAGE 160

1    thinks that I needed to do, to send it in for formal pre-
2    certification, I thought it was too long, because Dr.
3    Howorth had spent such a long time getting me back the
4    request for surgery, that Emory needed surgery as soon as
5    possible.  I thought it would take too long.  So I took
6    the request for surgery, I took the MRI report that I had,
7    and I walked across the street to my -- across the desk to
8    my team leader and I said, you know, I said, Emory has an
9    an injury at the store, he needs surgery, he has a rotator
10   cuff repair, Dr. Howorth wants to --
11   Q.   Who are you talking to?
12   A.   I m talking to my team leader, Tisha Montgomery.
13   Q.   You said she is still there?
14   A.   She is in the office.  Yes.
15              MR. TINNEY:  Is she the one we ve got lined up
16              to do?
17              MR. BROWN:  No.  I just learned her identity
18              yesterday.
19   A.   I walked over to her.  I said, Tisha, I said --
20   MR. TINNEY:
21   Q.   What day are we talking about now?
22   A.   Same day.  The 23rd of November.
23   Q.   What did you look at to determine that?
24   A.   Let me just make sure.  Now, you ve asked me -- oh,
25   oh, did I --

160

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 161 SHEET 41

1    Q.    You seemed pretty sure of that when you spouted it

2    out.

3    A.    On the 23rd of November? How would I know that?

4    Q.    Yes.

5    A.    Okay. On Page 7 of 19, at the bottom, and Page 8 of

6    19. 7 of 19. Now, if you will hold it like this, sir,

7    here would be the top of the note pad here. It says,

8    Sequence 56.

9    Q.    All right.

10   A.    Do you see where it says Sequence 56 right here on

11   the bottom of number 7, Page 7 of 19?

12   Q.    Yes. I've got Sequence 56.

13   A.    Now, it says, 49 year old associate, do you see

14   where it says that?

15   Q.    Yes.

16   A.    Okay. It says, lost time conversion. It says the

17   date is November 26th, 2004, at 1300 hours and 28 minutes,

18   about 28 after --

19   Q.    1:28.

20   A.    1:28 in the afternoon. At that time, which was right

21   after Thanksgiving, this was Thanksgiving week holiday. I

22   had asked Tisha about surgery. I had gone to her desk on

23   the 23rd. The reason I knew it was on the 23rd is because

24   it was right before she would be gone the next four days

25   for Thanksgiving weekend. I, the low man on the totem

161

PAGE 162

1    pole, get to work that Friday. It's entered on the 26th,

2    because I would have time. The medical providers are not

3    open on that day and I would have time to spend on the

4    file and make sure that all the screens were updated,

5    everything is set, for Emory to do surgery. So on the

6    23rd is the day I went to Tisha. I talked to her about

7    approving it because I said, if I ask the doctor more

8    questions, form questions to the doctors and fax over a

9    letter or anything like that, I'm afraid it is going to

10   take too long. It's taken too long already. He has a

11   legitimate injury at the store. He's been a long-time

12   associate. The mechanism of injury, he has pain, he needs

13   -- the MRI shows that he needs a repair. I think we need

14   to authorize this surgery. She said, if you feel that it

15   needs to be authorized, then let's authorize it. She

16   looked at the surgical request and she looked at the MRI

17   and then she took my word for it. Then what I did

18   immediately on the 23rd is I called Dr. Howorth's office.

19   I told Amy that the surgery has been authorized. I called

20   the store, either to get Emory or to tell the store that

21   the surgery has been authorized, because he's an overnight

22   associate, on second shift, and it's not always possible

23   for me to get a hold of him. Also I had difficulty

24   because he -- I could only leave messages at his mother-

25   in-law's house and he would then get a message back to me.

162

PAGE 163

1    So I called and gave authorization on that date

2    immediately so they could start the ball rolling and get

3    the surgery request as soon as possible. The

4    documentation at the time was not as important on that

5    initial date, on the 23rd, as it was me spending time to

6    put the quality work in the file on the 26th when I had

7    time and the doctors are closed. But that was already in

8    the process. I had already notified him, too, at that day

9    that surgery was being approved and he could do it.

10   Q.    So the day that you actually told everybody it was

11   approved was what day?

12   A.    The 23rd of November, 2004.

13   Q.    There is not anything in the file records whatsoever

14   that you called Dr. Howorth's office, is there?

15   A.    No.

16   Q.    There is not anything that you called Emory Brown, is

17   there?

18   A.    No.

19   Q.    There is not any indication on that date that you

20   talked to Ms. Montgomery?

21   A.    No.

22   Q.    And you said that all it took for you to get this

23   surgery approved was to take the MRI report and Dr.

24   Howorth's office record of October the 27th to Ms.

25   Montgomery to show them to her, and those two documents

163

PAGE 164

1    were the basis of her approving this surgery?

2              MR. BROWN: I'm going to object to the form.

3              It's completely misstated.

4    MR. TINNEY:

5    Q.    Did I misunderstand that?

6              MR. BROWN: Yes, you did, because that misstates

7              her --

8              MR. TINNEY: I'm talking about documents.

9              MR. BROWN: Can I object to your question first?

10             MR. TINNEY: Okay.

11             MR. BROWN: Your question misstates her prior

12             testimony.

13             MR. TINNEY: Let me ask it this way.

14             MR. BROWN: It is taking the facts out of

15             context.

16   MR. TINNEY:

17   Q.    What documents did you take to Ms. Montgomery at the

18   time that you asked her to approve the surgery?

19   A.    I took the MRI report and the request for surgery and

20   the medical notes.

21   Q.    You took Plaintiff's Exhibit 11?

22   A.    Yes.

23   Q.    You took Plaintiff's Exhibit 8?

24   A.    Yes.

25   Q.    And you took the first page of --

164

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 165   SHEET 42

1    A.    The request for surgery.
2    Q.    I m sorry. The first page of Plaintiff s Exhibit 10?
3    A.    Yes.
4    Q.    Is that right? All three pages of Plaintiff s
5          Exhibit 10?
6    A.    Yes.
7                MR. BROWN: Plaintiff s Exhibit 7 is --
8    MR. TINNEY:
9    Q.    Did you take any other documents with you?
10   A.    I don t remember.
11   Q.    She gave your verbal authorization at that time?
12   A.    Uh-huh. We discussed it.
13   Q.    So why did you not call someone on the 23rd?
14   A.    I did.
15   Q.    And there s going to be records, I guess, telephone
16         records showing you did that?
17   A.    There should be some place.
18   Q.    Let s talk a minute about your Sequence Entry Number
19         56. You told me that you made this entry and these are
20         your words; is that correct?
21   A.    Yes.
22   Q.    We got down to the last of the first paragraph,
23         acute tear of supraspinatus rotator cuff. Correct?
24   A.    Yes.
25   Q.    Where did you get the term acute that you entered

165

PAGE 166

1    there?
2    A.    I don t know.
3    Q.    I ve never seen that word appear before you entered
4          it, so why did you choose to use the term acute there?
5    A.    I don t know.
6    Q.    What does acute mean?
7    A.    It means very bad.
8                MR. BROWN: Ask her the question and let her look
9                at the records, because you said you ve never
10               seen the word acute tear, and it is in Exhibit
11               Number 11.
12               MR. TINNEY: Well, I stand corrected if it is in
13               there. Is it in there?
14               MR. BROWN: Diagnosis acute tear of supra
15               spinatus rotator cuff. Also ACJOA.
16   MR. TINNEY:
17   Q.    So on your entry of November 26th you said, surgery
18         has been requested by Dr. Howorth, and that had been
19         requested on October 27th; correct?
20   A.    It had been asked for.
21   Q.    Yes. Requested. So we are, I guess, one day short
22         of a month after he requested it when you are making this
23         entry; correct?
24   A.    Uh-huh. Yes.
25   Q.    It says, after receiving all medical records, did

