# EXHIBIT

# 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

 CONDENSED  COPY

EMORY STEVE BROWN,            )
           Plaintiff,          )
                               )CIVIL ACTION
vs.                            )
                               )
CLAIMS MANAGEMENT, INC.,       )FILE NO. 3:05-CV-0681-WKW
                               )
           Defendant.          )

Oral deposition of AMY MILLER, Witness, called by the Defendant, taken before Betsy J. Peterson, Registered Professional Reporter, taken at Alexander City Orthopaedics, 1120 Airport Drive, Alexander City, Alabama, on the 11th day of August, 2006, commencing at 3:20 p.m. CST.

---

APPEARANCES

On behalf of the Plaintiff:

 MR. CLAY TINNEY
 Law Office of John Tinney
 739 Main Street
 Post Office Box 1430
 Roanoke, Alabama  36274

On behalf of the Defendant:

 MR. ARCHIE GRUBB
 Carlock, Copeland, Semler & Stair, LLP
 The Rothschild Building
 1214 First Avenue, Suite 400
 Post Office Box 139
 Columbus, Georgia  31902-0139
 706-653-6109

---

STIPULATIONS

IT IS STIPULATED AND AGREED by and between counsel appearing for the respective parties that:

1) The deposition of AMY MILLER, Witness, shall be taken by the Defendant, for all purposes under the Federal Rules of Civil Procedure, before Betsy J. Peterson, Registered Professional Reporter, at the office of Alexander City Orthopaedics, 1120 Airport Drive, Alexander City, Alabama, commencing at 4:20 p.m. CST on the 11th day of August, 2006;

2) ALL FORMALITIES with reference to notice of taking, notice of time and place of taking, and all other matters precedent to the taking of depositions are WAIVED;

3) THAT THE READING of this deposition to, or by, the witness and the signing thereof by the witness are hereby expressly WAIVED;

4) ALL OBJECTIONS, EXCEPT as to the form of the question and responsiveness of the answer, are RESERVED to the time of the hearing of the case; and

5) ALL FORMALITIES with reference to the filing of depositions, including notice of filing, et cetera, are WAIVED.

---

EXAMINATION INDEX

AMY MILLER
    BY MR. GRUBB . . . . . . . . . .    5

EXHIBIT INDEX

                                            MAR
Defendant's
 1    Precert Information Sheet            20

 2    Claims Management, Inc. Surgery      26
      Request

 3    Russell Medical Center Surgery       40
      Scheduling Form

**Page 5**

MR. GRUBB: Okay. This is the deposition of Amy Miller. And we'll have the usual stipulations. We'll reserve all objections except as to the form of the question and responsiveness of the answer.

Does that sound good?

MR. TINNEY: Sure.

THEREUPON,

AMY MILLER

was called as a witness, and having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. GRUBB:

Q. Okay. Ms. Miller, have you given a deposition before?

A. No.

Q. Okay. Well, it's just a conversation between me and you. And I'll ask some questions that won't be any trick questions.

Any question that you don't understand, please just tell me you don't understand. I'll try to make it as simple as possible. I don't want to try to trip you up in any way. I'll try to make them straight-forward, although I will unintentionally ask some bad questions at times, so I'll try to

**Page 6**

straighten those out.

The court reporter is taking everything down, so speak clearly where she can hear you and try to eliminate uh-huhs and huh-uhs and things like that and say yes or no. Make sure to say yes or no rather than nodding your head, that type of thing.

And if you need to take a break at any time just let me know, but hopefully we'll go through this fairly quickly.

First I'm going to ask some background questions, some of these for the purpose if the case goes to trial and we had to do jury selection, so we'll know -- you know, make sure you don't have any relatives on the jury or something like that.

Please state your full name.

A. Amy Carter Miller.

Q. Okay. And your present address?

A. 11512 Highway 280, Jackson's Gap.

Q. And Jackson's Gap is in Alabama?

A. Right.

Q. And your birthday?

A. August 18, 1976.

Q. Okay. Are you married?

A. No.

Q. Okay. Have you been married?

**Page 7**

A. Yes.

Q. Okay. What's your ex-husband's name?

A. Robert Miller, Jr.

Q. Okay. Is that your only ex-husband?

A. Yes.

Q. Okay. What were the dates of that marriage, approximately?

A. June 1997. And I'm not sure of the divorce date.

Q. Okay. Do you have any children?

A. One.

Q. Okay. Is that child under the age of 18, I take it?

A. Yes, he is.

Q. Okay. Are your parents still living?

A. Yes.

Q. What are their names, please?

A. Kenny and Laurie Carter.

Q. And where do they live?

A. Alexander City, Alabama.

Q. How about, are your grandparents still living?

A. Yes.

Q. And what are their names?

A. Jewel and Wilton Carter and Margie Caylor.

**Page 8**

Q. Okay. And the Carters, where do they live?

A. Jackson's Gap, Alabama.

Q. And Ms. Caylor?

A. Tallahassee, Florida.

Q. Okay. And then do you have any brothers or sisters?

A. One brother.

Q. And what's his name?

A. Daniel Carter.

Q. Okay. And where does he live?

A. Alexander City, Alabama.

Q. Is he married?

A. No.

Q. Okay. And how about aunts and uncles?

A. Carol Cooper is in Prattville, Alabama; and Steve Carter, Auburn, Alabama; and Rosemary Caylor in Childersburg, Alabama.