166

PAGE 167

1          you receive any other medical records from Dr. Howorth
2          after October the 27th between that date and the time you
3          wrote this on November the 26th?
4                MR. BROWN: I m sorry?
5    MR. TINNEY:
6    Q.    Did you receive any other medical records from Dr.
7          Howorth between October the 27th and November 26th?
8    A.    On November 18th, Sequence 54, Page 8 of 19, I have
9          documented. It says, MRI scan verbatim . From what the
10         MRI is I know it is from the doctor. Now I put the
11         doctor s name on top, but I know it is from Dr. Howorth
12         because he put the RX at the last line, it says, RX,
13         Robaxin, Ibuprofen, and Darvocet . Those are the three
14         medications that Dr. Howorth had prescribed for him.
15   Q.    Well, I understand, but what I m asking you is, are
16         you saying that you got another medical record from Dr.
17         Howorth between October 27th and November 26th?
18   A.    I have it documented here on the 18th, November 18th.
19   Q.    That you received what?
20   A.    That I documented in the file. This is a medical --
21         the evaluation from Dr. Howorth. He was only seen once.
22   Q.    Well, what records are you referring to that you got
23         from Dr. Howorth?
24   A.    I am referring to this one.
25   Q.    But what you are pointing to, Code Sequence 54, what

167

PAGE 168

1          physical records did you receive?
2    A.    Physical records?
3    Q.    On November the 18th.
4    A.    October 27th this is Plaintiff s Deposition Exhibit
5          7.
6    Q.    You received that October the 18th?
7    A.    November the 18th?
8    Q.    I mean, November the 18th.
9    A.    Yes, sir.
10   Q.    Okay. What else?
11   A.    That s all.
12   Q.    It says, going back to Page 8 of 19 at the top, it
13         says, surgery has been requested by Dr. Howorth and after
14         receiving all medical records and formal surgical
15         requests , what are the formal surgical requests that you
16         received?
17   A.    This is a formal surgical requests, which is --
18   Q.    Plaintiff s Exhibit 10.
19   A.    Yes, sir.
20   Q.    Are you telling us that if you don t get back what
21         you call the formal surgical request, Plaintiff s Exhibit
22         10, that Mr. Brown would never have been approved for his
23         rotator cuff surgery?
24               MR. BROWN: Object to the form, mischaracterizes
25               prior testimony. It s been asked and answered

168

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 169  SHEET 43

```
1              three or four times.
2    A.   I m not going to answer that.
3    MR. TINNEY:
4    Q.   You have to answer.  You re not going to tell a
5    Federal Judge that you re not going to answer.
6              MR. BROWN:  Objection.
7    A.   Can I talk to my counsel, please?
8    MR. TINNEY:
9    Q.   Well, this is about the fifth or sixth time, you
10   know, when we get to a hard question and you want to go
11   out and talk to your lawyer.
12             MR. BROWN:  Restate the question.
13   MR. TINNEY:
14   Q.   Are you telling me that if you did not get back these
15   formal surgical requests documents that Emory Brown would
16   not have had rotator cuff surgery approved?
17   A.   No.
18   Q.   Why do you say that?
19   A.   Because, number one, if Dr. Howorth had not gotten me
20   the surgical requests back in a timely manner, which was
21   pretty much going on the edge of time there, I mean to my
22   time limit, I would have offered Emory Brown a panel of
23   choice and said, this doctor is not working well with us,
24   he s not getting us what we need, would you like a panel
25   for another choice of authorized orthopedic specialists?
```
169

PAGE 170

```
1    You have a choice of a panel of four, would you like that?
2    Q.   So you re saying you do have to have the formal
3    request?
4    A.   Yes.
5    Q.   From either the treating physician or from another
6    panel doctor?
7    A.   Yes.
8    Q.   Then it says,  adjuster has converted screens to
9    reflect lost time , what did you do there?
10   A.   Well, when a claim comes in and it is medically only,
11   we re still treating the medical, but the minute we get a
12   surgical request and it has been authorized and we have
13   all the medical notes and all the paperwork and everything
14   is in place and the approval has been given, then I can go
15   in and change from medical only to lost time, and I change
16   on one page in the file -- it s several pages of the file
17   in several different areas.  I make sure that it s the
18   doctor s phone numbers, addresses, what facility he is
19   going to use is in there, make sure that where it says TTD
20   or permanent partial, it goes to TTD.  I turn it to TTD,
21   because now the file is -- that s why I said I like to
22   take time in doing that.  Sometimes I take two hours
23   because I like to get 100 percent.
24   Q.   What do you mean you like to get 100 percent?
25   A.   I like to get 100 percent.  One of the things my
```
170

PAGE 171

```
1    performance is graded on is how well I medically manage,
2    in a timely fashion, and get medical records and approvals
3    and documentation and everything in the file when I do a
4    lost time conversion and how I manage the file.
5    Q.   Do you get a grade on every file you handle?
6    A.   Only lost time conversions.
7    Q.   So what kind of grade did you get on Mr. Brown?
8    A.   I don t remember.
9    Q.   Well, who gives you the grade?
10   A.   My team leader would give me the grade.
11   Q.   And who would have given you this grade?
12   A.   My team leader at the time was Tisha Montgomery.
13   Q.   How do you learn what your grade is?
14   A.   She would hand me the Q A, it s called, which is
15   questions and answers on various things that have to be in
16   the file.  You get graded.  Some of them are not
17   applicable in our State of Alabama, but most of them are
18   applicable.  Have you made the 24 hour contact?  Have you
19   called the doctor?  Have you spoken with the claimant?
20   Things like that.  Have you gotten all the medical, the
21   request for surgery.  All the things --
22   Q.   So this is a form that you fill out for her?
23   A.   No.  It s a form that when she goes through the file,
24   she goes through every area of the file to make sure I
25   reserve right, make sure of everything, and I get graded
```
171

PAGE 172

```
1    on it.
2    Q.   Then she gives her grading back to you?
3    A.   Yes.
4    Q.   What is the form in which she gives the grading back
5    to you?
6    A.   It s called Q and A.
7    Q.   How does it come to you?  Is it emailed to you or
8    what?
9    A.   Sometimes it s given to me on paper, but we re trying
10   to be a paperless company, so it can come either way.  I
11   do keep a copy of every Q and A I have in my file, that I
12   get.  She doesn t do it on every one, but she will pick
13   one if we happen to have a lot at the time.
14   Q.   So you ve got the Q and A on Mr. Brown?
15   A.   I don t know.
16   Q.   Well, you just said you have it on every file?
17   A.   No.  I said she doesn t pick every file that we have
18   a lost time conversion.  She ll pick one file.  I do not
19   know if I had a Q and A on him.  But if she did choose
20   this file I would want to get 100 percent.  So I would
21   want to have everything done in the file.  So what I would
22   do is on that day of lost time conversion -- that s why I
23   number one through seven.  Nowadays you ll see my lost
24   time conversions will go one through 21 or one through 24,
25   because I ll show more documentation as far as what I m
```
172

PAGE 173  SHEET 44

1  doing and what they can expect, what s happening in the
2  lost time conversion, what I ve done and what the
3  justification is that it is being converted to lost time
4  for surgery.
5  Q.  Can you show me where you did anything on the file,
6  based on these records, that says you converted screens to
7  reflect lost time prior to November the 26th?
8  A.  Yes.  It s on Page 15 of Page 19, Sequence 25.
9  Q.  What does it say?
10  A.  It says, file came in lost time .  Do you see where
11  I m talking about?
12  Q.  Yes, I see that.  So what did you do on November the
13  26th to convert it or is this just referring to what you
14  had done back on October the 6th?
15  A.  Well, it had already been converted to lost time, but
16  I wanted to document it in the file, surgery has been
17  approved, who was doing the surgery and that the reserves
18  were going to be set and everything and that all screens
19  were updated.  At that time he had gone back to work.  He
20  had been at work in a light duty position until he was
21  going to be taking off the day of surgery.  Now, he had
22  already met his waiting period, which is the grace period,
23  the first three days after his injury.  The store always
24  pays them for the day of injury and this accident happened
25  about 4:30 in the morning, so he was paid for that whole