Q. Okay. All right. Do you attend a church?

A. No.

Q. Okay. Do you belong to any civic clubs or organizations or anything?

A. No.

Q. Okay. And where does your child attend school?

A. Stevens Elementary.

Page 9

Q. Okay. Thank you.
When did you start work at Alexander City Orthopaedics?
A. June of 2000.
Q. Okay. Did you work anywhere in the medical profession prior to that?
A. Temple Medical Clinic.
Q. Okay. And where is that located?
A. Here in this building.
Q. I thought I recognized that.
Approximately what dates did you work there at Temple Medical Clinic? Just the month and the year.
A. Maybe November of '98 to November of '99.
Q. Okay. Any other prior medical experience?
A. Russell Medical Center. I worked in the registration department.
Q. Okay. About what day -- what period was that?
A. 1994 until 1998.
Q. Okay. Any other medical experience?
A. That's all.
Q. Do you have any professional medical training or education?
A. No, no. Just a home program.

Page 10

Q. Okay. Who was that through?
A. Professional Career Development Institute.
Q. Did you complete that program?
A. I did.
Q. And what was --
A. It's for medical assistant.
Q. Okay. About when did you complete that?
A. 1997 maybe.
Q. Okay. Are you a high school graduate?
A. Yes.
Q. What high school did you go to?
A. Benjamin Russell High School.
Q. What year did you graduate?
A. 1994.
Q. Have you had any education after high school other than the home program?
A. Central Alabama Community College, from '94 to '96, and then from 2005 to present.
Q. Okay. So you're continuing with that.
A. Right.
Q. Okay. Great.
Dr. Howorth, is he the only doctor at Alexander City Orthopaedics?
A. Yes.
Q. Who else is on the staff?

Page 11

A. There's the receptionist, Mary; the office manager, Lynn; and his assistant and x-ray tech, Jonathan.
Q. And so with you, that would make five on the staff, and then -- I guess five all together; is that correct?
A. Including --
Q. Including Dr. Howorth.
What is your title?
A. I'm his clinic assistant.
Q. Okay. Has that been your title throughout the time that you've been employed here?
A. I was receptionist for the first year.
Q. Okay. So that would be about 2000 to 2001; is that right?
A. Right.
Q. And since then you've been clinic assistant?
A. Right.
Q. Tell me a little bit about your duties as clinic assistant.
A. Check the patient out with next appointment, write the physical therapy orders. I do any insurance verification or precertification for surgeries.

Page 12

Q. Okay. And were you doing the insurance verification and precertification back in 2001 when you began --
A. Yes.
Q. -- this job?
And you have continued to do that up until the present time?
A. Yes.
Q. Okay. Now, as you know, the reason we're here today -- and we'll get more into it in just a minute -- is to talk about some of the treatment -- or not necessarily the treatment, but your interaction with a patient by the name of Emory Brown who was treated here back in October 2004, and I believe he's still a patient.
Was there anyone else on the staff from October 2004 to the present who is no longer on the staff?
A. Maybe the receptionist.
Q. Have y'all had a different receptionist in the past before -- I guess, is it Mary now?
A. Yes.
Q. Who was the previous receptionist?
A. To be honest, I don't remember.
Q. Okay.
A. There's been a few.

**Page 13**

Q. Okay. Is the -- are the duties of the receptionist mainly just answering the telephone and greeting people at the window out there?
A. Yes.
Q. Does the receptionist do anything as far as insurance verification or precertification of surgery?
A. No.
Q. Does anyone else in the office do any of that other than yourself?
A. No.
Q. Okay. What's your normal work schedule?
A. Tuesday, Wednesday, and Friday is from 8 to 4:30. Monday and Thursday is from 10 until 6:30.
Q. Has that been pretty much a normal schedule during the period that you've been employed here?
A. We used to go to Sylacauga. We had an office in Sylacauga.
Q. When was that? Do you remember?
A. We moved back here in December of 2004 maybe.
Q. Okay. So what day -- would you go on a certain day to Sylacauga?
A. Tuesday and Friday.
Q. Were you doing the same things as you would

**Page 14**

do here as far as seeing patients and so forth?
A. Yes.
Q. Tell me about what you do just with a normal patient as far as precertifying surgery.
A. Depending on their insurance, I can either go on-line or call the insurance company and get their surgical benefits. For the precert, I just follow the instructions.
Q. Okay. Do you have to ever send faxes to the insurance company, that type of thing?
A. Yes.
Q. Surgical request forms, that type of thing?
A. Yes.
Q. Do you have any procedures that you follow as far as documenting when you send a fax or when you receive a fax?
A. I try to write it on the precert form.
Q. Okay. Have you done pretty good about that?
A. I have tried to. It's hard to write every conversation every time they call or I call them.
Q. Just as far as the faxes.
A. Uh-huh.
Q. Okay.
A. I do.

**Page 15**

Q. Okay. You document those by writing on the form?
A. Yes.
Q. It was received.
Okay. And then in regard to telephone calls with the insurance carrier, do you document those?
A. I try to.
Q. Okay. I think you said that's a little bit harder to do.
A. Right. If there's more than one conversation a day, it's hard to stop and write all that down.
Q. Yeah. Now, what do you do -- I know you were just down there. Y'all were having a clinic, and you were busy with that. What type of thing normally keeps you busy in that situation as patients are coming in and so forth?
A. Scheduling the patient or on the phone with the referral for them to MRI, physical therapy, surgery.
Q. So you are seeing a good number of patients on a regular day?
A. We do.
Q. Do you have an estimate of how many patients come through the office on an average day?