173

PAGE 174

1  day.  So if his waiting period -- when his waiting period
2  starts is the next day.
3  Q.  What does this mean, calculated TTD for payment?
4  A.  That was --
5  Q.  Where you had already paid him everything you were
6  supposed to pay him?
7  A.  You know, that should be 10-8 instead of 10-18.  I
8  made an error there.
9  Q.  Where?
10  A.  On the approval, Sequence 24, still on Page 15, where
11  it says, approved TTD .  Is that where you re looking?
12  Q.  No.  I m back on Page 8 of 19.
13  A.  Calculated TTD means I have reserved in the file
14  because of the request for surgery here, the time frame
15  that Dr. Howorth feels -- okay, the Request for Surgery,
16  Exhibit 10, Dr. Howorth says -- here s the question posed
17  to him, what if any physical restrictions will be
18  recommended in regards to employment and activities of
19  daily living after surgery ?  The next question, what is
20  the expected time frame of return to work in a modified
21  duty capacity after surgery ?  It says, one to two
22  weeks .  So when I calculate TTD I have already calculated
23  in the file, in that area, what his average weekly wages
24  before the date of injury, what he was making, his hourly
25  wage, because I have confirmed that with the store and his

174

PAGE 175

1  comp rate.  Now the comp rate, what we put in there is for
2  one week.
3  Q.  Let s move on.  What is this address VT notepad?
4  What is that?
5  A.  That s waiting period notepad.
6  Q.  What is a waiting period notepad?
7  A.  Waiting period notepad is back here.  Because the
8  file was converted to lost time, it came in lost time, it
9  says here --
10  Q.  What page are you on?
11  A.  I m on Page 15 of Page 19.  That s the correction.
12  Let me see where the notepad is.  Page 14 of Page 19.  The
13  last sequence at the bottom, Sequence 22, this was the
14  correction.
15  Q.  What do those dates mean?
16  A.  The dates mean to me that he went to Randolph Medical
17  Center ER on the 29th or 30th in the morning.  They took
18  him off work on the 30th and the 1st.
19  Q.  What is crossed out?  You don t have to tell me what
20  it is, but is that something relating to the reserve?
21       MR. BROWN:  Yes.
22  MR. TINNEY:
23  Q.  That s what that is, where you changed the reserve?
24  You need to answer that on the record.  Is that where you
25  changed the reserve?  Back on Page 8 of 19.  What s

175

PAGE 176

1  blacked out.
2       MR. BROWN:  Off the record.
3  (Off the record discussion.)
4  MR. TINNEY:
5  Q.  What is entered on Number 4, is that indicating that
6  you changed the reserve on the file?
7  A.  It says, Number 4*, and it s blacked out so I can t
8  answer the question correctly.
9  Q.  Well, I don t want you to talk numbers with me.  All
10  I m asking is did you change the reserve on the file and
11  that s where you re talking about it?
12  A.  It could -- well, it s blacked out so I can t give
13  you a yes answer.
14  Q.  You don t know.  On Number 5, you say,  documented
15  all medical records and MRI report .  How did you document
16  all medical records?
17  A.  I put it in the file, in notepad.
18  Q.  Well, why do we not have Dr. Shirah s records in the
19  file?
20  A.  Because we haven t got those yet.
21  Q.  You never got them.  You didn t turn them over to me
22  as being part of your file, so you never got them, did
23  you?
24  A.  Yes.
25  Q.  Yes, you got them?

176

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

1    A.    No.

2    Q.    No, you did not get them.  This last entry where it

3    says, I ve called claimant and advised of surgery

4    approval , even though you made this entry on November

5    26th, you re sure you did it on November 23rd?

6    A.    Called, yes.

7    Q.    Let s go back now to the October 27th time frame.  We

8    sent the surgical request to Dr. Howorth and you expected

9    it right back.  Tell me what the next date was that you

10   had any communication with Dr. Howorth s office trying to

11   get or understand why you hadn t gotten it back or asking

12   for the form back?

13   A.    I think we went through that.

14   Q.    We keep getting side tracked with various issues.

15   A.    No, we did.  We did.  After the 27th, again, on Page

16   9 of 19, Sequence 51, where it says --

17   Q.    Sequence 51?

18   A.    Yes.  Close to the top of the page.  Second down from

19   the top.  I have faxed over surgical request for the

20   second time.  Claimant needs surgery and is six weeks out

21   from injury.  MRI report, but no medical records .

22   Q.    When you had your conversation with -- I think you

23   talked to Amy, at Dr. Howorth s, on the 27th; is that

24   correct?

25   A.    Yes.

177

1    Q.    You said Amy gave you the information on Plaintiff s

2    Exhibit 11.  What did you believe that Dr. Howorth meant

3    when he said it is much better to proceed with rotator

4    cuff reconstruction within the first six weeks during the

5    acute phase, as the results are more predictable.

6    A.    She never told me that.  She told me that surgery was

7    -- that he needed surgery.  So I said I d fax over a

8    request for surgery and that I needed the medical records

9    for the evaluation.  Amy is not a doctor either so she

10   couldn t -- if she didn t have the notes on that date

11   because he had just done them, done the evaluation, and

12   usually it takes a couple of days, she could not go

13   verbatim what he said on there.  A lot of the doctor s

14   notes from the room, when he goes in to see him, you know,

15   you can t read a lot of doctors  notes.  You have to wait

16   until they are transcribed.  No, she didn t say verbatim

17   what it says on there.

18   Q.    Well, let me just ask you if you had been told on or

19   around October 27th that Dr. Howorth says that since he is

20   four weeks out already it is much better to proceed with

21   rotator cuff reconstruction within the first six weeks

22   during the acute phase as the results are more

23   predictable, what different course of action, if any,

24   would you have taken than what you did concerning Mr.

25   Brown s surgery?

178

1    A.    I still would have faxed them the request for surgery

2    immediately, like I did.

3    Q.    So does that mean you wouldn t have done anything any

4    differently?

5    A.    No.

6    Q.    You would not have done anything any differently?

7    A.    No.

8    Q.    That s not going to be clear on the record.  If your

9    answer is --

10   A.    Well, first of all you gave me an if question and I

11   don t answer ifs.

12   Q.    You are going to have to answer ifs.  I can assure

13   you, you will have to answers ifs.

14   A.    Okay.  Because if is like --

15   Q.    I just want to get it clear on the record.  If your

16   answer to me is I would not have done anything any

17   differently, please state that.

18   A.    Yes.  I would not have done anything differently.

19   Q.    We were talking about when you didn t get anything

20   back from Dr. Howorth after the 27th.  I asked you what

21   you did after that and you referred me to Code 51 on Page

22   9 of 19.  There s 13 days between October 27th and

23   November the 8th; a 13 day period there.  What did you do

24   in that 13 days to try to call the doctor s office again

25   or to followup to get what you needed?  That s almost two

179

1    weeks.

2    A.    Personally, because it was a surgical request, I d

3    like to call daily.  I did try to call at least every

4    couple of days or every week, at least, because the ball

5    was in their court.  When he finally sends the paper --

6    you know, when I d call and talk with Amy she would say,

7    yes, he s got it.  I confirmed that they received it on

8    the 27th, because I called to let her known it was coming

9    and that he needed to fill it out and get it back to me as

10   soon as possible.  I authorized the physical therapy also

11   on that day, upstairs, three times a week for three weeks,

12   12 visits authorized with Lake Martin Physical Therapy.

13   So I would like to get back at least -- if I haven t heard

14   by my next diary date --

15        MR. BROWN:  You ve answered the question.

16   MR. TINNEY:

17   Q.    It looks like Dr. Howorth, on Plaintiff s Exhibit 10,

18   signed this form on October the 30th, of 2004; do you see

19   that?

20   A.    Yes.

21   Q.    If I understand, you re calling his office at least

22   every other day?

23   A.    Well, I can t be sure.  That s what I -- several

24   times.