**Page 16**

A. Usually 30 to 35.
Q. Okay. Then it's my understanding that the doctor does surgery about two days a week; is that right?
A. Yes.
Q. And what days are those?
A. Monday and Thursday morning.
Q. Okay. On average about how many surgeries will he do on one of those days?
A. Four.
Q. Do you recall a patient by the name of Emory Steve Brown?
A. I recall the name, not the face.
Q. Okay. So you wouldn't recognize him if he came in?
A. No.
Q. Okay. Do you recall the name more because you've been dealing with it with requests for medical records --
A. Probably.
Q. -- than just if he were a regular patient that didn't have a lawsuit going on?
A. Probably.
Q. Yeah. My records that I received from your office show his treatment as beginning on October

**Page 17**

```
 1  27, 2004.  Does that sound about right to you?
 2       A.  I guess.
 3       Q.  Okay.  You don't really know?
 4       A.  I don't know, no.
 5       Q.  Okay.  And that's fair enough.  If you
 6  don't know, just say you don't know.
 7       A.  Yeah, I don't know.
 8       Q.  Do you recall dealing with Claims
 9  Management Incorporated, or CMI, in regard to his
10  workers' compensation benefits, the approval of his
11  surgery and so forth?
12       A.  Not necessarily him individually.  We dealt
13  with them a lot.
14       Q.  Okay.  Do you have any type of estimate of
15  how many different patients you have had that have
16  been referred by Claims Management?
17       A.  I would say 10 to 15.
18       Q.  Is that all since this October 2004 time
19  period?
20       A.  Yes.
21       Q.  Was he one of the first ones that y'all had
22  dealt with that had been referred by Claims
23  Management?
24       A.  I don't remember.
25       Q.  Okay.  Do you recall who your primary
```

**Page 18**

```
 1  contact person was at Claims Management in regard to
 2  Emory Brown?
 3       A.  Not necessarily him, but Victoria.
 4       Q.  Would that be Victoria Greenspan?
 5       A.  Yes.
 6       Q.  If I told you that she was the primary
 7  contact person on this case, I mean, would you
 8  think, yeah, that's probably right?
 9       A.  Right.  She was the main one that I spoke
10  to on all of them.
11       Q.  Okay.  So you do you recall anyone else
12  that you spoke to at CMI in regard to these cases?
13       A.  No.
14       Q.  So it's fair to say, as far as you can
15  remember, Victoria Greenspan is the person you dealt
16  with at Claims Management?
17       A.  I don't recall, but I would suppose, yes.
18       Q.  Do you recall any interactions at all with
19  Emory Brown that you may have had?
20       A.  No.
21       Q.  Okay.  No telephone calls?
22       A.  I don't recall any.
23       Q.  Okay.  And no face-to-face contact?
24       A.  I'm sure I did, but...
25       Q.  You just don't remember?
```

**Page 19**

```
 1       A.  I don't know; right.
 2       Q.  Okay.  Do you know the telephone number at
 3  this office?
 4       A.  Dr. Howorth's office?
 5       Q.  Uh-huh.
 6       A.  (256)234-0989.
 7       Q.  Are there any alternate numbers?
 8       A.  There's a second line and a fax line.
 9       Q.  Do you know the number of that second line?
10       A.  No.
11       Q.  If I said (256)234-0920 --
12       A.  That sound correct.
13       Q.  -- does that sound -- okay.
14       And then what is the fax number?
15       A.  (256)234-3114.
16       Q.  Okay.  And are there any alternate fax
17  numbers?
18       A.  No.
19       Q.  To your knowledge, would there be any
20  documents that would be faxed to CMI, or Claims
21  Management, from a different fax number?
22       A.  No.
23       Q.  Okay.  And would you ever have occasion to
24  receive any faxes at a different fax number?
25       A.  No.
```

**Page 20**

```
 1       Q.  Okay.
 2       I'm sorry, if y'all would bear with me just a
 3  second.
 4       Okay.  I'm going to show you what I'm going to
 5  mark as Defendant's Exhibit No. 1.
 6            (Defendant's Exhibit 1 was marked for
 7             identification.)
 8       MR. GRUBB:  And I'm going to show it to
 9       Mr. Tinney and let him look at it real quick.
10            (Document handed to counsel.)
11       Q.  Can you tell me what this exhibit is?
12       A.  It's our precert information sheet that we
13  fill out for surgical approval.
14       Q.  Okay.  And this sheet is labeled with
15  Mr. Emory Brown's name; correct?
16       A.  Correct.
17       Q.  Okay.  Is that your handwriting on the
18  document?
19       A.  Yes.
20       Q.  Okay.  And is that your signature on there?
21       A.  Yes.
22       Q.  Is this a form that you fill out as part of
23  your normal course of business?
24       A.  Yes.
25       Q.  And this is something that you've been
```

Page 21

1  doing on a regular basis for the past five years or
2  so?
3      A. Yes.
4      Q. Okay. On an average day about how many of
5  these precert forms will you do?
6      A. Four.
7      Q. Okay. And tell me again the purpose of the
8  document.
9      A. For precert information or surgical
10 benefits.
11     Q. Okay. And is this a form that is used
12 within your office, or is this provided to you by
13 the insurance carrier?
14     A. No, it's for our office.
15     Q. I see on there where it says -- let me see
16 if I can find it. I believe down towards the bottom
17 it says, "10/27/04, left message for workers' comp
18 to call me back." Do you see that?
19     A. Yes.
20     Q. Is that your initials beside it?
21     A. Yes.
22     Q. Okay. And that's -- you wrote that, I
23 presume, after you called and left a message for
24 Victoria at Claims Management. Does that sound
25 correct?