25   Q.    It says,  please fax this completed form back .  That

180

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

1   number, is that the number you gave me earlier?
2   A.   On the fax cover sheet of the surgical request it
3   says, please fax the form to my attention upon
4   completion, the fax number if 479-273-8020". Yes, it is
5   the phone number I gave you earlier.
6   Q.   Again, there s no record or note that you called Dr.
7   Howorth s office at all between October 27th and November
8   the 8th, contained in the file?
9   A.   No.
10   Q.   Why do you think you would not notate that if you re
11   doing it every other day, which would be five or six
12   times. Why would you not notate that in your file if
13   that s your custom and practice to do so?
14   A.   Sometimes when Emory would call me or I would call
15   over there I would not always get to document every phone
16   call. It would be my custom and practice. I d love to do
17   it. Also, because it was a new system, even if I had and
18   -- I m saying that s what I do because it was a surgical
19   request. If I had and it was a new system and it s not in
20   there, that s all I can say. I could have documented it
21   but it could not have been saved, because it was a new
22   system.
23   Q.   Now, you told me that you were telling Emory that you
24   had to get this CorVel Company to do a precertification.
25   How many times do you think you told him that?

181

1   A.   I don t know, probably several. Every time he
2   called, probably.
3   Q.   What was your understanding, that CorVel would do
4   what?
5   A.   I think I ve already answered that. But a
6   precertification is they do a certification on whether the
7   surgery is medically necessary, meets the criteria of the
8   mechanism of injury. They do a research on it. They call
9   the doctor. They go over the medical notes. They make
10   sure the facility is the correct facility. You know,
11   because on the format you have to ask for -- one of the
12   questions is, who is the doctor, what is his speciality,
13   what is his phone number, where s he going to do it and
14   what s the phone number. They want to know because they
15   are going to call there too.
16   Q.   All right. Now, looking again at Sequence 51 on Page
17   9 of 19. It says that you have faxed the surgery request
18   over for the second time.
19   A.   Yes.
20   Q.   When you sent the surgery request over the second
21   time did you send all of the forms again for the second
22   time?
23   A.   That s all one complete package.
24   Q.   I see that was done at 8:31. Is it just a
25   coincidence that Emory called you two minutes later after

182

1   you did that?
2   A.   I think so.
3   Q.   You think that s just a coincidence?
4   A.   Yes.
5   Q.   So after November the 8th when you faxed it --
6   A.   He called me at 8:33, is that what you re telling me?
7   Q.   Yes. And see it looks like you made a phone call to
8   the medical provider at 8:31; correct?
9   A.   Well, it was documented at 8:31.
10   Q.   When was the next time you tried to get what you
11   needed from Dr. Howorth s office after November the 8th?
12   A.   Did I try after the 8th?
13   Q.   I m asking what did you do to try to get back the
14   information you had been asking earlier for?
15   A.   The same thing I did after November 8th after I faxed
16   for the second time. I would be calling there often. I m
17   not going to say everyday, but calling often.
18   Q.   What is the next documentation that shows you did
19   anything?
20   A.   That same page, on 9 of 19.
21   Q.   Sequence Code 53?
22   A.   Yes, sir. It says, Dr. Howorth, adjuster is waiting
23   for surgical request, faxed failed. This will be third
24   attempt for surgical request in writing for claimant.
25   Adjuster will call again .

183

1   Q.   What does this mean, fax failed?
2   A.   Because when I send a fax on my desktop it will
3   confirm that the fax has been sent or it has failed, to
4   this number, and then I delete it.
5   Q.   So when the fax failed, what did you do?
6   A.   It says here, adjuster is waiting for surgical
7   request and the fax failed. This will be the third
8   attempt for surgical request in writing. So I sent it
9   again for the third time, is what I m assuming.
10   Q.   How would you have sent it?
11   A.   By fax. I would have still had it there on my
12   desktop until I get that confirmation. It was already
13   filled out.
14   Q.   Then the next entry is on November the 18th.
15   A.   Sequence 54, is that the one you re talking about?
16   Q.   Yes.
17   A.   Let me see if there is anything else. That was on
18   the 8th -- no, 15th. Yes, sir.
19   Q.   I m talking about 11-18.
20   A.   Yes, sir.
21   Q.   What is that, approval? What does that mean?
22   A.   I probably put it in wrong. It should have said
23   medical records, because this was the medical records from
24   Dr. Howorth, from his evaluation. Like we ve talked
25   before, it was verbatim what the MRI said except for the

184

BROWN VS CLAIMS MANAGEMENT          DEPOSITION OF VICTORIA HEPPES      4-13-06

PAGE 185  SHEET 47

1  pharmaceutical, which says, Rx Robaxin, Ibuprofen and
2  Darvocet. That s why I knew that it was from his office.
3  Q.  You re saying this is a reference to Plaintiff s
4  Exhibit 7?
5  A.  Yes, sir.
6  Q.  What does that mean, approval? Why does it say
7  approval on there? What are you approving?
8  A.  It was a scroll down and I put the wrong
9  documentation. I should have put medical records, but I
10  didn t know that it was there at the time or I put the
11  wrong thing. It didn t mean I was approving anything.
12  The only reason we use the word approval is for paying
13  TTD. So that s the code that we use. Evidently in the
14  category where you put that in, in the notepad, it scrolls
15  down and you go down to whatever it is. It may be it says
16  approval -- it should have either been medical record or
17  -- today I would put medical record there, because I m
18  much more used to the system, or adjuster correspondence,
19  medical provider. Adjuster is close to approval, under
20  the A s, so it could be the next one.
21  Q.  Your next entry, 55, is where you were authorizing
22  payment of the MRI.
23  A.   Independent laboratory, that was from the 19th. Yes,
24  sir. That s a lab workup. That s not the MRI bill. The
25  19th was the date of service for the MRI, but that is the

185

PAGE 186

1  lab work.
2  Q.  What do you mean lab work?
3  A.  Well, it says, Independent laboratory . Now, I
4  could have documented it wrong, because I m new there, but
5  --
6  Q.  The MRI was the only thing done on the 19th?
7  A.  Yes, that s why it is very strange that -- and the
8  price is about right for what they usually bill us at, but
9  so the independent lab, I d have to -- I don t know. I m
10  sure it s the MRI, because of the date of service and it
11  was sent to Blue Cross Blue Shield. I can look through
12  the bills if you d like me to. I can confirm that.
13  Q.  What is the date you said you finally received
14  Exhibit 10, on the 23rd of November?
15  A.  15th.
16  Q.  The 15th of November?
17  A.  Yes, sir.
18  Q.  Did you get that in the mail from Dr. Howorth or was
19  it faxed?
20  A.  Faxed. Mail received. Mail received.
21  Q.  What are you looking at now that would indicate how
22  you got it?
23        MR. BROWN: Page Number 24.
24  MR. TINNEY:
25  Q.  I m going to mark as Plaintiff s Exhibit 12 this

186

PAGE 187

1  document.
2
3  PLAINTIFF S DEPOSITION EXHIBIT NUMBER 12, marked for
4  identification. (Fax, Dr. Howorth. Page 228.)
5  MR. TINNEY:
6  Q.  I ll ask you if that is what you re referring to?
7  A.  Yes, sir.
8  Q.  What are the two pages behind that in your records,
9  Number 25 and 26?
10  A.  25 is a piece of scratch paper, that I used to write
11  some of my notes down. 26 is from Alexander City
12  Orthopedics, October 27.
13  Q.  So what about Plaintiff s Exhibit 12 indicates to you
14  that you received this on, November 15th?
15  A.  Because it s dated November 15th, 04, the fax cover
16  sheet. Total pages include three. Cover sheet including
17  three.
18  Q.  I know what the second one is, that s the October
19  27th. What is the third page of that?
20  A.  Page Number 26, is that the one you re referring to?
21  Q.  That s Number 2, the October 27th letter. So what is
22  the third page that was sent by Dr. Howorth? I guess it
23  would be -- what have you got as Page Number 27. That s
24  the second page of October 27th.
25        MR. BROWN: Those were not sequentially