Page 22

1      A. Correct.
2      Q. Okay. According to the records that I
3  have, 10/27/04 would have been the first day that
4  Mr. Brown treated with your office. Do you have any
5  knowledge if that was his -- the day of his first
6  appointment?
7      A. I do not, huh-uh.
8      Q. Okay. I'll show you this, and I'm not
9  going to mark it as an exhibit. And I'll show
10 Mr. Tinney. That's just his records from his first
11 appointment.
12         (Document handed to counsel and
13         witness.)
14     Q. And I'll just let you look at that. And
15 notice on the top it says, "Emory is a delightful
16 new patient," and it's dated October 27, 2004.
17     A. Right.
18     Q. Does that look like a record that y'all
19 normally keep following a patient's visit?
20     A. Yes.
21     Q. And if you need more time to look over it.
22     Does that look like that was produced after his
23 first consultation here at Alexander City
24 Orthopaedics?
25     A. Yes.

Page 23

1      Q. Do you have any records of your telephone
2  calls with Victoria at Claims Management?
3      A. In his chart, yes.
4      Q. You do?
5      A. Uh-huh.
6      Q. Do you think if we take a couple-minute
7  break, you could go and get those?
8      A. He's got his chart. Dr. Howorth has his
9  chart.
10     Q. Okay.
11     A. The only thing that I have is what's
12 written.
13     Q. Okay. Do you think -- would Dr. Howorth
14 let us look at those telephone records?
15     A. I can ask him.
16        MR. GRUBB: Okay. Go off the record for
17     just a second.
18        (A discussion was held off the
19        record.)
20        MR. GRUBB: We'll go back on the record.
21     Q. On October 27, 2004, I show four telephone
22 calls. I'm going to mark this, but I need to do a
23 redacted copy. I tell you what. I'm just going to
24 skip that for now.
25     We have -- on 10/27/04 you have a message for

Page 24

1  Victoria to call you back; is that correct?
2      A. Correct.
3      Q. Okay. Do you have any record that she
4  called you back at any point?
5      A. Just from where she said that they wanted
6  him to go through therapy.
7      Q. Okay. And where is that written?
8      A. Under her name.
9      Q. Okay. And that looks like by secondary
10 insurance company; is that right?
11     A. Yes.
12     Q. Okay. And just read what that note says.
13     A. "Work comp wants him to go through therapy
14 first. Then they will precert surgery."
15     Q. Okay. And do you know what time -- what
16 date that note was written on?
17     A. It should be also 10/27/04.
18     Q. Okay. So that would indicate that you
19 talked to her at some point --
20     A. Yes.
21     Q. -- that day.
22     And if I had telephone records from Claims
23 Management that show four telephone calls on that
24 day between Alexander City Orthoaedics and Claims
25 Management, would you dispute that?

**Page 25**

A. No.
Q. Okay. Would you be able to say if it's accurate or not?
A. I don't remember.
Q. Okay. Now, on the bottom of that form I see a note. And tell me what that says about "approved."
A. "Approved on 11/16/04."
Q. Okay. So that's the date that the surgery was approved?
A. Right.
Q. And that's by Victoria at Claims Management?
A. Right.
Q. Okay. And then it looks like you signed it and dated it on that date?
A. Right.
Q. And that's your initials out there again, A.M.?
A. Yes.
Q. So is it correct to say this form shows your initial contact with Victoria on October 27, 2004, and then that the surgery was approved on November 16th?
A. Yes.

**Page 26**

Q. Okay. I have here a second document. I'm going to label it Defendant's Exhibit No. 2. And it is four pages long. It appears to be a surgery request form.
   (Defendant's Exhibit 2 was marked for identification.)
   (Document handed to counsel and witness.)
Q. Is that something that you received from Claims Management?
A. Yes.
Q. Okay. And does it indicate what date you received that on?
A. It's dated 10/27/04.
Q. Okay. And would you say that's the date that you received it on?
A. I don't recall.
Q. Okay. Would you have -- would you have any reason to think that it came on a different date?
A. No.
Q. Okay. Is that something that would have been faxed to you?
A. Yes.
Q. Okay. So that was faxed to you by Victoria Greenspan?