187

PAGE 188

1        numbered, so I don t know.
2  MR. TINNEY:
3  Q.  It looks like Dr. Howorth sent you, on November the
4  15th, three pages; correct?
5  A.  Uh-huh.
6  Q.  That s going to be what we ve marked as Plaintiff s
7  Exhibit 12, and then the October 27th two page report;
8  correct?
9  A.  It looks like it, correct.
10  Q.  So that doesn t say anything about him sending you
11  Plaintiff s Exhibit 10 on November the 15th, does it?
12  A.  No.
13  Q.  How do you know it was on November 15th that you got
14  Plaintiff s Exhibit 10, when there s no reference to it
15  anywhere?
16  A.  Because it says 11-15.
17  Q.  I know that. But it is not the surgery request forms
18  that you wanted. It s not them. I asked you when you got
19  them and you said November the 15th.
20  A.  I don t know if I got this on November 15th, the
21  surgical request.
22  Q.  Well, how do we know that you didn t get it on
23  October the 27th?
24  A.  Because I had called after that on the 8th and also
25  faxed on the -- what does it say here, on the 15th, for

188

PAGE 189  SHEET 48

1    the third time.
2    Q.    So after November the 18th -- I guess we need
3    Sequence Code Number 56.    Let s go up to Page 7 of 19.
4    That was just correspondence, on the reserve that you had
5    set, from your manager.    Code 57.
6    A.    At the top it says, category reserve, action is
7    correspondence from, object is my manager, Sequence 57,
8    created by Victoria A. Heppes, authorized by Victoria A.
9    Heppes on November 26th, of 04, at 13:42".
10    Q.    Do you set the reserve or does your manager?
11    A.    I don t know, because it is blacked out.
12    Q.    Do you ever set reserves?
13    A.    Yes.
14    Q.    Now, the next one, Sequence Code 58, that doesn t say
15    anything about a reserve.    It talks about approval.    Why
16    is it blacked out?
17    A.    I don t know.
18              MR. BROWN:    It s all about numbers and dollars.
19              MR. TINNEY:    That s all that s in there?
20              MR. BROWN:    Yes.    If you take issue with it I ll
21    be glad to show it to the Court in camera.    I
22    just don t think it is discoverable.
23    MR. TINNEY:
24    Q.    On Sequence Code Number 60 you got a phone call from
25    Emory; is that correct?

189

PAGE 190

1    A.    Number?
2    Q.    60 on Page 7.    Do you see that, on the surgery
3    report?    Where would you get the information that says the
4    doctor is concerned?
5    A.    On Sequence 60, let me finish reading that.
6    Q.    Is that a statement that he made to you that the
7    doctor was concerned or what?
8    A.    It says, surgical report, claimant, phone call from
9    Victoria Heppes on November 30th, 2001.    Yes.
10    Q.    What did you tell me WP stood for?
11    A.    Waiting period.    Surgery was done on the 29th.
12    Q.    On Page 6 of 19 there is a reference to Sequence Code
13    63, it says, object monitoring , what does that mean?
14    A.    Sequence 63?
15    Q.    Yes.
16    A.    It says, post-op visit --
17    Q.    No, I m talking about the object, it says,
18    monitoring , up at the top of Sequence 63?
19    A.    I don t know.    I ve never used that word before.
20    It s probably something that could be -- let s see what
21    date this is.    It is the 8th.    He was returned to work on
22    the 9th.    It was a work status.    Correspondence from
23    object monitoring.    If the post-op visit was on the 8th,
24    which it says, post-op visit 12-8-04", that means I
25    called there and I was monitoring his progress and return

190

PAGE 191

1    to work at light duty position.    Like it says, date
2    returned to work full duty expected four to six weeks.
3    May return to work with restrictions 12-9-04.    No use of
4    right arm .
5    Q.    Come over to Page 4 of 19.    We ve got Sequence Code
6    74 in the middle of the page and Russell Hospital, an
7    amount, and then you ve got recovery room anesthesia M13.
8    What does M13 mean?
9    A.    M13 means diagnostic, which is an x-ray.    So that
10    bill includes recovery room, anesthesia, M13, which is an
11    x-ray for diagnostic testing and RX, which means his
12    prescriptions.
13    Q.    Come over to Page 2 of 19, Sequence Code 87, and it
14    says, created by -- who is that?    Is it E-a-s-e-l-i-g?
15    A.    It s S-a-s-e-l-i-g.    It s Stacy Sledge.    Which is my
16    team leader now.    Her name is Annie Martin.    Her name is
17    Annie Stacy Sledge Martin.    So her married name is Martin.
18    Q.    What does it mean, TL comments?
19    A.    Team leader comments.    That means she reviewed the
20    file.
21    Q.    So is that something that was sent to you?
22    A.    That was put in the file.
23    Q.    Was it addressed to you?
24    A.    Yes.
25    Q.    What did you do where it says, when you monitor TAD

191

PAGE 192

1    -- tell me again what TAD was?
2    A.    TAD, which means temporary alternative duty.
3    Q.    When you monitor temporary alternative disposition
4    please follow up on obtaining  -- is that OS?
5    A.    OS means outstanding medical, which are medical
6    records.
7    Q.    -- And set up an appropriate date to follow up on
8    that as well as a future date to review for closure .    Has
9    this file been closed.
10    A.    No, sir.
11    Q.    Then on Page 1 of 19, Sequence Code 89, again I guess
12    from your team leader.
13    A.    TL diary.    It goes like this.
14    Q.    Okay.    So this indicates the claimant had still not
15    been fully released; correct?    Where it says, set a TAD
16    task to follow up on  -- what is ID work?
17              MR. BROWN:    I think it s LD.
18    MR. TINNEY:
19    Q.    LD, what does that mean?
20    A.    Light duty.
21    Q.    As claimant has not been fully released .    Then it
22    says, send a letter to the MD asking when MD expects
23    MMI , did you do that?
24    A.    Not yet.
25    Q.    That was on April the 26th, of 2005.    We are almost a

192

PAGE 193 SHEET 49

1     year down the road. When do you intend to do that?
2     A.   Well, I would have probably done it after his April
3     25th visit, but that s when he called me and told me the
4     doctor said that he needed another surgery.
5     Q.   A different one, not related to workman s comp; is
6     that what you re talking about?
7     A.   Okay. This was after the lawsuit was filed. This
8     was here to let me know --
9     Q.   We didn t file the lawsuit until June.
10          MR. BROWN: Correct.
11    A.   4-26. That was something to do for the future. If I
12    hadn t had a date in there timely -- now, for example,
13    closing the claim where she put on the last one where you
14    asked --
15          MR. TINNEY:
16    Q.   Pursue FD release, is that final disposition?
17    A.   Full duty.
18    Q.   Full duty release, did you do that?
19    A.   Let me see. Pursue full duty release. I haven t yet
20    because he is not at full duty yet. I still have him on
21    restrictions from Dr. Howorth.
22    Q.   On Page 1 of 19, is there some kind of an agreement
23    that you have with Dr. Shirah that if an attorney asks for
24    somebody s medical records, workman s comp medical
25    records, that they ve got to have your approval?

                          193

PAGE 194

1     A.   No.
2     Q.   Do you know why they called you and asked you?
3     A.   I have no idea. Probably to see if you were who you
4     say you were, you know.
5     Q.   What now?
6     A.   That you are who you say you are, because you
7     probably --
8          MR. BROWN: You ve answered the question.
9          MR. TINNEY:
10    Q.   Since I represent Dr. Shirah, I think he knows who I
11    am.
12    A.   Oh, I didn t know. I don t know.
13    Q.   Who is Berneta J. Boyle?
14    A.   She s a person that works at CMI.
15    Q.   What does she do? What are her responsibilities?
16    A.   From what I know, when a new loss comes into the
17    system it goes to her first and she keys it into our
18    system. I do not know what all her job duties are.
19    Q.   I see a lot of bar codes applied on these records.
20    Do you know where these bar codes come from or what they
21    relate to?
22    A.   No.
23    Q.   Let me show you what I ve marked as 9. I think I
24    skipped Exhibit 9. This is a document that was presented
25    to us, ISO Claim Search Match Report.