**Page 27**

A. Yes.
Q. Okay. And you believe that was on 10/27/04?
A. Yes.
Q. Okay. Tell me what that surgery request form is.
A. It looks like that it's a form for the physician to fill out on -- for the surgical procedure: whether it's inpatient or outpatient; where it will be completed; physical restrictions for after surgery; release to return to work in modified duty after surgery; will physical therapy be expected; projected MMI; permanent impairment rating expected afterwards; should this patient choose not to proceed with surgery, what permanent impairment would he have; and is surgical intervention requested in whole or part due to the reported work injury; and his signature.
Q. Okay. And is some of this form -- is any of this form in your handwriting?
A. It looks like the second question, the third question, the fourth and fifth question, and then it's the physical therapy referral.
Q. So those questions, the first one -- I just want to make sure I have got this right. The first

**Page 28**

one again, "Is this patient a good, fair, or poor candidate?" Or the second question, the first one with your handwriting.
A. Yes.
Q. And the next one with your handwriting is "surgical procedure"?
A. Right.
Q. And then the next one with your handwriting is, "Will the procedure be completed on an outpatient or inpatient basis?"
A. Yes.
Q. And then the final question that you responded to in your handwriting is "name, address, and phone number of the facility."
A. There's one more at the bottom.
Q. Okay. I see that one. The last question on this page, which is labeled at the top "Claims Management, Incorporated"; and it says, "Is a physical therapy referral or home exercise program expected postoperatively?" You wrote "yes" on that?
A. Right.
Q. Okay. Who filled out the remaining questions and the answers on this?
A. Dr. Howorth.
Q. Okay. And is that his signature on the

29
1 bottom?
2   A. It is.
3   Q. Okay. And then did he date that?
4   A. Yes.
5   Q. Okay. What date is that?
6   A. 10/30/04.
7   Q. So this would indicate he completed the
8 surgical request form on 10/30/04?
9   A. Yes.
10  Q. Okay. Is this something that y'all do on a
11 regular basis, completing this type of paperwork?
12  A. Yes.
13  Q. And this is part of your normal duties, to
14 help fill out this paperwork?
15  A. Yes.
16  Q. Okay. And is it also part of your normal
17 duties to receive the forms from the insurance
18 carrier and then return those forms to them once
19 they are complete?
20  A. Yes.
21  Q. Okay. Is this a fairly -- is this form
22 fairly typical as far as the ones that --
23  A. Yes.
24  Q. -- you come across?
25  Is this the standard form for Claims

30
1 Management, Incorporated?
2   A. I don't recall.
3   Q. Okay. So we've said that it appears that
4 Victoria Greenspan faxed this form to you on October
5 27.
6   A. Right.
7   Q. And it appears that the doctor signed and
8 dated the form on October 30th.
9   A. Right.
10  Q. Okay. Okay. Let me look at that exhibit
11 again.
12          (Document handed to counsel.)
13  Q. On the first page of Exhibit 2, which
14 appears to be the fax cover sheet that's labeled
15 "Surgery Request," there's a handwritten note down
16 towards the bottom right-hand corner as you are
17 looking at the page. Is that your handwriting?
18  A. Yes.
19  Q. What does that say?
20  A. "11/15/04 faxed" and my initials.
21  Q. Okay. Does that indicate that you faxed
22 that surgery request form on that date, 11/15/04?
23  A. Yes.
24  Q. Is there any other record that you have of
25 any other faxes that you sent to Claims Management

31
1 of that surgery request form?
2   A. No.
3   Q. Okay. Then if we go back to Exhibit 1, the
4 precert information sheet, it shows that the surgery
5 was approved on 11/16/04; is that correct?
6   A. Right.
7   Q. And that's in your handwriting at the
8 bottom?
9   A. Yes.
10  Q. So just to construct a time line here from
11 what we have gone over so far -- and I'll just ask
12 you to tell me if this is correct -- it appears that
13 Emory Brown first presented for treatment on October
14 27th, 2004 --
15  A. Right.
16  Q. -- at Alexander City Orthopaedics?
17  A. Right.
18  Q. Okay. And on October 27, 2004, you made
19 contact with Victoria at Claims Management?
20  A. Yes.
21  Q. On October 27, 2004, there's a record of a
22 fax sent from Claims Management?
23  A. Yes.
24  Q. And that fax is a surgery request form?
25  A. Yes.

32
1   Q. That fax was filled out, dated and signed
2 by Dr. Howorth on October 30, 2004; is that correct?
3   A. Yes.
4   Q. And then there's a note on Defendant's
5 Exhibit No. 2 that you faxed the surgery request
6 back to Claims Management on November 15, 2004?
7   A. Yes.
8   Q. And on Defendant's Exhibit No. 1, there's a
9 note that the surgery was approved on November 16,
10 2004?
11  A. Right
12  Q. Okay. Do you have on there -- or do you
13 know the date on which Mr. Brown's surgery actually
14 took place?
15  A. No.
16  Q. Okay. If I said November 29, 2004, does
17 that sound right to you?
18  A. Yes.
19  Q. Okay. Do you have any knowledge as to why
20 there was a 13-day gap between when the surgery was
21 approved on November 16th and the surgery actually
22 taking place on November 29, 2004?
23  A. No.
24  Q. Okay. What date does Dr -- Dr. Howorth,
25 you said he normally performs his surgery on what

**Page 33**

days?
A. Monday and Thursday mornings.
Q. Would that schedule have been altered at all by the Thanksgiving holiday falling within that time in late November?
A. I don't recall.
Q. Okay. Do you have any records of any telephone conversations with Claims Management from that period between November 16th through the 29th?
A. No.
Q. Okay. Do you have any records of the conversations between Claims Management or between your office and Claims Management between October 30th, when Dr. Howorth signed that surgery request, to November 15th?
A. No.
Q. Okay. Do you have any record that Mr. Brown's surgery was ever scheduled for an earlier time and then was canceled?
A. Not in front of me. I don't recall.
Q. Okay. So you don't recall whether that ever happened?
A. No.
Q. Okay. Have you seen any type of record that would lead you to believe that has happened?