                          194

PAGE 195

1     PLAINTIFF S DEPOSITION EXHIBIT 9, marked for
2     identification. (Claim Search Report. Page 222.)
3     MR. TINNEY:
4     Q.   Can you identify that for me and tell me what that
5     is?
6     A.   This is a state report that shows if Emory Brown has
7     filed any insurance claims.
8     Q.   Any previous workman s comp claims?
9     A.   Or anything else from insurance.
10    Q.   And did it indicate whether he had?
11    A.   Let me see.
12    Q.   Well, it will speak for itself.
13    A.   This is the one that s there s one match and that is
14    the one of the injury there at the store on 9-29.
15    Q.   I ll show you what I ve marked as Plaintiff s Exhibit
16    13, which appears to be something called a Presurveillance
17    Checklist, with some documents after it.
18
19    PLAINTIFF S DEPOSITION EXHIBIT NUMBER 13, marked for
20    identification. (Presurveillance Checklist. Page 231.)
21    MR. TINNEY:
22    Q.   What is that?
23    A.   That is something I put wrong in the file.
24    Q.   What do you mean you put it wrong in the file?
25    A.   Well, I was scanning it -- as a matter of fact, I

                          195

PAGE 196

1     noticed it in the file the other day and I thought I have
2     probably, some place down the line, touched the wrong
3     button and put the wrong thing in the file. This is
4     something that I would fill out if I wanted surveillance
5     and send it in to a surveillance person for outside
6     surveillance. This has not been filled out or anything,
7     so I may have just pulled off the wrong thing to put into
8     the file. I did pull off the wrong thing.
9     Q.   Did you ever at any time intend to have outside
10    surveillance conducted of Mr. Brown?
11    A.   No.
12    Q.   So it s another mistake that this is in the file.
13    A.   Yes.
14    Q.   I ll show you what I ve marked as Plaintiff s Exhibit
15    14 and I ll ask you to identify what this is, please,
16    ma am?
17    A.   I don t know.
18
19    PLAINTIFF S DEPOSITION EXHIBIT NUMBER 14, marked for
20    identification. (Factel. Page 235.)
21    MR. TINNEY:
22    Q.   Well, it s something that you put in the file or was
23    contained in the file. Have you ever seen that?
24    A.   No.
25    Q.   I ll show you what is marked as Plaintiff s Exhibit

                          196

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 197 SHEET 50

1    15 and I ll ask you to identify this, please, ma am.
2    A.   I don t know.
3
4    PLAINTIFF S DEPOSITION EXHIBIT NUMBER 15, marked for
5    identification. (Map. Page 236.)
6    MR. TINNEY:
7    Q.   Do you know what Factel is?
8    A.   Factel, that s surveillance.   I think.
9    Q.   I ll show you what s marked as Plaintiff s Exhibit 16
10   and I ll ask you what that is, ma am?
11   A.   It says it s a Global Security Document.
12
13   PLAINTIFF S DEPOSITION EXHIBIT NUMBER 16, marked for
14   identification. (Global Security. Page 237.)
15   MR. TINNEY:
16   Q.   Do you know what that is or why you would have
17   printed that off?
18   A.   No.
19   Q.   Have you ever printed those off before?
20   A.   No.
21   Q.   So this is the only case you ve ever printed
22   surveillance information off in?
23   A.   I didn t do it in this one for a reason.   It was a
24   mistake.
25   Q.   Did you have to have Mr. Brown s medical records

197

PAGE 198

1    reviewed by another physician in order for him to have
2    surgery approved?
3    A.   Did I or did I have to?
4    Q.   Did you have to?
5    A.   To answer that question, and I think I ve answered it
6    before, in a precert, to send a formal precert in, that s
7    what they are, is medical.   There s a medical doctor or
8    medical group there that does the precertification.
9    Because I took it upon myself to go to my team leader with
10   it, without sending it in for a formal precert.
11   Q.   We ve gone through that.   But I m just asking you if
12   we re talking about this CorVel, do you know if they use
13   medical doctors or what their review process is?
14   A.   It s medical doctors, yes.   At the time I don t
15   remember his name.
16   Q.   When you get something back from CorVel is it a
17   statement from a physician?
18   A.   Yes.
19   Q.   So did you tell Mr. Brown that his case had to be
20   reviewed by a doctor before he could get approval for
21   surgery?
22   A.   I may have.
23   Q.   Did you tell him it had to be reviewed by two doctors
24   before he could get approval for surgery?
25   A.   No.

198

PAGE 199

1    Q.   Have you, in your manuals and all that you referred
2    to earlier, seen a statement anywhere that says surgery
3    must be approved by CorVel before it s done?
4    A.   I m sorry.   Can you say that question again?
5    Q.   In the manuals and training information that you have
6    referenced earlier in the deposition, have you seen any
7    statement that says surgery must be approved by CorVel
8    before surgery can be authorized?
9    A.   In the manual, my work manual, that s the procedure.
10   Q.   Did you have any records in your file at any time
11   that you believed indicated that rotator cuff surgery was
12   not medically necessary for Mr. Brown?
13   A.   No.
14   Q.   Why didn t you tell Mr. Brown that you believed that
15   he needed the surgery too?
16   A.   Because he had a legitimate injury at the store.   He
17   was told, was told by me, that he needed surgery because I
18   saw the MRI report and it doesn t say normal.
19   Q.   But I m saying why didn t you tell Mr. Brown --
20   A.   Why didn t I tell?
21   Q.   Yes.   Why did you not tell him that you thought he
22   needed this surgery to be done too?
23   A.   Because I think that s a little too personal.   I need
24   to go by guidelines and the guidelines say what I should
25   do.   Do I feel that he needed surgery, yes, and I

199

PAGE 200

1    sympathize with all my associates, but I m not going to
2    tell him that it didn t need to be done.
3    Q.   Did you tell him that you had not received the
4    records from Howorth?
5    A.   At what date?
6    Q.   Any time?
7    A.   Oh, I m sure I did.   And after I got off the phone
8    with him I immediately called Amy and I said, do you know
9    what -- if I had called her already that day and he
10   happened to call me that day, I d tell him, yes, I just
11   called and she said they are on their way, or I ll call
12   right now and bug Amy again and see if she can get them
13   sent over.   I haven t received them yet.   I ll check my
14   faxes.
15   Q.   Did you ever tell Mr. Brown that -- I think it was
16   Ms. Abbott stated that she could not say that his surgery
17   was medically necessary?
18   A.   No.
19   Q.   Did anyone ever send you these photographs of Mr.
20   Brown?
21   A.   I don t recall, no.
22   Q.   Is there another branch of CMI located anywhere other
23   than in Rogers?
24   A.   In this state?
25   Q.   In the country.

200

BROWN VS CLAIMS MANAGEMENT    DEPOSITION OF VICTORIA HEPPES    4-13-06

PAGE 201    SHEET 51

```
1    A.   We have a Bartlesville office, I think.
2    Q.   You don t know the state it s in?
3    A.   No.
4    Q.   Did you ever ask Dr. Howorth for a disability rating?
5    A.   On the surgery request, Page 6 of 6, it says,  what
6    permanent impairment rating do you anticipate following
7    surgery , do you see where I m talking about?
8    Q.   What did he say?
9    A.   It says,  e-s-t, period, two to four percent  -- I
10   can t read that word -- body as a whole, five to 10
11   percent arm.
12   Q.   What duty do you have as his claim s manager to get
13   back in touch with Mr. Brown and discuss with him whether
14   he has any entitlement to workman s compensation?
15   A.   It is in the process of medical -- it is my duty.
16   After the doctor has seen if that is -- after surgery,
17   after we ve gone through physical therapy, usually we have
18   a FCE exam and that FCE exam would then be reviewed by the
19   treating physician and the treating physician will at that
20   time give the exact rating that he has chosen or that the
21   claimant has and if there are any permanent restrictions.
22   I cannot know that until after he has reached MMI.
23   Q.   Did you ever have the physical therapy records sent
24   to you?
25   A.   I don t know if I have it in the file.  I always
```
                            201

PAGE 202

```
1    followup on physical therapy.
2    Q.   I haven t seen anything, in what you gave me, on
3    physical therapy.
4         MR. BROWN:  I don t know that there is.
5    A.   No, I don t think there is any.
6    MR. TINNEY:
7    Q.   Did you request any?
8    A.   I think I did.  I m sure I did.
9    Q.   Did you followup on it?
10   A.   When I authorized the evaluation I asked that
11   progress reports be sent periodically to my office so that
12   I could put them in the file.  That doesn t mean that they
13   do them and I don t call on those like I would on medical
14   notes or surgical requests.  It s not that they are not
15   important, but --
16        MR. BROWN:  You ve answered the question.
17   MR. TINNEY:
18   Q.   Once the CorVel report comes back does somebody,
19   either team leader or somebody higher than you, still have
20   to approve the surgery?
21   A.   No.  If it s certified it comes right to me and they
22   immediately email it to me.
23   Q.   Does CMI adjust workman s comp for any client other
24   than Wal-Mart, to your knowledge?
25   A.   No.
```
                            202