**Page 34**

A. No. I don't see where he rescheduled.
Q. Was that -- where it said "approved on 11/16/04," would you have been able to schedule a surgery before it was approved?
A. No, we don't.
    MR. GRUBB: Okay. If I could take a break for just a couple minutes.
        (Brief break)
Q. All right. Back on the record. Ms. Miller, who schedules the surgeries for Dr. Howorth's office?
A. I do.
Q. Okay. Did you schedule the surgery for Mr. Emory Brown?
A. I'm sure I did. I don't recall.
Q. Okay. Was that part of your normal duties --
A. Yes.
Q. -- at that time? Okay. Is that something you do on a daily basis?
A. Yes.
Q. Okay. Tell me -- tell me how you go about scheduling a surgery.
A. I look at our surgery schedule and give

**Page 35**

them the first spot that's open.
Q. Okay. As we discussed a few minutes ago, it looks like Mr. Brown's surgery was approved on November 16th; is that right?
A. Right.
Q. What -- do you recall what you did upon receiving that approval as far as scheduling the surgery goes?
A. No.
Q. What would you normally do?
A. I would get out the surgery schedule, surgery book, and put him in the first spot, fill out his paperwork. Dr. Howorth signs it. And I fax it over to surgery.
Q. Okay. Once surgery is approved by the insurance carrier, do they do anything to schedule the surgery?
A. No.
Q. Okay. Once Mr. Brown's surgery was approved, did Victoria have any input as far as what date and time his surgery would be?
A. I don't know.
Q. Okay. Would that have been unusual if she did have such input?
A. I don't know really.

**Page 36**

Q. Do you understand what I'm saying?
A. I don't know. I don't think so.
Q. Is that something you would normally do on your own? You know, Victoria approves the surgery and then it would be you that would schedule it?
A. Right.
Q. Okay. And you schedule for the first available slot?
A. Yes.
Q. Do you have any type of record, either in front of you or in the office, that would show when that surgery actually went on the books with Russell hospital?
A. No.
Q. Okay. Are all your surgeries with Russell hospital?
A. Yes.
Q. Okay. So you can't tell me today when you would have scheduled -- scheduled a surgery after it was approved?
A. No.
Q. Okay. And do you have -- I think you have already answered this one, so I apologize if I ask it again.
    Do you have any idea why it took 13 days from

Page 37

1  the time it was approved for Mr. Brown to have his
2  surgery?
3      A. No.
4      Q. Is that an unusual length of time for
5  someone to wait after being approved for surgery?
6      A. No.
7      Q. Okay. What is the average patient's wait
8  to have surgery with Dr. Howorth after they are
9  approved?
10     A. I would say 10 to 14 days.
11     Q. Okay. So this is within the normal flow of
12 his schedule.
13     A. Yes.
14     Q. Once you are approved, it takes ten days to
15 two weeks to actually go into the operating room?
16     A. Most of the time.
17     Q. Are there any circumstances where a surgery
18 can be expedited; in other words, Dr. Howorth might
19 say this one needs to go first?
20     A. For extreme pain.
21     Q. Okay. Did you receive any indication from
22 Dr. Howorth that this one needed to be expedited?
23     A. I don't know.
24     Q. You can't remember?
25     A. Huh-uh.

Page 38

1      Q. I guess it's fair to say it was not
2  expedited, if it took 13 days from the date it was
3  approved; is that right?
4      A. Yes.
5      Q. Okay. So this was maybe not considered to
6  be extreme pain?
7      A. I don't know the circumstances.
8      Q. Okay. You just know you didn't get any --
9  or you don't even know whether you got any
10 information about that or not.
11     A. Right. It may be he may not have known
12 that it was approved.
13     Q. Okay. And tell me what happens once a
14 surgery approves. Then what do you do as far as
15 notifying the doctor or so forth?
16     A. He's not notified until he signs the
17 orders.
18     Q. Okay. And, for instance, in Mr. Brown's
19 case -- and I know -- just as an example. I'm not
20 going to ask you to testify exactly what happened in
21 Mr. Brown's case unless you know. But if he's the
22 run-of-a-mill patient that's approved on the 16th
23 and his surgery is on the 29th --
24     A. Uh-huh.
25     Q. -- when would Dr. Howorth typically sign

Page 39

1  the orders?
2      A. Usually two days before.
3      Q. Okay. So in a typical case, he may not
4  know for 10 or 12 days that that patient's surgery
5  has been approved.
6      A. Right.
7      Q. Okay. Is there any type of paperwork that
8  is generated by your office in connection with this
9  scheduling of a surgery?
10     A. I have a surgery scheduling form that we
11 fill out and fax to surgery at the hospital.
12     Q. Okay. Do you have a copy of Mr. Brown's
13 surgery scheduling form?
14     A. In his chart maybe.
15     Q. Okay.
16     A. There's no dates on it, though. Only the
17 date of surgery is the only date that goes on them.
18     Q. Okay. And would there be any particular
19 reason why I haven't received that as far as my
20 request for his records goes?
21     A. No.
22     Q. Okay. I mean, do you know it was -- would
23 it be your job or someone else's to handle sending
24 out medical records?
25     A. It's mine.