PAGE 203

```
1    Q.   You don t know or they don t?
2    A.   CMI is -- no, I don t know.
3    Q.   Did you ever personally talk to Dr. Howorth?
4    A.   Just Amy.  I think I only talked to Amy.
5    Q.   Have you referred anyone else to Dr. Howorth since
6    Mr. Brown?
7    A.   Yes.
8    Q.   After Mr. Brown was treated?
9    A.   During the same time frame.
10   Q.   Have you ever been reprimanded or criticized by your
11   team leader or superiors for not logging calls made or
12   received by you?
13        MR. BROWN:  At what point in time?
14        MR. TINNEY:  At any time.
15        MR. BROWN:  I m going to object then to anything
16        after the fact as being something that s not
17        relevant.  Before the fact, she can answer.
18   A.   Reprimanded, no.
19   MR. TINNEY:
20   Q.   Have you been talked to about it?
21   A.   I think that s a harsh word, reprimanded.
22   Q.   Well, did they talk to you about it?
23   A.   Yes.
24   Q.   Who talked to you?
25   A.   My team leader.
```
                            203

PAGE 204

```
1    Q.   What did she say to you?
2    A.   Remember that documentation is very important and try
3    to document everything.
4    Q.   Did you ever have to file any long, narrative report
5    about Mr. Brown s case, before the lawsuit was filed, with
6    anyone?
7    A.   No.
8    Q.   Did you ever change any of the entries in the records
9    after the lawsuit was filed?
10   A.   No.
11   Q.   Do you have any judgment or opinion as to why these
12   diary entries are so out of sequence and out of order?
13   A.   Because when somebody else goes in the file and pulls
14   up the notepad to look at and read, it seems to go back in
15   the system not in sequence.
16        MR. BROWN:  You didn t answer his question.  If
17        you know, tell him.  If you don t know, you
18        don t know.
19   A.   I don t know.
20   MR. TINNEY:
21   Q.   You mentioned that you would always have to call
22   Steve s mother-in-law s house?
23   A.   Emory.
24   Q.   Well, Emory s mother-in-law s house.
25   A.   Yes.
```
                            204

PAGE 205  SHEET 52

```
1    Q.   You never called his house?
2    A.   He doesn t have a phone number.
3    Q.   Did you ever talk to his wife about his case?
4    A.   I don t remember.
5    Q.   Emory testified that Dr. Howorth told him -- in his
6         deposition, that Dr. Howorth told him he had to have
7         surgery and set him up to do it, I think, on the following
8         Monday and before he even got home you had cancelled the
9         surgery. Did you cancel his surgery?
10   A.   I needed this medical request, so it was -- did I
11        cancel it, I said, wait until we get the medical request
12        so that it can be approved. It has to be approved before
13        it can be scheduled.
14   Q.   So you did stop the surgery?
15            MR. BROWN: Object to form.
16   A.   I don t remember.
17   MR. TINNEY:
18   Q.   You just said that you made that statement that you
19        just told us about. Who did you make that statement to?
20   A.   That s my process. So if they had ordered surgery I
21        said that I needed the surgical request back and the
22        medical notes before it could be approved and that we
23        would -- if I did say that, I d say we have to postpone it
24        until all the medical records are in.
25   Q.   Emory said you called his house before he even got
                              205
```

PAGE 206

```
1         home and told someone that you had canceled it or stopped
2         it; is that correct?
3    A.   Yes.
4    Q.   Unless you have a question you want me to ask you, I
5         think I m through.
6    A.   I don t think so.
7            MR. TINNEY: That s all.
8
9                 CROSS EXAMINATION
10   MR. BROWN:
11   Q.   Ms. Heppes, are you part of any computer systems or
12        Information Technologies Department at CMI?
13   A.   No.
14   Q.   So as to whether documents are retained on a computer
15        or if they can be retrieved from a computer, if you said
16        something can be done, would you defer to somebody in
17        Information Technologies.
18   A.   Yes.
19            MR. BROWN: That s the only two questions I
20            have.
21            MR. TINNEY: We have agreed that defense counsel
22            will retain what is marked in Ms. Heppes
23            deposition as Plaintiff s Exhibit 1, which
24            consist of pages numbered in the lower right-
25            hand corner, by Jeff Brown, as being pages one
                              206
```

PAGE 207

```
1         through 100, that was presented in Response to
2         Request For Production of Documents as being all
3         the records that Wal-Mart had.
4            MR. BROWN: I want to add a caveat. All the
5         records that have been provided to me up until
6         the date the production was made, which was
7         April 10th, 2006.
8    (Deposition Concluded.)
                              207
```

FROM :          FAX NO. :          Jan. 26 2006 12:40PM  P4

**Workmen's Compensation Claim**
**Employer:**      **Wal-Mart**
**Employee:**     **Emory Brown**
**Date:**         **October 04, 2004**



P: Right shoulder pain.

S: Patient was seen in the ER five days ago for a work related injury. He states he was unloading a 50 pound sack of potatoes which he accidentally dropped. When he tried to catch them, he reached with his right arm suddenly and felt a "pop" in the right shoulder followed by pain. He was seen in the ER where x-rays were done and were negative for fracture or dislocation. He was treated with Lortab 5/500 prn pain and advised to follow up in a few days. He states the pain is primarily about the right shoulder. It occasionally radiates to the right elbow. No definite paresthesias.

O: Exam of the right shoulder reveals restricted ROM secondary to pain. Mild to moderate diffuse tenderness about the shoulder. Neurovascular intact of the right upper extremity.

Assessment:          Severe sprain of the right shoulder.

Plan:  Start Motrin 800 mg p.o. and h.s. and Robaxin 750 mg two q.i.d. for three days followed by one q.i.d. Darvocet N 100 one or two q4-6h prn pain. Moist heat as directed. He is not to return to work until follow up in four days.
MSadb

**Workmen's Compensation Claim**
**Employer:**      **Wal-Mart**
**Employee:**     **Emory Brown**
**Date:**         **October 08, 2004**

P: Follow up.

S: Patient states the pain is better but he still can't use his right upper extremity. Pain is located anteriorly and posteriorly in the right shoulder. Complains of a "pulling" with movement of the right upper extremity.

O: Exam essentially unchanged.

Assessment:          Severe sprain of the right shoulder.
                     Cannot rule out rotator cuff tear.

Plan:  Continue present medications. Consider MRI if symptoms persist without improvement. Patient may return to light duty on 10-10-04. Return here in one week.
MSadb

216

FROM :                                    FAX NO. :                        Jan. 26 2006 12:39PM  P3

**Workmen's Compensation Claim**
**Employer:**    **Wal-Mart**
**Employee:**    **Emory Brown**
**Date:**        **October 15, 2004**

P: Follow up.
S: Patient still having pain extending from the shoulder to the mid portion of the right upper arm.
O: Patient has active abduction to approximately 90° at which point he experiences moderate pain. No crepitus. Neurovascular still intact.

Assessment:          Severe sprain of the right shoulder with possible rotator cuff tear.

Plan: Continue present medications. MRI is scheduled. Continue light duties at work.
Return here in one week.
MSadb

**Workmen's Compensation Claim**
**Employer:**    **Wal-Mart**
**Employee:**    **Emory Brown**
**Date:**        **October 22, 2004**

P: Follow up.
S: Right shoulder pain is unchanged.
O: Exam is essentially unchanged. MRI shows a tear of the anterior portion of the supraspinatus tendon. A subchondral cyst is noted in the greater tuberosity. Also noted is a tear of the anterosuperior aspect of the labrum. Advanced degenerative changes of the AC joint are noted with impingement as well as subacromial bursitis.