Page 40

1      Q. Okay. Do you think it would be possible to
2  get a copy of that surgery request form?
3      A. If I have one, yes.
4      Q. Okay.
5      A. It's fairly new. To be honest, I don't
6  know if we were doing it then.
7      Q. Okay. Because this was October 2004.
8      A. Right.
9      Q. Do you know when you started that?
10     A. I don't.
11     Q. Is it possible you could have been doing it
12 then?
13     A. It's possible.
14     Q. Do you mind, could you run down and check
15 real quick?
16     A. I can look, uh-huh.
17        MR. GRUBB: If we could take just a couple-
18     minute break.
19        (Brief break)
20        MR. GRUBB: We're back on the record. And
21     Ms. Miller has retrieved a form which I'm
22     marking as Defendant's Deposition Exhibit 3.
23        (Defendant's Exhibit 3 was marked for
24        identification.)
25        MR. GRUBB: And it's Russell Medical Center

Page 41

```
 1  surgery scheduling form. And I'll show it to
 2  Mr. Tinney.
 3       (Document handed to counsel and
 4        witness.)
 5   Q. And, Ms. Miller, is that a form that you
 6  are familiar with?
 7   A. Yes.
 8   Q. Okay. And is that your handwriting on the
 9  form?
10   A. Yes.
11   Q. Okay. And this is, again, the type of form
12  that you fill out every day during your normal
13  course of business?
14   A. Yes.
15   Q. Okay. Who is this particular form for,
16  what patient?
17   A. Emory Brown.
18   Q. Okay. And does it show surgery scheduled
19  for him?
20   A. Yes.
21   Q. And what date is the surgery scheduled for?
22   A. 11/29/04.
23   Q. And what hospital was that?
24   A. Russell Medical Center.
25   Q. Does it show the date that you filled this
```

Page 42

```
 1  form out?
 2   A. No.
 3   Q. Okay. Would it have been after 11/16 when
 4  the surgery was approved?
 5   A. Or on 11/16.
 6   Q. Okay. On or after 11/16?
 7   A. Yes.
 8   Q. Okay. And this is what you would have
 9  faxed to Russell Medical Center after looking at
10  Dr. Howorth's schedule. Is that how it works?
11   A. Yes.
12   Q. Just tell me how that works. I don't want
13  to put words in your mouth.
14   A. That's correct. I get the approval, and I
15  look at the surgery schedule and I give them the
16  first available.
17   Q. Okay. And is there ever a problem when
18  Russell Medical Center says we don't have space for
19  you, or anything like that?
20   A. Yes, they do.
21   Q. Okay. Is there any indication that that
22  happened in this case?
23   A. No indication.
24   Q. Okay. Does that happen often?
25   A. Yes.
```

Page 43

```
 1   Q. What do you do when that happens?
 2   A. We have to give them another day.
 3   Q. Do you have any -- was there any record in
 4  Mr. Brown's file that you had to go back and give
 5  them another day?
 6   A. No.
 7   Q. Okay. So it looks like whatever day that
 8  you filled this out and faxed it, then it was
 9  scheduled for November 29th?
10   A. Right.
11   Q. Okay. I tell you what I have that I have
12  received from y'all pursuant to our request. I got
13  the medical records of his visits, Mr. Brown's
14  visits, and the bills. And those are visits
15  beginning on October 27, 2004, and going into May --
16  May 25, 2005. I have the bills associated with
17  those visits. I have what we've marked as
18  Defendant's Exhibit No. 1, 2, and 3 there, which is
19  the precert information sheet, the surgery request
20  form, and the surgery schedule form.
21      Are there any other documents that y'all have
22  in Mr. Brown's file that I don't have yet?
23   A. No, not other than maybe the actual surgery
24  orders, if you are interested.
25   Q. Okay. And would that typically be kept in
```

Page 44

```
 1  your records or in the records of the hospital?
 2  Because I also have the hospital records that relate
 3  to his actual surgery.
 4   A. They get those, yes.
 5   Q. Okay. So I may have those.
 6   A. Right.
 7   Q. But that would be more dealing with medical
 8  information and not what we're talking about here
 9  today where we're just talking about scheduling --
10   A. Right.
11   Q. -- things and so forth.
12      Okay. Are there any records of any other faxes
13  in there?
14   A. No.
15   Q. Are there any records of any other
16  telephone calls in there?
17   A. No.
18   Q. And just to summarize. It appears that
19  Mr. Brown's surgery was first scheduled on October
20  27th, or his first appointment with Dr. Howorth was
21  October 27, 2004; is that correct?
22   A. Yes.
23   Q. Did you receive a fax from Victoria
24  Greenspan at Claims Management on that day?
25   A. Yes.
```

Page 45

```
 1    Q. Okay. And what was the nature of that
 2  fax?
 3    A. It's the surgery request form for
 4  Dr. Howorth to fill out.
 5    Q. Okay. And did Dr. Howorth complete that
 6  form?
 7    A. Yes.
 8    Q. Okay. And on what date did he complete
 9  that form?
10    A. It's dated 10/30/04.
11    Q. Okay. When was that surgery request faxed
12  by Alexander City Orthopaedics to Victoria Greenspan
13  at Claims Management?
14    A. November 15, '04.
15    Q. Okay. And did you fax that information
16  over to them?
17    A. Yes.
18    Q. When was the surgery approved?
19    A. November 16, '04.
20    Q. Okay. And you made a notation of that on
21  the precert information sheet.
22    A. Yes.
23    Q. Is that correct? Which we have marked as
24  Exhibit No. 1.
25    And then we have Exhibit No. 3 which is the
```