Assessment:          Right rotator cuff tear.

Plan: Patient is referred to an orthopedist of the company's choice. Return here prn.
MSadb

216

Mail Receive Date: 2004-10-29

OCT-21-2004 10:31 FROM:OPEN MRI OXFORD    256 832 0461    TO:One Call Medical Inc P.4/4



**Patient Name: BROWN, EMORY**
Ref. Physician: Shiruh, Mitchell
Account #: 1008914
Date of Birth: 8/24/1955

Day Phone:
Evening Phone:
DOS: 10/19/2004
Page: 1 of 1

### PROCEDURE: MRI OF THE RIGHT SHOULDER.

**FINDINGS:** No fractures or contusions are present. There is subchondral cyst in the greater tuberosity. There is a tear of the distal anterior third of the supraspinatus tendon with retraction of the free edge to the level of the acromion. There are degenerative changes of the AC joint with impingement upon the distal supraspinatus muscle.

There is some fluid in the joint and also undersurface spurring and joint narrowing. The infraspinatus tendon is normal.

A sublabial foramen is present. There is tear through the anterosuperior aspect of the labrum. The biceps and subscapularis tendons are normal. Acromion is type II.

**OPINION:**

1. Tear of the anterior portion of the supraspinatus tendon.
2. Subchondral cyst in the greater tuberosity.
3. Tear of the anterosuperior aspect of the labrum.
4. Advanced degenerative changes of the AC joint with impingement.
5. Subacromial bursitis.

PLAINTIFF'S DEPOSITION EXHIBIT
8
FREEMAN-Bayonne, N.J.



Thomas G. Harrell, MD
334-863-2361

Joseph Adcock
lemigh
Open MRI of Oxford

D05UNDEF

**Thank you for referring your patient to Open MRI of Oxford**

22l
12

Mail Receive Date: 2004-12-08

99999999                    P.03

**BROWN, EMERY**
ACO #21738
10/27/04
PAGE 2

He has had no previous difficulties with his right shoulder. He reports no history of injury or pain.

**DIAGNOSES:**
1. Acute tear of supraspinatus rotator cuff.
2. ACJ OA.

**PLAN:**
1. Preoperative ROM & strengthening to improve his ROM and become familiar with postoperative exercise program.
2. Recommend immediate arthroscopy & rotator cuff repair. He is 4 weeks post injury, and it is much better to proceed with rotator cuff reconstruction within the first 6 weeks during the acute phase, as the results are more predictable. After 6 weeks, the results become more unpredictable. He has had severe pain, inability to sleep, and inability to use his arm since his injury. I do not feel that this will improve with PT or any other modalities at this time. Without rotator cuff reconstruction, he will have permanent weakness secondary to the loss of the supraspinatus function. The rotator cuff muscle will retract, become scarred, and be impossible to repair easily. I discussed this with him extensively. He will need 6 weeks to 12 weeks of PT, modified work activities, minimal or no use of the right hand. After 3 months, he should be able to return to full duties without restrictions.

Respectively submitted,

**GRAHAM L. HOWORTH, JR., M.D.**
**FELLOW OF AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS**

/jhw

cc: Dr. Shirah
    Roanoke Family Care

    Wal-Mart

PLAINTIFF'S DEPOSITION
EXHIBIT
11

227

Mail Receive Date: 2004-12-08

99999999                                    P 01

C4270431

# GRAHAM L. HOWORTH, M.D., P.C.
## ORTHOPAEDIC SURGERY

COOSA VALLEY ORTHOPAEDICS
121 SOUTH ANNISTON AVENUE
SYLACAUGA, AL 35150
(256) 249-5866
(256) 249-5810 FAX

ALEXANDER CITY ORTHOPAEDICS
1120 AIRPORT DRIVE SUITE 101
ALEXANDER CITY, AL 35010
(256) 234-0989
(256) 234-5114 FAX

LAKE MARTIN ORTHOPAEDICS
201 MARIARDEN ROAD
DADEVILLE, AL 36853
(256) 825-2294
(256) 825-7095 FAX

TO: Victoria                    FAX# 479 273 8020

SENDER: Amy                     OFFICE:

DATE & TIME: 11-15-04           TOTAL PAGES INCLUDING COVERSHEET: 3

Confidentiality Notice: The document(s) accompanying this facsimile transmission contain(s) confidential information belonging to the sender, that is legally privileged. This information is intended only for the use of the individual or entity named above. The authorized recipient of this information is prohibited from disclosing this information to any other party and is required to destroy the information after its stated need has been fulfilled, unless otherwise required by state law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or action taken in reliance on the contents of these documents is strictly prohibited. IF THIS FAX HAS BEEN RECEIVED IN ERROR, PLEASE CONTACT OUR OFFICE IMMEDIATELY!

COMMENTS:

Re: Emery Brown
Surgery Approval

Who puts or
when

PC4270431128?

D05UNDEF

IF YOU HAVE ANY QUESTIONS, PLEASE DO NOT HESITATE TO CALL

PLAINTIFF'S DEPOSITION
EXHIBIT
12

228

24

Mail Receive Date: 2004-12-08

99999999                    P.02

## ALEXANDER CITY ORTHOPAEDICS          OCTOBER 27, 2004

**BROWN, EMERY**
#21738

Emery is a delightful new patient, 49 years old, seen for evaluation of a painful right shoulder. DOI: 09/28/04. Mechanism – unloading a produce truck. He experienced a pop in his right shoulder when he was lifting 50-lb bags of potatoes. He was initially placed on medications but continued to have severe pain with inability to sleep, inability to lift his right arm.

**X-RAYS:**
MRI scan was subsequently performed on 10/19/04 and is remarkable for a tear of the supraspinatus with retraction of the free edge at the level of the acromion. There is also noted some subchondral cyst formation in the greater tuberosity, tear of the anterior-superior aspect of the labrum, and acromioclavicular joint changes. Radiographs of his shoulder from 09/29/04 showed healed rib fractures and changes consistent with osteoarthritis of the acromioclavicular joint.

**ON EXAMINATION:**
He has weakness with initiation of abduction consistent with a rotator cuff tear. He has a painful arc with assistance from 70-110 degrees. He has stiffness secondary to disuse of his shoulder over the last 4 weeks. His cervical spine is unremarkable.

He works at the Wal-Mart in Roanoke and was referred by Dr. Shirah.

WT: 152. HT: 5'8".

**MEDICATIONS:**
Include Robaxin, ibuprofen, and Darvocet.

**ROS:**
Backache, leg swelling, history of poor circulation.

**SOCIAL HISTORY:**
Positive for tobacco.

**ALLERGIES:**
NKDA.

**FAMILY HISTORY:**
Remarkable for cancer, diabetes, CVDZ.

**SURGICAL HISTORY:**
Appendicitis in 1974.

229

28

Mail Receive Date: 2004-12-08

99999999                    P.03

BROWN, EMERY
ACO #21738
10/27/04
PAGE 2

He has had no previous difficulties with his right shoulder. He reports no history of injury or pain.

DIAGNOSES:
1. Acute tear of supraspinatus rotator cuff.
2. ACJ OA.

PLAN:
1. Preoperative ROM & strengthening to improve his ROM and become familiar with postoperative exercise program.
2. Recommend immediate arthroscopy & rotator cuff repair. He is 4 weeks post injury, and it is much better to proceed with rotator cuff reconstruction within the first 6 weeks during the acute phase, as the results are more predictable. After 6 weeks, the results become more unpredictable. He has had severe pain, inability to sleep, and inability to use his arm since his injury. I do not feel that this will improve with PT or any other modalities at this time. Without rotator cuff reconstruction, he will have permanent weakness secondary to the loss of the supraspinatus function. The rotator cuff muscle will retract, become scarred, and be impossible to repair easily. I discussed this with him extensively. He will need 6 weeks to 12 weeks of PT, modified work activities, minimal or no use of the right hand. After 3 months, he should be able to return to full duties without restrictions.

Respectively submitted,

GRAHAM L. HOWORTH, JR., M.D.
FELLOW OF AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS

/jhw

cc: Dr. Shirah
    Roanoke Family Care

    Wal-Mart

230