Page 46

```
 1  surgery scheduling form that shows that the surgery
 2  was scheduled on what date?
 3    A. November 29th, '04.
 4    Q. Okay. And you were the one that scheduled
 5  that surgery?
 6    A. Yes.
 7    Q. Did -- to your knowledge, did anyone at
 8  Claims Management call the hospital to schedule the
 9  surgery?
10    A. I don't know.
11    Q. Okay. Was that your responsibility at that
12  point, to schedule that surgery?
13    A. Yes.
14         MR. GRUBB: Okay. All right. I think
15      that's all I have.
16         MR. TINNEY: No.
17            (Proceedings concluded.)
```

Page 47

```
 1  STATE OF GEORGIA
 2  COUNTY OF HARRIS
 3
 4                    CERTIFICATE
 5
 6      The foregoing transcript of the
 7  proceedings was taken before me as a Registered
 8  Professional Reporter and reduced to this
 9  transcript under my direction and supervision,
10  and I certify that it is a true and correct
11  transcript of the proceedings to the best of my
12  ability.
13      This 13th day of August, 2006.
14
15
16
17                    _____
18                    Betsy J. Peterson, RPR, CCR
                      Certificate No. B-2187
19
```



**CLAIMS MANAGEMENT, INC.**
P.O. Box 1288
Bentonville, AR 72712-1288
479-621-2900

# Surgery Request

| | | | |
|---|---|---|---|
| **To:** | Attn: Amy | **From:** | Victoria Heppes Greenspan |
| **Fax:** | 256-254-3114 | **#:** | 3 |
| **Phone:** | | **Date:** | 10/27/04 |
| **Re:** | Please have doctor fill out the following form. Thank You | **Patient:** | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☒ Please Reply   ☐ Please Recycle

Workers' Compensation Surgery Request information sheet: Wal-Mart, Sam's Club, and Wal-Mart Warehouse WC Patients.

Please take a few minutes to complete the attached form.

Thank you for your time and care of this Valued Wal-Mart Associate. I can be reached at (479)621-2900 1 ...

Please fax the form to my attention upon completion.

Fax: (479) 273 - 8020

**Please Note:** All billing from Wal-Mart or Sam's Club worker's compensation claims should be filed the same, please update your system with the billing information. If treatment is approved all billing should be directed to the following:

BCBS
ATTN: Terri Flanagan
P.O. Box 361787
Birmingham, AL 35216

11-15-04
Faxed
AM

Please re-submit any outstanding bills to Blue Cross/Blue Shield. In order for billing to be paid correctly, the bill must include the patient's SSN with WRI as a prefix. The group number is 12060. The patient will not have an insurance card because this is worker's compensation. It is not required for you to attach notes to the bills, however, all records should be faxed to my



DEFENDANT'S DEPOSITION EXHIBIT

attention for immediate review. If a bill is received by Blue Cross and we do not have medical records, that bill will not be processed.



P.O. Box 1288
Bentonville, AR 72712-1288
479-621-2900 Ext: 20770

Emory Brown
Claim #: C4270431

Dear Dr. Howorth,

We are in receipt of your request for surgical intervention for _____. In order to continue to coordinate benefits under workers' compensation and send this request for pre-certification, please complete the information below and fax back at your earliest convenience.

If you have any questions, please call me at (800)527-0566 Ext. 20776
Thank you in advance for your time.

Have all conservative measures been exhausted? Please explain:
① Year on MRI, Needs Surgical repair ASAP

Is this patient a good, fair or poor candidate for a positive outcome associated with this surgery? Please explain:
Good

Surgical procedure (include ICD 9 code)?
® Shoulder scope, +/- open repair / 23420

Will the procedure be completed on an outpatient or inpatient basis?
Outpatient

Name, address and phone number of facility where surgery will be completed:
Russell Med. Center Hwy 280   256-329-7100

What if any physical restrictions will be recommended in regards to employment and activities of daily living **after surgery?**
No restriction p/u 3-6 mo usually.

What is the expected time frame of release to return to work in a *modified duty* capacity after surgery?
1-2 wks no use @ MR, 6-12 wks RTW Full Duty

Is a physical therapy referral or home exercise program expected post-operatively?
Yes

If so, please list the anticipated time frame of treatment: _6-12 weeks_

Projected MMI (maximum medical improvement) date: _3-6mo post surgery_

What permanent impairment rating do you anticipate following surgery?
_est. 2-4% B.dy, 5-10% ARM_

Should this patient choose not to proceed with surgery, what permanent impairment rating would you assign?
_est. 5-7% B.dy, 15-20 ARM_

Is surgical intervention requested in whole or part due to the reported work injury of
_Yes_

Please specify/provide explanation:
_Large Shoulder, @ RM rotator cuff tear._

Please note:

> *Alabama Workers' Compensation Law Statute 25-5-58 states:*
> *If the degree or duration of disability resulting from an accident is increased or prolonged because of a preexisting injury or infirmity, the employer shall be liable only for the disability that would have resulted from the accident had the par'l injury o infirmity not existed.*

To your knowledge, is there any preexisting injury or infirmity that may increase the degree or duration of disability associated with the current injury? _NO_

Physician Signature _____

Date __10/30/4__

Please fax this completed form to (479)273-8020

**Approval for the requested surgery is subject to review of medical records and may be subject to the utilization review process.**

CONFIDENTIALITY NOTICE: This fax and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this fax in error, please notify the Wal-Mart confidentiality contact at [illegible]. If you are reading this message and are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.